**DYNAMIS LLP**
Jamie Hoxie Solano, Esq.
NJ Bar No. 426422024
(214) 454-8829
11 Park Place
New York, NY 10008

Michael B. Homer, Esq.
*Pro hac vice application forthcoming*
(617) 693-9732
Constantine Economides, Esq.
*Pro hac vice application forthcoming*
(305) 985-2959
Eric Rosen, Esq.
*Pro hac vice application forthcoming*
(617) 802-9157
225 Franklin Street, 26th Floor
Boston, MA 02110

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Hayden Gateway LLC, and Bloc Dispensary LLC, | |
| Plaintiffs, | Civil Action No. |
| v. | |
| Advanced Flower Capital Inc., and AFC Agent LLC, | **COMPLAINT** |
| Defendants. | **JURY TRIAL DEMANDED** |

1

## INTRODUCTION

Defendants have willfully and maliciously breached their lending contracts with Plaintiffs and are continuing this conduct to the point of threatening imminent irreparable harm to Plaintiffs. As described herein, Defendants and Plaintiffs entered into loan agreements in connection with Plaintiffs' cannabis operations in Pennsylvania and New Jersey. Because of industry-wide headwinds, the cannabis operations delayed in generating their projected profits. Nonetheless, Plaintiffs have worked diligently and in good faith to increase revenues and profits. Although Plaintiffs initially faced some difficulties in making full payments on the loan, they invested additional capital in consideration for forbearance by Defendants. And Plaintiffs' efforts paid off. For the past year, they have not missed any payments on the loan, and their operations are more than sufficient to generate the required payments.

Defendants, however, have run their publicly traded company into distress, and they require immediate capital. To obtain that capital, they falsely claimed that Plaintiffs are in default (Plaintiffs are not) and then used that fabricated default as a pretext to sweep two of Plaintiffs' bank accounts, effectively stealing Plaintiffs' funds. Although Defendants have a deposit account control agreement with Plaintiffs, Defendants' access to Plaintiffs' accounts is contractually and legally limited to remedies for continuing defaults by Plaintiffs. Consequently, Defendants sent two default letters to Plaintiffs, claimed assorted non-monetary defaults, and then unilaterally withdrew Plaintiffs' operating funds from Plaintiffs' bank accounts, while using the fake defaults as justification.

Notably, Defendants (despite being a publicly traded company) did not have counsel sign or send either default notice, even though the alleged defaults involve the largest loan in

Defendants' portfolio. Rather, Defendants' CEO and Partner, Daniel Neville, sent the default letters. Presumably, Defendants' counsel refused to participate in this scheme.

Following this theft, Defendants paid dividends to shareholders, despite Defendants' plummeting market cap and underperforming loan portfolio. Worse yet, Defendants are continuing their efforts to misappropriate Plaintiffs' assets. They have threatened additional self-help remedies arising from the fabricated defaults. They have also filed a frivolous RICO complaint against Plaintiffs' individual owners.

Plaintiffs require legal and equitable relief. Simply put, Plaintiffs can readily prove that they were not and are not in default, that they have not triggered any remedies for default, and that Defendants' actions are contractually and legally impermissible, and threatening immediate and irreparable harm.

## PARTIES

1.      The Plaintiffs are licensed cannabis businesses operating in New Jersey and Pennsylvania. Plaintiffs are part of a group of affiliated cannabis companies in five states doing business as Justice Cannabis Co.

2.      Plaintiff Hayden Gateway LLC ("Hayden") is a Pennsylvania limited liability company that owns and operates three licensed cannabis dispensaries in Pennsylvania. Hayden's principal place of business is in Pennsylvania. Hayden's sole member is JG Holdco LLC, which, in turn, has 10 members: 3 natural persons domiciled in Illinois; 1 natural person domiciled in New York; 1 natural person domiciled in Nevada; 1 natural person domiciled in Ontario, Canada; Boka Capital LLC; Blust Family 2019 Irrevocable Trust; Pines Family LLC; and FOL 21, LLC. Boka Capital LLC's sole member is Boka Family Trust, with the sole trustee domiciled in Illinois. Blust

Family 2019 Irrevocable Trust's sole trustee is domiciled in Illinois. Pines Family LLC's sole member is domiciled in Illinois. FOL 21, LLC has three members, who are domiciled, respectively, in Illinois, Illinois, and Tennessee.

3.    For purposes of this Court's diversity jurisdiction, therefore, Plaintiff Hayden is a citizen of Pennsylvania, Illinois, New York, Nevada, and Tennessee.

4.    Plaintiff Bloc Dispensary LLC ("Bloc") is a New Jersey limited liability company that owns and operates a licensed cannabis cultivation and manufacturing facility and three licensed cannabis dispensaries in New Jersey. Bloc's principal place of business is in New Jersey. It operates a cultivation facility in Ewing Township, New Jersey, as well as three dispensaries in central New Jersey. Bloc's principal place of business is in New Jersey. Bloc has 7 members, as follows: 3 natural persons domiciled in New Jersey; JG Holdco LLC; NJ JG Investment I, LLC; Double Up LLC; and Rookie Deal LLC. NJ JG Investment I, LLC's sole member is domiciled in California. Double Up LLC's sole member is domiciled in New Jersey. Rookie Deal LLC's sole member is domiciled in New Jersey.

5.    For purposes of this Court's diversity jurisdiction, therefore, Plaintiff Bloc is a citizen of New Jersey and California.

6.    Collectively, Plaintiffs and their affiliates in other states do business as Justice Cannabis Co. ("Justice").

7.    The Defendants are Advanced Flower Capital Inc. and its agent AFC Agent LLC.

8.    Defendant Advanced Flower Capital Inc. ("AFCG") is a Maryland corporation with its principal place of business in Florida. AFCG is listed on the NASDAQ under the symbol "AFCG."

9.      AFC Agent LLC ("AFC Agent") is a Delaware limited liability company with its principal place of business in Florida. AFC Agent LLC is wholly owned by Leonard M. Tannenbaum (AFC's Chairman of the Board) and Robyn Tannenbaum (AFC's President). On information and belief, both of them are domiciled in West Palm Beach, Florida.

10.     AFCG and AFC Agent, together with their affiliates, are referred to herein as "AFC Gamma." AFC Gamma is a publicly traded REIT (real estate investment trust) that specializes in lending to cannabis companies.

### OTHER RELEVANT ACTORS

11.     Leonard Tannenbaum is the largest shareholder and Chairman of the Board of AFC Gamma. He also supervises the CEO, Dan Neville, making Tannenbaum the primary manager.

12.     Tannenbaum made his fortune in the finance industry by previously starting Fifth Street Asset Management ("Fifth Street"), described by Forbes Magazine in a feature article as "his fee-reaping management company" attached to an "obscure financing vehicle" akin to a REIT. The company made high-yield loans, generating enormous fees, "while Tannenbaum assured investors that his portfolio was sound."

13.     According to the sources quoted in the Forbes article, Tannenbaum's company was the "poster child" for a poor-performing management company that "has been mismanaged for the benefit of the external manager," i.e., Tannenbaum-controlled entities.

14.     Tannenbaum took Fifth Street public, but it eventually collapsed under the weight of underperforming loans, leaving Tannenbaum rich but his investors holding the bag.

15.     Tannenbaum had been staked by his very wealthy (former) father-in-law, who

later sued Tannenbaum.

16.    When Tannenbaum started over again with AFC Gamma in 2021, he brought over many of his former colleagues from his Fifth Street company, as well as his new wife, Robyn Tannenbaum, who serves as AFC Gamma's President.

17.    As described below, Plaintiffs are two of eight entities that together borrowed money from AFC Gamma to finance the build-out and operation of the Pennsylvania and New Jersey cannabis operations. The other six borrowers are:

      a.    Pier Cove LLC, the licensed entity that owns and operates a cannabis cultivation facility in Hazle Township, Pennsylvania;

      b.    SRG HI Park LLC, a single-purpose entity that owns the real estate on which Pier Cove's Pennsylvania cultivation facility is located;

      c.    SRG 272 Main Street LLC, a single-purpose entity that used to own the real estate on which one of Plaintiffs' Pennsylvania dispensaries is located;

      d.    SRG Waretown LLC, a single-purpose entity that owns the real estate on which one of Bloc's New Jersey dispensaries is located;

      e.    SRG 1761 North Olden LLC, a single-purpose entity that owns the real estate on which another one of Bloc's New Jersey dispensaries is located; and

      f.    SRG 1474 Prospect LLC, a single-purpose entity that owns the real estate on which Bloc's New Jersey cultivation facility is located.

18.    Those eight entities (the "Borrowers") constitute the Borrowers under the loan with AFC Gamma. In addition, JG HoldCo LLC is a corporate guarantor on the loan, and two of JG HoldCo LLC's individual owners have executed limited personal guaranties on the loan.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are all of diverse citizenship and the amount in controversy exceed $75,000.

20.    Personal jurisdiction over the Defendants is proper as this action arises out of a loan to a borrower in New Jersey to build cannabis facilities here, including a cultivation facility in Ewing Township, New Jersey.

21.    Defendants also availed themselves of this Court's jurisdiction by knowingly lending for construction to occur in the District of New Jersey and by installing their own agent to run Borrowers' facility in New Jersey. Defendants also exercised control over one of the Borrowers' bank accounts in the District of New Jersey and stole money from the accounts maintained in the District of New Jersey. Further, this action seeks an injunction to enjoin further thefts from the accounts maintained in the District of New Jersey. Agents of Defendants have also traveled to New Jersey on over a dozen occasions to inspect Bloc's assets in this District.

22.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this judicial district and because a substantial part of property that is the subject of the action is situated here. Moreover, Defendants are subject to the Court's personal jurisdiction and Plaintiff Bloc resides here.

## BACKGROUND

23.    This lawsuit is brought to prevent AFC Gamma, a lender, from continuing to raid the operating bank accounts of Plaintiffs, its borrowers.

24.    Beginning about a decade ago, various States began launching licensing programs to legalize cannabis for medical purposes. Plaintiffs applied for and won licenses in Pennsylvania and

New Jersey.

25.    In many states, including Pennsylvania and New Jersey, these licenses were limited, meaning that only several dozen were issued to aspiring companies based on a competitive process under which applicants were scored and ranked. The limited nature of the licenses made them valuable.

26.    Plaintiff Hayden applied for and won a license to operate three retail medical dispensaries in the Northeast region of Pennsylvania. Plaintiff Bloc applied for and won an integrated license in New Jersey that allowed it to operate a cannabis cultivation and manufacturing facility, as well as three retail cannabis dispensaries, in New Jersey.

27.    Once Plaintiffs won the licenses, they needed funding to build the cultivation and dispensary facilities.

28.    Because the production and sale of cannabis remained illegal under federal law, it was very difficult to obtain financing for cannabis-related construction projects.

29.    Taking advantage of the fact that cannabis companies generally cannot borrow money from banks at conventional interest rates, AFC Gamma saw an opportunity to lend money at extremely high interest rates, exceeding 20% per annum once fees and costs are factored in.

30.    In 2021, AFC Gamma lent money to Plaintiffs and the other Justice affiliates in Pennsylvania and New Jersey to build and operate cannabis cultivation facilities and dispensaries in Pennsylvania and New Jersey.

## A.    AFC Gamma's Financial Problems

31.    AFC Gamma is a publicly traded company that operates as a real estate investment trust. Real estate investment trusts (which are not supposed to be cannabis "plant-touching") are attractive to investors primarily for their payment of steady dividends. Accordingly, there is great

pressure on AFC Gamma to maintain a steady and healthy dividend.

32.    Until very recently, AFC Gamma's Board and manager (AFC Management) have had little problem distributing that dividend, and in the process, they have earned millions of dollars in fees annually. In the years 2023-2024, for example, AFC Management (beneficially owned by the Chairman of AFC Gamma's Board and its key executives) extracted $31 million of capital from AFC Gamma in management fees, in addition to the dividends flowing to the same people as owners individually.

33.    More recently, however, AFC Gamma's business has begun to suffer badly. Its borrowers are operators in the cannabis industry, an industry that has struggled mightily for numerous reasons, such as federal illegality, punishing taxation, and lack of access to financial markets and banking services. The federal government's failure to deliver long-anticipated regulatory relief that would normalize the ability to operate cannabis businesses, including permitting access to banking, has only made things worse. Multiple presidential administrations also failed to deliver any fixes to the tax code, resulting in cannabis businesses being subjected to a much higher effective tax rate than any other business.

34.    Because of these persistent challenges, AFC Gamma's cannabis borrowers are falling behind, and almost none of the cannabis loans in AFC Gamma's portfolio have performed as hoped or expected. Accordingly, AFC Gamma has not generated the cash it modeled when making its extremely high-interest loans.

35.    The Board and AFC Manager were able to paper over the problem for a time by paying themselves and the dividends from shareholder equity. Essentially, they have been deferring borrower interest payments into the future to avoid writing down loans but booking the future

interest as earnings in the present. Because no actual cash comes in the door from future payments, AFC Gamma has used equity to pay their fees and dividends. The scheme must eventually collapse unless the borrowers' businesses turn around. But that profitability has not come to pass in the cannabis space where the business landscape has continued to worsen.

36.    Warren Buffet famously said that, when the tide goes out, you discover who's been swimming naked. AFC's management has faced that reality in the recent bear market. The market no longer believes the bloated values at which management is carrying the loans.

37.    Over the past month, AFC Gamma's stock price (AFCG) has lost about half of its value. In the past week, the stock price hit at an all-time low, roughly $4.35/share, down from a prior peak of around $16/share. Its total market capitalization collapsed to the point where the entire company is worth less than the face value of Plaintiffs' loan, even though Plaintiffs' loan is only one of many in AFC Gamma's portfolio.

38.    As a result, AFC Gamma is now experiencing extreme financial distress and has begun to collapse. With the collapse of its share price, it cannot raise more equity in the market.

39.    At some point soon, if not already, AFC Gamma will be in breach of its financial covenants with its own lenders, including East West Bank. If AFC Gamma's loans are called or it loses its source of funding, it likely will cease to exist as a going concern.

40.    Because of those pressures of the Defendants' own making, AFC Gamma is in dire straights.

**B.    AFC Gamma's Attempt to Extort $10 Million**

41.    Having used up its shareholders' money, AFC Gamma is in a desperate grab for cash.

42.    On April 10, 2025, AFC Gamma made a demand that Plaintiffs pay AFC Gamma

$10 million in cash to reduce Plaintiffs' loan balance and that Plaintiffs contribute additional collateral worth tens of millions of dollars. This $10 million cash infusion was not required or contemplated by the loan. AFC Gamma communicated that unless Plaintiffs agreed to this shakedown by the conclusion of that meeting, AFC Gamma was going to try to destroy the company, seize all of its assets, and sue the owners personally.

43.    That last threat was nothing but extortion. To be clear, Plaintiffs are not in default. For more than a year, Plaintiffs have timely made every monthly payment (at least $250,000) required under the loan. AFC Gamma does not and cannot argue otherwise. Plaintiffs owe AFC Gamma nothing other than the $250,000 cash minimum due every month, which they have consistently delivered. The loan is performing. Plaintiffs have not even been a day late on any such payment in more than a year. Plaintiffs are not in default.

44.    To maximize leverage for its $10 million shakedown, AFC Gamma nonetheless threatened to sue the owners personally (and baselessly) for purported RICO violations and fraud— solely to try to embarrass and extort them into acceding to the $10 million demand. When the Plaintiffs' owners refused to give in to blackmail, AFC Gamma followed through with its misguided RICO lawsuit, seeking to enforce the Shareholder Guarantee on a loan that is not even in default and has not triggered any guarantee(s).

45.    AFC Gamma's resulting purported RICO action is frivolous. Not only is the loan not in default, but the Borrowers' owners are not personally liable for the loan, regardless.

**C.    AFC Gamma's Recent Theft**

46.    Unable to successfully extort $10 million from the Borrowers, AFC Gamma became even more desperate, and more lawless.

47.    Specifically, on April 10, 2025, AFC Gamma stole almost two million dollars from

11

Plaintiffs' pledged bank accounts, which AFC Gamma controls through AFC Agent.

48.    This theft occurred just days before AFC Gamma was obligated to pay a $5 million dividend it announced before its stock price crashed 40%. As explained below, if AFC Gamma used the stolen funds for the dividend, then it has distributed, hastily and desperately, prohibited proceeds of plant-touching activity to all of its shareholders. And AFC Gamma never had the right to obtain or distribute those discrete funds to anyone.

49.    To be clear, the accounts from which AFC Gamma took the money were already controlled by a deposit account control agreement (DACA) such that Plaintiffs could not have withdrawn any money without consent from AFC Gamma. Thus, there was no emergent need to move the money, even if Plaintiffs were in a default under the loan agreement. In other words— even if Defendants' pretext for seizing those funds had been true—Defendants could have better served their interests by freezing those funds or permitting the use of those funds for Plaintiffs' operations (i.e., the operations that generate the capital used to make the required payments under the loan). Instead, AFC Gamma took the money on the eve of its dividend obligation. Hence, Defendants were not responding to a default; they were employing a scheme to immediately obtain funds for other obligations.

50.    As part of the scheme to raise cash for itself, AFC Gamma is also threatening to sell Plaintiff Hayden's membership interests, which it also holds as a pledge for the loan.

51.    To justify these actions, AFC Gamma is baselessly claiming that Plaintiffs are in default of their loan, even though Plaintiffs are most definitely not in default. On the day before stealing the money in the bank accounts, AFC Gamma sent a letter declaring default, again baselessly, and purporting to accelerate Plaintiffs' loan. Less than 24 hours later, it had raided

Plaintiffs' accounts.

52.    Specifically, on April 10, 2025, AFC Gamma took $1,500,000 of money generated by plant-touching activity from Plaintiff Hayden's bank account and transferred it to AFC Gamma's bank account at Flagstar Bank, account number XXXX824732. It did so without notice to or permission from Hayden. AFC Gamma also transferred $288,501.63 from Plaintiff Bloc's bank accounts (including its tax reserve account), again without notice or permission. This money was also generated by plant-touching activity and was also sent to Flagstar Bank, account number ending in XXXX824732.

53.    AFC Gamma stole this money, knowing full well that it was the day before Bloc's check run to its vendors and its payroll to employees went out, threatening to upend not only the viability of the business, but also the lives of the employees who depend on their salaries. Plaintiffs employ 151 employees in New Jersey and 56 employees in Pennsylvania. Those employees' payroll is paid through the very bank accounts Defendants raided. If Defendants continue to transfer money out of the accounts, Plaintiffs will very soon be unable to meet payroll.

54.    Had it not been for the fortuity that a substantial vendor payment hit Plaintiffs' account the same day, AFC Gamma's theft would have left Plaintiffs unable to make their full payroll and check run.

55.    AFC Gamma is apparently not finished. According to its emails, it intends to continue raiding Plaintiffs' accounts without notice. In addition, desperate to try to grab more money for itself, it is now threatening to seize and sell Plaintiffs' assets without going through the courts.

**D.    The Need For Emergency Relief**

56.    Based on its recent communications, AFC Gamma apparently intends to continue

taking money from Plaintiffs' bank accounts going forward, in violation of the parties' agreement (not to mention state and federal controlled substances laws).

57.     In fact, Plaintiffs are not in default, and there are no valid grounds to seize Plaintiffs' money under the applicable agreements.

58.     AFC Gamma's actions are a breach of the parties' loan agreements and a wrongful conversion.

59.     Plaintiffs are operating businesses, incurring ongoing bills and expenses of approximately $300,000 to $500,000 per week, apart from payroll, paid from the very bank accounts Defendants raided. If Defendants continue to take money out of those accounts without authorization or justification, Plaintiffs will very soon be unable to pay their bills as they come due. That failure will have significant downstream effects on the many New Jersey and Pennsylvania companies and individuals with whom Plaintiffs do business. If Plaintiffs are unable to make payroll, their business will collapse and their employees will lose their jobs.

60.     Many of Plaintiff Bloc's 151 employees are members of a union subject to a collective bargaining agreement. If Bloc is unable to pay its workers their bargained-for wages, it could be in breach of the National Labor Relations Act and its contract.

61.     It is therefore necessary for Plaintiffs to seek the protection of the Court to prevent AFC Gamma from stealing Plaintiffs' assets, monies to which AFC Gamma has no lawful claim, in a desperate and unjustified attempt to forestall AFC Gamma's own impending bankruptcy.

## **FACTUAL ALLEGATIONS**

### **A.    Plaintiffs' Licenses**

62.     To cultivate cannabis or operate a cannabis dispensary, an entity must be licensed to do so by the state in which it operates. Cannabis sold in any given state must be produced in that

14

state and cannot be transported across state lines.

63.     Part of the reason Plaintiffs' licenses are valuable is that each State's operations are vertically integrated, meaning that the Plaintiff could supply its own dispensaries with products grown and manufactured at its own cultivation facilities. Likewise, the affiliated dispensaries give the manufacturers assurance of shelf-space for their products. Thus, integrated cannabis operations are less risky and can achieve greater economies and maximize profits.

64.     Plaintiffs' integrated licenses are also relatively rare, with Pennsylvania and New Jersey having issued only a limited number of them. This enhanced their value even further.

**B.     The Loan**

65.     The loan from AFC Gamma to the Borrowers consists of an original agreement, plus at least five amendments and two separate forbearance agreements, which together comprise nearly a thousand pages of dense, complex legal terms. The course of the loan has not been smooth, and its history is somewhat lengthy. While the documents speak for themselves, for the Court's convenience, Plaintiffs summarize the documents below.

66.     In 2021, AFC Gamma loaned money to various Justice-related entities for the purpose of building and operating cannabis facilities in New Jersey and Pennsylvania. As described above, the eight Borrowers on the AFC Gamma Loan were the three licensed entities and five SRG entities.

67.     At the same time, Justice's parent company, JG HoldCo LLC ("HoldCo"), executed a Corporate Guaranty, pursuant to which HoldCo agreed to guarantee the repayment of the loan. Likewise, the two primary individual owners of HoldCo entered into a Limited Shareholder Guaranty (the "Bad Boy Guaranty"), a typical version of that type of agreement, pursuant to which those two individuals agreed to guarantee only the losses caused by specific bad conduct, such as

15

fraud that they personally committed or directed others to commit.

68.    The various written agreements comprising the AFC Gamma Loan Agreement (collectively, the "Loan Agreement") include the original credit agreement executed and then amended in April 2021; the Second Amended and Restated Credit Agreement executed in September 2021 (the "Credit Agreement"); a Corporate Guaranty executed in September 2021 (the "Corporate Guaranty"); a Limited Shareholder Guaranty executed in September 2021 (the "Bad Boy Guaranty"); Amendment No. 1 to the Credit Agreement executed in June 2022; Amendment No. 2 to the Credit Agreement executed in August 2022; Amendment No. 3 to the Credit Agreement executed in December 2022; Amendment No. 4 to the Credit Agreement executed in April 2023; a Forbearance Agreement executed in September 2023 (the "2023 Forbearance"); and a subsequent forbearance agreement executed in March 2024 (the "2024 Forbearance"). In addition, the parties entered into multiple agreements not reflected in integrated documents, including an agreement to re-open the Pennsylvania cultivation facility reached in the autumn of 2024 (the "Reopening Agreement").

69.    The various written iterations of the loan documents are reflected in the table below:

| Date | Name of Document | Obligor |
|------|------------------|---------|
| 4/5/2021 | Credit Agreement | New Jersey Borrowers |
| 4/5/2021 | Parent Guaranty | JG HoldCo LLC |
| 4/5/2021 | Shareholder Guaranty | Loevy and Kanovitz |
| 4/29/2021 | Amended and Restated Credit Agreement | Borrowers |
| 9/30/2021 | Second Amended and Restated Credit Agreement | Borrowers |
| 6/30/2022 | Amendment No. 1 | Borrowers |
| 8/26/2022 | Amendment No. 2 | Borrowers |
| 12/31/2022 | Amendment No. 3 | Borrowers |
| 4/26/2023 | Amendment No. 4 | Borrowers |
| 9/12/2023 | 2023 Forbearance Agreement | Borrowers |
| 3/6/2024 | 2024 Forbearance Agreement | Borrowers |

70.     The Credit Agreement contemplated that AFC Gamma would lend the Borrowers up to $75,400,000 to fund the build-out of two cultivations and four of the six dispensaries collateralized at the time within the loan (the "Cannabis Businesses").

71.     The Credit Agreement required the Borrowers to comply with certain financial covenants relating to the performance of the Cannabis Businesses. Those covenants included a minimum adjusted EBITDA, free cash flow, cash balance, and similar metrics.

72.     All told, over the course of the past four years, AFC Gamma has disbursed approximately $50-60 million. AFC Gamma charged close to $15mm in PIK/capitalized interest and $10mm in asserted loan fees.

73.     Because of the absence of conventional financing options to cannabis borrowers, AFC Gamma was able to charge an extremely high interest rate, at times effectively over 20%.

**C.    The Loan's Poor Performance Causes the Borrower to Seek (and Pay For) Forbearance**

74.     The cannabis industry has turned out to be volatile, and the parties' plans did not proceed as expected. Almost as soon as the loan was closed, the Borrowers struggled to comply with their financial covenants.

75.     The COVID pandemic struck at a very inopportune time. Construction of the eight Cannabis Businesses was significantly delayed, and costs substantially higher than expected, due to, among other things, COVID-related supply chain disruptions.

76.     Regulatory approvals in New Jersey also took substantially longer than expected due to changes in the regulatory scheme.

77.     Additionally, the general contractor for the Pennsylvania cultivation performed very poorly, ultimately ending with the contractor being terminated for cause, and the cultivation facility

left partially constructed.

78.     The federal government has promised, but failed to implement, banking and taxation reform that would have relieved some of the onerous financial burdens plaguing the industry.

79.     Within months of closing the loan, the Borrowers could not meet their financial covenants and were in default.

80.     At that time, AFC Gamma could have foreclosed on the loan, but it chose not to do so. Instead, the parties began renegotiating the loan obligations.

81.     As a result of the renegotiation, the parties entered into Amendment No. 1, pursuant to which Borrowers paid AFC Gamma millions of dollars for the right to avoid foreclosure under renegotiated terms that the Borrowers could satisfy.

82.     As more time passed, the same pattern repeated, leading to a Second, Third, and Fourth Amendment, and then two successive forbearance agreements.

83.     The pandemic dragged on, and the project remained stalled, the Borrowers fell back into default. With each amendment, AFC Gamma could have foreclosed, but again the parties renegotiated the loan obligations, with the Borrowers making significant financial payments to AFC Gamma in order to purchase the right to forbearance.

84.     All told, the parties amended, restated, and reconfigured the terms of the loan seven times over the past four years. Each time, Justice and its owners dug deeper and deeper into their pockets to purchase forbearance and put the loan back into compliance.

85.     Over the course of those amendments and forbearances, the Borrowers and their owners paid AFC Gamma more than $19 million in additional capital contributions and "amendment fees" to AFC Gamma. Sometimes those additional payments required the owners to

sell completely unrelated real estate and other assets to meet AFC Gamma's cash demands.

86.     The Borrowers acceded to AFC Gamma's demands because they wanted to avoid foreclosure and secure new covenants and payment obligations that the cannabis operations could satisfy and finally begin to operate their companies profitably. The Borrowers thus paid AFC Gamma dearly for forbearance, and for the privilege of getting out of default to live to fight another day.

### D.     The March 2024 Forbearance Agreement

87.     In March 2024, the Borrowers and AFC Gamma renegotiated the parties' obligations a final time. The goal was to right-size the interest payments to a level that the Borrowers could satisfy and ensure the loan could stay out of default.

88.     The resulting agreement, referred to herein as the 2024 Forbearance, was a lengthy and complex 50-page agreement. It established, *inter alia*, a cash-sweep mechanism for the Borrowers' monthly payments, with a minimum of $250,000 per month. Pursuant to that agreement, AFC Gamma controlled Plaintiffs' operating bank accounts, and approved every dollar that Plaintiffs spent from those accounts—every payroll, every bill paid, every expenditure had to be approved by AFC Gamma.

89.     To be clear, the sole purpose of the agreement for control of the accounts was so that AFC Gamma could approve Justice's payments to keep the businesses operating, not so that AFC Gamma could take the money in the accounts for its own use and without Justice's approval.

90.     Plaintiffs have met the loan payment obligation each and every month since. They have never even been late.

91.     The 2024 Forbearance also required Justice to hire an outside consultant as its Chief Restructuring Officer, which AFC Gamma had the sole discretion to approve, to manage the New

Jersey operations. The parties also agreed to use best efforts to find an investor for the still-unfinished Pennsylvania cultivation facility to fund completion of construction and resumption of cultivation operations.

92.     As stated, all told, Justice and its owners paid AFC Gamma and its affiliates more than $19 million in cash, liquidated real estate, and other valuable assets to keep the loan out of default. (That $19 million is separate and apart from regular principal and interest payments on the loan.) The company sold many of its other assets to satisfy AFC Gamma, and its owners drained their personal savings.

93.     Justice paid this $19 million pursuant to agreements with AFC Gamma that if Justice made this financial investment, then the loan would be adjusted to financial terms that Justice could satisfy going forward, including lowering the interest rate down to a far more manageable 12.5% and minimum monthly payments of $250,000.

**E.     The Valuable Collateral**

94.     The reason Justice paid AFC Gamma $19 million over the course of three years in order to purchase forbearance was because the cannabis operations have the prospect of becoming very valuable.

95.     Once fully constructed and operating optimally, each of the Pennsylvania and New Jersey cultivation facilities should be generating revenues of more than $5 million per month, at a very high profit margin. Together with the six dispensaries, the company should be earning upwards of $13 million per month.

96.     At present cannabis multiples, that performance would make the company worth at least several hundred million dollars.

97.     Moreover, Pennsylvania law currently only permits the sale of medical cannabis, but

the state is poised to approve recreational cannabis in the coming months, dramatically increasing the value of the Pennsylvania assets.

98.    All of those projections, however, are dependent on the company operating with maximum efficiency and effectiveness.

### F.    AFC Runs the Business

99.    As noted, the 2024 Forbearance required Justice to retain an outside Chief Restructuring Officer (CRO) to manage all the New Jersey operations. AFC Gamma negotiated for itself the sole and exclusive right to approve the CRO, and expressly prohibited Bloc or Justice from interfering with the CRO's control of the New Jersey assets. In this way, AFC Gamma used the 2024 Forbearance agreement to select a CRO that it controlled and who in turn exerted total operational control over the New Jersey operations.

100.    From the outset, AFC Gamma insisted that Bloc hire Timothy Bossidy as the CRO. Justice reached out to other qualified candidates, but AFC Gamma rejected those candidates and insisted on Bossidy. Plaintiffs asked AFC Gamma to conduct a search process and consider additional candidates for the CRO role, but AFC Gamma refused any process other than a direct hire of Bossidy.

101.    From the very beginning, Bossidy took his direction from AFC Gamma, which managed and controlled his actions and directed him on a nearly daily basis.

102.    By contrast, Bossidy never spoke to either of Plaintiffs' two main owners a single time during the nearly one year he was in charge of the New Jersey operations. Moreover, he repeatedly rebuffed any input or assistance from Plaintiffs' CEO, Alexzandra Fields, whom he effectively shut out.

103.    In fact, AFC Gamma's Forbearance Agreement expressly prohibited Bloc and

Justice from having a reporting relationship with Bossidy. It provided that Bloc "shall not interfere with or otherwise challenge the operational control of" Bossidy, a restriction that Bossidy and AFC Gamma lorded over Justice. The agreement literally prohibited Bloc and Justice from running their own company.

104.    Emails and other communications confirm that AFC Gamma was in fact running the company through its agent, Bossidy. For example, there are emails confirming that Bossidy had to get AFC Gamma's sign-off on even the most granular decisions, such as employee raises, expenditure of funds, and payment of contractors. These emails demonstrate Bossidy worked in conjunction with AFC Gamma to run the operation.

105.    What is more, whenever Justice complained about Bossidy's performance, AFC Gamma responded that Justice needed to let Bossidy run the company and stop complaining, or AFC Gamma would consider it a default of the 2024 Forbearance.

**G.    AFC Gamma Attempts to Undermine the Forbearance Agreement Through Bossidy**

106.    Despite legally owing a fiduciary duty to Justice and no one else, Bossidy subordinated Plaintiffs' interests to those of AFC Gamma, and began actively promoting AFC Gamma's interests at the expense of those of Bloc, his putative employer.

107.    To take an example, just two months after AFC Gamma installed Bossidy, Bossidy forwarded to AFC Gamma a privileged email from Justice's in-house counsel. Included with the forwarded, privileged email is a message from Bossidy to AFC Gamma stating that the email will help AFC Gamma hold Bloc in default, taking its assets and/or charging more millions of dollars for further forbearance. Bossidy's message to AFC Gamma states in relevant part (emphasis added):

> I'll manage this - so nothing for you to do - *I just wanted to flag for you another forbearance breach to add to your list.*

108.    In other words, AFC Gamma forced Justice to hire Bossidy to run the New Jersey operation as its CRO (a C-suite level employee) so that Bossidy could use his inside position, including access to attorney-client communications, to assist AFC Gamma in manufacturing a case against Justice to revoke the very forbearance agreement Justice had paid millions of dollars for. Bossidy did so while serving as Justice's highly-paid fiduciary, earning $700/hour for his services.

109.    This pattern further demonstrates that AFC Gamma was acting in bad faith and never intended to honor the 2024 Forbearance. It was searching for any colorable grounds to unilaterally revoke the Forbearance Agreement (and enlisting the assistance of the CRO it forced Justice to hire) that AFC Gamma had negotiated just a few months before, after extracting many millions of dollars more in fees and payments from Justice for the privilege of continuing to own the company.

110.    Just one month later, on July 18, 2024, Justice's Chief Legal Officer, Gail Brashers-Krug, sent Mr. Bossidy another attorney-client privileged email, this one outlining a dispute between the company and one of its vendors, and containing the same privilege warnings at the bottom. Less than two hours later, Bossidy forwarded this privileged email to AFC Gamma's CEO and its Vice President, stating: "FYI - will call you today [] - want to pick your brain on Gail [Brashers-Krug]."

111.    Plaintiffs were not aware that Bossidy was forwarding confidential and privileged emails to AFC Gamma, and would have strenuously objected and prevented him from doing so had they known.

112.    When AFC Gamma received this and other privileged emails from Justice's lawyer about privileged subjects, AFC Gamma took no steps to urge Bossidy to stop that behavior. To the

contrary, it eagerly and willingly encouraged Bossidy to continue to spy on Justice and help it manufacture a case against it.

### H.    Withheld (Additional) Bossidy Emails

113.    Beginning almost immediately after his tenure as CRO began in April 2024, Bossidy began to run the business into the ground. His performance was catastrophic by every metric, as described below in greater detail.

114.    Plaintiffs' CEO and other senior management began to express concerns about Bossidy's performance. After several months of disastrous performance, Plaintiffs' CEO implored AFC Gamma to fire Bossidy and approve a different CRO. AFC Gamma repeatedly refused.

115.    On February 18, 2025, Plaintiffs' CEO and CFO drafted a memorandum to AFC Gamma, outlining Bossidy's failures and proposing a plan to move forward without him.

116.    AFC Gamma did not agree to Plaintiffs' proposal. Instead, they went on the attack. The next day, on February 19, 2025, AFC Gamma sent Plaintiffs an official letter, falsely claiming that Plaintiffs were in default of the 2024 Forbearance for, *inter alia*, mismanaging the New Jersey operations under Bossidy's tenure and interfering with Bossidy's control of the New Jersey operations (the "February Default Notice").

117.    With hindsight, it is now clear that this counter-factual letter was sent in the lead-up to AFC Gamma's annual earnings call in March, at which it intentionally misled its investors about Justice and this loan.

118.    Now under threat of default, Plaintiffs instructed Bossidy to provide all his communications with AFC Gamma, so Plaintiffs could gather evidence to defend themselves from the new false accusations.

119.    Bossidy was plainly obligated to provide these documents to Plaintiff Bloc as its

fiduciary. There is no possible argument otherwise. He was working for Bloc as a senior executive at the time he sent the emails, and owed Bloc his loyalties.

120.    Bossidy nevertheless refused Bloc's reasonable requests to turn them over to Justice. On information and belief, he took that action, a further breach of his fiduciary duties, in conjunction with members of AFC Gamma, his true patron.

121.    When Bossidy kept stalling and making excuses rather than turn over Bloc's property in the form of these communications, Bloc eventually had to take legal action, culminating in a lawsuit entitled *Bloc Dispensary LLC v. Bossidy*, 25-CV-1725 (D.N.J.).

122.    AFC Gamma is very aware of this dispute and has done nothing to resolve it. For example, AFC Gamma has failed to share the communications it had with Bossidy via Bossidy's non-Justice servers, even though it certainly could. Rather, on information and belief, Bossidy and AFC Gamma are conspiring together to prevent these documents from coming to light.

## I.    AFC Gamma Runs the Facility Into the Ground

123.    At the time AFC Gamma installed Bossidy to run the New Jersey operations, construction of the New Jersey manufacturing facility was largely completed. The facility was finally primed and ready to reach its potential, which is around $5 million per month in revenue.

124.    AFC Gamma is a REIT, owned and run by Wall Street professionals. Despite ample experience in financial wizardry and the like, AFC Gamma was woefully bad at running a cannabis company.

125.    AFC Gamma's insistence on installing Bossidy and then insisting that he remain in charge has been a disaster for Plaintiffs' New Jersey business. Under Bossidy, AFC Gamma ran the New Jersey operation with extraordinary incompetence. AFC Gamma's mismanagement under Bossidy was epic.

126.    Over the course of the year since AFC Gamma installed Bossidy, the New Jersey operation's cultivation sales are down by more than 50%. The inventory backlog has increased five-fold.

127.    After almost one year with AFC Gamma's agent in charge, Bloc's financial performance has plummeted. At the end of the nearly one year during which Bossidy was in charge, Bloc has been basically unable to pay down the principle, which continues to grow as interest gets added on.

128.    Critically, however, Plaintiffs have always and invariably been able to make the minimum monthly cash payment ($250,000) that is required under the revised terms of the loan. The loan is not in default, and has not been since the 2024 Forbearance agreement.

129.    Throughout the debacle, Justice employees repeatedly complained to AFC Gamma about the havoc that Bossidy was inflicting on Bloc. However, AFC Gamma steadfastly insisted that Bossidy remain in a place and that Justice do nothing to interfere with his decisions, even as the damages from his mismanagement continued to pile up.

130.    AFC Gamma's refusal to replace such an obviously flawed manager seems counter-intuitive, since a lender acting in good faith should want Bloc to succeed. AFC Gamma's conduct makes perfect sense, however, because it is instead in fact acting as a would-be acquisitor who wants to take more of Justice's assets. As it turns out, AFC Gamma has intentionally sabotaged Bloc's performance in order to try to cause Plaintiffs to default on the loan, so that it could foreclose and seize Plaintiffs' valuable cannabis assets.

131.    A telling example is the backlog of accumulated inventory. Over the course of Bossidy's tenure, the cultivation facility continued to grow and harvest cannabis successfully, but

Bossidy inexplicably failed to sell the cannabis to dispensaries and wholesalers. By the end of his tenure, the facility had accumulated hundreds of pounds of harvested, cured cannabis, stored in totes stacked to the ceiling throughout the facility, ready to be packaged and sold.

132.    The entire facility filled with unsold cannabis, even as Bossidy fired the relatively modestly-paid employees whose job it was to package and sell it. No matter how many times Bloc and its President begged AFC Gamma and Bossidy to reconfigure the operation (e.g., hire employees) so that it could sell this backlogged inventory, AFC Gamma and Bossidy refused.

133.    The cannabis backlog represents approximately ten months' worth of sales at the rates Bossidy's management has imposed. There is no legitimate business justification to accumulate so much inventory. First of all, cannabis degrades in quality over time and loses potency and value rapidly. Second, storing so much controlled substances creates a needless security hazard. On information and belief, no cannabis cultivation in New Jersey would or ever has built up even 25% as much inventory as AFC Gamma did under Bossidy's tenure. Again, however, the effort to build up inventory on Justice's dime is perfectly rational if the goal is to benefit AFC Gamma so that it can gain control of the assets, and sell them for its own profit.

134.    Bossidy's intentional creation of a backlog also pushed Bloc to the brink by vastly diminishing the revenues it could earn, while keeping its costs high.

135.    Bossidy's catastrophic mismanagement did not just harm the operation of the cultivation facility, he also interfered in the ability of Bloc's dispensary retail staff to perform their jobs. Bloc's cultivation is the primary supplier, but by no means the only supplier, to its three dispensaries. Bossidy's actions harmed the dispensaries in at least two ways. First, he cut popular product lines (also called SKUs) from cultivation operations, so that the dispensaries no longer

27

stocked some of their most popular products. Second, he limited the outside suppliers from the

dispensaries were allowed to buy from. Specifically, he refused to allow the dispensaries to

purchase products from suppliers who did not buy from Bloc's cultivation. The result is that Bloc's

dispensaries have lost customers and sales volume to competitors who are willing to supply the

products they want.

136.    There is also a long and documented history of other mismanagement by which

Bossidy has alienated vendors, employees, and others. For example, he insisted on delaying

payments to New Jersey vendors in order to increase payments to AFC Gamma, demoralized

employees, and otherwise disadvantaged the business.

137.    Justice raised these and many other concerns with AFC Gamma's CEO on

numerous occasions. For example, Justice's CEO wrote in October 2024:

> I feel our conversation about how Tim [Bossidy] approaches production and retail
> has had the exact opposite effect and he is doubling down on bad ideas. There isn't a
> single person on our NJ staff that has confidence in him. Our bank balance continues
> to tank bc of his 'ideas' and he wants to get more and more expensive equipment.

138.    Despite the serious nature of the complaint, AFC Gamma and its CEO ignored it.

Justice's CEO continued to try to remedy the situation, but AFC Gamma continued to ignore her.

139.    AFC Gamma finally responded the following month by making clear that nothing

was going to change: "[Bossidy will] remain in place until we're satisfied that we'll be paid back on

our loan. I let the last couple of texts on this subject slide, but also want to remind you and Justice

and Grown (sic) of ypur (sic) commitments to not interfere in Tim's oversight of the New Jersey

operations."

140.    At these and many other junctures, AFC Gamma refused to replace Bossidy and

insisted that Justice allow him to continue his disastrous mismanagement on threat of being held in

default. Unbeknownst to Justice at the time, Bossidy was secretly working behind the scenes with AFC Gamma to help it build its case to allow it to seize Justice's assets, e.g., the email described above wherein Bossidy (nominally Justice's CRO) writes to AFC Gamma about "another forbearance breach to add to your list."

141.    The performance of Justice's New Jersey operations under Bossidy stands in sharp contrast to successes by many of the same Justice team members in other states where Justice Cannabis's affiliates operate, and which are outside of AFC Gamma's and Bossidy's control. In fact, of all five states where Justice Cannabis operates, all other than New Jersey are profitable.

**J.    Video Evidence Proving Bossidy's Fraud and Dereliction Finally Forced AFC Gamma's Hand**

142.    Two series of events forced AFC Gamma's hand to finally relent and allow its agent, Bossidy, to be removed from Bloc.

143.    First, the public awareness of the lawsuit brought after Bossidy refused to turn over his emails (company property) brought out into the open the close prior relationship between Bossidy and AFC Gamma, and Bossidy's prior acts of malfeasance involving other cannabis borrowers. AFC Gamma's stock price dropped 30% after AFC Gamma disclosed the Bossidy lawsuit to its shareholders, making it difficult for AFC Gamma to keep Bossidy in place.

144.    Second, as part of Justice's investigation, it analyzed video of Mr. Bossidy during his visits to Bloc's facilities. As a licensed cannabis facility, all activity on the premises is required to be recorded. What Justice discovered was proof that Bossidy is a fraud. The CRO was merely pretending to work, while charging $700 per hour. During his somewhat-rare visits to the facility, he would park himself in a conference room for hours on end and surf the internet for scantily clad models, exotic cars, vacation homes, luxury watches, and clickbait photos.

145.    On a budgeting video call he took from the facility with Justice's CEO, for example, instead of engaging with the critical budgeting subject matter, he immediately switched over from the video call to his browser and viewed other websites, including bikini models.

146.    Justice sent a link to the video to AFC Gamma's CEO, and demanded Bossidy's immediate firing.

147.    The fact that Mr. Bossidy was only pretending to be a CRO while he was billing $700/hour to surf the internet powerfully demonstrated that he understood his job was not to run Justice successfully. To the contrary, AFC Gamma installed him to spy on Justice, and to help it build a case that would permit AFC Gamma to baselessly declare Justice in default, which is exactly what Bossidy did.

148.    AFC Gamma cannot dispute that Bossidy's financial performance was abysmal, and that he mismanaged the facility. There is no serious argument otherwise. Despite having ample time to do so after having been in charge for nearly a full year, Bossidy not only failed to reach the facility's $5 million per month potential—which would have made the venture highly successful—but he actually took the facility's performance backwards, leaving it in far worse shape than when he took over (at a time when it was finally getting on its feet after having completed construction).

**K.    Bloc's Post-Bossidy Turnaround**

149.    The proof of Bossidy's incompetence is proved by his absence. About three weeks ago, in mid-March of this year, Bossidy was finally relieved of his CRO post with consent of AFC Gamma. Thereafter, Justice took over the operation of the facility and, under the control of their CEO, Alexzandra Fields, almost immediately turned it around.

150.    In the first full week of the first full month after AFC Gamma relinquished control,

cultivation sales are up more than **70%** over the numbers from the first week of each of the previous three months.

151. As of April 8, 2025, just eight days into the month, Bloc's third-party sales from cultivation *had already exceeded sales under Bossidy for the entire months of February and March.*

152. Freed of Bossidy's completely disastrous tenure, the New Jersey team is energized and motivated. After only one month, the trajectory is moving toward the facility's $5 million per month potential, and is on track to reach it in less than a year.

153. The manufacturing lab finally received its long-awaited temporary certificate of occupancy, and is poised to sell its first products within one week of this filing.

154. Justice's operations are profitable in every single of one its states other than New Jersey. This includes Illinois, Michigan, Utah, and Pennsylvania. Had AFC Gamma not seized control and installed the profoundly incompetent Bossidy, the New Jersey cultivation operation would by now be earning over $3 million per month in revenues, and ramping quickly toward the facility's expected potential of $5 million per month.

155. AFC Gamma, however, is not motivated to have the facility succeed. Quite the opposite, it wants the facility to perform poorly. Having seized control and run it into the ground, AFC Gamma faces massive exposure for lender liability for the lost profits, a fact that has not gone unstated as the loan parties posture with one another.

156. The arrows from the Bossidy era all pointed sharply downward, but they immediately turned steeply upward as soon as AFC Gamma lost control of managing the facility. Justice anticipates that provable damages from lender liability will well exceed one hundred million dollars, and possibly two.

157.    AFC Gamma is not unsophisticated. It understands the exposure it has created by installing Bossidy and running the business so poorly.

158.    AFC Gamma is also interested in trying to push Plaintiffs into default, so it can seize the assets for itself while it still can. Having lost control of the operation, and with its share prices at disastrous lows, AFC Gamma has decided now is the time to launch an unjustified attack.

**L.    AFC Gamma Confronts Its Own Financial Emergency**

159.    Given the performance of the cannabis loans in its portfolio, AFC Gamma's revenues and income have been much lower than expected. To maintain its dividend and keep the large management fees flowing, AFC Gamma has been dipping into capital, paying dividends to the investors using the investors' own money.

160.    This is confirmed by the fact that its "payout ratio"—the ratio of dividends to actual income—has become increasingly dire. Beginning in 2023 the ratio exceeded 1, meaning that the company was paying out more in dividends then it took in cash income, hitting approximately 1.5 and then over 3 in 2024.

161.    These ratios are well outside the norm, and obviously unsustainable. A company can only continue functioning in this way by luring in more investors—essentially becoming a Ponzi scheme. This is how AFC Gamma has been paying its dividends and funneling fees to its Chairman and primary shareholder, Len Tannenbaum.

162.    As a publicly traded company, AFC Gamma must file quarterly and annual financial reporting. The AFC Gamma 10k for the year ending December 31, 2024 reveals the irregular scheme, defining "distributable earnings" as not earnings:

> We define Distributable Earnings as, for a specified period, the net income (loss)
> computed in accordance with GAAP . . . provided that Distributable Earnings **does**

**not exclude**, in the case of investments with a deferred interest feature (such as OID, debt instruments with PIK interest and zero coupon securities), accrued **income that we have not yet received in cash**. . . . after discussions between our Manager and our independent directors and after approval by a majority of such independent directors. (emphasis added)

163.    In other words, AFC Gamma's management uses potential interest payments—that is, interest that is owed but uncollected—to justify a high dividend, even when there is no certainty, and potentially not even good grounds for AFC Gamma to conclude, it will ever collect such interest in the future.

164.    Such dividends are therefore paid not from real "earnings" but from the very cash already provided by investors and from borrowing against the investors' capital (which is the same thing), essentially becoming a Ponzi scheme.

165.    Hence, the portion of every AFC Gamma dividend with a payout ratio exceeding 1 has been paid to the shareholders using their own money. Indeed, even those with a ratio of less than 1 were substantially paid with the shareholders' own money, because AFC Gamma counted millions of dollars in loan "origination fees" as income when these fees were taken out of the loan proceeds themselves—the loan proceeds being the investors' money.

166.    With its Q4 2024 dividend, AFC Gamma could no longer keep up the charade. There were too many underperforming loans in its portfolio, and it could not paper over its losses, so it had to cut its dividend sharply.

167.    Rather than coming clean with its shareholders about its own mismanagement, AFC Gamma chose to use Justice as scapegoat, promising that it would take Justice Cannabis Co.'s assets to improve its balance sheet, supposedly by redeploying the proceeds into new loans. To do that, AFC Gamma needed to declare Plaintiffs in default, even though Plaintiffs, having paid AFC

Gamma $19 million to purchase new loan terms, are not in default.

**M.    AFC Gamma Begins Threatening Plaintiffs**

168.    On February 19, 2025, the day after Plaintiffs complained about Bossidy's mismanagement and proposed a plan to replace him, AFC Gamma sent Plaintiffs the February Default Notice, claiming falsely that they were in default of the 2024 Forbearance. AFC Gamma's letter and notice listed a number of purported defaults, none of which were true or accurate.

169.    The February Default Notice simply provided notice that AFC Gamma considered the Plaintiffs' actions to be a default, but did not purport to act on the alleged default.

170.    Simultaneously with the February Default Notice, AFC Gamma sent a separate letter to Plaintiffs' two owners, demanding that they personally pay AFC Gamma a total of $30 million under the "Bad Boy" Guaranty. The letter demanded a response within seven days, and threatened immediate litigation if the owners did not agree to pay the $30 million.

171.    Because the loan was not even in default, and because Justice's owners had done nothing that could have even remotely triggered their personal liability for anything, much less $30 million, Justice's owners rejected AFC Gamma's demand that they pay $30 million from their own pocket to satisfy a debt that did not exist.

**N.    Plaintiffs Continued to Make Timely Loan Payments**

172.    Between February and April of 2025, while the Parties debated AFC Gamma's outrageous claims, the parties continued their ordinary financial arrangements as set forth in the 2024 Forbearance.

173.    That is, as described above, AFC Gamma already had a veto over Plaintiffs' bank accounts, and AFC Gamma had to approve every dollar spent from those accounts. Moreover, as set

forth in section 5.9 of the 2024 Forbearance, AFC Gamma conducted biweekly cash sweeps of all New Jersey bank accounts (the "Scheduled NJ Cash Sweeps") and monthly sweeps of the Pennsylvania bank account (the "Scheduled PA Cash Sweeps").

174.    The **Scheduled NJ Cash Sweeps**, which took place shortly after Plaintiffs' biweekly payroll, were conducted as follows, pursuant to section 5.9 of the 2024 Forbearance:

    a.  AFC Gamma calculated Ending Cash, which is the amount of cash in the accounts after payroll and the weekly payment of all outstanding bills, less a set percentage of retail sales (which is transferred to a separate tax reserve account, the "tax reserve"), less the $300,000 minimum balance that the account is required to maintain.

    b.  AFC Gamma swept 75 percent of the Ending Cash from Plaintiffs' accounts to its own bank accounts, applied toward the loan.

    c.  Plaintiffs were obligated to use the remaining 25% of Ending Cash to pay any additional tax liability above the tax reserve and pay down accumulated bills that had accrued prior to the 2024 Forbearance.

    d.  Beginning in January 2025, Plaintiffs had paid off all the accrued bills and were therefore permitted to use a portion of their 25% to reimburse Justice $40,000 per month for overhead expenses incurred by its corporate offices, such as HR, accounting services, compliance functions, and the like. AFC Gamma has refused to approve those reimbursements, which currently total $120,000.

175.    The **Scheduled PA Cash Sweeps** took place on a monthly basis, under a slightly different formula. For operational reasons, a much larger portion of Pennsylvania revenues were

reserved for taxes.

176.    The parties undertook the Scheduled NJ Cash Sweeps every other week, and the Scheduled PA Cash Sweeps every month, for more than a year, assuring that AFC Gamma received all revenues generated by Plaintiffs in excess of operating expenses. Moreover, AFC Gamma had to approve all operating expenses on a line-item basis. Thus, AFC Gamma controlled the accounts, and there was no possibility that Plaintiffs could divert any funds from those accounts or apply those funds to anything not approved by AFC Gamma.

177.    In sum, Plaintiffs are and have been in compliance with the terms of the loan as modified by the 2024 Forbearance. Every month, AFC Gamma gets its $250,000 on time from Plaintiffs' bank account, and the payment terms are satisfied.

### O.    AFC Gamma's April 2025 Attempted Extortion

178.    Lacking any legitimate basis to declare Justice in default, and desperately in need of cash, AFC Gamma began to shakedown Justice and its principals again. This time, it lowered its extortionate threat to $10 million in cash, plus contribution of Justice's valuable cannabis assets from other states into the collateral package.

179.    AFC Gamma and its principals have made a career out of strangling borrowers with high interest loans, extracting expensive concessions, and then attempting to take their assets. That play does not fit here, however, because Justice is making all of the payments required under the (very expensive) forbearance agreements.

180.    During the week of April 7, 2025, AFC Gamma turned up the pressure, threatening to bring a lawsuit naming the owners of Justice personally, thereby causing them personal and professional embarrassment, even though Justice's owners were not personally liable

for the loan.

181.    AFC Gamma's threats were nothing but a classic shakedown. Having already contributed $19 million to stabilize the loan, Plaintiffs owe AFC Gamma nothing apart from their contractual loan payment that they continue to timely pay and were unwilling to be extorted for millions more.

182.    AFC Gamma gave Plaintiffs a deadline of April 10, 2025, and texted several times asking whether Plaintiffs would agree to their demand. When the deadline passed, AFC Gamma filed their baseless lawsuit against the two Justice owners personally, stating bogus RICO claims and contriving false allegations of fraud.

### P.    AFC Gamma Seizes Plaintiffs' Cash

183.    AFC Gamma's attack was not limited to frivolous lawsuits.

184.    On April 9, 2025, just after close of business, AFC Gamma sent a letter to Plaintiffs alleging additional pretextual defaults, purporting to terminate the 2024 Forbearance, and providing notice that AFC Gamma was accelerating the loan ("The April Termination"). The April Termination demanded full and immediate payment of an amount they had calculated now somehow exceeded $120 million—on $50-60 million of disbursements and after already receiving over $25 million in payments.

185.    Again, Plaintiffs were not and are not in default of the 2024 Forbearance.

186.    The next morning, April 10, 2025, less than 24 hours later, and without notice to or permission from Hayden, AFC Gamma took $1,500,000 from Plaintiff Hayden's Pennsylvania bank account and transferred it to AFC Gamma's bank account. This was money that had been accumulating in the account and set aside for payment of Hayden's taxes.

187.    At the same time, AFC Gamma also transferred $288,501.63 from Plaintiff Bloc's New Jersey bank accounts to AFC Gamma's bank account, again without notice to or permission from Bloc.

188.    The amounts seized by AFC Gamma were not part of the Scheduled NJ or PA Cash Sweeps, and the amounts seized exceeded by well more than a million dollars the amount that AFC Gamma was entitled to transfer under any Scheduled Cash Sweeps.

189.    Specifically, the Scheduled NJ Cash Sweep should have been approximately $72,000, and should have occurred Friday, April 11. Instead, AFC Gamma took $288,501.63 on April 10. Moreover, the amounts seized by AFC Gamma left the balance of Bloc's operating account far below the $300,000 minimum balance required by the 2024 Forbearance. Bloc was left perilously illiquid, extremely vulnerable to any unanticipated expenses.

190.    Likewise, the Scheduled PA Cash Sweep should have been approximately $140,000. Instead, AFC Gamma seized one and a half million dollars ($1,500,000). AFC Gamma's theft of those funds included the dedicated tax account and left the Pennsylvania bank account without a sufficient reserve for taxes.

191.    AFC Gamma's theft of Plaintiffs' cash harms Plaintiffs in at least three ways: (1) it unlawfully converts cash from Plaintiffs to AFC Gamma; (2) it threatens to force Plaintiffs out of business by rendering them unable to pay their workforce, their bills, or their taxes; and (3) it introduces enormous uncertainty to Plaintiffs' business operations. If Plaintiffs do not know from day to day how much cash will be in their operating accounts, they cannot make basic operational decisions. If AFC Gamma's actions continue, Plaintiffs face insolvency and run the risk of losing their licenses.

### Q.    Plaintiffs Are Not in Default

192.    Contrary to AFC Gamma's pretextual allegations, Plaintiffs are not in default.

193.    The bases recently provided for the purported default are false. They are pretext for AFC Gamma's desperate need to try to get money to shore up its sinking stock price, which, as stated, has recently fallen to all-time low. Its market cap recently fell below the face value of the parties' loan (which is only one among many in the AFC Gamma portfolio) and is so low that it is undoubtedly creating a risk that AFC Gamma will be out of compliance with its own loan covenants, jeopardizing its own funding sources and risking bankruptcy.

194.    It is undisputed that Plaintiffs are not in monetary default. Despite effectively being sabotaged by AFC Gamma and Bossidy's mismanagement, Justice has remained out of financial default since the execution of the 2024 Forbearance in March 2024. Every month, Justice has made its minimum payment, and the loan has continued.

195.    Nor are Plaintiffs in non-monetary default. As set forth by AFC Gamma in the February Default Notice and the April Termination, Justice's alleged non-monetary defaults fall into seven broad categories: (i) the Perfection Certificate; (ii) inventory records; (iii) the CRO agreement; (iv) construction of the New Jersey manufacturing facility; (v) financial statements and projections; (vi) the Pennsylvania cultivation facility; and (vii) the Restricted Payments. Plaintiffs address each category in turn. Each and every one of them is false and pretextual.

196.    Perfection Certificate: As part of the 2024 Forbearance, the Borrowers completed an extremely detailed Perfection Certificate listing all of the Borrowers' assets and Justice's assets. The completed Perfection Certificate was 16 pages long and included the most granular detail, such as vehicles owned by any Justice-related entity. Justice completed the certificate and provided it to AFC Gamma on May 9, 2024.

197.    In the February Default Notice, nine months after Justice filed the Perfection Certificate, AFC Gamma claimed that it was defective. AFC Gamma alleged, for the first time and with no explanation, that the Perfection Certificate "failed to contain any information related to TC Applico, LLC and its assets located in Missouri." That allegation is baffling, because it is both factually wrong and irrelevant.

198.    The Perfection Certificate required Justice to disclose various assets owned by and information relating to "Specified Persons," a defined term under the agreement that included the Borrowers and Justice and its employees, subsidiaries, and affiliates.

199.    TC Applico LLC is not a Specified Person under the definition set forth in the Perfection Certificate. It is a Missouri entity only tenuously connected to Borrowers or Justice. Neither Justice nor its owners own any interest whatsoever in TC Applico. Neither Justice nor its owners manage the TC Applico dispensaries, or financially benefit from them in any way. One of the owners is a personal friend of Jon Loevy, one of Justice's owners, and Loevy helped him win the licenses.

200.    The only relevant connection between Justice and TC Applico is that, once TC Applico was awarded its licenses in 2020, a Justice entity, Oakland Manager LLC, had loaned TC Applico $5,000,000 for the build-out of its dispensaries. Unfortunately, although the parties drafted a note reflecting that loan, it was never executed, and the other owners of TC Applico disputed its validity and refused to repay it. Moreover, the value of TC Applico's assets had diminished sharply, as the entity had badly mismanaged its dispensaries. Justice's owner concluded that, even if the note had been legally enforceable, the entity was virtually judgment-proof. The putative, unexecuted note was virtually worthless.

201.    Nonetheless, Justice disclosed the existence of the unenforceable debt to AFC Gamma during the course of the negotiations for the 2023 Forbearance. Justice's Chief Legal Officer held a lengthy video conversation with AFC Gamma's CEO and other AFC Gamma personnel during which she explained in detail the nature of the debt. Justice's CLO offered to assign the dubious note to AFC Gamma, or to give AFC Gamma a lien on any future repayment thereof. After consideration, AFC Gamma declined, on the basis that they could not sell a legally unenforceable note. The CLO confirmed that conversation in an email to AFC Gamma's CEO and other personnel on December 11, 2023, which attached a schedule of Justice's debts and leases. In the email she stated (emphasis added),

> Assets: HoldCo's assets primarily consist of the licenses disclosed in my prior email of today, as well as the assets of each facility, including inventory, fixtures, equipment, and the like. As noted in my earlier email, HoldCo does not hold an ownership interest in any entities that are not licensed and disclosed on the license spreadsheet. HoldCo does not own any real property. **HoldCo is the payee on two notes to an unrelated Missouri entity, but, as we have discussed previously, those notes face significant legal barriers to enforcement**.

202.    Thus, the unenforceable TC Applico note (1) was not required to be disclosed on the Perfection Certificate, because TC Applico is not a Specified Person, and (2) was, regardless, fully disclosed to AFC Gamma for the express purpose of offering it as security for the loan, and AFC Gamma considered and rejected it.

203.    <u>Inventory records</u>: AFC Gamma claimed an event of default "for the failure to notify [AFC Gamma] that the inventory records and other records provided to Agent were materially inaccurate."

204.    AFC Gamma has never explained to Plaintiffs the basis for this alleged event of default. Plaintiffs' best guess is that it refers to a minor discrepancy discovered at the New Jersey

cultivation facility. As is required by New Jersey law, the Bloc cultivation meticulously tracks each and every plant as it proceeds from seedling to harvested cannabis, using bar codes and RFID tags. Bloc maintains the records of each plant on an internal, proprietary tracking system. At the same time, Bloc also maintains the state-mandated tracking system called Metrc, which is used by the state to monitor the sale of cannabis. Metrc is therefore visible to the CRC and which the CRC can view at any time. Bloc's employees input the tracking data into both systems.

205.    In August 2024, Bossidy, the CRO chosen by AFC Gamma, discovered that some of the information accurately maintained in Bloc's proprietary tracking system was not uploaded to Metrc. Specifically, that information related to unsellable biomass. When cannabis plants are harvested, the flower is picked, dried, cured, and packaged for sale. The stems, leaves, and other biomass, often called "trim," are either destroyed and rendered chemically inert through a heavily regulated process or used by an extraction lab to make distillate, which can be turned into vape cartridges or edible gummies.

206.    Bossidy discovered that Bloc employees had correctly entered the weight of the trim into Bloc's own tracking system, but had not entered that information into Metrc. The trim had been placed in storage totes. On information and belief, Bossidy informed AFC Gamma about the discrepancy immediately.

207.    Four months later, Bossidy informed Justice's Chief Compliance Officer about his discovery. The two worked together with Bloc's post-harvest technicians, security personnel, and compliance specialist to conduct a fulsome audit of all trim that had not been recorded in Metrc. They verified that none of the unrecorded trim had been sold, destroyed, or diverted, and that all of it had been accurately tracked in Bloc's proprietary tracking system. They self-

reported the discrepancy to the CRC; entered the trim weights into Metrc; produced and implemented a Corrective Action Plan; revised Bloc's relevant Standard Operating Procedures to clarify the requirement to enter the trim weights in Metrc; and retrained post-harvest staff to comply with those requirements. Upon review of Bloc's self-report and corrective action plan, the CRC determined not to take any action or require any further action.

208.    Moreover, Bossidy provided the self-report and corrective action plan to AFC Gamma via email contemporaneously.

209.    This event does not constitute an event of default. Plaintiffs simply did not "fail[] to notify [AFC Gamma] that the inventory records and other records provided to Agent were materially inaccurate."

210.    First, Plaintiffs are not required to, and do not, report inventory records to AFC Gamma. The Credit Agreement sets forth a lengthy and specific list of records that Borrowers are required to provide to AFC Gamma on a regular basis; that list does not include inventory records. Bloc did not provide any inventory records to AFC Gamma, much less inaccurate inventory records to AFC Gamma.

211.    Second, to the extent that any inventory records were reported to AFC Gamma for some reason, they would likely have been from Bloc's internal, proprietary inventory tracking system, which was accurate at all times.

212.    Third, even if Bloc had provided the Metrc records to AFC Gamma (and it did not), those records were never "materially inaccurate." The Metrc system exists so that the CRC can track the sale, disposition, and/or destruction. The unrecorded trim was discovered and entered into Metrc prior to any sale, disposition, or destruction of the trim.

213.    Fourth, once Plaintiffs became aware of the discrepancy, Plaintiffs did, in fact "notify [AFC Gamma] that the inventory records" contained a discrepancy.

214.    Fifth, to the extent that the trim discrepancy constituted a default, the default was quickly and completely cured. All inventory records at the cultivation, both Metrc and Bloc's internal records, are accurate and fully up to date.

215.    The CRO Agreement: As noted above, the 2024 Forbearance required Plaintiffs to hire an outside consultant to be Bloc's CRO, and AFC Gamma had the sole discretion to approve or reject candidates for that position. AFC Gamma insisted on Bossidy, who then acted as AFC Gamma's agent, reporting directly to and taking direction from AFC Gamma and not Plaintiffs. The 2024 Forbearance prohibited Plaintiffs from interfering with the CRO's performance.

216.    AFC Gamma made two vague allegations that appear to relate to Bossidy's consulting contract. First, in February 2025, prior to Bossidy's termination, AFC Gamma alleged that Plaintiffs committed an event of default "for the failure . . . to observe and perform certain covenants, terms, conditions and agreements contained in certain Material Contracts, including the NJ Consulting Agreement." Second, after Bossidy's termination, in April 2025, AFC Gamma claimed Plaintiffs defaulted because they failed to "promptly enter into a consulting or similar agreement on similar terms as the NJ Consulting Agreement with a consultant or operations manager acceptable to Agent in its sole discretion."

217.    Again, AFC Gamma has never explained how Plaintiffs allegedly failed to perform under the consulting contract. Plaintiffs can only assume that AFC Gamma is referring to the many emails, texts, and phone calls from Justice CEO complaining about Bossidy's performance and asking that he be terminated. Undersigned counsel is frankly unable to identify any theory by which

44

those complaints and requests constitute a breach of that contract.

218.    As to finding a replacement, the 2024 Forbearance imposes no deadline by which Plaintiffs must hire a replacement. It simply requires Plaintiff to act "promptly":

> In the event the NJ Consulting Agreement is terminated for any reason prior to the Specified End Date, JG New Jersey LLC shall promptly enter into a consulting or similar agreement on similar terms as the NJ Consulting Agreement with a consultant or operations manager acceptable to Agent in its sole discretion.

219.    Justice is complying with that requirement. Justice is making all reasonable efforts to find and retain a replacement. Bossidy was terminated approximately one month ago. The role of CRO involves overseeing the operations of three dispensaries and a cultivation and manufacturing facility, employing 151 people, and generating several million dollars of revenue per month. Plaintiff Bloc has learned through bitter experience that a hasty, poor choice in this role can be devastating to the company's performance. Bloc is therefore not rushing to replace Bossidy, but rather conducting a careful, thorough search for a qualified candidate.

220.    Justice has already sent AFC Gamma two qualified candidates, people who deserve the credit for the immediate business turnaround, but AFC Gamma rejected both of these candidates, per its veto right in the 2024 Forbearance. Having rejected qualified candidates and protracted the process unnecessarily, AFC Gamma cannot legitimately use the fact that the position remains temporarily unfilled as a basis to declare a default, and steal Plaintiffs' funds.

221.    <u>New Jersey construction</u>: At the time the parties entered into the 2024 Forbearance, construction of a small manufacturing laboratory facility, located on the second floor of the New Jersey cultivation facility, was still under construction. Section 5.3 of the 2024 Forbearance required Plaintiffs to "obtain the final certificate of occupancy and close out documents related to the NJ

Construction by no later than May 15, 2024."

222.    By way of background, the allegation relates to the manufacturing laboratory located at Bloc's cultivation facility. Construction of the cultivation facility was completed long ago, and the cultivation has been operating at or near full capacity since 2023. The cultivation areas of the building have been operating under a temporary certificate of occupancy ("TCO") issued by Ewing Township. The Township will not issue a COO until all construction in the building is complete and final inspections have taken place.

223.    Bossidy, AFC Gamma's agent, took complete and exclusive control of the New Jersey operations just one month after that agreement was executed. Bossidy assumed control over the construction, and regularly—at least weekly—updated AFC Gamma as to the project's progress. Bossidy was ultimately unable to obtain the final certificate occupancy by the time he was terminated, nearly a year later.

224.    While Bossidy and AFC Gamma controlled the operations at the cultivation, May 15, 2024, came and went, and AFC Gamma raised no objection. To the contrary, from before the May 15 deadline through a few days before Bossidy was terminated, he was in regular contact with Martin Bixler, AFC Gamma's Vice President of Construction concerning the status of the TCO and the COO for the lab. Those emails detailed all of the setbacks that delayed the TCO and COO until March of 2025 at the earliest. Bixler routinely responded, "Sounds great," and "Thanks for the update."

225.    In sum, AFC Gamma repeatedly and knowingly waived the requirement that COO be achieved by May 15, 2024. The failure to achieve COO was not an event of default.

226.    Alternatively, if it was a default, the default was entirely attributable to AFC

Gamma's agent.

227.    <u>The Pennsylvania cultivation facility and license</u>: The Justice entity that holds the cultivation license in Pennsylvania is Pier Cove LLC ("Pier Cove"), a Pennsylvania limited liability company wholly owned by Justice.

228.    By way of background, in 2023, Justice began experiencing difficulties with its Pennsylvania cultivation facility. When the facility's construction was only about 60 percent complete, a dispute with the general contractor caused a work stoppage. Cultivating cannabis in the partially-built facility became increasingly difficult, and, at the urging of AFC Gamma, Justice shut down the facility in late 2023.

229.    At the end of July 2024, the Pennsylvania Department of Health ("DOH") denied Pier Cove's application to renew its annual cultivation license, citing the failure to operate the facility. Pier Cove appealed that administrative decision; that appeal is still pending. AFC Gamma knew about the appeal contemporaneously.

230.    To resolve the appellate dispute, Pier Cove negotiated a deal with the DOH to renew the cultivation license in exchange for Justice's owners committing to contribute the cost of completing construction, remediating issues with the facility, and restarting cultivation and manufacturing operations. Justice submitted a proposal to do exactly that, pursuant to which its owners would commit $5 million to complete the construction and resume operations.

231.    At the same time, Pier Cove negotiated an agreement with AFC Gamma pursuant to which AFC Gamma approved of Justice's restart proposal and agreed to make $500,000 of Justice's funds that it was currently holding in escrow available for some of the restart expenses. AFC Gamma also agreed not to initiate foreclosure proceedings.

232.    In sum, Justice proposed an extensive and detailed reopening plan for the cannabis facility in which its owners committed themselves to invest an additional $5 million, a plan to which AFC Gamma expressly agreed (the "Reopening Agreement"). The Reopening Agreement is subsequent to all of the prior agreements with AFC Gamma and novated them.

233.    AFC Gamma agreed to the Reopening Agreement because it protected the value of its collateral. Plaintiffs agreed to contribute an additional $5 million and finish construction of the Pennsylvania facility, all to the direct benefit of AFC Gamma.

234.    In reliance on the Reopening Agreement it reached with AFC Gamma, Justice obligated itself to DOH to invest another $5 million upon resolution of the appeal and began expending funds and staff time developing the reopening plan, hiring outside counsel to negotiate the reopening with the Department of Health, and paying for contractors and service providers to prepare the site for renewed construction.

235.    AFC Gamma was aware of Justice's negotiations with the DOH and actions in reliance on the Reopening Agreement at all times.

236.    Despite the express agreement and Justice's detrimental reliance thereon, AFC Gamma abruptly filed a lawsuit seeking foreclosure of the Pier Cove property. The foreclosure action is in bad faith and has imperiled Justice's settlement negotiations with the DOH.

237.    AFC Gamma now claims that Plaintiffs' actions with respect to the Pier Cove cultivation facility constitute defaults. AFC Gamma is wrong for the following reasons, among others:

        i.    The parties novated their prior agreements relating to Pennsylvania and entered into the Reopening Agreement. Justice has performed and continues to perform

under the Reopening Agreement, but AFC Gamma has breached by instituting

foreclosure proceedings.

ii.   In addition to modification and/or novation, the same facts set out herein

constitute accord and satisfaction, waiver and/or forfeiture, and should also estop

AFC Gamma from claiming that Justice's acts, which are required by the

Reopening Agreement, constitute defaults under other agreements.

iii.  Laches is also an independent bar to AFC Gamma's assertions of defaults.  AFC

Gamma knew about the negotiations that Justice was conducting with the

Department of Health to get to a settlement and all of the preparatory work it

was doing to satisfy the Department going back to September of 2024 if not

August. Yet AFC Gamma delayed until February of 2025, after Justice put in all

of these efforts and spent money, and just as Justice was on the verge of securing

the settlement with the State that would renew the license. This undue delay

while Justice labored under the Reopening Agreement is a breach of that

Reopening Agreement and was motivated by AFC Gamma's need to do

something (even if improper) to assuage its investors as described above.

238.   <u>Financial statements and projections</u>: AFC Gamma complains that Justice failed to

produce audited financial statements for 2024 and a projected budget for 2025 on a timely basis.

AFC Gamma is wrong on both points.

239.   First, Justice was not required to produce audited financial statements. Section 5.1

the original Credit Agreement required audited financials within 75 days of the end of the fiscal year

(which, for 2025, was Monday, March 17, 2025). But the 2024 Forbearance replaced the

Borrowers' 5.1 financial reporting requirements with section 5.11, titled "Access to Information and Reporting." That section lists four categories of financial information that Borrowers must provide, including payroll information and vendor expenses; none of them includes or references audited financials. The fifth category states as follows:

> (e) any other information reasonably requested by Agent relating to the financial condition or operations of Parent, Borrowers and the Shareholder Guarantors or the Collateral, within three (3) Business Days of request thereof.

240.    Audited financial statements for a company of Justice's size are not something that can be produced in three business days. An auditing firm must be engaged, and the process takes a minimum of three months, and typically costs upwards of $100,000. A full, audited financial statement in three days is not a "reasonable request."

241.    For exactly that reason—that audited financials are expensive, cumbersome, and slow to produce—the parties had agreed since 2022 to waive audited financials.

242.    On March 17, AFC Gamma CEO Neville emailed Plaintiffs and requested audited financials by the next day, March 18. Plaintiffs, via owner Kanovitz, responded as follows:

> Dear Mr. Neville:
>
> The team forwarded me your demand to receive financials with a 24-hour turnaround time. My understanding is that the terms of our agreement give us three full business days to respond. Nevertheless, as a courtesy to you and AFC, the team is endeavoring to respond on your timeline.
>
> I write separately to document my concern that you are making your 24-hour demand in bad faith to bully the team as retaliation for terminating Mr. Bossidy. Several facts lead me to this concern:
>
> --First, even though we are entitled to the three business days, you tried to intimidate the team by demanding an immediate turnaround.
>
> --Second, in your entire time at AFC Gamma, you have never mentioned, much less asked to see the financial information you have now demanded.

50

Your sudden timing is highly suspicious.

--Third, Ms. Fields wrote you several months ago, on January 6, 2025, stating "He (Bossidy) mentioned there were some financials that AFC would like to have access to, can you share that list with us so Tripp and I can work on them for you?" (emphasis added). Rather than tell Ms. Fields what financials you wanted, you ignored her. Almost two and one-half months later, you demand a 24-hour turnaround time. That certainly does not appear to be good faith by you or AFC. Moreover, I note that this was no mistake. Ms. Fields followed-up with you again on January 30th and you ignored her again.

--Fourth, as I expect you are aware, AFC has waived the audited financials provision of the credit agreement. AFC waived the provision to save money when we informed it that none of our other lenders require audited financials and thus the expense, $120,000-$150,000, would come out of New Jersey and Pennsylvania funds. Relatedly, were it not for AFC's express verbal waiver, the forbearance agreement would have waived it separately expressly in writing. In particular, the forbearance agreement spells out the financial reporting which will be required (Section 5.1) and it does not include audited financials.

All that said, assuming AFC wants to rescind the waiver and the forbearance on this point, we are prepared to grant it if that is how AFC wants to spend the money. Let me know if you are prepared to release the necessary funds and we will provide you with a reasonable timeline for completing a 2023 audit and a 2024 audit. Obviously, unaudited financials can be made available much sooner and at no additional cost.

--Fifth and finally, you previously had complete access to the financial information directly through Mr. Bossidy and Colin Moran. Moreover, AFC has had not only access to, but control over all money in and out of our bank accounts for a year. AFC has had perfect transparency into our finances at the most granular level. So, again, the timing of your immediate turnaround demand stands out as suspicious.

Accordingly, I would appreciate, and hereby demand, that you promptly forward to me all of AFC's communications with Mr. Bossidy requesting or receiving financial information about the company, so that the company can assess the good or bad faith of your actions.

243.    Thus, as set forth succinctly in Kanovitz's email, Justice was not required to produce audited financials because (1) the Forbearance expressly waives that requirement by requiring

different financial reporting, which does not include audited financials; (2) AFC Gamma waived that requirement in an express oral agreement and by its course of dealing since 2022; and (3) at the beginning of 2025, Justice's CEO had explicitly asked AFC Gamma if it required additional financial reporting, and AFC Gamma did not respond. Nonetheless, Justice offered to undertake the process of getting audited financials "if that is how AFC wants to spend the money." Again, AFC Gamma did not respond.

244.    To sum up, Justice was not required to produce audited financial statements; any such requirement was waived; and Justice offered to comply, and still stands willing to do so, but AFC Gamma ignored that offer.

245.    Likewise, AFC Gamma is wrong about Justice's alleged "failure" to produce 2025 financial projections. Again, that requirement was expressly waived, orally and in writing. Projections are not required under the 2024 Forbearance.

246.    Even so, Justice actually produced 2025 Projections to AFC Gamma. On January 30, 2025, in his capacity as CRO, Bossidy emailed to AFC Gamma's CEO a spreadsheet titled "JG NJ Budget FY25 v5 tm.xlsx"—that is, the 2025 Projections.

247.    Nevertheless, because Justice was skeptical of the quality of Bossidy's work, Justice created revised 2025 Projections and produced them to AFC Gamma on April 9, 2025.

248.    Thus, Justice was not required to produce 2025 Projections; nevertheless, Justice did produce 2025 Projections, and even produced revised and corrected Projections.

249.    <u>Alleged Restricted Payments</u>: In October 2023, AFC Gamma complained that, over the past two years, various payments had been made from one Justice entity to another. AFC Gamma now alleges that those years-old payments were purportedly Restricted Payments

prohibited under the Credit Agreement, and therefore constituted an event of default. That is false. Those payments do not constitute a default, for the following reasons, among others:

i.  The payments were not Restricted Payments as defined in the parties' agreements;

ii.  To the extent that any were Restricted Payments, Justice and its owners repaid those amounts;

iii.  By entering to the 2024 Forbearance with full knowledge of the payments, AFC Gamma waived its claims;

iv.  By entering to the 2024 Forbearance with full knowledge of the payments, AFC Gamma is estopped from making claims relating to them.

v.  AFC Gamma itself failed to perform conditions precedent.

### R.  Plaintiffs Are Not in Default, and AFC Gamma Must Be Enjoined From Stealing Plaintiffs' Assets

250.  In sum, Plaintiffs are not in default under the 2024 Forbearance Agreement. AFC Gamma's financial problems, while very real, simply do not constitute a default on Plaintiffs' part.

251.  As explained throughout this complaint, the alleged defaults that AFC Gamma alleges are factually unsupported or are insufficient as a matter of law because those alleged defaults did not happen, are de minimis, have been cured, and/or otherwise waived and forfeited.

252.  Moreover, even if AFC Gamma could point to actionable defaults, which it cannot, it has not provided a proper opportunity to Plaintiffs to cure them. Instead, less than 24 hours after improperly and unilaterally declaring Plaintiffs in default, AFC Gamma is compounding the damages by stealing cash necessary to operate the businesses from Plaintiffs' bank accounts, which is independently detrimental to Plaintiffs' business.

253.     AFC Gamma's ongoing theft of Plaintiffs' assets has already caused Plaintiffs monetary harm. If it continues, it will cause irreparable harm to Plaintiffs business, Plaintiffs' more than 200 employees, Plaintiffs' customers, and Plaintiffs' creditors.

## COUNT I: BREACH OF CONTRACT

254.     Plaintiff incorporates each allegation of this complaint as if fully set forth herein.

255.     One or more contracts exist between Plaintiffs and Defendants.

256.     Plaintiffs performed in accordance with the contract(s).

257.     Defendants breached their contractual obligations.

258.     Defendants' breach has resulted in damages to Plaintiffs.

## COUNT II: BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

259.     Plaintiffs incorporate each allegation of this complaint as if fully set forth herein.

260.     The implied covenant of good faith and fair dealing requires parties to a contract to adhere to the terms of that contract, as intended, and thus, not to utilize the contract in a manner that would undercut the purposes of the contract.

261.     One or more contracts exist between Plaintiffs and Defendants.

262.     Plaintiffs performed in accordance with the contract(s).

263.     Defendants' actions as set forth herein breached the implied covenant of good faith and fair dealing by undermining the purposes of the contract(s).

## COUNT III: RELIEF UNDER SECTION 9-625 OF THE NEW YORK UCC

264.     Plaintiffs incorporate each allegation of this complaint as if fully set forth herein.

265.     Defendants hold secured interests in some of Plaintiffs' assets, including equity ownership of Plaintiff Hayden.

266.    Defendants have threatened to seize those assets and sell them at a public auction under Section 9-610 of the New York Uniform Commercial Code, which provides, in relevant part, "After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral . . . ."

267.    Such a seizure and sale would be wrongful and in violation of Section 9-610, as Plaintiffs are not in default.

268.    Pursuant to Section 9-625(a), when a secured party is not proceeding in accordance with Article 9, this Court may restrain collection, enforcement, or disposition of collateral.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(a) Declare that Plaintiffs are not in default of the 2024 Forbearance and have not materially breached the 2024 Forbearance;

(b) Permanently enjoin Defendants, their agents, servants, officers, directors, employees, representatives, successors, and assigns, and all others acting in concert or participation with Defendants, from seizing funds from Plaintiffs' accounts in excess of the Scheduled Transfers and from foreclosing or seizing Plaintiffs' assets; and

(c) Award Plaintiffs' damages on its Complaint in an amount to be determined at trial, but not less than $150,000, including compensatory damages, special damages, punitive damages, the costs and expenses of this action, reasonable attorney's fees as permitted by law, pre- and post-judgment interest, and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand trial by jury on all issues so triable.

Dated:  April 16, 2025

Respectfully submitted,

**DYNAMIS LLP**

By: *s/ Jamie Hoxie Solano*
Jamie Hoxie Solano, Esq.
NJ Bar No. 426422024
(214) 454-8829
11 Park Place
New York, NY 10008
JSolano@dynamisllp.com

Michael B. Homer, Esq.
*Pro hac vice application forthcoming*
(617) 693-9732
MHomer@dynamisllp.com
Constantine Economides, Esq.
*Pro hac vice application forthcoming*
(305) 985-2959
CEconomides@dynamisllp.com
Eric Rosen, Esq.
*Pro hac vice application forthcoming*
(617) 802-9157
ERosen@dynamisllp.com
225 Franklin Street, 26th Floor
Boston, MA 02110

**Local Civ. R. 11.2 Certification**

I, Gail Brashers-Krug, on behalf of Plaintiffs, certify under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct to the best of our knowledge, as contemplated by 28 U.S.C. § 1746: that the matter in controversy here is not the subject of any other action pending in any court, or of a pending arbitration proceeding other than the following proceedings:

1. *Bloc Dispensary LLC v. Timothy Bossidy*, filed in U.S. District Court for the District of New Jersey on March 7, 2025, currently pending before the Honorable Zahid Quraishi, in which the following are parties:
   a. Bloc Dispensary LLC (Plaintiff)
   b. Timothy Bossidy (Defendant)

2. *Advanced Flower Capital Inc., et al., v. Michael Kanovitz, et al.*, filed in U.S. District Court for the Southern District of New York on April 10, 2025, in which the following are parties:
   a. Advanced Flower Capital Inc. (Plaintiff)
   b. AFC Agent LLC (Plaintiff)
   c. Michael Kanovitz (Defendant)
   d. Jon Loevy (Defendant)


*Gail Brashers-Krug*
__                                    _____

Authorized Representative of Plaintiffs

*s/ Jamie Hoxie Solano*
Jamie Hoxie Solano, Esq.


**Local Civ. R. 201.1(d)(1) Certification**

This matter does not fall within the compulsory arbitration requirement set forth in L. Civ. R. 201.1(d)(1) because Plaintiffs seeks injunctive relief in addition to money damages in excess of $150,000.

*s/ Jamie Hoxie Solano*
Jamie Hoxie Solano, Esq.