**DYNAMIS LLP**
Jamie Hoxie Solano, Esq.
NJ Bar No. 426422024
(214) 454-8829
11 Park Place
New York, NY 10007

Michael B. Homer, Esq.
*Pro hac vice application pending*
(617) 693-9732
Constantine Economides, Esq.
*Pro hac vice application pending*
(305) 985-2959
Eric Rosen, Esq.
*Pro hac vice application pending*
(617) 802-9157
225 Franklin Street, 26th Floor
Boston, MA 02110
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **HAYDEN GATEWAY LLC and BLOC DISPENSARY LLC,**<br><br>       **Plaintiffs,**<br><br>**v.**<br><br>**ADVANCED FLOWER CAPITAL INC. and AFC AGENT LLC,**<br><br>       **Defendants.** | **CIVIL ACTION NO. <u>3:25-CV-02789 (ZHQ) (JBD)</u>**<br><br>**MEMORANDUM OF LAW IN SUPPORT OF EMERGENT APPLICATION BY PETITIONERS FOR AN ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINTS TO BE CONVERTED TO A PRELIMINARY INJUNCTION**<br><br>**<u>Oral Argument Requested</u>**<br><br>**Return Date: To Be Determined** |

# TABLE OF CONTENTS

**FACTUAL BACKGROUND**.................................................................................................**2**

THE LOAN HISTORY ...................................................................................................3

THE MARCH 2024 FORBEARANCE AGREEMENT...............................................4

THE MARCH 2024 FORBEARANCE SUCCEEDED...............................................5

THE VALUABLE COLLATERAL .............................................................................5

AFC'S OPERATIONAL TAKE-OVER ......................................................................5

BOSSIDY'S RELATIONSHIP WITH AFC ...............................................................6

THROUGH BOSSIDY, AFC RUNS THE FACILITY INTO THE GROUND .........7

BOSSIDY IS FINALLY REMOVED .........................................................................8

BLOC'S POST-BOSSIDY TURNAROUND ..............................................................8

AFC'S FUNDAMENTAL FINANCIAL INSTABILITY..........................................9

AFC BEGINS THREATENING PLAINTIFFS .........................................................10

PLAINTIFFS CONTINUED TO MAKE TIMELY LOAN PAYMENTS ................11

AFC'S CONFRONTS A RECENT AND DESPERATE NEED FOR CASH............11

AFC'S APRIL 2025 ATTEMPTED EXTORTION ...................................................12

AFC ILLEGAL SEIZURES OF PLAINTIFFS' CASH............................................13

**PRELIMINARY INJUNCTIVE RELIEF SOUGHT** ................................................**14**

**LEGAL STANDARD FOR INJUNCTIVE RELIEF**..................................................**15**

**ARGUMENT** ....................................................................................................................**15**

    I.    PLAINTIFFS CAN ESTABLISH A HIGH LIKELIHOOD OF SUCCESS ON THE MERITS BECAUSE THEY ARE NOT IN DEFAULT ......................................................16

      A.    PLAINTIFFS ARE NOT IN DEFAULT .................................................16

         1.    THE INVENTORY RECORDS..........................................................17

         2.    FINANCIAL REPORTING ...............................................................18

         3.    THE CHIEF RESTRUCTURING OFFICER (BOSSIDY)....................21

         4.    NEW JERSEY CONSTRUCTION .....................................................22

         5.    THE PRE-FORBEARANCE "RESTRICTED PAYMENTS" .............23

            a.    BACKGROUND: THE HAYDEN ACCOUNT ...............................24

            b.    THERE WERE NO RESTRICTED PAYMENTS ...........................25

    c.    INDEPENDENTLY, THERE IS NO DEFAULT WHERE THE PAYMENTS ALLEGED TO BE RESTRICTED ARE NOT "CONTINUING" ............................26

    d.    AFC FAILED TO PROVIDE THE PROPER NOTICE REQUIRED FOR A DEFAULT ....................................................................................................................27

    6.    THE PENNSYLVANIA CULTIVATION ........................................................29

    a.    BACKGROUND: THE PENNSYLVANIA CULTIVATION SHUTDOWN .29

    b.    THE SEPTEMBER 2023 FORBEARANCE AGREEMENT .........................30

    c.    THE MARCH 2024 FORBEARANCE ............................................................30

    d.    THE DOH RESOLUTION AND THE REOPENING AGREEMENT ............31

    e.    JUSTICE GIVES CONSIDERATION AND COMMENCES PERFORMANCE ...................................................................................................33

    f.    AFC RENEGES AFTER JUSTICE GIVES CONSIDERATION AND RELIES ...............................................................................................................33

    g.    AFC CANNOT LAWFULLY DISAVOW THE REOPENING AGREEMENT IT ALREADY AGREED TO ....................................................................................34

    h.    THE ARE NO DEFAULTS REGARDING THE PENDING LICENSE NON-RENEWAL ..................................................................................................................37

    i.    THE PROVISION ON WHICH AFC RELIES IS UNENFORCEABLE ........39

    7.    THE PERFECTION CERTIFICATE ...................................................................40

    a.    TCA IS NOT A "SPECIFIED PERSON" ...........................................................40

    b.    DISCLOSURE OF THE TCA NOTE TO AFC ...............................................40

B.    PLAINTIFFS WILL SUCCEED ON THE MERITS BECAUSE NONE OF AFC'S ALLEGED DEFAULTS ARE "CONTINUING," AND PLAINTIFFS HAVE BEEN GIVEN NO OPPORTUNITY TO CURE ....................................................................42

C.    PLAINTIFFS WILL SUCCEED ON THE MERITS BECAUSE, EVEN ASSUMING THERE WERE TECHNICAL DEFAULTS, NON-MONETARY DEFAULTS DO NOT PERMIT AFC TO FORECLOSE ................................................43

II.    IF AFC IS NOT ENJOINED FROM CONTINUING TO RAID PLAINTIFFS' BANK ACCOUNTS, PLAINTIFFS AND OTHER INNOCENT PEOPLE WILL SUFFER IRREPARABLE HARM ..................................................................................................44

III.    BALANCING THE EQUITIES, THE RELIEF SOUGHT WOULD NOT RESULT IN GREATER HARM TO AFC GAMMA ....................................................................45

IV.    THE PUBLIC INTEREST FACTOR ALSO POINTS IN FAVOR OF THE RELIEF SOUGHT .............................................................................................................................46

**CONCLUSION** .............................................................................................................................**48**

# TABLE OF AUTHORITIES

## CASES

*22nd Century Techs., Inc. v. iLabs, Inc.,* 2022 WL 819668, at *10 (D.N.J. Mar. 18, 2022).............46

*22nd Century Techs., Inc. v. iLabs, Inc.,* 2023 WL 3409063, at *6 (3d Cir. May 12, 2023) ......15, 46

*Amalgamated Transit Union Local 85 v. Port Auth. Of Allegheny Cty.,* 39 F.4th 95, 102-03 (3d Cir. 2022) .................................................................................................................................................15

*American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1427 n. 8 (3d Cir.1994) ...................................................................................................................................................47

*Aryeh Realty Corp. v. 18 E. 69th St. Tenant, LLC,* No. 570353, 2024 WL 4587047, at *1 (N.Y. App. Div. Oct. 25, 2024) ...........................................................................................................................36

*Automated Irr'n Controls, LLC v. Watt Stopper, Inc.,* 407 F. Supp. 3d 274, 284 (S.D.N.Y. 2019)..35

*Beilowitz v. Gen. Motors Corp.,* 233 F. Supp. 2d 631, 645 (D.N.J. 2002) .......................................45

*Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP,* 528 F.3d 176, 180 (3d Cir. 2008).....45

*Bloc Dispensary LLC v. Bossidy,* 25-CV-1725 (D.N.J.)....................................................................7

*CoraMed USA, LLC v. Alexion Pharma., Inc.,* 695 F. Supp. 3d 251, 265-67 (E.D.N.Y. 2023) .......37

*DiStefano v. Maclay,* 102 F App'x 188, 189 (2d Cir. 2004) ............................................................33

*E. Baby Stores, Inc. v. Cent. Mut. Ins. Co.,* No. 07 CIV. 3890 (LAP), 2008 WL 2276527, at *2 (S.D.N.Y. June 2, 2008), aff'd, 337 F. App'x 10 (2d Cir. 2009) ....................................................28

*Fifty States Mgt. Corp. v. Pioneer Auto Parks,* 46 N.Y.2d 573, 576-77 (1979) ..............................43

*Frank Brunckhorst Co., LLC v. JPKJ Realty, LLC,* 12 N.Y.S.3d 241, 243 [2d Dept. 2015]...........37

*Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 208 (3d Cir. 1990) .......................................46

*Hylan Ross, LLC v. 2582 Hylan Blvd. Fitness Grp., LLC,* 206 A.D.3d 893, 896 (N.Y. App. Div. 2022) ...............................................................................................................................................36

*Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 802 (3d Cir. 1989) .......................44

*Kos Pharms., Inc. v. Andrx Corp.,* 369 F.3d 700, 731 (3d Cir. 2004) .............................................47

*Laborers Health & Welfare Tr. Fund For N. Cal. v. Advanced Lightweight Concrete Co.,* 484 U.S. 539, 544 n. 6 (1988).......................................................................................................................47

*Lipkis v. Gilmour,* 606 N.Y.S.2d 503, 504 (N.Y. App. Term 1st Dep't 1993)................................39

*LVL Co., LLC v. Atiyeh,* 469 F. Supp. 3d 390, 425 (E.D. Pa. 2020) ...............................................48

*MaxEn Capital Advisors, Ltd. v. Pure Lithium Corp.,* No. 1:24-CV-2231-GHW, 2024 WL 4520062, at *10 (S.D.N.Y. Oct. 17, 2024)....................................................................................................32

iv

*Milligan v. GEICO Gen. Ins. Co.*, No. 22-2950, 2025 WL 799276, at *4 (2d Cir. Mar. 13, 2025)..42

*Montague v. Poly Prep Country Day Sch.*, No. 21-CV-04054 (MKB) (LKE), 2025 WL 1075063, at *5 (E.D.N.Y. Apr. 10, 2025)........................................................................................................38

*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 805 (3d Cir. 1998)......................45

*Prof'l Fighters League, LLC v. Takeover Indus., Inc.*, No. 24 CIV. 1335 (GS), 2025 WL 833873, at *4 (S.D.N.Y. Mar. 17, 2025) ..........................................................................................................19

*Reilly v. City of Harrisburg,* 858 F.3d 173, 179 (3d Cir. 2017) ........................................................15

*Rossrock Fund II LP v. Arroyo*, 943 N.Y.S.2d 794, 2012 WL 127444, at *3 (N.Y. Sup. Ct. 2012).39

*Salto v. Alberto's Constr., LLC*, No. 17 CIV. 3583, 2020 WL 4383674, at *6 (S.D.N.Y. July 31, 2020) .........................................................................................................................................36

*Su v. RiversEdge Advanced Ret. Sols.,* LLC, No. 2:24-CV-00104 (MJH), 2024 WL 1193858, at *10 (W.D.Pa. Feb. 20, 2024)....................................................................................................48

*Ultrashmere House, Ltd. v. 38 Town Assocs.*, 473 N.Y.S.2d 120, 122 (N.Y. Sup. Ct. 1984)...........39

*Wells Fargo Bank, N.A. v. PF Allied Gardens LLC,* No. 4:22-CV-180, 2024 WL 664890, *3 (E.D. Ark. Feb. 16, 2024).....................................................................................................................43

## STATUTES

35 Penn. Stat. 10231.102……………………………………………………………………………47

N.J. Rev. Stat. 24:6I-2 (2024)………………………………………………………………………...47

N.Y. U.C.C. Law § 9-609………………………………………………………………………………16

N.Y. U.C.C. Law § 9-610………………………………………………………………………………16

N.Y. U.C.C. Law § 9-625………………………………………………………………………………16

## REGULATIONS

28 Pa. Code § 1141a.38(c)(1) ..........................................................................................................37

## OTHER AUTHORITIES

Simpson Thatcher Leveraged Finance 101: A Covenant Handbook at 4…………………………..25

# INTRODUCTION

Plaintiffs are a group of borrowers who contracted with a lender called AFC to fund the development of cannabis factories and retail businesses in New Jersey and Pennsylvania. The loan is performing, and not in default. Every month for more than a year, Plaintiffs have made their monthly payment of $250,000 – always on time, and always in at least the required amount.

AFC recently ran into a desperate financial crisis. As a publicly traded company, its stock price is cratering, dropping by half in the past six months. By all outward appearances, it had apparent trouble making its shareholder dividends on April 15, and is in some danger of insolvency.

For no reason other than its own critical shortage of cash, last week AFC unilaterally (and falsely) declared that Plaintiffs were purportedly in default, and raided their bank accounts. Without asking any court to adjudicate whether Plaintiffs really were in default (they are not) and/or whether Plaintiffs actually owe AFC anything (they do not), AFC unilaterally drained more than $1.75 million from Plaintiffs' accounts without permission, taking most of their operating funds and all of their tax reserves. Not only were Plaintiffs left with insufficient funds to run their business, but AFC informed Plaintiffs that it will keep raiding the accounts every time the balances rise, and plans to attempt to liquidate and sell some of Plaintiffs' assets to raise cash.

AFC's actions are as outrageous as they are lawless. But for the fortuity that a large receivable had recently arrived, AFC's unauthorized looting would have left the company unable to fully cover its payroll and check run. Under a prior loan renegotiation by which the borrowers purchased forbearance and put a DACA in place, AFC is already entitled to scheduled cash sweeps for most of the profits, leaving an agreed minimum floor so Plaintiffs can remain operational. AFC's recent unauthorized looting depletes Plaintiffs' operating capital below the critical floor.

If AFC is permitted to keep stealing from Plaintiffs' accounts, which it says it plans to do, Plaintiffs will be unable to make payroll and quickly shut down, causing irreparable harm to their

businesses and the employees whose jobs depend on them. Plaintiffs will be unable to comply with regulations for licensed cannabis businesses and will risk their current licenses. Money damages will be insufficient for many reasons discussed below, not the least of which is that AFC will have long since become insolvent and thus unable to compensate for the damage its actions are causing.

Plaintiffs have an extremely high likelihood of success on the merits. As demonstrated herein, Plaintiffs are not in default of this loan. Plaintiffs owe AFC nothing other than their $250,000 monthly payments, which they are dutifully making. In stealing Plaintiffs' money to cover for its own financial problems, AFC purported to rely on its notice of default, which contains nothing but fabricated and ridiculously pretextual allegations. The reality that AFC apparently does not have any more time to wait for the expiration of this loan (13 months from now) does not give it the right to self-help itself to relief that no court would ever grant.

By this motion for a TRO, Plaintiffs simply ask this Court to freeze the status quo. Plaintiffs seek nothing but a temporary order barring AFC from destroying their business by helping themselves to Plaintiffs' operating capital unless and until it can persuade this Court –or any court – that Plaintiffs really are in default, which Plaintiffs are not. Following temporary injunctive relief, a preliminary injunction hearing could happen as quickly as the Court deems appropriate.

## FACTUAL BACKGROUND

Plaintiffs, Bloc Dispensary LLC ("Bloc") and Hayden Gateway LLC ("Hayden"), are part of a group of cannabis companies founded by two civil rights attorneys, doing business as Justice Cannabis Co. ("Justice"). When some States began to legalize cannabis for medical purposes about a decade ago, Justice applied for and won integrated licenses allowing them to operate three retail dispensaries and a cultivation in each of New Jersey and Pennsylvania. Kanovitz Decl. ¶ 3.[1]

---

[1] As Local Civil Rule 65.1 contemplates the filing of affidavits and/or declarations rather than Verified Complaint, Plaintiffs have attached Declarations in support of this Memorandum.

Plaintiffs needed funding for construction. Because the production and sale of cannabis remained illegal under federal law, obtaining construction financing was a challenge. *Id.*

Defendant, Advanced Flower Capital Inc. and its agent AFC Agent LLC (together with affiliates, "AFC") is a publicly traded REIT that lends to cannabis companies. Exploiting the lack of conventional financing options available to cannabis companies, AFC saw an opportunity to lend at extremely high interest rates, approaching or exceeding 20% per annum, factoring in fees/costs.

In 2021, AFC lent money to Plaintiffs and other Justice affiliates in Pennsylvania and New Jersey (collectively, the "Borrowers") to build and operate cannabis facilities. Feldman Decl. ¶ 2.

### The Loan History

The 2021 loan from AFC to the Borrowers contemplated that AFC would lend Borrowers up to $75 million. Over the course of the past four years, AFC claims to have extended approximately $50-65 million (although the actual number is curiously elusive). AFC charged close to $15 million in PIK/capitalized interest and $10 million in asserted loan fees. Papatheofanis Decl. ¶ 2.

The parties' plans did not proceed as expected. The cannabis industry has been challenging for reasons such as lack of banking and federal regulatory inaction on issues like taxation. Also, the pandemic struck just as construction was getting underway, causing delays and increased costs due to COVID-related supply chain disruptions. Regulatory approvals in New Jersey also took quite a bit longer than expected. The general contractor for Pennsylvania performed very poorly, ultimately being terminated for cause with the facility left partially constructed. Feldman Decl. ¶ 3.

Almost as soon as the loan was closed, the Borrowers struggled to comply with the financial covenants governing financial metrics. Within months, Borrowers fell into default. *Id.* ¶ 4.

There is no dispute that AFC could have foreclosed on the loan at the time. It chose not to do so. Instead, the parties began renegotiating the loan obligations. The parties soon entered into an Amendment, pursuant to which Borrower paid AFC millions of dollars for the right to avoid

foreclosure under renegotiated terms that the Borrower could satisfy. *Id.* ¶ 5-6.

The pattern repeated itself. The pandemic dragged on, and the project remained stalled, and the Borrower fell back into default. With each new amendment, AFC could have foreclosed, but the parties instead kept renegotiating the loan obligations, with the Borrower making significant financial payments to AFC in order to purchase the right to forbearance. *Id.*

All told, the parties amended and reconfigured the terms of the loan nine times. Each time, Justice dug deeper into its pockets to purchase forbearance, put the loan back into compliance, and negotiate terms the project could manage. *Id.* ¶ 7.

In total, Plaintiffs' owners handed **$15.6 million** in cash to AFC, not even counting over **$3.0 million** in "amendment fees," for the modifications and forbearances, including: **$2,500,000** in capital (Amendment No. 1); **$5,000,000** in capital and **$3,195,295** in fees (No. 2); **$1,900,000** in capital and **$500,000** in fees (No. 3); **$100,000** in fees (No. 4); **$3,000,000** in capital, plus the real property that was sold for a combined **$2,200,000** million and an Ohio license that was sold for **$1,000,000** for a total additional capital contribution of **$6,200,000** (2023 Forbearance). *Id.* ¶ 7.

The Borrowers acceded to AFC's demands for all this money because they wanted to avoid foreclosure and needed new covenants and payment obligations that the cannabis operations could satisfy, so that they could finally begin to operate their companies profitably. *Id.*

**The March 2024 Forbearance Agreement**

In March 2024, the Borrowers and AFC renegotiated the parties' obligations a final time. The mutual intention was to right-size the interest payments to a level the Borrowers could satisfy, to ensure once and for all that the loan could stay out of default. *Id.* ¶ 8.

The resulting agreement, referred to herein as the 2024 Forbearance, established, *inter alia,* a cash-sweep mechanism for Borrower's monthly payments, with a minimum of $250,000/month to AFC. Ex. A, §5.8. Pursuant to that agreement, AFC controlled Plaintiffs' operating bank accounts

and approved every dollar that Plaintiffs spent; every payroll, every bill paid, every expenditure had to be approved by AFC, enforced by putting in place a DACA. Papatheofanis Decl.  ¶ 3.

### The March 2024 Forbearance Succeeded

Unlike the loan's history prior to the 2024 Forbearance (when Plaintiffs were frequently late or unable to pay, resulting in defaults and forbearance agreements), Plaintiffs have never missed a payment, nor even been late. Frequently, Plaintiffs have exceeded the minimum required. *Id.* ¶ 8.

### The Valuable Collateral

The reason Justice dug so deep to pay AFC more than $18 million over the course of three years to purchase forbearance and secure a monthly payment they could meet was because Plaintiffs' cannabis operations have always had the potential of becoming extremely valuable. Once fully constructed and operating optimally, each of the NJ/PA cultivation facilities should generate revenues of more than $5 million/month, at a high profit margin. Together with the dispensaries, the company should be earning upwards of $13 million/month. At present cannabis multiples, that performance would make the company worth hundreds of millions of dollars. Kanovitz Decl. ¶ 5.

All of those projections, however, depend on the company operating with maximum efficiency and effectiveness.

### AFC's Operational Take-Over

The 2024 Forbearance required Justice to hire a new outside consultant as its Chief Restructuring Officer (CRO) to manage the New Jersey operations. AFC negotiated for itself the sole and exclusive right to approve the CRO, and expressly prohibited Plaintiffs from interfering with the CRO's control of the New Jersey assets. Ex. A, 2024 Forbearance, §5.7.

As part of the 2024 negotiation, AFC insisted that Bloc hire Tim Bossidy, a CRO whom AFC's CEO had worked with before. Plaintiffs asked AFC to consider their candidates, or at least conduct a search, but AFC refused any process other than hiring Bossidy. Fields Decl. ¶ 4.

5

From the beginning, Bossidy took his direction from AFC, which managed and controlled his actions, and directed him on a nearly daily basis. By contrast, Bossidy never spoke to either of Plaintiffs' two main owners a single time during the entire year he was in charge. *Id.* ¶ 5. Bossidy also repeatedly rebuffed any input or assistance from Plaintiffs' CEO, Alexzandra Fields, whom he effectively shut out. *Id.* ¶¶ 19-20. In fact, AFC's Forbearance Agreement expressly prohibited Bloc and Justice from having a reporting relationship with Bossidy, providing that Bloc "shall not interfere with or otherwise challenge the operational control of" Bossidy. Ex. A, §5.7(c). The agreement literally prohibited Plaintiffs from running their own company. *Id.*

Written communications establish that AFC was in fact running the company through its agent, Bossidy. Emails confirm that Bossidy had to get AFC's sign-off on even the most granular decisions, such as employee raises and contractor payments. Kanovitz Decl. ¶ 23.

### Bossidy's Relationship With AFC

Despite owing a fiduciary duty to Justice and no one else, Bossidy began actively promoting AFC's interests to the detriment of Bloc, his putative employer. To take a stunning example, Plaintiffs recently discovered that just two months after AFC installed Bossidy, he forwarded to AFC a privileged email from Justice's in-house counsel. Included with the forwarded, privileged email is a message from Bossidy to AFC stating that the email will help AFC hold Bloc in default, thereby opening a path for AFC to take its assets and/or charge more millions of dollars for further forbearance. Bossidy's message to AFC states in relevant part (Ex. B (emphasis added):

> I'll manage this - so nothing for you to do - ***I just wanted to flag for you another forbearance breach to add to your list.***

In other words, AFC forced Justice to hire Bossidy as its CRO (a C-suite level employee) to run New Jersey so that Bossidy could use his inside position, including access to attorney-client communications, to assist AFC in manufacturing a case against Justice to revoke the very forbearance agreement for which Justice had paid so many millions of dollars. Bossidy did so while

serving as Bloc's highly-paid fiduciary, earning $700/hour. Kanovitz Decl. ¶ 26.

When Plaintiffs belatedly figured out this betrayal, they directed Bossidy to provide them with all his communications with AFC. As Plaintiff's officer and fiduciary, Bossidy was obligated to comply. He was working for Bloc as a senior executive at the time he sent the emails, and owed Bloc his loyalties. But given his allegiance to AFC, Bossidy kept stalling and making excuses. That prompted Plaintiff Bloc to file the original lawsuit pending before this Court, *Bloc Dispensary LLC v. Bossidy,* 25-CV-1725 (D.N.J.), to which this action was reassigned as related. *Id.* ¶ 22.

**Through Bossidy, AFC Runs
The Facility Into The Ground**

At the time AFC installed Bossidy to run the New Jersey operations, construction of the New Jersey manufacturing facility was largely completed. The facility was finally tuned up and ready to reach its potential, around $4.5 to $5 million per month in revenue. Fields Decl. ¶ 13.

Despite AFC's ample experience in financial wizardry, it was woefully poor at running a cannabis company. Its decision to install Bossidy as CRO, oversee him, and then insist that he remain in charge has been a disaster for Plaintiffs' business. Beginning almost immediately after he started in April 2024, Bossidy began to run the business into the ground. *Id.* ¶ 6.

Plaintiffs quickly began to express concerns about Bossidy's incompetence, complaining to AFC about the havoc Bossidy was inflicting. After several months of disastrous performance, Plaintiffs' CEO implored AFC to fire Bossidy and approve a different CRO. AFC repeatedly refused, requiring that Bossidy remain in place, and that Justice do nothing to interfere with his decisions, even as the damages from his mismanagement continued to pile up. *Id.* ¶¶ 19, 21-23.[2]

---

[2] Bossidy also interfered with the ability of Bloc's dispensary staff to perform their jobs, and cut popular product lines. He limited the outside suppliers dispensaries were allowed to buy from, costing Bloc customers and sales volume to competitors. He also alienated vendors, employees, and others, for example, insisting on delaying vendor payments in order to increase payments to AFC. *Id.* ¶ 12.

After almost one year with AFC's agent in charge, Bloc's financial performance plummeted. During his entire tenure, Bossidy was unable to pay down a single dollar of the loan principal, which continues to grow as interest gets added on. Papatheofanis Decl. ¶ 9.

Justice raised its concerns with AFC on numerous occasions. In October 2024, Justice's CEO raised serious concerns about Bossidy's decisions and sent an email asking AFC to reconsider leaving him in charge. Fields Decl. ¶ 22. Neville ignored Justice's CEO. She continued to try to make changes, but Neville ignored her for another month, at which point he finally made clear that nothing was going to change. Ex. C (Neville email, stating: "[Bossidy will] remain in place…").

AFC's refusal to replace such a terrible manager might seem counter-intuitive: a lender acting in good faith should want Bloc to succeed. AFC, however, was reasonably indifferent, confident it could eventually take Plaintiffs' assets under a "loan-to-own" scenario if it could wait long enough. Serving as a CRO at two other cannabis companies (Greenrose and MedMen), Bossidy had previously delivered other borrowers' assets to Neville and another company that employed Neville as the CFIO. Kanovitz Decl. ¶ 31.

### Bossidy Is Finally Removed

As part of an investigation, Plaintiffs analyzed video of Bossidy's visits to Bloc's facilities. The results confirmed that Bossidy is a fraud. The CRO was merely pretending to work, while billing $800,000 in total fees. During his somewhat-rare visits to the facility, he would park himself in a conference room for hours and surf the internet for scantily-clad women and clickbait. *Id.* ¶ 27.

Justice sent a link to the video to AFC and demanded Bossidy's immediate firing. About three weeks ago, in mid-March, AFC finally agreed to fire him. *Id.* ¶ 28.

### Bloc's Post-Bossidy Turnaround

With control returned to Plaintiffs, Justice's CEO almost immediately turned things around. As of last week, just 12 business days into the first full month without Bossidy, Bloc's wholesale

sales from New Jersey cultivation had already *exceeded sales under Bossidy for the entire months of January and February combined.* The trajectory is moving toward the facility's $5mm per month potential, and is on track to reach it within about a year. Fields Decl. ¶¶ 28-30.[3]

AFC, however, is no longer motivated to have the facility succeed (at least for the post-Bossidy short-term). Quite the opposite. Having seized control and run it into the ground, AFC faces massive lender liability exposure for lost profits, a fact that has not gone unsaid as the loan parties posture with one another. AFC is not unsophisticated. It sees the liability it has created by installing Bossidy and running the business so poorly. It now needs Plaintiffs to struggle for at least some period of time; a quick turn-around for Plaintiffs after Bossidy is very bad for AFC.

AFC is also incentivized to push Plaintiffs into default so it can seize the assets for itself. Having lost control of the operation, and having previously agreed to a monthly minimum payment that it now obviously finds too low to cover its dividends (after Bossidy put up such disastrous profit-sweep numbers, discussed below), AFC has recently found itself in a jam. To try to save itself, it has decided now is the time to launch an unjustified attack.

### AFC's Fundamental Financial Instability

AFC's Chairman, Len Tannenbaum, made his fortune in finance by starting Fifth Street Asset Management, described in *Forbes* as "his fee-reaping management company" attached to an "obscure financing vehicle" akin to a REIT. The company made high-yield loans, generating huge fees "while Tannenbaum assured investors that his portfolio was sound." Kanovitz Decl. ¶ 12.

According to sources quoted in Forbes, Tannenbaum's company was the "poster child" for a poor-performing management company that "has been mismanaged for the benefit of the external manager," *i.e.,* Tannenbaum-controlled entities. He took Fifth Street public, but it collapsed under

---

[3]  Unlike New Jersey under AFC and Bossidy's control, Justice's businesses in the other states where they operate are all profitable. *Id.* ¶ 32.

the weight of underperforming loans, leaving Tannenbaum rich but his investors holding the bag, one of whom was his former father-in-law, who originally staked him, but later sued him. *Id.*

Following the same playbook that previously enriched him, Tannenbaum and his affiliated entities have extracted tens of millions of dollars from AFC in management fees and other payments. Recently, however, things have turned sharply against them. Many of the (predatory) cannabis loans in AFC's portfolio have performed poorly, and AFC has not generated the cash it modeled when making its extremely high-interest loans. *Id.* ¶ 14.

As described more fully in the Complaint ¶¶ 159-67, AFC is actually an elaborate Ponzi scheme. The Board and AFC Manager were able to paper over the problem for a time by paying themselves and the dividends from shareholder equity. Essentially, they have been deferring borrower interest payments into the future to avoid writing down loans but booking the future interest as earnings in the present. Because no actual cash comes in the door from future payments, AFC has used equity to pay their fees and dividends. The scheme must eventually collapse unless the cannabis industry turns around. But that has not happened. *Id.* ¶ 8.

### AFC Begins Threatening Plaintiffs

On February 19, 2025, one day after Plaintiffs complained about Bossidy's mismanagement again and proposed a plan to replace him, AFC sent Plaintiffs a Default Notice, claiming falsely that they were in default of the 2024 Forbearance. AFC's letter and notice listed a number of vague purported non-monetary defaults, none of which were true or accurate. Ex. D. An accompanying letter demanded a response within seven days, and threatened immediate litigation against the owners personally *if they did not agree to fork over $30 million to AFC.* Ex. E.

$30 million? Why would Plaintiffs' owners have to pay AFC $30 million? The loan was not in default, and Justice's owners had done nothing that could have even remotely triggered their personal liability for any amount of money, much less $30 million. Justice's owners rejected AFC's

10

demand that they pay $30 million from their own pocket to save AFC from bankruptcy.

**Plaintiffs Continued To Make Timely Loan Payments**

Between February and April of 2025, the parties continued their ordinary financial cadence. The minimum interest payment was paid, and as agreed in the 2024 Forbearance, AFC conducted regular cash sweeps of all Pennsylvania and New Jersey bank accounts. Papatheofanis Decl. ¶ 3.

These scheduled cash sweeps, which took place shortly after Plaintiffs' biweekly payroll, are described more fully in Plaintiffs' Complaint. *See* R.1, ¶¶ 173-74. In summary, AFC swept up 75% of any cash left over after expenses, and Plaintiffs had to use their 25% share to satisfy unpaid taxes, all subject to the condition that the account balance could not dip below a $300,000 minimum necessary to ensure against business disruption. *Id.* ¶ 5.

As described previously, AFC's rights to sweep up most of any cash surplus and approve every dollar spent did not come cheap. Under the renegotiated Forbearance agreements, Plaintiffs gave up these rights, plus paid AFC more than $18,000,000 in cash, in consideration for excusing prior defaults, reducing the rate to a more manageable 12.5%, and setting the monthly minimum interest payment at $250,000, an amount they could satisfy while they got the business on track.

Plaintiffs are and have been at all times in compliance with the terms of the loan as modified by the 2024 Forbearance. Every month, AFC gets its $250k interest payment on time. *Id.* ¶ 8. AFC may have come to regret its decision to accept millions to renegotiate the loan to terms Plaintiffs could afford, and it may be disappointed by Bossidy's inability to generate the profits AFC's anticipated for its scheduled cash sweeps. But buyer's remorse and its own unforeseen financial pressures are not grounds to terminate. The loan is performing, and will continue to do so until the loan terms expire in May 2026 -- at which time, but not before, the balance will come due.

**AFC Confronts a Recent and Desperate Need For Cash**

Warren Buffet famously said that when the tide goes out, you discover who's swimming

naked. AFC has no bathing suit. The market no longer believes the bloated values at which AFC is carrying the loans. Over the past month, its stock price has lost about half of its value, recently hitting an all-time low, roughly $4.35/share, down from a prior peak of $16/share. Its total market capitalization has collapsed to the point where the entire company is worth less than the purported face value of Plaintiffs' loan, which is only one of many in AFC's portfolio. Murray Decl. ¶ 6.

As a result, AFC is now experiencing extreme financial distress, and appears to have begun to fail. It had to cut its most recent dividend, which it has been paying with its shareholders' own money. Kanovitz Decl. ¶ 11. With the cratering of its share price, it cannot raise more equity at a reasonable price. At some point soon, if not already, AFC will surely be in breach of its financial covenants with its own lenders. If AFC loses its sources of funding, it faces insolvency.

On Thursday, April 17, 2025, after the market closed for a long holiday weekend, AFC filed a "Shelf Filing" on Form S-3 with the SEC. This maneuver enables issuers to access markets very quickly. Because such a filing is often associated with discounts and shareholder dilution, this is a very troubling sign, particularly for a small company. Murray Decl. ¶¶ 2-5.

### AFC's April 2025 Attempted Extortion

With its dividend due on April 15, and having used up its shareholders' money, AFC was in a tough spot. On April 10, it made a demand on the Borrowers to pay AFC *$10 million in cash* to reduce the loan balance, plus contribute new collateral worth tens of millions. Kanovitz Decl. ¶ 18.

This demand bears absolutely no relationship to reality. Plaintiffs owe AFC nothing more than what has already been agreed to in the 2024 Forbearance.

AFC nonetheless communicated that unless Plaintiffs agreed before the end of the April 10 meeting, AFC was going to try to seize the company's assets. To maximize leverage for its $30mm+ shakedown, AFC also threatened (baselessly) to sue the owners personally for purported "RICO violations" and "fraud" to sully their reputations. *Id.*

The threat was nothing but extortion. The loan balance is high, but Plaintiff are not in default, and have committed no fraud. They have not violated RICO. Having negotiated for the Forbearance agreements, and contributed more than $18.5 million of their own money in additional equity/fees, Plaintiffs have bargained for a monthly payment that they can and have been satisfying. Plaintiffs owe AFC nothing more and were unwilling to be extorted for tens of millions of dollars.

AFC gave Plaintiffs a deadline of April 10. Tannenbaum texted several times on April 9 (six days before his April 15 dividend was due) asking Plaintiffs for a response. Because they owe AFC nothing, Plaintiffs refused to be bullied any further. *Id.* ¶ 20.

### AFC Illegal Seizures of Plaintiffs' Cash

On April 9, just after close of business, AFC sent Plaintiffs a letter alleging additional pretextual defaults; claiming to terminate the 2024 Forbearance; and providing notice that AFC was terminating the loan and demanding full repayment (the "April Termination"). *See* Ex. F. AFC demanded an amount it calculated now *somehow exceeded $120 million* – based on only $50-60mm of disbursements, and after already receiving over $25 million. Papatheofanis Dec. ¶ 2.

The next morning, April 10, less than 24 hours later, and without notice to or permission from Hayden, AFC stole $1,500,000 from Plaintiff Hayden's bank account and transferred it to AFC's bank account. This money had been set aside for payment of taxes. At the same time, AFC also took $288,501.63 from Bloc's accounts, again without notice to or permission. *Id.* ¶¶ 10-11.

The amounts seized exceeded by well more than a million dollars what AFC was entitled to transfer under the sweep formula. Because AFC already controls the accounts, there was no exigent need to move the money, *e.g.,* to prevent dissipation. *Id.* ¶ 7. The unauthorized withdrawals, which constitute theft, put the balance of Bloc's operating account below the $300,000 minimum balance to run the company as required by the 2024 Forbearance. Bloc was left perilously illiquid, extremely vulnerable to any unanticipated expenses. *Id.* ¶ 14.

13

AFC stole this money knowing full well that Bloc's payroll and check run to its vendors was due to go out the following day, thereby threatening to upend not only the viability of the business, but also the lives of the 207 employees in Pennsylvania and New Jersey who depend on their paychecks. Had a substantial vendor payment not hit Plaintiffs' account the same day, AFC's looting would have left Plaintiffs unable to fully satisfy payroll and the check run. *Id.* ¶ 16.

As operating businesses, Plaintiffs incur ongoing bills and expenses of $300,000 to $500,000 per week, plus payroll, all paid from the very bank accounts Defendants raided. As described more fully below in Section III, if Defendants continue to take money out of those accounts without authorization or justification, Plaintiffs will very soon be unable to pay their bills as they come due, their business will collapse, and their employees will lose their jobs. That failure will have significant downstream effects on the many New Jersey and Pennsylvania companies and individuals with whom Plaintiffs do business. *Id.* ¶¶ 17-18.

AFC is apparently not finished. According to its emails, it intends to continue raiding the accounts without notice. In its desperation for cash, it is also threatening to seize and sell Plaintiffs' assets (which it holds as a pledge for the loan) without going through the courts. Krug Decl. ¶ 40.

**PRELIMINARY INJUNCTIVE RELIEF SOUGHT**

Plaintiffs seek temporary restraints freezing the status quo until the Court can further consider the parties' respective rights at a preliminary injunction evidentiary hearing, upon which Plaintiffs will seek a conversion of the temporary restraints into a preliminary injunction maintaining the status quo until a final judgment. Immediately, and while this case is pending, AFC should be prohibited from further raiding Plaintiffs' bank accounts, leaving insufficient funds to make payroll and run the business. Because of the DACA already in place by which AFC must approve every penny coming out of the account, the status quo also prevents Plaintiffs from withdrawing assets and protects AFC while the litigation continues and the Court sorts out who is right.

14

## LEGAL STANDARD FOR INJUNCTIVE RELIEF

The same standard for granting a preliminary injunction applies to a temporary restraining order. *Nutrasweet Co. v. Vit-Mar Enters.*, 112 F.3d 689, 693 (3d Cir. 1997). "To determine whether a preliminary injunction should issue, a court must consider '(1) whether the movant has a reasonable probability of success on the merits; (2) whether irreparable harm would result if the relief sought is not granted; (3) whether the relief would result in greater harm to the non-moving party; and (4) whether the relief is in the public interest.'" *Amalgamated Transit Union Local 85 v. Port Auth. Of Allegheny Cty.*, 39 F.4th 95, 102-03 (3d Cir. 2022) (citations omitted). The first two factors are the "most critical." *Reilly v. City of Harrisburg,* 858 F.3d 173, 179 (3d Cir. 2017).

According to the Third Circuit, likelihood of success requires a prospect more than "negligible" but less than "more likely than not." *Reilly,* 858 F.3d at 179; *see also 22nd Century Techs., Inc. v. iLabs, Inc.*, No. 22-1830, 2023 WL 3409063, at *3 (3d Cir. May 12, 2023) (To establish likelihood of success on the merits, "a plaintiff must show a reasonable chance, or probability, of winning") (cleaned up). "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly*, 858 F.3d at 179.

## ARGUMENT

Plaintiffs do not dispute that over the first few years of this loan, they were repeatedly in default. But by investing more than $18mm of their own money and contributing $20mm in additional collateral, Plaintiffs purchased forbearance. Under their 2024 Forbearance agreement, Plaintiffs only have to pay $250,000 per month, which they have been consistently doing, while finally positioning themselves to ramp up their business to its full and valuable potential.

Having accepted the financial benefits of the Forbearance agreement, AFC has apparently come to regret it. Rather than continue to honor the terms of the loan, AFC would prefer to drain

Plaintiffs' cash and liquidate their business – a year before the loan comes due next May.

AFC cannot do that. This is a country of laws. For AFC to be able to take those actions, Plaintiffs would have to be in default of the Forbearance agreement. Plaintiffs are not.

**I.    Plaintiffs Can Establish a High Likelihood of Success on the Merits Because They Are Not in Default**

New York law is clear: a secured party may only take possession of collateral "after default." N.Y. U.C.C. Law §§ 9-609, 9-610. New York law is equally clear that if "a secured party is not proceeding in accordance with [article 9], a court may order or restrain collection, enforcement, or disposition of collateral on appropriate terms and conditions." *Id.* § 9-625.[4]

Absent a valid basis to raid Plaintiffs' bank account, AFC's actions constitute nothing short of theft. It took the money, and threatens to do so again, without judicial process, supposedly on the ground that Plaintiffs are allegedly in default of the 2024 Forbearance. This is pretextual and false. As a matter of fact and of law, the pretextual so-called non-monetary "defaults" identified by AFC are either flat-out wrong or immaterial, or both, and plainly do not give rise to any right to foreclose.

**A.    Plaintiffs Are Not In Default**

The defaults alleged by AFC are set forth in two documents AFC sent to Plaintiffs: the February Default Notice and the April Termination. Exs. D, F. The alleged defaults fall into seven categories: (1) inventory records; (2) financial reporting; (3) the CRO; (4) New Jersey construction; (5) alleged "restricted payments"; (6) the PA cultivation; and (7) a perfection certificate. *Id.*

As discussed below, none of those events constitutes a default under the parties' agreements. And even if they did, which they do not, they are not of a character sufficient under New York law to permit foreclosure. *See* Section I.B*, infra.* Independently, AFC loses on the plain terms of the agreements because none are "continuing." *See* Section II.C*, infra.*

---

[4] The parties agreed that the loan would be governed by New York law. Ex. H § 13(a).

### 1.    The Inventory Records

In the February Default Notice, AFC claimed an event of default "for the failure to notify [AFC] that the inventory records and other records provided to Agent were materially inaccurate." Ex. D at 3. Like all their claimed defaults, this was unduly vague. AFC has never explained the basis for this alleged default, making it a bit tricky to rebut. Plaintiffs' best guess is that it can only refer to a minor discrepancy discovered at the New Jersey cultivation facility last summer. In no world, however, can those events be fairly construed as a genuine event of default.

As is required by law, the Bloc cultivation meticulously tracks every plant using bar codes and RFID tags on an internal, proprietary tracking system. Bloc also maintains the state-mandated tracking system called Metrc, by which the state monitors cannabis sales. Metrc is visible at all times to the regulating body (New Jersey's Cannabis Regulatory Commission, or "CRC"). Bloc's employees input the tracking data into both systems. Krug Decl. ¶¶ 37.

In August 2024, Bossidy discovered that some of the information accurately maintained in Bloc's proprietary tracking system was not uploaded to Metrc. The information related to unsellable biomass. Bossidy discovered that Bloc employees had *correctly* entered the weight of the trim into Bloc's own tracking system, but had not entered it into Metrc. The trim had been placed in storage totes. *Id.* ¶¶ 38-39. After an (unexplained) four months delay, Bossidy informed Justice's Chief Compliance Officer about his discovery. The two worked with Bloc's post-harvest technicians, security personnel, and compliance specialist to conduct a fulsome audit of all trim that had not been recorded in Metrc. They verified that none of the unrecorded trim had been sold, destroyed, or diverted, and that all of it had been accurately tracked in Bloc's tracking system. They self-reported the discrepancy to the CRC; entered the trim weights into Metrc; produced and implemented a Corrective Action Plan; revised Bloc's relevant SOPs to clarify the requirement to enter the trim weights in Metrc; and retrained post-harvest staff to comply with those requirements. *Id.* ¶¶ 40-41.

All Metrc records, and internal inventory records were corrected, and all are presently up to date. Upon review of Bloc's self-report and corrective action plan, the CRC determined not to take any action or require any further action. *Id.* ¶¶ 42-43. Moreover, Bossidy provided the self-report and corrective action plan to AFC via email contemporaneously, so AFC was in fact "notified," as required by the applicable contract provision. *Id.* ¶ 44.

This was not an event of default. Plaintiffs did not "fail[] to notify [AFC] that the inventory records and other records provided to [AFC] were materially inaccurate." For starters, Plaintiffs are not required to, and do not, contemporaneously report inventory records to AFC at all. The Credit Agreement sets forth a lengthy and specific list of records that Borrowers are required to provide to AFC; that list does not include inventory records. Bloc did not provide inaccurate inventory records to AFC, because it never provided any inventory records to AFC. Fields Decl. ¶ 33. And to the extent that any inventory records were for some reason reported to AFC, that would have been from Bloc's internal inventory tracking system -- which was in fact at all times accurate. Krug Decl. ¶ 40.

Even assuming counter-factually that Bloc had provided the Metrc records to AFC, those records were never "materially inaccurate." The Metrc system exists so that the CRC can track the sale, disposition, and/or destruction. The unrecorded trim was discovered and entered into Metrc prior to any sale, disposition, or destruction. *Id.* ¶ 43. Finally, once Plaintiffs became aware of the discrepancy, they did, in fact "notify [AFC] that the inventory records" contained a discrepancy. There was no event of default. Like the other purported bases, it is pure pretext.

### 2. Financial Reporting

AFC's April Termination notice alleged that Justice had defaulted by failing to produce required financial reporting. Specifically, AFC alleged that Justice failed "to deliver annual audited financial statements for the fiscal year ending December 31, 2024" and "to deliver copies of Borrowers' Projections for the fiscal year ending December 31, 2025." Ex. F at 2.

AFC is wrong on both points. First, Justice was not required to produce audited financial statements. Section 5.1 the original Credit Agreement required audited financials within 75 days of the end of the fiscal year (which, for 2025, was March 17, 2025). But the 2024 Forbearance replaced the Borrowers' 5.1 financial reporting requirements with section 5.11, titled "Access to Information and Reporting." That section lists four categories of financial information that Borrowers must provide, including payroll information and vendor expenses. None of them reference audited financial statements. Ex. A § 5.11.

The fifth catch-all category refers to an obligation to produce "any other information reasonably requested by Agent relating to the financial condition or operations … within three (3) Business Days of request thereof." *Id.* Whatever is meant by "categories of financial information" to be available upon three days request, it cannot mean audited financial statements. For a company of Justice's size, this is not something that can be produced in three days. An auditing firm must be engaged, and the process takes a minimum of three months, and typically costs $100,000 or more. Papatheofanis Decl. ¶ 35. A full, audited financial statement within three days thus cannot be a "reasonable request." *See, e.g., Prof'l Fighters League, LLC v. Takeover Indus., Inc*., No. 24 CIV. 1335 (GS), 2025 WL 833873, at *4 (S.D.N.Y. Mar. 17, 2025) ("The Court . . . need not follow the literal meaning of the language used if doing so would … produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectation of the parties.").

For exactly that reason (*i.e.,* that audited financials are expensive and slow to produce) the parties had agreed every year since 2022 to waive audited financials. Papatheofanis Decl. ¶ 36. AFC never previously received them for Justice, or, likely, any other AFC borrowers.

Additionally, the parties' correspondence demonstrates that throughout the loan history, audited financials were never requested nor required—until that is, Defendants began creating pretexts to justify seizing Plaintiffs' assets. Early this year, Bossidy mentioned to Justice's President

19

(Alexzandra Fields) that AFC Gamma's CEO (Dan Neville) wanted some sort of financials. In an email on January 6 to Neville, Ms. Fields asked for a list of exactly what he wanted so she and the CFO "can work on them for you". Neville ignored the email. Ms. Fields followed up by another email on January 30, which Neville also ignored. Kanovitz Decl. ¶ 30.

Only after Plaintiffs sued Bossidy (to compel his AFC-related emails) did Neville email Plaintiffs, suddenly requesting, for the first time, audited financials by the next day, March 18. Plaintiffs, via one of its owners, responded by email that the request was inconsistent with the parties' contract, contrary to the parties' course of dealing and industry norms, unreasonable, and raised in bad faith. *See id.* Plaintiffs' email very clearly communicated the following:

- specified that the cost would be $120,000 to $150,000;

- offered to complete the audited financials on a reasonable timeline if Defendants authorized the release from the DACA of those projected costs;

- noted that unaudited financials were available on a much faster timeline; and

- noted that Defendants had always maintained direct access to Plaintiffs' raw financial data (i.e., those data on which accountants would rely when generating audited financials).

*Id.* AFC never responded. *Id.* Justice followed with an offer to undertake the process of getting audited financials "if that is how AFC wants to spend the money." For a second time, AFC ignored that offer. *Id.* This cannot be a valid reason for default.

AFC is equally wrong about Justice's alleged "failure" to produce 2025 financial projections. Again, that requirement was expressly waived, orally and in writing: Projections are not required under the 2024 Forbearance. Ex. A § 5.11. Even so, Justice actually did produce 2025 Projections to AFC. On January 30, 2025, in his capacity as CRO, Bossidy emailed to AFC's CEO a spreadsheet titled "JG NJ Budget FY25 v5 tm.xlsx" -- the very 2025 Projections AFC sought. Papatheofanis Decl. ¶ 37. What is more, because Justice was skeptical of the quality of Bossidy's work, it created revised 2025 Projections, and sent those to AFC too. *Id.* There was no default.

### 3.    The Chief Restructuring Officer (Bossidy)

AFC makes two pretextual allegations relating to Bloc's consulting contract retaining Tim Bossidy as the company's CRO, which Bloc was required to execute under the 2024 Forbearance.

First, in February 2025, prior to Bossidy's termination, AFC wrote to Plaintiffs alleging (once again with undue vagueness) a default over failure "to observe and perform certain covenants, terms, conditions and agreements" in Bossidy's consulting agreement. Ex. D at p. 3.[5]

Second, after Bossidy was fired, AFC's April Termination Notice claimed that Plaintiffs defaulted not for firing Bossidy (who was by all accounts incompetent), but because they supposedly failed to "promptly enter into a consulting or similar agreement on similar terms … with a consultant or operations manager acceptable to Agent in its sole discretion." Ex. F.

As for the pre-termination allegation, AFC has completely failed to explain how Plaintiffs allegedly failed to perform. Plaintiffs can only assume that AFC is referring to the many communications from Justice to AFC complaining about Bossidy's performance and asking that he be removed. However, there is no plausible interpretation by which making those requests could constitute a breach of the terms of Bossidy's consulting contract. Ex. G.

Moreover, it turned out that Plaintiffs were right. Even AFC cannot defend Bossidy's conduct. Plaintiffs' requests that AFC do something about Bossidy over his disastrous leadership thus could not be breaches of any consulting agreement.[6]

---

[5]  There is a recurring failure of AFC's notices to provide clear or sufficient details as to what the alleged defaults actually are. This is telling. If AFC had sound reasons for their actions, they presumably would have put their cards on the table instead of obfuscating.

[6]  In a recent letter, AFC tried to claim that Bossidy dramatically improved revenues ("500%") from 2023 to 2024, but that is extremely misleading. When Bossidy first arrived, the cultivation had recently come on-line and was ramping, so comparison to the prior baseline is a fake. The far more relevant numbers are that Bossidy demolished Bloc's revenues on a rolling year basis by 50% from the time he arrived and that he was unable to pay down a single dollar of principal during his year-long tenure. *See* Papatheofanis Decl. ¶ 9.

21

As to the allegation that Plaintiffs have not yet replaced Bossidy in the few weeks since he left, this is an equally ridiculous basis for default. The 2024 Forbearance imposes no deadline for hiring a replacement. It simply requires Plaintiffs to act "promptly." Ex. A ¶ 5.7(b). Plaintiffs are complying. They are and have been making all reasonable efforts to find a suitable replacement, having already proposed two separate candidates -- both of whom AFC summarily rejected. Fields Decl. ¶¶ 27, 31. Bossidy was terminated only about three weeks prior the AFC's Termination notice. The CRO role is critical, and another bad choice can be devastating. Under no compulsion to rush, Plaintiffs have been conducting a careful and thorough search for a qualified candidate. *Id.*

It is also worth noting that while AFC had a contractual right to reject the first two candidates, those decisions were unreasonable. The two proffered individuals (Justice's President and CFO) are not only deeply familiar with the operation, but have overseen a remarkable turn-around in the facility's productivity and performance while serving in interim roles during the replacement search in the weeks since Bossidy was ousted. *Id*. ¶ 28. As described above, the facility sold more products in the first half of April than it did under Bossidy in all of January and February combined. *Id*. ¶ 28.

In sum, nothing about Plaintiffs' actions regarding the CRO could possibly constitute an event of default, much less the sort that could justify stealing millions of dollars from Plaintiffs.

### 4. New Jersey Construction

AFC alleges that Bloc defaulted "for the failure to obtain the final certificate of occupancy ("COO") and close out documents related to the NJ Construction by no later than May 15, 2024." Ex. A § 5.3(a). It is true that Bloc did not obtain the COO by May 15, 2024, but that is hardly grounds for default. The failure is solely and entirely attributable to AFC's own agent, Bossidy.

The allegation relates to the manufacturing lab at Bloc's cultivation facility. Construction was completed long ago, with cultivation operating at or near full capacity since 2023 pursuant to a temporary certificate of occupancy ("TCO") issued by Ewing Township. Fields Decl. ¶ 13.

The COO has not yet issued because, until recently, construction was not complete in one corner of the building housing the lab, due to disputes with the general contractor. *Id.* ¶ 15. Both Bloc and AFC therefore made it clear to Bossidy that this should be his top priority. *Id.* ¶ 14.

To that end, Bossidy spent his year with the company trying to get it done. He met regularly, at least weekly, with AFC's employees about the status of the lab. AFC directed, supervised, and approved of all of Bossidy's actions with respect to the lab. Bloc was therefore dismayed when one of Bossidy's and AFC's first decisions about the lab was to delay payment of the lab's general contractor's invoices, in an apparent effort to achieve concessions from the contractor on an unrelated dispute. This had the very predictable result of causing work on the lab to slow to a trickle and then stop dead until Bossidy and AFC approved payment of the invoices. *Id.* ¶ 15. That circumstance, as with everything else related to the lab time-line, was caused by nothing other than AFC and Bossidy's own decisions.

With Bossidy and AFC controlling the operations at the cultivation, the May 15, 2024 date came and went. That was almost a year ago. Knowing that it would be nonsensical to try to hold Bloc responsible for the delay after divesting Bloc of any power to overrule Bossidy's lab-related decisions, AFC raised no contemporaneous objection.

Ultimately, if the failure to obtain COO by the deadline could constitute an event of default, that default was entirely caused and controlled by AFC. And in any event, after Bossidy was removed, Plaintiffs were finally able to obtain their TCO for the lab last week, paving the way for the COO sometime soon. *Id.* ¶ 16. This allegation is just another pretext.

### 5.    The Pre-Forbearance "Restricted Payments"

The next attempt to justify stealing Plaintiffs' money is even more frivolous. Specifically, AFC purports to default Plaintiffs based upon supposedly-prohibited "Restricted Payments" made by Justice to its other affiliates, which, according to AFC, amount to $19 million of transactions

over a two-year period, all prior to the parties' 2024 Forbearance agreement.

Such a claim would presumably justify some development and backup. Yet neither AFC's default nor termination notices (Ex. D & F) list a single offending transaction, nor explain how even one of them supposedly violates the loan agreement. AFC offers no specifics and no explanations precisely because the accusation rests on a sleight of hand, one that cannot withstand scrutiny. AFC is complaining about perfectly legitimate behavior.

### a.    Background: The Hayden Account

By way of background, banking has proved to be a difficult service for cannabis companies to secure. Even though cannabis is legal in many states, it remains illegal at the federal level, so most banks will not accept deposits from cannabis companies. When Pennsylvania legalized medical marijuana, a bank called Parke Bank saw a business opportunity and opened to cannabis companies. Hayden was able to get an account there via its dispensary. Papatheofanis Decl. ¶ 26.

For a time, Pennsylvania-based Hayden was Justice's only subsidiary with access to legal banking, and Plaintiffs properly and legally used Hayden's Parke account for all operations. Hayden therefore acted not only as the operator for the Pennsylvania dispensaries, but also hosted the company bank account for Justice's operating entities in all states that it operated. *Id*. ¶ 26.[7]

In that role as the company's bank account, Plaintiffs paid things like company-wide payroll, health insurance, and other company-wide expenses out of the Hayden Parke Bank account. Hayden had the company's only bank account at the time that Plaintiffs took the loan from AFC in 2022, and there is no allegation or evidence that AFC somehow misunderstood that structure.

---

[7] To be clear, there is absolutely nothing improper about using Parke as Plaintiffs' company-wide bank for its out-of-state transactions too, which was done with Parke's knowledge and consent, and not just for Plaintiffs, but for its other cannabis customers as well.

In that context, it is beyond misleading, and irrelevant, for AFC to point to the fact that Hayden spent $19 million on transactions for Justice's subsidiaries outside of NJ/PA. *That only counts one side of the ledger.* As the company's operating bank account, *Hayden also received far, far more than $19 million* from Plaintiffs' parent, other Justice subsidiaries, and Justice's owners during the same period. The net in-flow of cash into Hayden from outside the borrowing group was *thus net positive, by millions of dollars* – with proper accounting for every dollar. *Id*. ¶ 24.

Specifically, during the two-year period that AFC relies on for its bogus default claim, Justice's subsidiaries outside of NJ/PA transferred some $15 million in receivables into Hayden's bank account, while Justice's owners injected another $9.5 million into Hayden, for a total of almost $25 million coming into the account. Id. ¶¶ 27-28. *In other words, far more money flowed into than out of Hayden's bank account from other sources outside NJ/PA. Id.*

Given that background, it is clear that there was no "Restricted Payment" problem in 2023-24, much less one that could justify AFC calling this a default. AFC cannot legitimately allege impropriety based on transfers out of an account without ever even purporting to account for corresponding deposits, the reasons for the transactions, and the net effect on the account balance.

### b.    There Were No Restricted Payments

Credit agreements like the ones Plaintiffs signed commonly include terms restricting the borrower from making certain payments in order to protect the lender's collateral and ensure that the borrower maintains the wherewithal to make payments under the loan. *See* Simpson Thatcher Leveraged Finance 101: A Covenant Handbook at 4. This loan contained that standard term. AFC's definition of "Restricted Payment" was amended from time to time, but was always intended to address this concern about value leaking out of loan proceeds and/or the Borrower's revenues. *E.g.* Ex. H at 29 (defining "Restricted Payment" to include dividends, management fees, and payments to owners, family members and affiliates, among others).

Hayden's performance of the same company-account hosting function it always performed (using monies deposited to its bank account from outside the loan to pay all company expenses) is not what is prohibited by the term "Restricted Payment." The monies that left PA/NJ did not come out of AFC's loan proceeds, nor are they generated from Hayden's PA/NJ dispensary revenues. So long as more money was coming in than was going out (which was the case), then nothing of value "leaks" from AFC's loan when outside monies are spent for outside purposes. Hayden is not making those payments in its capacity as an AFC loan party, so it has no right to restrict them.

Again, the critical fact is the net inflow of payments into Hayden's account. Justice deposited substantially more than enough money from sources outside of PA/NJ to cover all debits that originated outside PA/NJ. Over the time period at issue, the net cash in-flow was positive by more than $5 million. Papatheofanis Decl. ¶ 29. Under those circumstances, none of the resulting payments outside PA/NJ could be accurately characterized as Restricted.

Far from giving rise to anything about which AFC could legitimately complain, Justice's transactions thus actually made AFC's borrowing group *far more secure* by bolstering and backstopping Hayden's bank account with a *substantial surplus.* Restricted Payments are prohibited precisely because leakage *weakens* the borrowing group's bank account. In this case, there was no leakage; Justice *strengthened* the borrowing group to the tune of more than $5 million. Under both the letter and intent of the Restricted Payments prohibition, there was no default here.

### c.    Independently, There Is No Default Where the Payments Alleged To Be Restricted Are Not "Continuing"

There is no Restricted Payment violation because there were no Restricted Payments. But even assuming *arguendo* that AFC was correct about these payments being restricted, there is an independent fatal flaw in its argument. AFC is talking about ancient history.

According to AFC's own notice, the payments alleged to have been restricted occurred in 2022-23. In 2023, Justice's new CEO reconstituted the company's accounting, and began the

26

process of segregating the company's various subsidiaries' records and bank accounts by state. Papatheofanis Decl. ¶ 32. By the end of 2023 (before the March 2024 Forbearance agreement), *no payments ever left the NJ/PA accounts for expenses related to other subsidiaries,* and certainly none AFC has ever identified. *Id.* In fact, by summer 2023, AFC assumed control of Plaintiffs' PA/NJ bank accounts, *which meant that every payment from the NJ/PA bank account had to be expressly approved by AFC – which surely would not have approved "restricted" ones. Id.* ¶ 33.

In its February Notice of Default, AFC claimed without explanation or support that the supposed Restricted Payments default "has occurred and is continuing," Ex. D at 2. AFC included that language because a "continuing" violation is the express condition precedent required to default Plaintiffs and seize their assets. Section 9.1 of the Credit Agreement ("Rights and Remedies"), makes that "and is continuing" condition very clear: "Upon the occurrence and during the continuation of an Event of Default and in addition to any other rights or remedies provided for hereunder or under any other Loan Document or by Applicable Law, Agent may, and, at the direction of the Required Lenders, shall, do any one or more of the following. . .". *See* Ex. H § 9.1.

Simply reciting the words that Section 9.1 requires does not make the accusation true. Even if the Hayden paymaster transactions were Restricted Payments, which they are not, they are in no way "continuing." AFC's own February Notice of Default described the transactions as having occurred in 2022-2023, Ex. D at 2, so the practice cannot be said to be "continuing." And the parties entered the March 2024 Forbearance after the Hayden Account paymaster arrangement had already ceased, so it could not give rise to a continuing Restricted Payment allegation regardless.

### d.    AFC Failed to Provide The Proper Notice Required for a Default

Given that there were no Restricted Payments and there is no argument that a default is continuing, pointing out that AFC failed to satisfy the condition precedent of proper notice may feel like gilding the lily. But AFC's notice-and-cure problem is also worth explaining.

The Credit Agreement gives Plaintiffs certain protections against an erroneous claim of default. Section 8.1 (Events of Default) puts the onus on AFC, stating that the violation of a covenant does not even become a default unless and until 10 days after the borrower learns about the violation on its own or AFC gives notice of the violation. Ex. D at § 8.1. To this day, Plaintiffs do not know of any Restricted Payments, and do not believe they have made any. So AFC can only satisfy its notice duties by giving notice sufficient to explain to Plaintiffs what restricted payments have occurred. AFC has pointedly failed to identify any.

Instead, AFC's notice claims an undifferentiated and aggregate of $19,247,622.42 in restricted payments. The exact number, $19,247,622.42, belies a conspicuous absence of specificity. Anyone reading the February Default Notice has no way to determine what transactions AFC is even talking about, making the accusation impossible to defend. There is thus no "what": AFC did not identify any supposedly offending transactions, much less provide a spreadsheet explaining this massive sum. There is also no "why": AFC did not explain why any of the transactions supposedly meet the definition of a Restricted Payments. And there is barely a "when": 2022-2023.

The point is, upon receiving such a notice, Plaintiffs have no method to cure within the 10 days -- other than to just roll over and cut AFC a check for the requested $19,247,622.42. The foregoing plainly does not provide sufficient notice, as it does not give Plaintiffs any way to intelligently assess their rights and decide how to proceed, which defeats AFC's argument. *See E. Baby Stores, Inc. v. Cent. Mut. Ins. Co.,* No. 07 CIV. 3890 (LAP), 2008 WL 2276527, at *2 (S.D.N.Y. June 2, 2008), aff'd, 337 F. App'x 10 (2d Cir. 2009) ("EBS had a contractual obligation to provide notice to the defendant insurance carrier 'as soon as practicable.' Provisions of this sort are familiar to New York courts. Their purpose is to 'to afford the insurer an adequate opportunity to investigate, to prevent fraud and imposition upon it, and to form an intelligent estimate of its rights and liabilities before it is obliged to pay.'").

28

Far from giving Plaintiffs the information to fairly assess the claim, AFC's deliberately-opaque reservation of rights notice instead served as a threat. As described above in the summary of facts, AFC was pressuring Plaintiffs' owners to pay AFC tens of millions of dollars in cash that they do not owe, claiming AFC would baselessly sue Plaintiffs' owners personally for a Restricted Payment "RICO" claim if they did not hand over at least $10 million in cash (a threat that AFC, in obvious desperation, has since followed through on). There was no default.

### 6. The Pennsylvania Cultivation

Equally lacking merit are the alleged defaults identified by AFC relating to the cultivation facility located in Hazle Township, Pennsylvania (the "Pennsylvania Cultivation").

#### a. Background: The Pennsylvania Cultivation Shutdown

In early 2023, Justice began experiencing challenges with its Pennsylvania Cultivation facility. When the facility's construction was only about 60% complete, a dispute with the general contractor caused a work stoppage. Cultivating cannabis in the partially-built facility became increasingly difficult and decreasingly profitable. Fields Decl. ¶ 35.

After examining the numbers, AFC strongly encouraged Justice to shutter the Pennsylvania Cultivation because it was losing money. AFC's Chairman (Tannenbaum) communicated repeatedly that he preferred the company to concentrate its funds on the New Jersey assets. *Id*. ¶ 36.

In the summer of 2023, AFC turned up the pressure. It assumed control of Justice's Pennsylvania and New Jersey bank accounts, which meant that all expenditures related to the Pennsylvania Cultivation had to be expressly approved by AFC. Because AFC took the position that operating the Pennsylvania Cultivation was financially unsound, it refused to approve routine expenditures for utilities, pest control, and suppliers. *Id*. ¶ 37. Due to the lack of power, some areas of the Pennsylvania Cultivation developed mold. Operations became impossible, and at AFC's urging, Justice ceased all cannabis operations and shuttered the facility in late 2023. *Id.* ¶ 38.

Justice and AFC decided together that they would seek an investor to inject capital into the Pennsylvania Cultivation to get it back on track. When they found such an investor, the parties planned to restart the facility. *Id.* ¶ 39.

Justice and AFC understood and discussed that, if the facility were not operational, the Pennsylvania Department of Health ("DOH") probably would not renew the facility's cannabis license when it came due in July 2024. *Id.* ¶ 40. They hoped to find an investor before then to mitigate the risk the license would not be renewed. The parties also agreed that, if they could not find an investor to get the Pennsylvania Cultivation restarted, or if the general contractor filed suit to enforce its mechanic's lien, AFC could foreclose on the property and sell it. *Id.* ¶ 41.

### b.    The September 2023 Forbearance Agreement

In September 2023, the parties entered into the 2023 Forbearance. The 2023 Forbearance reflected the parties' agreement that they would seek an investor to inject capital into the Pennsylvania Cultivation. Accordingly, AFC agreed it would not foreclose on the Pennsylvania Cultivation during the forbearance period unless the contractor sued,[8] the latter condition being added to protect AFC from the risk of a mechanics lien.

Both AFC and Justice tried for months to interest an investor in the Pennsylvania Cultivation, without success. *Id.* ¶ 39. During the ensuing months, however, Justice reached a settlement agreement with the contractor and paid it millions of dollars in resolution of its claims (using funds from Justice's operations in other states, not out of PA/NJ revenues). *Id.* ¶ 42.

### c.    The March 2024 Forbearance

While the parties searched for an investor in Pennsylvania, they also executed the 2024

---

[8] *See* Ex. I § 2.3 ("[AFC] shall not take any such [foreclosure] actions with respect to the PA Cultivation Property during the Forbearance Period unless Mosaic [the contractor] takes any action to enforce the mechanic's lien it has asserted against the PA Cultivation Property.").

Forbearance in March. The 2024 Forbearance reflected the parties' agreement that AFC could foreclose on the Pennsylvania Cultivation if the parties still could not find an investor by the end of April to pay for completing the construction. In that event, Justice agreed that it would not oppose such a foreclosure action. April passed. AFC did not initiate foreclosure. *Id.* ¶ 43.

As the parties predicted, when it came time to renew the facility's cannabis license, the DOH denied the application to renew in July, primarily on the ground that the facility was not operational. With the advice and consent of AFC, Justice retained outside counsel and filed an administrative appeal of the denial in August. DOH gave indications that that it would settle the appeal and renew the license if Justice came up with a reliable plan to restore operations. *Id.* ¶ 47.

### d.    The DOH Resolution and the Reopening Agreement

As stated, despite the April deadline for outside investment having passed, AFC did not exercise its right to foreclose. That remedy was unattractive: foreclosing on an unlicensed, unfinished, dark warehouse with mold and potential mechanics liens was less than optimal.

In September 2024, Justice approached AFC to discuss a path forward for the facility, with Justice's owners stepping in and injecting the capital the parties had thus far been unable to raise from outside investors. The eventual proposal, to which AFC ultimately agreed, was that instead of an outside investor, Justice's owners would contribute $5 million of their own money to complete construction, along with a buffer for unforeseen costs and early operating expenses. *Id.* ¶ 45.

In consideration for that additional capital, AFC would not foreclose -- just as if the parties had successfully found an outside investor to inject the funds. To help make it work, AFC agreed to release $500,000 of the Justice equity money it held in escrow to put towards its operating expenses once the facility reopened and until it could start selling its harvests. Both sides understood that the agreement was contingent upon DOH's sign off in a settlement of the appeal. *Id.*

The plan was attractive to Justice's owners because the facility, once operational would

generate much more than their investment, and because Pennsylvania had passed a law to give three new dispensary licenses to operating cultivators. That meant reviving Pennsylvania would double the company's valuable dispensaries from three to six (a swing worth as much as $20 million). AFC very much liked the deal too, because its collateral would be substantially improved, and the facility would generate funds to pay towards the loan. *Id.* ¶ 46.

With the plan agreed between Justice and AFC, Justice began negotiating a resolution of the appeal with DOH. The Commonwealth has an interest in an uninterrupted supply of medical cannabis, and did not want to take away the license of one of only several dozen cultivators for the whole state if that could be avoided. DOH simply wanted a specific and credible path to bring the facility back online, and by December 2024, it supported Plaintiffs and AFC's plan. *Id.* ¶ 47.

The agreement between AFC and Plaintiff described above is hereinafter referred to as the Reopening Agreement. In sum, by the September 2023 Forbearance agreement, the parties had agreed in writing that AFC would forbear foreclosure if an investor injected equity to reopen. By the March 2024 Forbearance, the parties agreed that Plaintiffs themselves could step into those investor shoes (avoiding foreclosure) by bringing the $5 million if it occurred by April 2024. It did not occur by April 2024, but AFC did not foreclose, and the parties subsequently reached the new agreement to proceed with the reopening plan anyway -- taking foreclosure off the table, as memorialized in the formal submission to DOH and the Fields-Neville emails described. As documented in writing, that new agreement expressly states that AFC agreed to "take no action to foreclose on the mortgage or otherwise impair the facility" pending the DOH approval. Ex. J-3 at 2.

In that context, the Reopening Agreement comprised a novation, or modification, of the parties' prior agreements concerning the circumstances under which AFC would forbear on fore-closure of the Pennsylvania cultivation. *E.g., MaxEn Cap. Advisors, Ltd. v. Pure Lithium Corp.*, No. 1:24-CV-2231-GHW, 2024 WL 4520062, at *10 (S.D.N.Y. Oct. 17, 2024) ("New York recognizes

oral modification or waiver of a contractual provision . . . 'when there has been partial performance of an agreement to modify, so long as the partial performance is unequivocally referable to the oral modification,' or . . . 'when one party has induced the other party to rely on an oral modification' such that 'the first party may be equitably estopped from invoking the requirement that any modification be in writing.'" (quoting *DiStefano v. Maclay*, 102 F App'x 188, 189 (2d Cir. 2004)).

### e.     Justice Gives Consideration and Commences Performance

Per its Reopening Agreement with AFC, Justice proceeded to pursue the settlement with DOH. Justice paid a law firm (Ice Miller) to do the legal work, invested significant executive time in drafting the documents, and paid thousands of dollars for contractors and service providers to prepare the site for renewed construction. Remediation began in January 2024, funded by Justice's two owners, who signed written pledge agreements to inject $5 million in cash.

The DOH submission included a detailed construction plan (to take approximately five months from the date of the settlement) and reopening plan (plotting out a six-month startup phase until the first sales revenues come in). Ex. J. It also highlighted the injection of $5 million in new capital by its owners for the restart, Ex. J-3 at 2, and additional capital from AFC. *Id.* ("Likewise, *our lender, AFC, has agreed to make available $500,000 toward start-up costs to complete and operate Pier Cove* until its cash flow is sufficient to be self-supporting.") (emphasis added).

The overture succeeded. DOH liked the offer. It indicated that it wanted to settle, and agreed to postpone the license renewal appeal hearing date to allow time to complete the settlement. Ex. L.

### f.     AFC Reneges After Justice Gives Consideration and Relies

In early February 2025, AFC unilaterally and abruptly breached the Reopening Agreement. Without notice or explanation, and directly threatening the progress Justice made with DOH, AFC filed a lawsuit in Pennsylvania state court on February 6, 2025, foreclosing on the Pennsylvania Cultivation (the "Foreclosure Lawsuit").

The Foreclosure Lawsuit was in direct breach of the Reopening Agreement. After Plaintiffs had reached that agreement with AFC and relied on it, an agreement in their mutual interest, AFC abruptly reneged. AFC's breach came out of the blue, and without any justification or explanation. Plaintiffs emailed AFC's CEO, its two Directors, and its General Counsel, urging it to dismiss the foreclosure and requesting a discussion. Krug Decl. ¶ 32. AFC refused. *Id.* ¶ 33.

The timing is telling. It turns out that the reason AFC tried to disavow its agreement was because it was desperate for cash (and someone to blame). One week after breaching the Reopening Agreement by filing the Foreclosure lawsuit, AFC notified shareholders that it would hold its earning call on March 13. Unbeknownst to anyone but AFC, its management was going to have to announce on the call that revenues were way down in Q4 2024, and that it therefore had to slash its dividend by a third (from .33 cents to .23 cents per share), a serious problem for any REIT. AFC had no intention of taking any blame. Rather, they planned to point the finger at Justice and announce that they were seizing its assets (*i.e.,* the cultivation facility) to raise funds.[9]

### g. AFC Cannot Lawfully Disavow the Reopening Agreement It Already Agreed To

There are multiple writings evidencing the parties' oral Reopening Agreement. After negotiating and reaching the Reopening Agreement with AFC, Plaintiffs summarized it to DOH:

> Likewise, our lender, AFC, has agreed to make available $500,000 toward start-up costs to complete and operate Pier Cove until its cash flow is sufficient to be self-supporting. Specifically, Mr. Daniel Neville, Chief Executive Officer of AFC, has informed Pier Cove of AFC's agreement to (1) *take no action to foreclose on the mortgage or otherwise impair the facility;* (2) continue to honor the terms of Pier Cove's forbearance agreement, which requires no payments from the Pier Cove entity; and (3) to make available $500,000 in cash to be used toward re-opening expenses, provided that Pier Cove's permit is renewed.

Ex J at 2 (emphasis added).

---

[9]  The announcement of the earnings call is located at https://investors.advancedflowercapital. com/news-releases/news-release-details/advanced-flower-capital-inc-announces-financial-results-fourth. Transcript of the earnings call is at https://www.investing.com/news/transcripts/ earnings-call-transcript-advanced-flower-capital-q4-2024-misses-eps-forecast-93CH-3927448.

There is no dispute that AFC was apprised of this submission, and received a copy of the entire submission along with exhibits. Krug Decl. ¶ 30. Upon receipt, Neville (AFC's CEO) certainly never disavowed the agreements, nor suggested the terms were not as represented to DOH.

Nor could he. There were contemporaneous communications confirming Neville's prior agreement. For example, on December 12, 2024, with settlement moving forward and DOH wanting confirmation of AFC's financial undertakings, Justice's CEO sent the following email to Neville stating that "As part of our settlement with the state to get the grow restarted and those 3 additional retail stores, we need to provide a letter from AFC" confirming that "we can use up to $500K from our equity account for initial restart fees (utilities, cleaning, initial staffing, etc)." Ex. N. The same email informed Neville that the DOH indicated they were "eager to settle" and assured AFC that "I am getting a pledge from owners on the additional capital needed for construction restart with Mosaic." *Id.*

The same day, Neville responded. Referring to Justice's outside law firm, Ice Miller: "Ok. Can you guys or Ice draft." *Id.* In response to the request for a letter from AFC confirming "that we [Justice] can use up to $500K from our equity account for initial restart fees (utilities, cleaning, initial staffing, etc)," Neville's email stated: "Happy to do[.]" *Id.*

While the Forbearance Agreement states that it may not be waived or modified except in writing, and while such provisions are generically enforceable under New York law, there are necessary and obvious exceptions. Specifically, a new agreement governing the same subject matter can be reached (novation) or a written agreement modified when there is consideration and reliance. *Automated Irr'n Controls, LLC v. Watt Stopper, Inc.,* 407 F. Supp. 3d 274, 284 (S.D.N.Y. 2019) ("[U]nder New York law, partial performance of an oral agreement to modify a written contract, if unequivocally referable to the modification, avoids the statutory requirement of a writing.").

That is exactly this situation. First, there is (or should be) no dispute that the parties reached

the agreement. It is memorialized in the DOH submission, which states that AFC's CEO confirmed: "AFC's agreement to (1) *take no action to foreclose on the mortgage or otherwise impair the facility;"* and to "(2) continue to honor the terms of Pier Cove's forbearance agreement, which requires no payments from the Pier Cove entity; and (3) to make available $500,000 in cash to be used toward re-opening expenses, provided that Pier Cove's permit is renewed." Ex. J-3 at 2.

When Neville received the written DOH submission, he certainly did not disavow it; indeed, as described above, he agreed to sign a letter committing the $500,000 from the equity account. There can thus be no real dispute there was an agreement.

Nor is there any dispute that Plaintiffs relied on the Reopening Agreement, provided valuable consideration for it, and partly performed in support thereof. Plaintiffs' owners gave a written commitment to pay $5 million. With AFC promising that Plaintiffs could also use $500,000 of their money from the equity account for initial restart fees, Plaintiffs also paid the Ice Miller law firm to create submissions for, and negotiate with, the DOH, which agreed to suspend the hearing to work out the settlement. New York recognizes such conduct as an exception to the statute enforcing written modification requirements. *Aryeh Realty Corp. v. 18 E. 69th St. Tenant, LLC,* No. 570353, 2024 WL 4587047, at *1 (N.Y. App. Div. Oct. 25, 2024); *Hylan Ross, LLC v. 2582 Hylan Blvd. Fitness Grp., LLC,* 206 A.D.3d 893, 896 (N.Y. App. Div. 2022).[10]

In short, AFC is the one in breach, not Justice. It is bound by the deal it made not to foreclose, and cannot claim the agreement contained some sort of one-way option, allowing it to change its mind after Plaintiffs relied. *Salto v. Alberto's Constr., LLC*, No. 17 CIV. 3583, 2020 WL 4383674, at *6 (S.D.N.Y. July 31, 2020) (a party is liable for breach of contract when it breaches an agreement under which the plaintiff "adequate[ly] perform[ed]," causing damages).

---

[10]  Pennsylvania law, which arguably governs the oral contract, requires the same result. *See CM Goat, LLC v. Valdez,* 318 A.3d 392, 397 (Pa. Super. 2024).

**h.  The Are No Defaults Regarding The Pending License Non-Renewal**

First, AFC alleges that Justice defaulted by having the license renewal denied. This contention lacks merit. As described above, the license is in an administrative process which DOH appears poised to settle. The DOH's decision (still pending on appeal) not to renew the licenses is not a default.

Far more importantly, as set forth above, AFC actively encouraged Justice to close the Pennsylvania Cultivation to save money, fully aware that such closure would cause exactly this result. Non-operational facilities cannot renew their licenses. 28 Pa. Code § 1141a.38(c)(1). AFC cannot encourage and approve Justice's actions, and then seek the forfeiture of foreclosure based on the very actions it encouraged and approved. *See, e.g., CoraMed USA, LLC v. Alexion Pharma., Inc.,* 695 F. Supp. 3d 251, 265-67 (E.D.N.Y. 2023) (covenant of good faith and fair dealing prohibits parties to a contract from "do[ing] anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract, or to violate the party's presumed intentions or reasonable expectations.").

Prior to closing down the facility, Justice was operating it with a skeleton crew satisfactory to maintain the license. Fields Decl. ¶ 35. AFC's firm insistence that Plaintiffs shutter the facility to save money, and AFC's own refusal to release the minimal funds from Plaintiff's account to pay to keep the operation going, were the factors that directly caused the alleged default. *Id*. ¶¶ 37-38.

In any event, the Reopening Agreement novating the prior agreements about the facility with a plan to inject significant capital to update it would have resolved the problems. Had AFC not reneged on that Agreement, the license would be intact. It is AFC's own action in abandoning the Reopening Agreement that caused the problem. *See, e.g.*, *Frank Brunckhorst Co., LLC v. JPKJ Realty, LLC*, 12 N.Y.S.3d 241, 243 [2d Dept. 2015] ("[W]hen a party to a contract causes the failure of the performance of the obligation due, it cannot in any way take advantage of that failure.").

37

For related reasons, AFC's next contention that Plaintiffs allegedly breached by "failing to maintain the Pennsylvania Cultivation in good condition" by operating "without utilities for a significant quantity of time, leading to the growth of mold," and allowing the site to remain unprotected and unsecure are nothing but functions of AFC's control of Plaintiffs' bank account, and its refusal to release Plaintiffs' funds to pay for even utilities and staff. Fields Decl. ¶ 37. Despite Justice's repeated requests, AFC refused to approve payment for even basic utilities, effectively causing the deterioration of the premises. *Id.* Defendants cannot hold Justice in default for their own actions, and the very foreseeable results thereof. *CoraMed,* 695 F. Supp. 3d at 265-67.

AFC's February Default Notice next claims that Plaintiffs failed "to provide notice of the lawsuit filed by the Pennsylvania [DOH]." Ex. D at 2. That is incorrect too. AFC appears to be confused. There is no lawsuit filed by DOH. The case caption cited by AFC refers to Justice's own administrative appeal, of which AFC received notice and remained in the loop through Neville, its CEO. Krug Decl. ¶¶ 28-33.

Finally, AFC contends that filing an answer and affirmative defenses in the Foreclosure Lawsuit is a default. That cannot be true. As set forth at length above, AFC expressly agreed not to foreclose, novating and/or modifying that portion of the Forbearance agreement. See Ex. J-3 at 2 (referring to: *"AFC's agreement to ... take no action to foreclose on the mortgage or otherwise impair the facility"*) (emphasis added).

"New York law recognizes an implied covenant of good faith and fair dealing in all contracts." *Montague v. Poly Prep Country Day Sch*., No. 21-CV-04054 (MKB) (LKE), 2025 WL 1075063, at *5 (E.D.N.Y. Apr. 10, 2025). "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* Where, as here, AFC reached an agreement to pursue the reopening of the cultivation facility, and where Plaintiffs took actions in reliance, including

providing valuable consideration (worth $5 million), AFC cannot hope to punish Plaintiffs for opposing AFC's efforts to renege by instead foreclosing.[11]

### i. The Provision On Which AFC Relies Is Unenforceable

Even were there no agreement not to foreclose (there was), AFC relies on terms purporting to prevent Justice from "assert[ing] *any* defense" in *any* "enforcement" action, and require Justice to "*fully* cooperate" in AFC's "exercise of *all* rights and remedies," "in connection with" the facility. Ex. A ¶¶ 4.1(b), 5.10(a) (emph. added). Under New York law, such provisions are unconscionable and contrary to public policy, and thus unenforceable. *Rossrock Fund II LP v. Arroyo*, 943 N.Y.S.2d 794, 2012 WL 127444, at *3 (N.Y. Sup. Ct. 2012) (rescinding "unconscionable" forbearance agreement where "the terms of the agreement were drafted entirely by [lender]" with little benefit to the borrower, while the agreement "to waive all defenses and not contest the action would be of significant benefit to [lender], who may then proceed to an inevitable judgment of foreclosure"); *Lipkis v. Gilmour*, 606 N.Y.S.2d 503, 504 (N.Y. App. Term 1st Dep't 1993) (lease provision that, "in the event Landlord shall commence a summary proceeding against Tenants, Tenants shall not be allowed to make an appearance nor shall Tenants be allowed to interpose any answer or defense" was "unenforceable as contrary to law and public policy"); *Ultrashmere House, Ltd. v. 38 Town Assocs.*, 473 N.Y.S.2d 120, 122 (N.Y. Sup. Ct. 1984) ("unusally broad" lease provision "going so far as to even prohibit the tenant from asserting a 'defense' to any action or summary proceeding … is clearly unconscionable as a matter of law, and hence unenforceable").

---

[11] As a final note, AFC cannot seriously dispute that the Reopening Agreement was premised on AFC's promise not to foreclose. AFC could never attract the millions in outside investment needed if the Agreement reserved a right to just turn around and foreclose after the money came in. The whole reason for putting in more money was the opportunity to operate the valuable cannabis facility. Also, the nascent settlement with DOH to return the cultivation license and award the three new dispensaries is part of an appeal by the existing licensee (Justice) that won the license, not a random, unvetted, post-foreclosure bidder. Foreclosure frustrates the whole purpose of the Reopening Agreement.

### 7.    The Perfection Certificate

As part of the March 2024 Forbearance, the Borrowers completed an extremely detailed Perfection Certificate listing all of the Borrowers' assets and Justice's assets. It was completed and provided to AFC on May 9, 2024.

In the February 2025 Default Notice, AFC alleged, for the first time and with no explanation, that the Perfection Certificate supposedly "failed to contain any information related to TC Applico, LLC and its assets located in Missouri." That allegation is completely unsupported: Justice is not affiliated with TCA, and its note from TCA was disclosed.

### a.    TCA Is Not a "Specified Person"

The Perfection Certificate required Justice to disclose assets owned by and information relating to "Specified Persons," a defined term under the agreement that included the Borrowers and Justice and its employees, subsidiaries and affiliates. The entity identified by AFC's default notice, TC Applico LLC ("TCA"), is not a Specified Person under the definition set forth in the Perfection Certificate. It is a Missouri entity not formally connected to Borrowers or Justice. One of the TCA owners is a friend of one of Justice's owners, whom he helped with the license application process. That does not make TCA an "Affiliate" of Justice. Neither Justice nor its owners own any interest whatsoever in TC Applico. Neither Justice nor its owners manage the TC Applico dispensaries, or financially benefit from them in any way. Krug Decl. ¶ 8.

### b.    Disclosure of the TCA Note to AFC

Leaving aside that the TCA is not a Specified Person anyway, AFC does know about the TCA note. It knows about it because Plaintiffs tried to sell AFC the TCA note -- well before the Perfection Certificate was executed. Its existence was most certainly not withheld.

By way of background, as a condition to the 2023 Forbearance, AFC required Justice to produce, among other things, a debt schedule identifying the indebtedness of all the Justice entities.

AFC was interested in expanding its collateral basket to obtain additional security for its loan by taking secured interests in assets owned by Justice's owners or Justice's subsidiaries in states outside New Jersey and Pennsylvania. *Id.* ¶ 22.

As part of the negotiations of the September 2023 Forbearance with AFC, Justice's attorney, Gail Krug, spoke at length by phone with Neville and Tannenbaum. Among other things, she offered them a promissory note executed by TCA in favor of a Justice affiliate. That note dated back to early 2021, a time when Justice had more cash. Justice had won its own triple-cultivation license in Missouri, and in order to succeed, it desired additional friendly dispensaries in its distribution network that could become customers of its planned Missouri cultivation. For that reason, a Justice entity loaned TCA $5 million for the build-out of its own three dispensaries. *Id.* ¶¶ 17-20.

The promissory note, however, was not well drafted, and never did get signed by each of the many individual TCA owners, some of whom later disputed their validity and refused to honor them. The time for repayment of the notes came and went, and TCA did not repay them. Moreover, the value of TC Applico's assets had diminished sharply, as the entity never built out some of its licenses, and mismanaged its dispensaries. Attempts at collection became tricky. *Id.* ¶ 13.

As stated, Justice nonetheless disclosed the existence of this debt to AFC during the course of the negotiations for the 2023 Forbearance. Krug had a phone conversation with AFC personnel during which she explained in detail the nature of the notes and the problems with enforcement. In search of acceptable collateral, Krug offered to assign the TCA note to AFC, or to give AFC a lien on any future repayment thereof. *Id.* ¶¶ 17-20.

After consideration, AFC declined, on the express basis that AFC deemed the note possibly unenforceable, and thus did not believe they could sell it for value. *Id.* ¶ 20. Krug confirmed the conversations in an email to Neville and other AFC personnel on December 11, 2023, which attached a schedule of Justice's debts and leases. Her email stated (Ex. M):

41

Assets: HoldCo's assets primarily consist of the licenses disclosed in my prior email of today, as well as the assets of each facility, including inventory, fixtures, equipment, and the like. As noted in my earlier email, HoldCo does not hold an ownership interest in any entities that are not licensed and disclosed on the license spreadsheet. HoldCo does not own any real property. *HoldCo is the payee on two notes to an unrelated Missouri entity, but, as we have discussed previously, those notes face significant legal barriers to enforcement.*

When the parties executed the 2023 Forbearance in September, the document did not include any reference to the TCA note that Justice held, as AFC had already decided not to pursue them as sources of collateral. There is thus absolutely no dispute that AFC was fully aware of the existence of the TCA note. They had already considered and rejected it as collateral.

In sum, the TCA note that AFC deemed unenforceable was (1) not required to be disclosed on the Perfection Certificate, because TCA is not a Specified Person, and, regardless, the note (2) was fully disclosed to AFC for the express purpose of offering it as security for the loan, and AFC considered and rejected it. The alleged omission of TCA from the Perfection Certificate is no more a breach than any of the other allegations discussed above. No matter how much AFC wishes it were otherwise, Plaintiffs are not in default.

**B.    Plaintiffs Will Succeed on the Merits Because None of AFC's Alleged Defaults Are "Continuing," and Plaintiffs Have Been Given No Opportunity To Cure**

As described above, Section 9.1 of the Credit Agreement provides that the Lender has rights to remedies for defaulting occurrences only "during the continuation of an Event of Default." *See* Ex. H, § 9.1. Each of the seven categories of defaults involve (fabricated) concerns over events that have long since been resolved. Absent "continuation" of default, AFC cannot enforce any remedies, much less help itself to Plaintiffs' cash.

"It is well established that, in interpreting a contract under New York law, a court should give words and phrases their plain meaning and construe the contract so as to give full meaning and effect to all of its provisions." *Milligan v. GEICO Gen. Ins. Co.*, No. 22-2950, 2025 WL 799276, at *4 (2d Cir. Mar. 13, 2025). Accordingly, any interpretation that renders a clause "superfluous or

meaningless" is to be avoided. *Id.* Because no alleged default was continuing, the plain terms of the agreement prohibit AFC from doing what it did and threatens to do again.[12]

### C. Plaintiffs Will Succeed on the Merits Because, Even Assuming There Were Technical Defaults, Non-Monetary Defaults do not Permit AFC to Foreclose

As the foregoing discussion makes amply clear, Plaintiffs have demonstrated a likelihood of success in proving that they are not in default in any respect. They have timely made every required monthly loan payment for more than a year, and each of the non-monetary bases asserted by AFC to justify its actions are pretextual, contrived, and flat out wrong.

But even assuming AFC's default notices had given the Court some minimal pause that at least some letter of some provision had not been fully satisfied (and we submit that there should be no such concern), that does not mean that AFC's actions are justified. Under the law, not every conceivable violation of a loan contract, no matter how immaterial, gives a lender permission to unilaterally declare a loan void and seize millions of dollars from the borrowers' account and sell its assets. *In re 53 Stanhope LLC,* 625 B.R. 573, 584 (Bankr. S.D.N.Y. 2021) (collecting cases); *see also Fifty States Mgt. Corp. v. Pioneer Auto Parks,* 46 N.Y.2d 573, 576-77 (1979) ("It is true that equity will often intervene to prevent a substantial forfeiture occasioned by a trivial or technical breach. . . . Similarly, equity may relieve against the effect of a good faith mistake, promptly cured by the party in default with no prejudice to the creditor to prevent unconscionable overreaching.").

Not surprisingly, the law is plain that only some types of defaults -- namely, monetary defaults -- justify maximum remedies, whereas others do not. *See Wells Fargo Bank, N.A. v. PF Allied Gardens LLC,* No. 4:22-CV-180, 2024 WL 664890, *3 (E.D. Ark. Feb. 16, 2024). Instead,

---

[12]    Relatedly, and equally fatal to AFC, Section 8.1 of the 2024 Forbearance (Events of Default) states that the violation of any covenant does not even become a default unless and until 10 days after the borrower learns about the violation on its own or AFC gives notice of the violation. Ex. H. This notice-and-cure provision is another way to reach the same conclusion: a non-continuing breach cannot constitute default for any of those relied upon by AFC.

technical or non-monetary defaults only justify acceleration and foreclosure when "(1) the lender has suffered actual damages as a result of the default; (2) the default has impaired the lender's security, such as the collateral securing the debt; and (3) the default makes the future payment of principal and interest less likely." *In re 975 Walton Bronx LLC,* No. 21-40487, 2022 WL 5265041, at *6 (Bankr. S.D.N.Y. Oct. 6, 2022) ("Courts also consider whether the default was inadvertent").

In this case, these factors weigh strongly in Plaintiffs' favor. To the extent that Plaintiffs can be shown to be in technical default based on any of the non-monetary reasons identified by AFC (which Plaintiffs vigorously dispute) such hypothetical defaults were promptly cured, no longer continue, and caused no harm to the lender, collateral, or likelihood of future payment. On these facts, New York law clearly does not permit AFC to foreclose, much less engage in patently illegal "self-help" to abuse access to Plaintiffs' bank accounts to steal money needed to operate.

## II.    If AFC Is Not Enjoined from Continuing to Raid Plaintiffs' Bank Accounts, Plaintiffs and Other Innocent People Will Suffer Irreparable Harm

Defendants' actions over the last week have already left Plaintiffs critically short of operating cash. Any further unauthorized withdrawals will leave Plaintiffs unable to pay their employees, leaving 207 employees throughout New Jersey and Pennsylvania without a paycheck as the first of the month looms. Papatheofanis Decl. ¶ 19. Further withdrawals will also leave Plaintiffs unable to pay their bills as they come due each week, including approximately $300,000 in payments to state and local vendors, suppliers, and utilities. *Id.* ¶ 17.

If AFC is permitted to continue diverting Plaintiffs' money beyond the scope of the parties' scheduled cash sweeps, Plaintiffs' operations will be shuttered in short order. *Id.* ¶ 18. Given the extremely competitive cannabis market in NJ/PA, Plaintiffs likely could not recover from that blow and will cease to exist. This constitutes irreparable harm. *See Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 802 (3d Cir. 1989) (recognizing that a business likely being "forced to shut down" constitutes irreparable harm); *Beilowitz v. Gen. Motors Corp.,* 233 F. Supp. 2d 631, 645

(D.N.J. 2002) (finding plaintiffs' reasonable belief that it would be unable to cover "payroll, insurance, and day-to-day operating expenses" satisfies showing of irreparable harm).

Second, the cannabis industry is highly regulated, and the regulatory consequences of continued diversions of Plaintiffs' funds could be devastating. This feature, too, "distinguish[es this case] from a myriad of other breach of contract cases" in which the economic loss from a breach does not usually constitute irreparable harm. *See Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP,* 528 F.3d 176, 180 (3d Cir. 2008).

Third, the downstream harms to Plaintiffs' vendors/suppliers are manifest. The destruction of trust risks irreparable damage to the relationships which are crucial to success in the industry. *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 805 (3d Cir. 1998) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill.").

Finally, as most of Plaintiff Bloc's employees are members of a union governed by a Collective Bargaining Agreement ("CBA"), disruption of business would also constitute a breach of Plaintiff's CBA, quickly leading to litigation and possible penalties, and would interfere with the parties' current renegotiation of the CBA. Krug Decl. ¶¶ 38-39.

In sum, if Defendants are permitted to continue raiding Plaintiffs' bank accounts, their actions will irreparably harm Plaintiffs, not to mention their 207 employees, their patients, and their vendors, and is likely to result in the permanent loss of Plaintiffs' valuable cannabis licenses. None of that would serve anyone's interests.

### III.    Balancing the Equities, the Relief Sought Would Not Result in Greater Harm to AFC Gamma

Importantly, a temporary freeze for just enough time for this Court to schedule and conduct a hearing would cause no real prejudice to AFC. Under the 2024 Forbearance and the DACA already in place, AFC already has full control over all of Plaintiffs' bank accounts, and must approve every check or electronic payment before it leaves the account. With AFC fully in control,

Plaintiffs could not squander or divert a penny even were they inclined to try, which they are not.

Moreover, under the March 2024 Forbearance cash sweeps, AFC is already permitted to extract virtually all of the profits in excess of operating expenses, with the rest covering unpaid taxes. The sweep formulas were thus already calculated to leave just enough operating capital for Plaintiffs to run the business; draining the account below that floor is reckless and unjustified.

At the end of the day, Plaintiffs are simply asking that the Court enforce the status quo ante, putting them back in the position the parties bargained for and agreed to in the 2024 Forbearance. AFC will not suffer any true harm by abiding by the 2024 Forbearance and its associated scheduled cash sweep formulas until a court can issue a judgment adjudicating whether a default has occurred. *22nd Century Techs., Inc. v. iLabs, Inc.,* 2022 WL 819668, at *10 (D.N.J. Mar. 18, 2022) (Quraishi, J.) ("[I]f the Court were to grant injunctive relief, in doing so, it would be doing no more than to establish how things should have been--which is to enforce the Master Contract according to its terms.").

Moreover, preventing Plaintiffs' facilities from closing their doors ultimately benefits AFC as much as it benefits Plaintiffs, as it maximizes the long-term value of the assets, which serve as collateral for AFC's loan. Operational businesses are worth a lot more than shuttered stores. Maintaining the status quo ante until such time as the parties' respective rights can be orderly adjudicated will not harm AFC, and will ultimately benefit all parties. *22nd Century Techs., Inc. v. iLabs, Inc.,* 2023 WL 3409063, at *6 (3d Cir. May 12, 2023) ("Harm resulting from the willful breach of a valid [contractual agreement] is not the sort of harm the law seeks to protect against.").

## IV.    The Public Interest Factor Also Points in Favor of the Relief Sought

In general, the public interest factor does not "add[] terribly much to the other factors" in considering an injunction encumbering funds in a dispute between creditors and debtors. *Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 208 (3d Cir. 1990); *see also American Tel. & Tel. Co. v.*

46

*Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1427 n. 8 (3d Cir.1994) ("As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff."). That said, considerations of the public interest weigh strongly here in favor of granting Plaintiffs' requested injunctive relief.

Defendants' actions could prevent thousands of people from accessing their necessary medications. Many of Bloc's New Jersey customers are medical patients, who would lose access. Nor is it a quick or simple matter for patients to find an alternative source for their medications. In New Jersey, for example, medical patients must register with a particular dispensary, and many New Jersey dispensaries do not offer medical cannabis. Fields Decl. ¶ 37. The public interest is served by continuing to allow those patients access to their medicine. *See* 35 Penn. Stat. 10231.102 (legislative declaration that access to medicinal marijuana is in the public interest); N.J. Rev. Stat. 24:6I-2 (2024) (same). Cutting off access to prescription drugs is a weighty public harm.  *See Kos Pharms., Inc. v. Andrx Corp.,* 369 F.3d 700, 731 (3d Cir. 2004).

Furthermore, keeping Plaintiffs' 207 employees gainfully employed also serves the public interest. These people, three-quarters of whom live and work in New Jersey, depend on Plaintiffs' continuing viability for their livelihoods. The vast majority of these employees are hourly workers making roughly $50,000 per year, which means that missing payroll would create tremendous hardship for them as well. Papatheofanis Decl. ¶ 19. Moreover, many of them are union employees, subject to a CBA. The public interest is served by allowing people to continue their employment, and by honoring collective bargaining agreements reached with organized labor. *Laborers Health & Welfare Tr. Fund For N. Cal. v. Advanced Lightweight Concrete Co.,* 484 U.S. 539, 544 n. 6 (1988) (noting that preserving the status quo established by a collective bargaining agreement is consistent with the policies established by the National Labor Relations Act).

The public interest is further served by allowing Plaintiffs to pay their bills. Dozens if not

47

hundreds of New Jersey and Pennsylvania businesses rely on Plaintiffs to pay for the goods and services they supply. *LVL Co., LLC v. Atiyeh,* 469 F. Supp. 3d 390, 425 (E.D. Pa. 2020) ("The public interest would be served by protecting the contractual interests of the parties in this case.").

Finally, the public interest is served by preventing powerful lenders from unilaterally declaring default and seizing their borrowers' assets. Certainty and predictability in business is good public policy. *See Su v. RiversEdge Advanced Ret. Sols.,* LLC, No. 2:24-CV-00104 (MJH), 2024 WL 1193858, at *10 (W.D.Pa. Feb. 20, 2024) (injunction to prevent defendants from treating funds as "their personal piggy banks" served the public interest).

## CONCLUSION

Plaintiffs do not seek the type of injunction that requires the Court to significantly alter anyone's rights. The parties have long been proceeding under the scheduled cash sweeps under which AFC already takes almost all of any surplus (with Plaintiffs' share paying down taxes). There is no good reason why AFC should be allowed to grab money beyond that surplus in a way that diminishes operating cash to below the level needed to sustain the business, not to mention the money Plaintiffs set aside to pay taxes. Particularly where Plaintiffs make every interest payment on time, and are not even arguably in monetary default. The Court should thus freeze the status quo while the parties adjudicate their respective rights.[13]

WHEREFORE, Plaintiffs respectfully request that the Court:

(A) Issue an Order to Show Cause with Temporary Restraints ordering Defendants to cease seizing any of Plaintiffs' assets or cash (beyond the permitted scheduled cash sweeps), and to cease any other attempted remedy for any alleged default; until such time as this Court has an opportunity to decide whether to grant or deny a preliminary injunction;

---

[13] Plaintiffs served copies of the Complaint and Summons upon defense counsel via electronic mail. Defense counsel accepted service and confirmed representation of the Defendants.

(B) Set a date for a preliminary injunction hearing at the Court's convenience, preferably within the next 14 days;

(C) Upon the hearing, convert the temporary restraints into a preliminary injunction; and/or

(D) Issue any further relief that the Court deems just and appropriate.

Dated: April 21, 2025

Respectfully submitted,

**DYNAMIS LLP**

By: */s/ Jamie Hoxie Solano*
Jamie Hoxie Solano, Esq.
NJ Bar No. 426422024
(214) 454-8829
11 Park Place
New York, NY 10007
JSolano@dynamisllp.com

Michael B. Homer, Esq.
*Pro hac vice application forthcoming*
(617) 693-9732
MHomer@dynamisllp.com
Constantine Economides, Esq.
*Pro hac vice application forthcoming*
(305) 985-2959
CEconomides@dynamisllp.com
Eric Rosen, Esq.
*Pro hac vice application forthcoming*
(617) 802-9157
ERosen@dynamisllp.com
225 Franklin Street, 26th Floor
Boston, MA 02110
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Jamie Hoxie Solano, hereby certify that on the date indicated below, I caused a true and correct copy of the foregoing document to be served via email on Abby F. Rudzin, counsel for the defendants, who has agreed accept service on behalf of the defendants.


Dated: April 21, 2025

/s/ Jamie Hoxie Solano
Jamie Hoxie Solano, Esq.