IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY

| | |
|---|---|
| HAYDEN GATEWAY LLC and BLOC DISPENSARY LLC,<br><br>  Plaintiffs,<br><br>v.<br><br>ADVANCED FLOWER CAPITAL INC. and AFC AGENT LLC,<br><br>  Defendants. | CIVIL ACTION NO. **3:25-CV-02789**<br><br>**DECLARATION OF MICHAEL KANOVITZ** |

  1.  Jon Loevy and I are the majority owners of Justice Cannabis Co. To the extent some affiliates and subsidiaries are directly owned, we are the majority owners of those as well. I will refer to Justice Cannabis Co. and its subsidiaries and affiliates as "Justice." Jon and I are also civil rights attorneys based out of Chicago, Illinois.

  2.  A little over a decade ago, some states began to legalize cannabis for medical purposes. Justice's New Jersey entity, Bloc Dispensary LLC (fka JG New Jersey LLC) ("Bloc"), applied for and won an integrated license that allowed it to operate three retail cannabis dispensaries in Northern New Jersey, as well as a cultivation facility in Ewing. Justice's Pennsylvania entity, Hayden Gateway LLC ("Hayden") applied for and won three retail medical dispensary licenses in Pennsylvania.  A separate Justice subsidiary applied for and won a Pennsylvania cultivation license.

1

3. These affiliates needed funding to build the cultivation and dispensary facilities. Because the production and sale of cannabis remained illegal under federal law, one could not obtain bank financing for cannabis related construction projects.

4. In 2021, AFC Gamma lent money to Bloc and Hayden, among other Justice entities, to build the New Jersey and Pennsylvania cannabis facilities.

5. Justice's New Jersey and Pennsylvania assets, if properly operated, have the potential to be extremely valuable. I am told that once fully constructed and operating optimally, each of the Pennsylvania and New Jersey cultivation facilities should be generating revenues of more than $5 million per month, at a very high profit margin, and that, together with the six dispensaries, the company could be earning upwards of $13 million per month, much of it EBITDA. I am told that the present multiples at which cannabis companies trade would make the New Jersey and Pennsylvania companies worth at least several hundred million dollars at that run rate.

6. Moreover, while Pennsylvania law currently only permits the sale of medical cannabis, I am told that it is poised to approve recreational cannabis in the coming months, which should dramatically increase the value of the Pennsylvania assets.

7. Based on investigation, review of AFC Gamma's public filings and statements, and other industry information, I am aware that AFC Gamma is experiencing financial distress. Numerous of its various cannabis borrowers are struggling for reasons such as federal illegality, punishing taxation, and lack of access to financial markets and banking services. From what I can tell, numerous of the cannabis loans AFC Gamma made have failed to perform as hoped or expected, and AFC Gamma has not generated the cash it had hoped.

8. It appears to me that AFC's management has been using the shareholder's capital to keep its dividends up when there is not sufficient cash coming in the door. Essentially, AFC calculates present financial performance to include interest obligations that have been deferred into the future even though the interest has not been received and may never be received, using that figure to justify the present dividend. Because no actual cash came in the door from these future payments, management has to use equity (or borrow against equity, which is the same thing) to pay this portion of the dividends. AFC Manager, the management company for AFC, pays itself essentially the same way when calculating its management fees. It includes the deferred interest in calculating the financial performance on which its own incentive fees are based, and therefore is paying itself using shareholder equity. Such a scheme must eventually collapse unless the deferred interest is later paid because sooner or later the shareholder equity runs out (and new shareholders will not continue injecting equity forever).

9. In the weeks following AFC's March 13 earnings call, its stock price lost more than 40% of its value, recently hitting an all-time low of roughly $4.35/share, down from its peak around $16/share. During that time, its total market capitalization fell under $100 million, making it worth less than the purported face value of Justice's loan, even though Justice's loan is only one of over a dozen in AFC Gamma's portfolio.

10. AFC borrows money from its own lenders. It has financial covenants with the lenders disclosed in its SEC filings. For example, AFC must meet requirements for maintaining sufficient cash liquidity, for maintaining sufficient asset value (e.g. its shareholders equity, the fair value of its portfolio of cannabis loans and collateral, etc), and for maintaining sufficient EBITDA to cover or more than cover its loan payment obligations. If its cannabis loans keep

deferring interest payments and lose value, AFC will eventually be in breach of one or more of its financial covenants.

11. On or about March 13, 2025, AFC Gamma announced that it would pay a dividend of 0.23 per share, a 30% cut from the prior quarter. The dividend was announced to be paid on April 15. With approximately 22 million shares outstanding, AFC would need about $5 million to pay that dividend.

12. Attached to this affidavit is an article in Forbes Magazine about AFC Gamma's largest shareholder and Chairman, Leonard Tannenbaum. As recounted in the article, he made his fortune by starting a company called Fifth Street Asset Management. The article characterizes his company as a "fee reaping management company" attached to an "obscure financing vehicle," akin to a mortgage REIT. According to the article, the company made high yield loans, generating enormous fees "while Tannenbaum assured investors that his portfolio was sound." According to the sources quoted in the Forbes article, Tannenbaum's company was the "poster child" for a poor performing management company that "has been mismanaged for the benefit of the external manager," i.e., Tannenbaum's controlled entities. The article also discusses the demise of the company and how Tannenbaum left rich even though the investors lost money. The article mentions that Mr. Tannenbaum's former father-in-law, staked him but later sued him.

13. Tannenbaum's affiliated entity, AFC Management, has charged tens of millions of dollars in fees to AFC. His wholly owned company, AFC Agent, has also received a great deal of money that it charged to AFC borrowers, including Justice.

14. Paragraph 7, above, describes that numerous of AFC's cannabis loans are underperforming and that AFC has not generated the cash it hoped for when making these extremely high interest loans.

15. Paragraph 8, above, describes dividend and management fee practices that appear to be deplete AFC's shareholders' equity.

16. AFC Gamma CEO Dan Neville sent Justice the February Default Notice, attached to this Declaration as Exhibit D.

17. Neville also sent a letter of the same date to me and Mr. Loevy demanding $30 million, supposedly because we violated the Bad Boy Guarantee. He threatened to sue each of us personally. That letter is attached to this Declaration as Exhibit E. His allegations were ridiculous. We wrote a lengthy response rejecting the demand entirely.

18. In April, AFC Gamma tried to shake us down again. First it sent an email purporting to hold Justice in default and accelerate the loan. That letter is attached to this Declaration as Exhibit F. Then AFC lowered its extortionate threat to $10 million. It also wanted us to agree to add Justice's cannabis assets from other states into the collateral package. It threatened that it would bring a "RICO" lawsuit naming Loevy and me personally to cause us personal and professional embarrassment. It even sent a draft complaint full of malicious falsehoods and defamatory vagaries and targeting our careers as attorneys.

19. We were unwilling to be extorted and resolved to fight if they did make good on their threats.

20. I have learned that Tannenbaum texted members of the Justice team several times on April 9 asking whether we would agree to the $10 million demand. The inference was he was going to pull the trigger on the extortionate suit if we did not kowtow to him.

21. We stood our ground. AFC then raided Justice's bank accounts and sued Loevy and me personally, alleging fraud and RICO violations.

22. When AFC Gamma sent the February Default Notice, I sought to investigate Mr. Neville's allegations. In particular, Mr. Neville accused me and Mr. Loevy of mismanaging AFC's collateral. This was absurd because Neville had put Bossidy in charge and insisted he stay in charge even as the team was telling Neville about Bossidy's damaging mismanagement. I responded to Neville, denying his absurd accusation and pointing out that AFC should be liable for Bossidy's mismanagement, not me and Mr. Loevy. Shortly thereafter, Bossidy sent a bizarre email to me and Mr. Loevy suggesting that we are in charge of him, even though he had never contacted us even once in the year that he held the role. It felt like he and Neville were working together to try to create false evidence. As recounted in Bloc Dispensary LLC v. Bossidy, 25 CV 1725 (D.N.J.) ("Bossidy Lawsuit"), I asked Bossidy to forward me an email he had with AFC and provide a list of the channels he had used to communicate with AFC. He behaved suspiciously and then got a lawyer. It became clearer and clearer to me that Bossidy was working in league with AFC to set us up. I learned from his lawyer that he had sent secret emails to AFC using servers outside the company (such that we could not access them). I demanded that Bossidy provide all his correspondence with AFC as it was directly relevant to prove Neville was making false accusations of how the company ran. Bossidy refused, prompting the Bossidy Lawsuit pending before this Court.

23. I have reviewed some, but not all, of Bossidy's emails—those he sent from and received on the Justice server and did not successfully delete, and not the texts and emails he sent and received using other platforms. From that review, it is apparent to me that Bossidy was acting as AFC Gamma's agent. AFC Gamma was running the company through him. For

example, I saw emails of Bossidy seeking approvals from Dan Neville for company decisions on purchases and payments to contractors, and stating that he had to get AFC's sign off on small matters like an employee's raise.

24. Separately, I saw an email from Dan Neville stating that he communicated with Bossidy at least weekly. I saw Bossidy checking with AFC Gamma's employees about the status of the lab construction and taking directions on this and other projects.

25. I also found evidence that Bossidy was conspiring with Neville and spying for him. For example, just two months after AFC Gamma installed Bossidy, Bossidy forwarded to AFC Gamma a privileged email from Justice's in house counsel. In the forward he indicated that he had been helping Neville build a case to revoke the Forbearance Agreement:

> I'll manage this so nothing for you to do   I just wanted to flag for you another forbearance breach to add to your list.

Email attached to this Declaration as Exhibit B (emphasis added).

26. As a licensed cannabis facility, all activity at Bloc must be recorded. I analyzed some videos of Bossidy while he was in Bloc's facilities.  I have seen bills from SierraConstellation Partners showing Bossidy billed $700/hour while there and am told that the bills from that firm totaled approximately $800,000. I am also told and have seen evidence indicating that Bossidy typically came to the facility only 1-2 days per month.

27. I found videos of Bossidy sitting for hours in Bloc's conference room with his laptop and cellphone. At times I could make out what was on his laptop screen.  While billing $700 per hour he was surfing the internet, visiting what appear to be auction sites for exotic cars and expensive watches. He would scroll through listings of what appeared to be vacation homes, and clickbait photos. I saw him get on a zoom with Justice's CEO to go through an important

budgeting call with her. Instead of engaging, he quickly switched his screen back to surfing, even looking at bikini models while occasionally switching back to the CEO for a moment or two.

28. I sent a link to the video to AFC Gamma's CEO and demanded Bossidy's immediate firing. This time AFC Gamma finally agreed. Bossidy was terminated in mid-March.

29. On March 17, after Justice terminated Bossidy, AFC Gamma's CEO Neville emailed Justice's Controller, Bill Papatheofanis. Neville demanded audited financials by the next day, March 18, or in short order.

30. I sent the following email in response:

Dear Mr. Neville:

The team forwarded me your demand to receive financials with a 24 hour turnaround time. My understanding is that the terms of our agreement give us three full business days to respond. Nevertheless, as a courtesy to you and AFC, the team is endeavoring to respond on your timeline.

I write separately to document my concern that you are making your 24 hour demand in bad faith to bully the team as retaliation for terminating Mr. Bossidy. Several facts lead me to this concern:

-- First, even though we are entitled to the three business days, you tried to intimidate the team by demanding an immediate turnaround.

-- Second, in your entire time at AFC Gamma, you have never mentioned, much less asked to see the financial information you have now demanded. Your sudden timing is highly suspicious.

-- Third, Ms. Fields wrote you several months ago, on January 6, 2025, stating "He (Bossidy) mentioned there were some financials that AFC would like to have access to, can you share that list with us so Tripp and I can work on them for you?" (emphasis added). Rather than tell Ms. Fields what financials you wanted, you ignored her. Almost two and one half months later, you demand a 24 hour turnaround time. That certainly does not appear to be good faith by you or AFC. Moreover, I note that this was no mistake. Ms. Fields followed up with you again on January 30th and you ignored her again.

-- Fourth, as I expect you are aware, AFC has waived the audited financials provision of the credit agreement. AFC waived the provision to save money when we informed it that none of our other lenders require audited financials and thus the expense, $120,000 $150,000, would come out of New Jersey and Pennsylvania funds. Relatedly, were it not for AFC's express verbal waiver, the forbearance agreement would have waived it

8

> separately expressly in writing. In particular, the forbearance agreement spells out the financial reporting which will be required (Section 5.1) and it does not include audited financials.
>
> All that said, assuming AFC wants to rescind the waiver and the forbearance on this point, we are prepared to grant it if that is how AFC wants to spend the money. Let me know if you are prepared to release the necessary funds and we will provide you with a reasonable timeline for completing a 2023 audit and a 2024 audit. Obviously, unaudited financials can be made available much sooner and at no additional cost.
>
> -- Fifth and finally, you previously had complete access to the financial information directly through Mr. Bossidy and Colin Moran. Moreover, AFC has had not only access to, but control over all money in and out of our bank accounts for a year. AFC has had perfect transparency into our finances at the most granular level. So, again, the timing of your immediate turnaround demand stands out as suspicious.
>
> Accordingly, I would appreciate, and hereby demand, that you promptly forward to me all of AFC's communications with Mr. Bossidy requesting or receiving financial information about the company, so that the company can assess the good or bad faith of your actions.

31.    In my opinion a lender who is acting in good faith would want Bloc to succeed. Therefore, upon being told repeatedly that the manager they selected was mismanaging the company and driving down earnings (something they could see from the financial reporting) the good faith lender would want to replace him. AFC, however, did the opposite. It insisted that Bossidy be left in place. I believe that AFC behaved this way because it was already planning to take Plaintiffs' assets, planned to have Bossidy assist it, and believed it could move to take the assets at a time of its choosing because of its list of supposed defaults to justify it. I have also learned from my investigation about the Greenrose case, where Bossidy had a similar role, and is alleged to have helped the lenders take the cannabis assets. I also learned that Bossidy had been put in charge of a cannabis company called Med Men when it had debt problems and attempted to deliver its assets at too low a price to a company where Neville was CFO.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __4/21/25__                         _____
                                                Michael Kanovitz