IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **HAYDEN GATEWAY LLC and BLOC DISPENSARY LLC,**<br><br>Plaintiffs,<br><br>v.<br><br>**ADVANCED FLOWER CAPITAL INC. and AFC AGENT LLC,**<br><br>Defendants. | CIVIL ACTION NO. **3:25-CV-02789**<br><br>**DECLARATION OF**<br>**GAIL BRASHERS-KRUG** |

1. I have served, at various points, as the Chief Legal Officer, Chief People Officer, and Chief Compliance Officer of Justice and its subsidiaries and affiliates.

**The Perfection Certificate and the TC Applico Note**

2. I participated in negotiating the 2023 Forbearance with AFC Gamma as the Chief Legal Officer of Justice Cannabis Co. ("Justice") and its subsidiaries.

3. In the course of those negotiations, I spoke multiple times via telephone with Dan Neville and Len Tannenbaum of AFC Gamma.

4. During those negotiations, AFC Gamma was interested in expanding its collateral basket. That is, AFC Gamma wanted, as additional security for its loan, to take secured interests in assets owned by Justice's owners or Justice's subsidiaries in states outside New Jersey and Pennsylvania.

1

5. At that time, Justice's Missouri entity, JG Missouri LLC, had dispensaries operating in Missouri. Those dispensaries were the subject of a first-priority lien by another cannabis lender, Altmore, and therefore were unavailable as collateral loan.

6. By way of background, Justice was awarded its Missouri dispensary licenses in 2021 through a highly competitive application process. Justice's owner, Jon Loevy, is particularly skilled at drafting comprehensive, well-conceived, winning license applications. Loevy has assisted a number of entities and individuals, particularly individuals who have been adversely impacted by the criminalization of cannabis, in winning licenses.

7. I explained to AFC Gamma that, when Justice won its Missouri dispensary licenses, Loevy also helped two other entities win dispensary licenses in Missouri. Those two entities are TC Applico LLC ("TC Applico") and Growing Jobs Missouri LLC ("Growing Jobs"). With Loevy's assistance, both entities won multiple licenses in Missouri.

8. Neither Loevy nor any Justice entity holds or has ever held any ownership interest in either TC Applico or Growing Jobs, or in any of their assets. No Justice entity manages or has ever managed the TC Applico dispensary.

9. JG Missouri LLC had also won a cultivation license in Missouri. Justice planned to establish a vertically integrated operation in Missouri through its cultivation and dispensaries. Justice also intended to foster positive relationships with other dispensary operators in Missouri that could become customers of the planned JG Missouri cultivation.

10. Loevy agreed that a Justice entity, Oakland Manager LLC, would lend TC Applico and Growing Jobs $5 million each, via a line of credit, to pay for construction of their dispensaries and start-up costs. Oakland Manager did, in fact, fund each of those loans fully.

11. Each of those loans was reflected in a promissory note (the "Missouri Notes"). Unfortunately, the promissory notes were not well drafted, fully executed, and/or executed by the proper signatories. They therefore faced significant legal barriers to enforcement.

12. Things did not go as planned. JG Missouri was unable to open its planned cultivation. TC Applico opened its dispensaries, but they were not as successful as the parties had hoped. Growing Jobs was unable to open all of its dispensaries, and performed very poorly, financially.

13. The time for repayment of the TC Applico and Growing Jobs loans came and went; not one dollar of the loans and the millions of dollars in accrued interest was repaid. Moreover, neither entity was performing well financially, and both were illiquid. Justice determined that efforts to enforce the notes through litigation would be unlikely to succeed, and collection on any judgment would be difficult.

14. The owners of TC Applico and some of the owners of Growing Jobs expressed interest in selling their dispensaries. In 2022 and 2023, Justice was also interested in selling its dispensaries in Missouri and exiting the Missouri market entirely.

15. Justice determined that its best chance of getting any portion of the notes repaid was to find a buyer and negotiate a deal for the purchase of JG Missouri's' dispensaries *and* those of TC Applico and/or Growing Jobs as a package deal. Justice began actively looking for buyers.

16. In mid- to late-2023, as described above, Justice was negotiating its 2023 Forbearance with AFC Gamma. AFC Gamma was interested in additional collateral to secure its loan. AFC Gamma inquired whether Justice held any financial interest in TC Applico or Growing Jobs that could serve as additional collateral.

17. I had at least one lengthy telephone conversation with either Dan Neville or Len Tannenbaum (or both) of AFC Gamma on this topic. I explained the background and history of the relationships as set forth above. I explained to AFC Gamma that Justice and its owners did not own any equity interests in either entity. Rather, a Justice entity held the Missouri Notes which, in our view, were likely unenforceable.

18. AFC Gamma was interested in exploring the possibility of selling or assigning the Missouri Notes to a third party as additional security for its loan. I explained the barriers to collection, and told AFC Gamma that Justice would consider selling, assigning, or pledging the notes as collateral.

19. I further explained that our best chance at getting any portion of the notes repaid was through a sale of the dispensaries, as described above, but I could not promise that such a sale would occur or that the Missouri Notes would be fully repaid even if it did occur.

20. AFC Gamma decided that the Missouri Notes would not be valuable collateral and decided to pursue other options.

21. The parties executed the 2023 Forbearance in September 2023. The 2023 Forbearance did not include any reference to the Missouri Notes, or to TC Applico or Growing Jobs, as AFC Gamma had decided not to pursue them as sources of collateral. The 2023 Forbearance is attached to this Declaration as Exhibit I.

22. As a condition to the 2023 Forbearance, AFC Gamma required Justice to produce, among other things, a debt schedule, identifying the indebtedness of all the Justice entities.

23. On December 11, 2023, I emailed that debt schedule to AFC Gamma CEO Dan Neville and other AFC Gamma personnel. In that email, I stated the following:

4

> Assets: HoldCo's assets primarily consist of the licenses disclosed in my prior email of today, as well as the assets of each facility, including inventory, fixtures, equipment, and the like. As noted in my earlier email, HoldCo does not hold an ownership interest in any entities that are not licensed and disclosed on the license spreadsheet. HoldCo does not own any real property. **HoldCo is the payee on two notes to an unrelated Missouri entity, but, as we have discussed previously, those notes face significant legal barriers to enforcement**.

(Email from Gail Brashers-Krug, attached to this Declaration as Exhibit M (emphasis added)).

24. AFC Gamma was thus fully aware of the existence of the Missouri Notes, and their strengths and weaknesses as additional security for the loan. They considered and rejected those notes as collateral.

25. In 2024, Justice was able to negotiate a deal with a third party pursuant to which the third part purchased the JG Missouri dispensaries and the TC Applico dispensaries, but not the Growing Jobs dispensaries. The TC Applico note was partially repaid to Justice out of the proceeds of that sale.

26. Justice has had no success negotiating the sale of the Growing Jobs dispensaries or otherwise getting any portion of the Growing Jobs note repaid.

### The Pennsylvania Cultivation Reopening Agreement

27. Pier Cove LLC ("Pier Cove") is the licensed Justice entity that operated the Pennsylvania cultivation. In late July 2025, the Pennsylvania Department of Health ("DOH") denied Pier Cove's application to renew its license, citing the fact that the facility was not operational.

28. Pier Cove timely appealed, using outside counsel at Ice, Miller. That appeal is still pending. Justice notified AFC via email of the denial, of our appeal, and of our decision to retain Ice, Miller to assist.

29. I assisted in preparing the settlement proposal for DOH with the goal of settling the appeal, renewing the license, and reopening the cultivation.

30. On December 12, 2024, as we were preparing our settlement proposal, Justice's CEO emailed AFC's CEO, Dan Neville, stating, "As part of our settlement with the state to get the grow restarted and those 3 additional retail stores, we need to provide a letter from AFC that confirms what we discussed a couple months back, that we can use up to $500K from our equity account for initial restart fees (utilities, cleaning, initial staffing, etc.)."

31. The same day, Neville replied, "Ok. Can you guys or Ice [Miller, outside counsel] draft. Happy to do. . . ." The email exchange is attached to the Declaration as Exhibit N.

32. On January 7, 2025, AFC's CEO Dan Neville requested a copy of our settlement proposal to DOH. On January 14, I emailed him a zip folder containing the entire submission, including exhibits, and offered to speak with him. He did not respond.

33. As part of the Reopening Agreement, Justice's owners, Jon Loevy and Michael Kanovitz, pledged to contribute $5 million to pay for construction and reopening costs for the cultivation. Those pledges are attached to this Declaration as Exhibit K.

34. Negotiations with DOH are going very well, and we anticipate a settlement soon. In its most recent Motion to Continue the status hearing on the administrative appeal, the DOH stated, "The parties continue to work in good faith towards a potential resolution outside of litigation. . . . Accordingly, the Department, in consideration of the time Pier Cove needs to work

with third-party contractors in the pursuit of settlement of this matter, requests the hearing be continued. . . ." The DOH's Motion is attached to this Declaration as Exhibit L.

35. On February 6, 2025, AFC filed its Foreclosure Lawsuit, in breach of the Reopening Agreement. I emailed AFC's CEO, its two Directors, and its General Counsel, urging it to dismiss the foreclosure and requesting a discussion. My email stated, in relevant part:

> We did the things we told AFC we would do: appealed the DOH's decision not to renew the cultivation permit, hired Ice Miller, and engaged with the agency to get the permit renewed. DOH invited us to submit a proposal, including a detailed plan to complete the construction on the cultivation and get it fully operational. I provided that submission to Dan in a previous email. With Dan's approval, we offered to spend $500,000 from the escrow account and the owners committed to put in approximately $4.5 million dollars more so that the construction is completed and the restart fully-funded.
> . . .
> In short, our prediction that promising the fresh capital and showing follow through would allow us to resolve the issue with DOH and reopen the facility has proven correct.
>
> What threatens the plan, though, is AFC's surprising move to foreclosure. We all agreed that both sides can benefit if we can get the cultivation re-opened and operational again. Obviously, you would have foreseen that filing foreclosure risked upending the process with DOH, and so we do not understand the move. The plan is a win/win for AFC and the company. It improves the value of AFC's collateral, revives a source of revenues for the company which we can use to more quickly pay down the loan, and could yield three new dispensary licenses for the company. The owners' agreement to invest the additional $4.5 million, as well as all of our time spent pursuing this resolution, was undertaken in direct reliance of the understanding that Justice and AFC are working together to get the cultivation operational again.
>
> Frankly, AFC's decision to attack while the plan was succeeding feels very much like a deliberate attempt to sabotage your borrower's ability to repay the loan. If that is not what is going on, then the incompetence of AFC is inconceivable. We now fear that AFC's maneuver has created problems that will cause DOH not to agree to the relicensing. Put simply, we do not expect that DOH will settle with us on a license dispute on a property that AFC is threatening to take in litigation.

36. AFC refused to stay or withdraw the Foreclosure Lawsuit.

**The Cultivation Inventory Discrepancy**

7

37. As is required by New Jersey law, the Bloc cultivation meticulously tracks each and every plant as it proceeds from seedling to harvested cannabis, using bar codes and RFID tags. Bloc maintains the records of each plant on an internal, proprietary tracking system. At the same time, Bloc also maintains the state-mandated tracking system called Metrc, which is used by the state to monitor the sale of cannabis. Metrc is therefore visible to the CRC and which the CRC can view at any time. Bloc's employees input the tracking data into both systems.

38. I have learned that in August 2024, Bossidy discovered that some of the information accurately maintained in Bloc's proprietary tracking system had not been uploaded to Metrc. Specifically, that information related to unsellable biomass. When cannabis plants are harvested, the flower is picked, dried, cured, and packaged for sale. The stems, leaves, and other biomass, often called "trim," are either destroyed and rendered chemically inert through a heavily regulated process or used by an extraction lab to make distillate, which can be turned into vape cartridges or edible gummies.

39. Bossidy told me he discovered that Bloc employees had correctly entered the weight of the trim into Bloc's own tracking system, but had not entered that information into Metrc. The trim had been placed in storage totes. Bossidy told me he informed AFC Gamma about the discrepancy immediately.

40. Four months later, Bossidy informed me about his discovery. The two of us then worked together with Bloc's post-harvest technicians, security personnel, and compliance specialist to conduct a fulsome audit of all trim that had not been recorded in Metrc. We verified that none of the unrecorded trim had been sold, destroyed, or diverted, and that all of it had been accurately tracked in Bloc's proprietary tracking system.

41. Bossidy and I self-reported the discrepancy to the CRC; entered the trim weights into Metrc; produced and implemented a Corrective Action Plan; revised Bloc's relevant Standard Operating Procedures to clarify the requirement to enter the trim weights in Metrc; and directed that the post-harvest staff be retrained to comply with those requirements.

42. Upon review of Bloc's self-report and corrective action plan, the CRC determined not to take any action or require any further action.

43. All Metrc records were updated to reflect the unrecorded trim. All Metrc and internal inventory records are accurate and up-to-date.

44. Moreover, Bossidy provided the self-report and corrective action plan to AFC Gamma via email contemporaneously.

45. This event does not constitute an event of default. Plaintiffs simply did not "fail[] to notify [AFC Gamma] that the inventory records and other records provided to Agent were materially inaccurate."

## The Need for Injunctive Relief

46. If AFC's raids on Plaintiffs' bank accounts are not enjoined, Plaintiffs will suffer irreparable harm. Cannabis is a highly regulated industry. If Plaintiffs are shuttered, there is a very real likelihood that the regulatory agencies in New Jersey and Pennsylvania will take administrative action, up to and including permanently revoking Plaintiffs' cannabis licenses.

47. The majority of our New Jersey employees are members of a union, with whom Plaintiff Bloc has entered into a Collective Bargaining Agreement ("CBA"). The CBA covers, among other things, the union members' pay. If Bloc misses a payroll, it will be in immediate breach of the CBA, which would likely lead to a finding by the National Labor Relations Board that Bloc committed an Unfair Labor Practice. Such a finding would likely lead to administrative

sanctions, including fines, and litigation. It can also imperil Bloc's licenses under New Jersey law.

48. We are currently negotiating a renewal of the CBA. If Bloc fails to make payroll during the CBA negotiations, the results would likely be disastrous to labor relations.

49. AFC has threatened to seize the pledged equity in Plaintiff Hayden—that is, to take ownership of Plaintiff Hayden—via a non-judicial foreclosure and sell it at a public sale under UCC section 9-610. That threat was communicated to me in a email from Dan Neville on March 12, 2025, stating, "[we] intend to foreclose on equity of Hayden Gateway, LLC, pursuant to a public auction under Section 9-610 of the New York Uniform Commercial Code."

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __4/21/2025__

_Gail Brashers-Krug_
Gail Brashers-Krug