# EXHIBIT I

*Execution Version*

# FORBEARANCE AGREEMENT

This FORBEARANCE AGREEMENT ("**Agreement**"), dated as of September 12, 2023 (the "**Forbearance Effective Date**"), is made by and among Bloc Dispensary LLC (f/k/a JG New Jersey LLC), SRG 1761 North Olden LLC, SRG 1474 Prospect LLC, SRG Waretown LLC, Hayden Gateway LLC, Pier Cove LLC, SRG 272 Main Street LLC, and SRG HI Park LLC (each, a "**Borrower**" and collectively, the "**Borrowers**"), JG Holdco LLC ("**Parent**"), the other Persons party hereto, the Lenders party hereto (the "**Forbearing Lenders**") and AFC Agent LLC, as administrative agent for the Lender Group (in such capacity, "**Agent**"). Capitalized terms used herein without definition shall have the meanings ascribed thereto in the Credit Agreement (as defined below).

## RECITALS

**WHEREAS**, Borrowers, Parent, Agent (as successor in interest to AFC Management, LLC), and the Forbearing Lenders are parties to that certain Second Amended and Restated Credit Agreement, dated as of September 30, 2021, as amended by that certain Amendment No. 1 to Second Amended and Restated Credit Agreement, dated as of June 30, 2022, Amendment No. 2 to Second Amended and Restated Credit Agreement, dated as of August 26, 2022, Amendment No. 3 to Second Amended and Restated Credit Agreement, effective as of December 31, 2022 and Amendment No. 4 to Second Amended and Restated Credit Agreement, effective as of April 26, 2023 (and as further amended, supplemented, restated or otherwise modified from time to time, the "**Credit Agreement**").

**WHEREAS**, as security for all of the indebtedness and obligations due to the Lenders under the Credit Agreement (collectively, the "**Obligations**"), (a) Borrowers executed and delivered to Agent that certain Second Amended and Restated Security Agreement, dated as of September 30, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Security Agreement**"), granting to Agent, for the benefit of the Lender Group, a security interest in the Collateral (as defined therein), (b) Parent, Jon Loevy, Michael Kanovitz and Vanessa Abbe Ferber Kruger executed and delivered to Agent that certain Second Amended and Restated Pledge Agreement dated as of September 30, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Pledge Agreement**"), granting to Agent, for the benefit of the Lender Group, a security interest in the Collateral (as defined therein), (c) Parent executed and delivered to Agent that certain Guaranty, dated as of April 5, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Parent Guaranty**"), pursuant to which Parent has unconditionally and irrevocably guaranteed the payment of any and all of the Guarantied Obligations (as defined therein) to Agent, for the benefit of the Lender Group, and (d) Jon Loevy and Michael Kanovitz executed and delivered to Agent that certain Shareholder Guaranty, dated as of April 5, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Shareholder Guaranty**"), pursuant to which each Shareholder Guarantor has unconditionally and irrevocably guaranteed the payment of any and all of the Guarantied Obligations (as defined therein) to Agent, for the benefit of the Lender Group;

**WHEREAS**, Borrowers are in default of the Credit Agreement by virtue of the certain Defaults and Events of Default set forth on <u>Schedule I</u> hereto (collectively, the "**Specified Defaults**"), each of which is currently or Borrowers anticipate will become an Event of Default under the Credit Agreement during the Forbearance Period;

**WHEREAS**, on July 28, 2023, Agent delivered to Borrowers a Notice of Events and Default and Reservation of Rights, pursuant to which Agent notified Borrowers of certain Events of Default continuing under the Credit Agreement;

**WHEREAS**, on July 28, 2023, Agent delivered to Parke Bank a Notice of Exclusive Control (the "**Notice of Exclusive Control**"), under the terms of that certain Account Control Agreement, dated as of October 22, 2021 (as amended, supplemented or otherwise modified from time to time, the "**DACA**"), by and among JG New Jersey LLC, Hayden Gateway LLC, AFC Agent LLC (as successor in interest to AFC Management, LLC) and Parke Bank, pursuant to which Agent obtained exclusive control of the bank accounts subject to the DACA (the "**Accounts**");

**WHEREAS**, on August 4, 2023, Agent delivered to Borrowers a Notice of Disposition of Collateral (Public Sale) (as amended, supplemented or otherwise modified from time to time, the "**Foreclosure Notice**"), pursuant to which Agent (and its designees) shall sell certain assets (the "**PA Assets**") of Hayden Gateway LLC in a public auction under Section 9-610 of the New York Uniform Commercial Code (as adjourned, continued or rescheduled, the "**PA Article 9 Foreclosure Sale**");

**WHEREAS**, Borrowers and Parent have requested Agent and Lenders to forbear from exercising their rights and remedies under the Credit Agreement and the other Loan Documents with respect to the Specified Defaults, provided, however, that the Specified Defaults do not include any that might be uncovered or confirmed pursuant to an inspection to be conducted under Section 5.4 of the Credit Agreement;

**WHEREAS**, Agent and the Forbearing Lenders are willing to forbear from exercising such rights and remedies with respect to the Specified Defaults for a limited period of time as set forth herein, provided that Borrowers comply with the terms and conditions of this Agreement, and excluding rights and remedies in connection with the Notice of Exclusive Control and the PA Article 9 Foreclosure Sale; and

**WHEREAS**, the Forbearing Lenders (which constitute Required Lenders) have authorized, instructed and directed Agent to enter into this Agreement and to take or not take all such actions, steps, deeds or other actions as provided herein or in connection herewith.

**NOW, THEREFORE**, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    <u>Acknowledgments</u>. Borrowers and Parent acknowledge and agree that:

1.1    <u>Recitals</u>. The above recitals are true and correct.

1.2    <u>Specified Defaults</u>. The occurrence of the Specified Defaults have resulted in, or shall result in, Events of Default under the Credit Agreement.

1.3    <u>Obligations</u>. The Obligations are not subject to any setoff, deduction, claim, counterclaim, or defenses of any kind or character whatsoever.

1.4    <u>Collateral</u>. The Agent, for the benefit of the Lender Group, has valid, enforceable, and perfected security interests in and liens on the Collateral, as to which there are no setoffs, deductions, claims, counterclaims, or defenses of any kind or character whatsoever.

1.5    <u>No Lending Obligation</u>. As a result of the Specified Defaults, Agent and Lenders have no obligation to make Loans or otherwise extend credit to Borrowers.

1.6    <u>Right to Accelerate Obligations</u>. As a result of the Specified Defaults, subject to the forbearance contemplated hereby, Lenders have the right to accelerate the maturity and demand immediate payment of the Obligations.

1.7    <u>No Waiver of Defaults</u>. Neither this Agreement, nor any actions taken in accordance with this Agreement or the Loan Documents, including Agent's and Lenders' continued making of loans to Borrower, shall be construed as a waiver of or consent to the Specified Defaults or any other existing or future defaults under the Loan Documents, including any that might be uncovered or confirmed pursuant to an inspection conducted under Section 5.4 of the Credit Agreement, as to which Agent's and Lenders' rights shall remain reserved.

1.8    <u>Preservation of Rights and Remedies</u>. Upon expiration of the Forbearance Period (as defined in <u>Section 2.1</u>), all of Agent's and Lenders' rights and remedies under the Loan Documents and at law and in equity shall be available without restriction or modification, as if the forbearance had not occurred.

1.9    <u>Lender Conduct</u>. Agent and Lenders have fully and timely performed all of their obligations and duties in compliance with the Loan Documents and applicable law, and have acted reasonably, in good faith, and appropriately under the circumstances.

1.10    <u>Notice of Exclusive Control</u>.  Agent and Lenders have properly and validly delivered the Notice of Exclusive Control and asserted control over the Accounts under the Loan Documents, the DACA and applicable law.

1.11    <u>PA Foreclosure Sale</u>.  Agent and Lenders have properly and validly delivered the Foreclosure Notice under the Loan Documents and applicable law.

1.12    <u>Default Interest</u>.  The occurrence and continuation of the Specified Defaults permit the Required Lenders to charge the default rate of interest in excess of the interest

rate otherwise applicable to the Obligations under the Credit Agreement (the "**Default Rate**") pursuant to Section 2.5(b) of the Credit Agreement with respect to all outstanding Obligations.

2.    Lender Forbearance.

2.1    Forbearance Period. Subject to compliance by Borrowers and Parent with the terms and conditions of this Agreement, Agent and the Forbearing Lenders hereby agree to forbear from exercising their rights and remedies under the Loan Documents with respect to the Specified Defaults (other than as expressly set forth in Section 2.3) during the period (the "**Forbearance Period**") commencing on the Forbearance Effective Date and ending on the earlier to occur of (i) October 15, 2023 and (ii) the date that any Forbearance Default (as defined in Section 10) occurs. The Forbearing Lenders' forbearance, as provided herein, shall immediately and automatically cease without notice or further action on the earlier to occur of (i) or (ii) (the "**Termination Date**"). On and from the Termination Date, Agent, at the direction of the Required Lenders, may exercise any and all remedies available under the Loan Documents by reason of the occurrence of any Events of Default thereunder or the continuation of any Specified Default.

2.2    Extension of Forbearance Period. In the sole discretion of the Forbearing Lenders and without obligation, they may renew or extend the Forbearance Period, or grant additional forbearance periods.

2.3    Scope of Forbearance. During the Forbearance Period, Agent and Lenders will not (i) accelerate the maturity of the Obligations or initiate proceedings to collect the Obligations; (ii) initiate or join in filing any involuntary bankruptcy petition with respect to Borrowers or Parent under the Bankruptcy Code, or otherwise file or participate in any insolvency, reorganization, moratorium, receivership, or other similar proceedings against Borrowers or Parent under the laws of the U.S.; (iii) repossess or dispose of any of the Collateral, through judicial proceedings or otherwise; (iv) exercise or enforce any other rights and remedies under the Credit Agreement, the other Loan Documents or applicable law; (v) initiate proceedings to enforce the Parent Guaranty; or (vi) charge the Default Rate pursuant to Section 2.5(b) of the Credit Agreement with respect to the outstanding Obligations; provided, that, notwithstanding anything to the contrary set forth herein, the following actions shall be excluded from the forbearance granted hereunder: (a) any and all actions taken pursuant to the DACA and the Notice of Exclusive Control, including the continued exercise by Agent of exclusive control of the Accounts and any application of the amounts on deposit therein to the Obligations as determined by Agent in accordance with the Loan Documents; (b) the process of selling the PA Assets in the PA Article 9 Foreclosure Sale, the consummation of the PA Article 9 Foreclosure Sale and any application of the proceeds thereof to the Obligations in accordance with the Loan Documents; (c) judicial foreclosure with respect to the real property located at Site 35A, Humboldt Industrial Park, Hazletown, PA 18201 (also known as 5 Chestnut Hill, Hazle Township, PA 18201) (the "**PA Cultivation Property**"), the process of selling the PA Cultivation Property, the consummation of the foregoing and any application of the proceeds

-4-

thereof to the Obligations in accordance with the Loan Documents; provided, that, notwithstanding the foregoing, Agent and Lenders shall not take any such actions with respect to the PA Cultivation Property during the Forbearance Period unless Mosaic takes any action to enforce the mechanic's lien it has asserted against the PA Cultivation Property; (d) the inspection authorized by Section 5.4 of the Credit Agreement and Agent's and Lenders' exercise of any rights and remedies and/or right to assert any claims or causes of action as a result of any fraud, intentional misconduct, gross negligence or bad faith by Parent, Borrower or any Shareholder Guarantor, including with respect to undisclosed tax liabilities, proceeds from equipment loans used for other purposes, and potential improper distributions of cash; and (e) Agent's and Lenders' right to initiate proceedings to enforce the Shareholder Guaranty.

2.4    <u>Default Interest</u>. Notwithstanding anything in this Agreement or elsewhere to the contrary, Borrowers acknowledge that nothing shall prohibit, limit, restrict or otherwise impact in any way any rights of Agent or any Lender from imposing, charging or collecting interest at the Default Rate set forth in and pursuant to Section 2.5(b) of the Credit Agreement at any time (i) on or after the Termination Date with respect to the Specified Defaults or (ii) on or after the occurrence of any other Event of Default (other than the Specified Defaults).

3.    <u>Conditions Precedent</u>. On or prior to the Forbearance Effective Date, each of the following conditions shall have been satisfied in Agent's sole discretion, unless waived in writing by Agent:

3.1    <u>Diligence</u>.  Agent shall have received the items requested in the "Special Requests Checklist" dated July 17, 2023, in each case, in form and substance satisfactory to Agent in its sole discretion.

3.2    <u>Agreement</u>.  Agent shall have received counterparts of this Agreement executed by each of the parties hereto, including the Lenders constituting Required Lenders.

3.3    <u>Representations and Warranties</u>.  The representations and warranties set forth in <u>Section 4</u> below shall be true and correct.

3.4    <u>No Default or Event of Default</u>.  No Default or Event of Default shall have occurred and be continuing, other than the Specified Defaults.

3.5    <u>Hazelwood Mortgage</u>.  Agent or the title company, Kensington Vanguard National Land Services, shall have received an original counterpart notarized signature page to the first priority Mortgage with respect to the real property located at 6850 Hazelwood Ave., Hazelwood, MO 63134 (the "**Hazelwood Property**").

3.6    <u>Ohio License</u>.  Michael Kanovitz shall have caused Cannavitz Ventures LLC ("**Cannavitz Ventures**") to execute and deliver to Agent a secured non-recourse guaranty, pursuant to which Cannavitz Ventures grants a first-priority lien on and security interest in the Ohio provisional dispensary license #MMD.04137 (the "**Ohio License**"), in favor of

-5-

Agent (for the benefit of the Lender Group) and guarantees the Obligations on a non-recourse basis to the extent of the Ohio License, in form and substance satisfactory to Agent.

3.7    <u>IL Licenses</u>.  JG IL LLC ("**JG IL**") shall have executed and delivered to Agent a secured non-recourse guaranty pursuant to which JG IL grants a first-priority lien on and security interest in the conditional dispensing licenses # 284.000339-CL, 284.000340-CL and 284.000341-CL (the "**Illinois Licenses**"), in favor of Agent (for the benefit of the Lender Group) and guarantees the Obligations on a non-recourse basis to the extent of the Illinois Licenses, in form and substance satisfactory to Agent.  Notwithstanding the foregoing, Agent and Lenders acknowledge and understand that, in connection with the lease JG IL entered into for the property commonly known as 2125 East 5th Street, Metropolis, Illinois (and as security against a default by JG IL under said lease), JG IL granted the landlord a security interest in conditional dispensing license # 284.000340-CL. JG IL shall, upon the request of Agent, use commercially reasonable efforts to obtain a subordination agreement from such landlord, in form and substance satisfactory to Agent, pursuant to which such landlord subordinates its lien and security interest in conditional dispensing license # 284.000340-CL to the lien and security interest of Agent.

3.8    <u>Costs and Expenses</u>. Borrowers shall have paid all of Agent's and the Forbearing Lenders' reasonable out-of-pocket costs and expenses (including documented attorneys' fees) incurred in connection with the Credit Agreement, the other Loan Documents, this Agreement and the other documents executed and/or delivered in connection herewith.

4.    <u>Representations and Warranties</u>.

4.1    Each Borrower and Parent represents and warrants to Agent and the Forbearing Lenders as follows:

(a)    <u>No Default</u>.  Other than the Specified Defaults, no Default or Event of Default has occurred and is continuing.

(b)    <u>No Defense</u>.  Each Borrower and Parent have no grounds to and will not assert any defense to the enforcement of Agent's or the Lenders' rights and remedies under the Notice of Exclusive Control and in connection with the PA Article 9 Foreclosure Sale.

(c)    <u>Incorporation of Representations and Warranties From Credit Agreement</u>.  Except with respect to the Specified Defaults (and, to the extent not constituting a Specified Default, except as otherwise previously disclosed by the Loan Parties to Agent with respect to the matters described in Section 3.7 of Amendment No. 2), the representations and warranties contained in Section 4 of the Credit Agreement are and will be true, correct and complete in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality or Material Adverse Effect in the text thereof) on and as of the date hereof to the same extent as though

-6-

made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case they were true, correct and complete in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality or Material Adverse Effect in the text thereof) on and as of such earlier date.

(d)    Accuracy of Information. All information provided by Borrowers and Parent, or any of their respective agents, is true, correct, and complete in all material respects, as of the date provided and does not contain any untrue statements of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

4.2    Each Borrower, Parent, Hazelwood, JG IL and Cannavitz Ventures (each, an "**Obligor**") represents and warrants to Agent and the Forbearing Lenders as follows:

(a)    Corporate Power and Authority.  Such Obligor has all requisite limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations hereunder.

(b)    Authorization of Agreements.  The execution and delivery of this Agreement has been duly authorized by all necessary limited liability company action on the part of such Obligor, as the case may be.

(c)    No Conflict.  The execution and delivery of this Agreement will not (a) violate any Laws, the organization documents of such Obligor or any order, judgment or decree of any court or other agency of government binding on such Obligor, (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any contractual obligation of such Obligor, (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of such Obligor (other than the Liens created under the Security Agreement, any Mortgage or any other Loan Document), or (d) require any approval or consent of any Person under any contractual obligations of such Obligor.

(d)    Governmental Consents.  The execution and delivery by such Obligor of this Agreement does not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body.

(e)    Binding Obligation.  This Agreement has been duly executed and delivered by such Obligor and this Agreement and is the legally valid and binding obligations of such Person, enforceable against such Person in accordance with its terms.

-7-

(f)    Advice of Counsel.  Such Obligor has freely and voluntarily entered into this Agreement with the advice of legal counsel of their choosing, or have knowingly waived the right to do so.

(g)    No Duress.  This Agreement has been entered into without force or duress, of the free will of such Obligor.  Such Obligor's decision to enter into this Agreement is a fully informed decision and each is aware of all legal and other ramifications of such decision.

5.    Covenants. In order to induce Agent and the Forbearing Lenders to forbear from the exercise of their rights and remedies as set forth above, the Obligors covenant and agree as follows:

5.1    Compliance with Loan Documents. Borrowers and Parent shall continue to perform and observe all covenants, terms, and conditions, and other obligations contained in all of the Loan Documents (as expressly modified herein) and this Agreement, except with respect to the Specified Defaults.

5.2    Sale of Pennsylvania Dispensary Real Estate.

(a)    SRG 272 Main Street LLC ("**Main Street**") shall promptly, and in any event within fifteen (15) days after execution of a management services agreement in connection with the operation of the Pennsylvania dispensaries (or such later date as may be agreed to by Agent in its sole discretion) (the "**PA Dispensary RE Sale Outside Date**"), sell the real property located at 256 Main Street, Dickson City, PA 18519 and 272 Main Street, Dickson City, PA 18519 (the "**PA Dispensary RE Sale**") for Net Cash Proceeds (as defined below) of not less than $700,000 in the aggregate, on terms and conditions satisfactory to Agent in its sole discretion.

(b)    Main Street shall, not later than one (1) Business Day following the consummation of the PA Dispensary RE Sale, apply such Net Cash Proceeds, first, to the payment of any accrued but unpaid cash interest under the Credit Agreement, second, and then to the repayment of any capitalized interest or fees under the Credit Agreement and third, to the repayment of outstanding principal under the Credit Agreement.

(c)    In the event Main Street fails to consummate the PA Dispensary RE Sale by the PA Dispensary RE Sale Outside Date, in addition to any other rights and remedies available to Agent and Lenders under the Loan Documents, Agent shall automatically, without further action by any party, have the right, as agent and attorney-in-fact for Main Street, to consummate the PA Dispensary RE Sale, in its sole and absolute discretion, without any further consent or approval of Main Street.

5.3    Mortgage and Sale of Hazelwood Property.

-8-

(a)    SRG 6850 Hazelwood LLC ("**Hazelwood**"), an Affiliate of Borrowers and Parent, shall promptly, and in any event within ten (10) Business Days after the date hereof, (i) pay, discharge and release (or caused to be paid, discharged and released) the overdue taxes and related tax liens on the Hazelwood Property for the fiscal year 2021 and (ii) deliver all Mortgage Supporting Documents with respect to the Hazelwood Property; provided that Hazelwood shall not be required to (1) deliver a local counsel opinion regarding enforceability of the Mortgage with respect to the Hazelwood Property or (2) pay the taxes and tax liens on the Hazelwood Property for the 2022 and 2023 fiscal years.

(b)    Hazelwood shall, on or before (i) October 6, 2023 (the "**Hazelwood Sale Outside Date**"), enter into a bona fide purchase and sale agreement with an unaffiliated third party for the Hazelwood Property for a purchase price of not less than $2,000,000 in the aggregate, on terms and conditions satisfactory to Agent in its sole discretion (the "**Hazelwood PSA**") and (ii) December 31, 2023, consummate the sale of the Hazelwood Property pursuant to the terms of the Hazelwood PSA.

(c)    Borrowers and Parent shall, and shall cause Hazelwood to, not later than one (1) Business Day following the consummation of the sale of the Hazelwood Property, apply such Net Cash Proceeds, first, to the payment of any accrued but unpaid cash interest under the Credit Agreement, second, to the repayment of any capitalized interest or fees under the Credit Agreement and third, to the repayment of outstanding principal under the Credit Agreement.

(d)    In the event Hazelwood fails to enter into the Hazelwood PSA by the Hazelwood Sale Outside Date, in addition to any other rights and remedies available to Agent and Lenders under the Loan Documents, Agent or its Affiliate shall automatically, without further action by any party, have the right in its sole and absolute discretion, as agent and attorney-in-fact for Hazelwood, to purchase the Hazelwood Property for gross proceeds of $1,500,000 (which amount is subject to diligence by Agent), which shall be applied, first, to payment of outstanding taxes on the Hazelwood Property (and any related fines and penalties), and second, in accordance with Section 5.3(c), above.  In the event the property is so purchased, then the covenants set forth in this Section 5.3 shall be deemed to have been satisfied.

(e)    Borrowers and Parent acknowledge and agree that Hazelwood and Borrowers are part of a controlled group of companies and the Loans and other financial accommodations provided to Borrowers under the Credit Agreement and the other Loan Documents and the forbearance and other accommodations granted by the Forbearing Lenders hereunder, directly and indirectly benefit Hazelwood.

5.4    New Jersey Construction.

(a)    Parent and Borrowers shall, by no later than September 15, 2023, deliver to Agent each of the following with respect to the construction of the extraction lab and kitchen at the cultivation facility (the "**NJ Facility**") at 1474

-9-

Prospect Street, Ewing, New Jersey 08638 (the "**NJ Construction**"), in each case, in form and substance satisfactory to Agent in its sole discretion: (i) remaining project scope, (ii) construction completion schedule (specifying the amount of liquidation damages payable by the general contractor ("**Mosaic**") if the general contractor fails to adhere to such schedule), (iii) a duly executed copy of the "guaranteed maximum price" construction contract with Mosaic in connection with the NJ Construction, specifying the guaranteed maximum price payable to Mosaic (the "**Mosaic GMP**"), (iv) full equipment list with pricing and delivery dates and (v) evidence that the revised drawings (such drawings to be approved by AFC in its reasonable discretion) (the "**Revised Drawings**"), have been submitted to the applicable Governmental Authority for approval.  Parent and Borrowers shall obtain approval of the Revised Drawings from the applicable Governmental Authority no later than thirty (30) days following submission.

(b)      Borrowers shall by no later than September 12, 2023, (i) resubmit a draw request to Agent in the amount of $1,653,065.75 (the "**Draw Request**") and (ii) pay or cause to be paid to Agent by wire transfer an amount equal to $52,096.75 (for pay app #28 and accrued interest due and payable from prior pay apps), which payment shall be made from the bank account of JG New Jersey LLC (the "**NJ Specified Payment**").  Borrowers shall not hinder, delay or otherwise interfere with the withdrawal or payment of the NJ Specified Payment.

(c)      Parent and Borrowers shall timely make, or cause to be made, all payments due and payable in connection with the NJ Construction and, if such payment is not made though Partner Engineering, shall promptly provide Agent with proof of each such payment (satisfactory to Agent in its sole discretion).

5.5      Sale of Ohio License.

(a)      Borrowers, Parent and Michael Kanovitz acknowledge and agree that (i) Michael Kanovitz is the sole member (and has the power to direct the actions of) Cannavitz Ventures and a manager of Hayden Gateway LLC, which is the manager of each Borrower, (ii) Cannavitz Ventures is an Affiliate of Borrowers and part of a controlled group of companies with Borrowers, and (iii) the Loans and other financial accommodations provided to Borrowers under the Credit Agreement and the other Loan Documents and the forbearance and other accommodations granted by the Forbearing Lenders hereunder, directly and indirectly benefit Cannavitz Ventures.

(b)      (i) Cannavitz Ventures shall promptly, and in any event within fourteen (14) days after the date hereof (the "**Ohio License Sale Outside Date**"), consummate the sale and transfer of the Ohio License (the "**Ohio License Sale**") for Net Cash Proceeds (as defined below) at closing of not less than $1,000,000 in the aggregate (the "**Ohio License Net Cash Proceeds**"), on terms and conditions satisfactory to Agent in its sole discretion and (ii) Michael Kanovitz shall promptly, and in any event, not later than one (1) Business Day following the consummation of the Ohio License

-10-

Sale, apply (or cause to be applied) the Ohio License Net Cash Proceeds, first, to any accrued but unpaid cash interest under the Credit Agreement, second, to the repayment of any capitalized interest or fees under the Credit Agreement, and third, to the repayment of outstanding principal under the Credit Agreement; provided, that any deferred purchase price (including any earnout or similar payments) with respect to the Ohio License Sale shall also be applied as set forth in this clause (b)(ii) within one (1) Business Day of receipt.

(c)    In the event the Ohio License Sale is consummated by the Ohio License Sale Outside Date and the Ohio License Net Cash Proceeds are applied to the Obligations in accordance with clause (b) above, Agent shall, at Cannavitz Ventures sole cost and expense, terminate the secured non-recourse guaranty by Cannavitz Ventures, release Agent's Lien on the Ohio License and execute and deliver all such documents as Cannavitz Ventures may reasonably request evidencing the foregoing termination and release.

5.6    Equity Contribution.

(a)    On or prior to October 6, 2023 (the "**Equity Contribution Outside Date**"), Borrowers shall deposit into escrow with Agent the proceeds of one or more cash equity capital contributions to Borrowers, in an aggregate amount of not less than $3,000,000 (the "**Equity Contribution Amount**" and together with additional amounts required to be deposited into escrow with Agent pursuant to clause (b) below, the "**Cash Equity Escrow Amount**"); provided that such cash equity capital contribution(s) (i) are upon terms and conditions satisfactory to Agent and (ii) constitute(s) Qualified Stock.

(b)    In the event that Agent determines that the estimated amount of the NJ Construction Liabilities (as defined below) exceeds the Cash Equity Escrow Amount, Agent shall promptly notify Borrowers of such determination, and Borrowers shall promptly, and in any event within fifteen (15) days of such notification, deposit into escrow with Agent, the proceeds of additional cash equity capital contributions in an amount equal to or greater than the amount of such shortfall.

(c)    The Cash Equity Escrow shall be applied by Agent (i) first, to repay the amount of the Protective Advance (together with accrued interest thereon) and (ii) second (and finally), towards the NJ Construction (including, for the avoidance of doubt, the cost of equipment and all additional estimated costs and expenses of completion of the NJ Construction) (the amounts described in the foregoing clauses (i) and (ii), the "**NJ Construction Liabilities**").

5.7    Illinois Licenses.

(a)    Borrowers and Parent acknowledge and agree that (i) JG IL is an Affiliate of Borrowers and part of a controlled group of companies with Borrowers, and (ii) the Loans and other financial accommodations provided to Borrowers under

-11-

the Credit Agreement and the other Loan Documents and the forbearance and other accommodations granted by the Forbearing Lenders hereunder, directly and indirectly benefit JG IL.

(b)     JG IL shall, on or before October 6, 2023 (the "**IL License Sale Outside Date**"), (i) enter into a bona fide purchase and sale agreement with an unaffiliated third party for its two (2) BLS-5 Illinois Licenses (being conditional dispensing licenses # 284.000339-CL and 284.000341-CL) (the "**BLS-5 Licenses**") for a purchase price of not less than $3,000,000 in the aggregate, on terms and conditions satisfactory to Agent in its sole discretion (the "**Illinois PSA**") and (ii) collaterally assign the Illinois PSA to Agent on terms and conditions satisfactory to Agent in its sole discretion (which collateral assignment shall provide, among other things, that Agent shall have the right to exercise its rights thereunder in the event the Equity Contribution Amount is not deposited into escrow by the Equity Contribution Outside Date).

(c)     In the event the Equity Contribution Amount is deposited into escrow by the Equity Contribution Outside Date in accordance with Section 5.6(a) above, Agent shall, at JG IL's sole cost and expense, terminate the secured non-recourse guaranty by JG IL, release Agent's Liens on the Illinois Licenses, terminate the collateral assignment of the Illinois PSA and execute and deliver all such documents as JG IL may reasonably request evidencing the foregoing releases and terminations.

(d)     In the event (i) the Equity Contribution Amount is not deposited into escrow by the Equity Contribution Outside Date in accordance with Section 5.6(a) above and (ii) JG IL fails to enter into the Illinois PSA by the IL License Sale Outside Date and collaterally assign the Illinois PSA to Agent on terms and conditions satisfactory to Agent in its sole discretion, in addition to any other rights and remedies available to Agent and Lenders under the Loan Documents, Agent shall automatically, without further action by any party, have the right, as agent and attorney-in-fact for JG IL, to conduct a sale process with respect to the Illinois Licenses and accept or reject any offer with respect thereto, in its sole and absolute discretion, without any further consent or approval of JG IL.

5.8     PA Article 9 Foreclosure Sale.    In connection with the PA Article 9 Foreclosure Sale, Parent and Borrowers shall promptly take such further actions and execute and deliver such further instruments and documents that Agent may reasonably request, in order for Agent to foreclose on the PA Assets, including the Pennsylvania dispensary permit # D-2013-17 (the "**PA Dispensary License**"), including, without limitation, forming a new subsidiary to which the PA Dispensary License will be transferred, executing and delivering any board or shareholder consents or approvals as may be required in connection therewith, and using best efforts to cooperate with the Pennsylvania Department of Health in connection with the foregoing.

4894-1993-3553.13

5.9     Prohibited Transactions.  Notwithstanding anything to the contrary set forth in the Credit Agreement, Parent and Borrowers shall not, without the express written consent of Agent, directly or indirectly (a) use the proceeds of any New Jersey operations or any cash held in any account of any Borrower with operations in New Jersey to pay any taxes, accounts payable or other expenses of any kind of any Borrower with operations in Pennsylvania or otherwise related to the Pennsylvania construction, business or operations (including in the form of any Investment or any Restricted Payment), or (b) comingle any assets of any Borrower operating in New Jersey with the assets of any Borrower operating in Pennsylvania.

5.10     Control Agreement.  Pursuant to the Notice of Exclusive Control, Parent and Borrowers shall not access, withdraw or transfer funds from the Accounts without the consent of Agent.

5.11     Perfection of Lenders' Liens. Borrowers and Parent shall execute and deliver, and shall cause each applicable Affiliate or other related party, as applicable, to execute and deliver to Agent, such documents and take such actions as Agent deems necessary or advisable to perfect or protect the security interests, mortgages, or liens granted to Agent for the benefit of the Lender Group.

5.12     Agent Appointed Attorney-in-Fact.  Without limiting any rights or remedies of Agent or the Lenders set forth in the Loan Documents or any power of attorney granted pursuant to or in connection with the Loan Documents, each Obligor hereby irrevocably appoints Agent its attorney-in-fact, with full authority in the place and stead of such Person and in the name of such Person or otherwise, in connection with the transactions contemplated hereunder, to take any action and to execute any instrument which Agent may reasonably deem necessary to accomplish the purposes of this Agreement.  To the extent permitted by law, each Obligor hereby ratifies all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof.  This power of attorney is coupled with an interest and shall be irrevocable until this Agreement is terminated.

For purposes of this Agreement, "**Net Cash Proceeds**" means the amount of cash proceeds received (directly or indirectly) by or on behalf of an Obligor as initial consideration (and not as deferred compensation), in connection a sale or disposition, after deducting therefrom only (i) reasonable fees, commissions, and expenses related thereto and required to be paid by a such Obligor in connection with such sale or disposition, (ii) taxes paid or payable to any taxing authorities by such Obligor in connection with such sale or disposition, in each case to the extent, but only to the extent, that the amounts so deducted are actually paid or payable to a Person that is not an Affiliate of such Obligor and are properly attributable to such transaction (or are required to be paid in order to close the subject transaction) and (iii) with respect to the Ohio License Sale only, $110,000, which may be paid to Michael Kanovitz as reimbursement for the application fee for the Ohio License.

6.     Agreements by Agent and Lenders.  So long as the Obligors timely comply with each of the covenants set forth in Section 5:

-13-

6.1    <u>Protective Advance; Payment to Mosaic</u>.

(a)    Agent shall, or shall cause its applicable Affiliate, subject to receipt of (i) the deliverables set forth in <u>Section 5.4(a)</u>, (ii) the NJ Specified Payment (which Agent shall withdraw from the bank account of JG New Jersey LLC), and (iii) a release from Mosaic with respect to any claims related to the construction at the NJ Facility, in form and substance satisfactory to Agent in its sole discretion, (x) advance an additional Term Loan under the Credit Agreement in excess of the Term Loan Amount (a "**Protective Advance**") equal to $1,600,969.00 to Borrowers, which shall be subject to the terms and conditions set forth in clauses (b) and (c) below, (y) submit the Draw Request to Partner Engineering for disbursement to Mosaic and the relevant subcontractors and (z) provide proof of funds to Mosaic in the amount of the Mosaic GMP.

(b)    The amount of the Protective Advance shall be allocated to the Lenders based on each Lender's Pro Rata Share of the Loan Commitment.

(c)    The Protective Advance (i) is reasonably necessary to preserve and protect the Collateral and enhance the likelihood of repayment of the Obligations, (ii) shall be deemed to be part of the Obligations under the Credit Agreement, part of the Secured Obligations under the Security Agreement, and part of the Guaranteed Obligations under the Parent Guaranty, (iii) shall be repayable on demand, secured by Agent's Liens, and bear interest at the rate applicable from time to time to the Term Loans under the Credit Agreement (without regard to the amendments to the interest rate set forth in <u>Section 6.2</u> below).  The provisions of this <u>Section 6.1(c)</u> are for the exclusive benefit of Agent and the Lenders and are not intended to benefit any Borrower or Parent in any way.

6.2    <u>Amendments to Credit Agreement</u>.  Agent and the Lenders agree that:

(a)    <u>Interest</u>.  Notwithstanding anything to the contrary set forth in the Credit Agreement, including Section 2.5 of the Credit Agreement, the Term Loans (other than, for the avoidance of doubt, the Protective Advance) shall bear interest as follows, which shall be payable in cash in arrears: (a) for the month ending September 30, 2023, in an amount equal to $800,000, (b) for the month ending October 31, 2023, in an amount equal to $1,000,000, (c) for the month ending November 30, 2023, in an amount equal to $1,000,000, and (d) for the month ending December 31, 2023, in an amount equal to $1,000,000.

(b)    <u>Amortization</u>.  Notwithstanding anything to the contrary set forth in the Credit Agreement, including Section 2.3(d) of the Credit Agreement, the "Amortization Trigger Date" shall be January 1, 2024.

(c)    <u>Excess Cash Flow Sweep</u>.  Notwithstanding anything to the contrary set forth in the Credit Agreement, including Section 2.3(f)(v) of the Credit Agreement,

-14-

the Excess Cash Flow Sweep shall re-commence with the month ending January 31, 2024.

6.3    Commencing with the month ending September 30, 2023, so long as Borrowers timely pay all accrued and unpaid interest due in accordance with Section 2.5 of the Credit Agreement (as modified by Section 6.2 above) and all amortization payments due in accordance with Section 2.3(d) of the Credit Agreement (as modified by Section 6.2 above), Borrowers may pay a management fee for the subsequent month from the Accounts to Oakland Manager LLC in an amount not to exceed $80,000.

7.    Reaffirmation of Guaranties.

7.1    Parent hereby ratifies and reaffirms (i) the validity, legality, and enforceability of the Parent Guaranty; (ii) that its reaffirmation of the Parent Guaranty is a material inducement to Agent and the Forbearing Lenders to enter into this Agreement; and (iii) that its obligations under the Parent Guaranty shall remain in full force and effect until all the Obligations have been paid in full.

7.2    Each Shareholder Guarantor ratifies and reaffirms (i) the validity, legality, and enforceability of the Shareholder Guaranty; (ii) that its reaffirmation of the Shareholder Guaranty is a material inducement to Agent and the Forbearing Lenders to enter into this Agreement; and (iii) that its obligations under the Shareholder Guaranty shall remain in full force and effect until all the Obligations have been paid in full.

8.    Release. Each Borrower and Parent, on behalf of itself and its and their respective agents, representatives, officers, directors, advisors, subsidiaries, affiliates, successors and assigns (collectively, "**Releasors**"), hereby forever waives, releases and discharges, to the fullest extent permitted by law, each Releasee (as hereinafter defined) from any and all claims, demands or causes of action of any kind or nature (collectively, the "**Claims**"), that such Releasor now has, whether known or unknown, whether arising at law or in equity, against Agent or any Lender in any capacity and its respective affiliates, subsidiaries, shareholders and "controlling persons" (within the meaning of the federal securities laws), and its respective successors and assigns and each and all of the officers, directors, agents, and other representatives of each of the foregoing (collectively, the "**Releasees**"), based in whole or in part on facts, whether or not now known, existing on or before the date hereof, that relate to or otherwise are in connection with the Obligations, the Credit Agreement and/or any other Loan Document, or the transactions contemplated thereby; provided, however, such release shall not apply to any Claims that are determined in a non-appealable judgment by a court of competent jurisdiction to result from such Releasee's gross negligence or willful misconduct.  It is the intention of each Borrower and Parent in providing this release that the same shall be effective as a bar to each and every Claim specified, and in furtherance of this intention it waives and relinquishes all rights and benefits under any applicable law.  The provisions of this Section 8 shall survive the termination of this Agreement, the Credit Agreement, the other Loan Documents and payment in full of the Obligations.

9.    <u>Indemnification</u>. Borrowers hereby expressly acknowledge, agree, and reaffirm their indemnification obligations to the Indemnified Persons as set forth in Section 11.3 of the Credit Agreement. Borrowers further acknowledge, agree, and reaffirm that all such indemnification obligations set forth in Section 11.3 of the Credit Agreement shall survive the expiration of the Forbearance Period and the termination of this Agreement, the Credit Agreement, the other Loan Documents, and the payment in full of the Obligations.

10.    <u>Events of Default</u>. The occurrence of one or more of the following shall constitute a "**Forbearance Default**" under this Agreement:

10.1    Any Obligor shall fail to abide by or observe any term, condition, covenant (including, for the avoidance of doubt, any covenant set forth in <u>Section 5</u>), or other provision contained in this Agreement or any document related to or executed in connection with this Agreement.

10.2    A Default or Event of Default shall occur under the Credit Agreement (other than the Specified Defaults).

10.3    (a) Any Borrower repudiates or asserts a defense to any obligations or liability under the Credit Agreement or any other Loan Document, (b) Parent revokes or terminates its liability under the Parent Guaranty, or challenges the validity or enforceability of the Parent Guaranty, or denies any further liability or obligation thereunder or (c) any Shareholder Guarantor revokes or terminates its liability under the Shareholder Guaranty, or challenges the validity or enforceability of the Shareholder Guaranty, or denies any further liability or obligation thereunder.

10.4    As of immediately prior to the date and time that any Borrower or Parent files any petition or is subject to an involuntary petition seeking relief under Title 11 of the United States Code or any voluntary or involuntary proceeding is commenced with respect to any Borrower or Parent under any other federal or state bankruptcy, insolvency, receivership or similar law.

10.5    Any Obligor or Shareholder Guarantor or any of their respective Affiliates commences a case, proceeding, or other action against Agent, any Lender or any Releasee (as defined below) relating to any of the Obligations, Collateral, Loan Documents, this Agreement, or any action or omission by Agent, Lender, or their agents in connection with any of the foregoing.

10.6    Any representation or warranty of any Obligor made herein shall be false, misleading, or incorrect in any material respect when made.

10.7    Any Person shall challenge the validity or enforceability or otherwise seek to challenge, enjoin, avoid or unwind in any way the Notice of Exclusive Control or the PA Article 9 Foreclosure Sale.

Borrowers or Parent, as applicable, shall provide notice to Agent, as soon as possible but in any event within one (1) Business Day of the occurrence of any Forbearance Default, which notice shall state that such event occurred and set forth, in reasonable detail, the facts and circumstances that gave rise to such event.

11.    <u>Remedies</u>. Immediately upon the occurrence of a Forbearance Default:

11.1    The Forbearance Period shall immediately and automatically cease without notice or further action without notice to, or action by, any party.

11.2    Agent and Lenders shall be entitled to exercise any or all of their rights and remedies under the Loan Documents, this Agreement, or any stipulations or other documents executed in connection with or related to this Agreement or any of the Loan Documents, or applicable law, including, without limitation, the appointment of a receiver.

12.    <u>Miscellaneous</u>.

12.1    <u>Ratification of Liability</u>.  Each Borrower, Parent and Shareholder Guarantor, as debtors, grantors, pledgors, guarantors, assignors, or in other similar capacities in which such parties grant liens or security interests in their properties or otherwise act as accommodation parties or guarantors, as the case may be, under the Credit Agreement and the other Loan Documents, hereby ratify and reaffirm all of their payment and performance obligations and obligations to indemnify, contingent or otherwise, under each of such Credit Agreement and other Loan Documents to which it is a party, and ratify and reaffirm their grants of liens on or security interests in their properties pursuant to such Credit Agreement and other Loan Documents to which they are a party, respectively, as security for the Obligations under or with respect to the Credit Agreement, and confirms and agrees that such liens and security interests hereafter secure all of the Obligations, including, without limitation, all additional Obligations hereafter arising or incurred pursuant to or in connection with this Agreement, the Credit Agreement or any other Loan Document.  Each Borrower, Parent and Shareholder Guarantor further agrees and reaffirms that the Loan Documents to which they are parties now apply to all Obligations as defined in the Credit Agreement (including, without limitation, all additional Obligations hereafter arising or incurred pursuant to or in connection with this Agreement, the Credit Agreement or any other Loan Document).  Each such party (i) further acknowledges receipt of a copy of this Agreement and all other agreements, documents, and instruments executed and/or delivered in connection herewith, (ii) consents to the terms and conditions of same, and (iii) agrees and acknowledges that each of the Loan Documents remains in full force and effect and is hereby ratified and confirmed.

12.2    <u>References to and Effect on the Credit Agreement</u>.

(a)    Except as specifically set forth herein, all terms, conditions, covenants, representations and warranties contained in the Credit Agreement and other Loan Documents, and all rights of the Lender Group and all of the Obligations, shall remain in full force and effect.  Borrowers and Parent hereby confirm that the Credit

-17-

Agreement and the other Loan Documents are in full force and effect and that neither Borrowers nor Parent has any right of setoff, recoupment or other offset or any defense, claim or counterclaim with respect to any of the Obligations, the Credit Agreement or any other Loan Document.

(b)     Except as expressly set forth herein, the execution, delivery and effectiveness of this Agreement shall not directly or indirectly (i) constitute a consent or waiver of any past, present or future violations of any provisions of the Credit Agreement or any other Loan Documents nor constitute a novation of any of the Obligations under the Credit Agreement or other Loan Documents, (ii) amend, modify or operate as a waiver of any provision of the Credit Agreement or any other Loan Documents or any right, power or remedy of any member of the Lender Group, (iii) constitute a course of dealing or other basis for altering any Obligations or any other contract or instrument or (iv) create any obligation to make any further Loans or to continue to defer any enforcement action after the occurrence of any Default or Event of Default (including, without limitation, any Forbearance Default).  Except as expressly set forth herein, each member of the Lender Group reserves all of its rights, powers, and remedies under the Credit Agreement, the other Loan Documents and applicable law.

(c)     From and after the Forbearance Effective Date, the term "Loan Documents" in the Credit Agreement and the other Loan Documents shall include, without limitation, this Agreement and any agreements, instruments and other documents executed and/or delivered in connection herewith.

(d)     The Loan Parties acknowledge and agree that the Forbearing Lenders' agreement to forbear from exercising their default-related rights and remedies with respect to the Specified Defaults during the Forbearance Period as set forth herein does not in any manner whatsoever limit any member of the Lender Group's right to insist upon strict compliance by Borrower and Parent with the Credit Agreement, this Agreement or any other Loan Document during the Forbearance Period, except as expressly set forth herein.

(e)     No member of the Lender Group has waived (regardless of any delay in exercising such rights and remedies), any Default or Event of Default that may be continuing on the date hereof or any Event of Default that may occur after the date hereof (whether the same or similar to the Specified Defaults or otherwise), and no member of the Lender Group has agreed to forbear with respect to any of its rights or remedies concerning any Events of Default (other than, during the Forbearance Period, the Specified Defaults solely to the extent expressly set forth herein), that may have occurred or are continuing as of the date hereof, or that may occur after the date hereof.

(f)     This Agreement shall not be deemed or construed to be a satisfaction, reinstatement, novation or release of the Credit Agreement or any other Loan Document.

12.3    <u>Fees and Expenses</u>.    Each of Borrower and Parent acknowledges that, in accordance with the Credit Agreement, all Lender Group Expenses incurred by Agent, Lenders and their respective counsel with respect to this Agreement and the documents and transactions contemplated hereby shall be for the account of Borrowers and Parent.

12.4    <u>Notices</u>. Any notices with respect to this Agreement shall be given in the manner provided for in Section 12 of the Credit Agreement, Section 31 of the Security Agreement and/or Section 20 of the Pledge Agreement, as applicable.

12.5    <u>Integration; Modification of Agreement</u>. This Agreement and the Loan Documents embody the entire understanding between the parties hereto and supersedes all prior agreements and understandings (whether written or oral) relating to the subject matter hereof and thereof.  The terms of this Agreement may not be waived, modified, altered, or amended except by agreement in writing signed by all the parties hereto. This Agreement shall not be construed against the drafter hereof.

12.6    <u>Severability of Provisions</u>. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

12.7    <u>Successors and Assigns</u>. This Agreement is binding upon and shall inure to the benefit of the parties hereto and their respective heirs, successors, and assigns, provided that Borrowers' and Parent's rights under this Agreement are not assignable. Agent and the Forbearing Lenders may assign their rights and interests in this Agreement, the Loan Documents, and all documents executed in connection with or related to this Agreement or the Loan Documents, at any time without the consent of or notice to Borrowers or Parent.

12.8    <u>Cumulative Rights</u>. The rights, remedies, powers, and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers, and privileges provided by law.

12.9    <u>Recommendation of Counsel</u>. Each Obligor acknowledges that Agent has recommended that they each consult with counsel prior to execution of this Agreement and represent that they either have done so or have knowingly waived the right to do so despite the express recommendation of Agent.

12.10   <u>Choice of Law and Venue; Jury Trial Waiver</u>.

(a)     THE VALIDITY OF THIS AGREEMENT, THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF, THE RIGHTS OF THE PARTIES HERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR RELATED HERETO, AND ANY CLAIMS, CONTROVERSIES

OR DISPUTES ARISING HEREUNDER OR RELATED HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK NOT INCLUDING CONFLICTS OF LAWS RULES.

(b)    TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HERETO HEREBY WAIVES THEIR RESPECTIVE RIGHTS, IF ANY, TO A JURY TRIAL OF ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS.  EACH PARTY HERETO REPRESENTS THAT IT HAS REVIEWED THIS WAIVER AND KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(c)    EACH    OBLIGOR    HEREBY    IRREVOCABLY    AND UNCONDITIONALLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF NEW YORK, SITTING IN THE COUNTY OF WESTCHESTER OR NEW YORK, AT THE REQUIRED LENDERS' DISCRETION, AND THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT AGENT MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AGAINST ANY OBLIGOR OR ANY OF THEIR PROPERTIES IN THE COURTS OF ANY JURISDICTION.

12.11  Section Headings.  Headings and numbers have been set forth herein for convenience only.  Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

12.12  Counterparts. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by electronic mail or other electronic method of transmission shall be equally as

effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by electronic mail or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

-21-

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**BORROWERS:**                    **BLOC DISPENSARY LLC (F/K/A JG NEW JERSEY LLC),**
                                  **SRG 1761 NORTH OLDEN LLC,**
                                  **SRG 1474 PROSPECT LLC,**
                                  **SRG WARETOWN LLC,**
                                  **HAYDEN GATEWAY LLC,**
                                  **PIER COVE LLC,**
                                  **SRG 272 MAIN STREET LLC,**
                                  **SRG HI PARK LLC**

                                  **By: Hayden Manager LLC, Manager**

                                  By:_____
                                  Name: Jon Loevy
                                  Title: Manager

**PARENT:**                       **JG HOLDCO LLC**

                                  By: _____
                                  Name: Jon Loevy
                                  Title:  Manager

**HAZELWOOD:**                    **SRG 6850 HAZELWOOD LLC (FOR PURPOSES OF SECTIONS 3.5, 4.2 AND 5.3 ONLY)**

                                  **By: Hayden Manager LLC, Manager**

                                  By:_____
                                  Name: Jon Loevy
                                  Title: Manager

**JG IL**                         **JG IL LLC (FOR PURPOSES OF SECTIONS 3.7, 4.2 and 5.7 ONLY)**

                                  **By: Hayden Manager LLC, Manager**

                                  By:_____
                                  Name: Jon Loevy
                                  Title: Manager

[*Signature Page to Forbearance Agreement*]

**SHAREHOLDER GUARANTORS**          **JON LOEVY (FOR PURPOSES OF SECTIONS 7.2 AND 12.1 ONLY)**

_____


**MICHAEL KANOVITZ (FOR PURPOSES OF SECTIONS 3.6, 5.5, 7.2 AND 12.1 ONLY)**

By: _____


**CANNAVITZ VENTURES**          **CANNAVITZ VENURES LLC (FOR PURPOSES OF SECTIONS 3.6, 4.2 and 5.5 ONLY)**

**By: Michael Kanovitz, Sole Member**


By:_____

**SHAREHOLDER GUARANTORS**　　　**JON LOEVY (FOR PURPOSES OF SECTIONS 7.2 AND 12.1 ONLY)**

_____

**MICHAEL KANOVITZ (FOR PURPOSES OF SECTIONS 3.6, 5.5, 7.2 AND 12.1 ONLY)**

By: _Michael Kanovitz/gbk_

**CANNAVITZ VENTURES**　　　**CANNAVITZ VENURES LLC (FOR PURPOSES OF SECTIONS 3.6, 4.2 and 5.5 ONLY)**

**By: Michael Kanovitz, Sole Member**

By: _Michael Kanovitz/gbk_

**AGENT:**                              **AFC AGENT LLC**

By:_____
Name:Gabriel Katz
Title:  Authorized Signatory


**FORBEARING LENDERS:**          **AFC GAMMA, INC.**


By: _____
Name: Brandon Hetzel
Title:  Chief Financial Officer

**AFC INSTITUTIONAL FUND, LLC**


By: _____
Name: Jeffrey Boccuzzi
Title:  Authorized Signatory

*[Signature Page to Forbearance Agreement]*

## SCHEDULE I

### Specified Defaults

1.  an Event of Default under Section 8.1(b)(i) of the Credit Agreement for the Liens filed by, among others, Mosaic Construction LLC, Arc Electric Construction Co., Inc., Troy Mechanical, Inc. and C.E. Ankiewicz Construction & Excavation, Inc., against the assets of one or more of the Borrowers, in violation of Section 6.2 of the Credit Agreement;

2.  an Event of Default under Section 8.1(b)(ii) of the Credit Agreement for the failure of the Loan Parties to observe and perform certain covenants, terms, conditions and agreements contained in certain Material Contracts, including under that certain Standard Form of Agreement Between Owner and Contractor (AIA Form A102 - 2017) dated as of October 25, 2021 by and between Mosaic Construction and SRG HI PARK, LLC , in each case, in violation of Section 5.15 of the Credit Agreement;

3.  an Event of Default under Section 8.1(b)(i) of the Credit Agreement for the failure to provide the relevant documents to Agent and each Lender in connection with the filing of the Liens described in clause (i) above, within 3 Business Days after obtaining knowledge thereof, in violation of Section 5.2 of the Credit Agreement;

4.  an Event of Default under Section 8.1(b)(i) of the Credit Agreement for the failure to provide the relevant documents to Agent and each Lender in connection with the violations of certain Material Contracts, as described in clause (ii) above, within 3 Business Days after obtaining knowledge thereof, in each case, in violation of Section 5.2 of the Credit Agreement;

5.  Events of Default under Section 8.1(a) of the Credit Agreement for the failure of the Loan Parties to make the cash interest payments due and owing for the months ending June 30, 2023 and July 31, 2023, in violation of Section 2.5(c) of the Credit Agreement;

6.  an Event of Default under Section 8.1(b)(i) of the Credit Agreement for the failure to provide notice of the Complaint to Enforce Mechanic's Lien Claim filed by Mosaic Construction, LLC, as plaintiff, against SRG HI PARK LLC (among others), as defendants, in the Court of Common Pleas, Luzerne County, which current liabilities or potential liability could reasonably be expected to exceed $250,000, within 3 Business Days after service of process with respect thereto, in violation of Section 5.1 of the Credit Agreement;

7.  an Event of Default under Section 8.1(b)(i) of the Credit Agreement for the failure to provide notice of the Complaint filed by Arc Electric Construction Co., Inc., as plaintiff, against Mosaic Construction, LLC (among others), as defendants, in the United States District Court for the Middle District of Pennsylvania, which current liabilities or potential liability could reasonably be expected to exceed $250,000, within 3 Business Days after service of process with respect thereto, in violation of Section 5.1 of the Credit Agreement;

8.     an Event of Default under Section 8.1(b)(i) for the failure by the Loan Parties to comply with the Minimum Cash Balance financial covenant for the fiscal quarter ending December 31, 2022, in violation of Section 7.5 of the Credit Agreement;

9.     Events of Default under Section 8.1(b)(i) for the failure by the Loan Parties to comply with the Minimum Adjusted EBITDA, Minimum Free Cash Flow, Maximum Total Leverage Ratio, Minimum Fixed Charge Coverage Ratio, Minimum Cash Balance, and Minimum Net Income financial covenants for the fiscal quarter ending March 31, 2023, in violation of Sections 7.1, 7.2, 7.3, 7.4, 7.5, and 7.6 of the Credit Agreement, respectively;

10.    an Event of Default under Section 8.1(b)(i) of the Credit Agreement for the failure by the Loan Parties to deliver annual audited financial statements for the fiscal year ending December 31, 2022, in violation of Section 5.1 of the Credit Agreement;

11.    an Event of Default under Section 8.1(b)(i) of the Credit Agreement for the failure by the Loan Parties to provide prior notice to Agent regarding the name change of JG New Jersey LLC, in violation of Section 6.5 of the Credit Agreement;

12.    an Event of Default under Section 8.1(b)(ii) of the Credit Agreement for the failure by the Loan Parties to defend their title and Agent's Lien on their assets and properties as described in clause (i) above, in violation of Section 5.5 of the Credit Agreement;

13.    an Event of Default under Section 8.1(b)(iii) of the Credit Agreement for the failure by the Loan Parties to execute and deliver a first priority Mortgage with respect to the real property located at 6850 Hazelwood Ave, Hazelwood, MO 63134, securing and being insured for $3,100,000 and all Mortgage Supporting Documents with respect thereto, in violation of Section 5.1 of the Amendment No. 4;

14.    an Event of Default under Section 8.1(n) of the Credit Agreement for the occurrence of a Material Adverse Effect;

15.    Events of Default under Section 8.1(b)(i) of the Credit Agreement for the failure to provide notice of each of the above events and conditions which constitute a Default or Event of Default and a statement of the curative action that the Loan Parties proposed to take with respect thereto, in each case, in violation of Section 5.1 of the Credit Agreement; and

16.    an Event of Default under Section 8.1(b)(i) of the Credit Agreement for the failure by the Loan Parties to comply with Section 6.15 of the Credit Agreement with respect to a draw request made in November 2022 for $408,814 for extraction equipment from Precision (in reference to Precision invoice no. S26402 dated November 9, 2022), which funds were advanced by Agent on November 11, 2022, but were not used to purchase the equipment identified on the referenced invoice.