**O'MELVENY & MYERS LLP**
Jeffrey A. N. Kopczynski
Abby F. Rudzin (*pro hac pending*)
1301 Ave. of the Americas, 17th Fl.
New York, NY 10019
Ph: (212) 326-2000
Fx: (212) 326-2061
jkopczynski@omm.com
arudzin@omm.com

*Counsel for Defendants*
*Advanced Flower Capital Inc.*
*and AFC Agent LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HAYDEN GATEWAY LLC and BLOC DISPENSARY LLC, | |
| Plaintiffs, | Civil Action No. 3:25-cv-02789-ZHQ-JBD |
| v. | |
| ADVANCED FLOWER CAPITAL INC. and AFC AGENT LLC, | Hearing: May 2, 2025 at 10:00 am |
| Defendants. | |

## DEFENDANTS' OPPOSITION TO EMERGENT
## <u>APPLICATION FOR A PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .......................................................................... 1

BACKGROUND ................................................................................................ 3

ARGUMENT ..................................................................................................... 6

    I.    The Borrowers cannot show a likelihood of success on the
    merits. .................................................................................................... 6

        A.    The Borrowers cannot show a likelihood of success on a
        claim that AFC is breaching the Credit Agreement or
        violating the UCC by exercising its remedies for the
        Borrowers' numerous continuing monetary defaults. ................. 8

        B.    The Borrowers cannot show a likelihood of success on a
        claim that AFC breached the Forbearance Agreement by
        exercising its remedies because AFC's obligation to
        forbear terminated long ago. ......................................................... 9

            1.    Failure to Obtain a Certificate of Occupancy for the
            New Jersey Lab by May 15, 2024. .................................... 10

            2.    Failure to Cooperate in the Pennsylvania
            Cultivation Foreclosure Proceeding. .............................. 12

            3.    Repeated Failure to Provide Audited Annual
            Financial Statements. ...................................................... 15

            4.    Loss of the Pennsylvania Cannabis License. ................... 17

            5.    Failure to Notify AFC of the Loss of the
            Pennsylvania Cannabis License. ..................................... 18

             6.    Failure to Provide Communications with the
            Pennsylvania DOH. ......................................................... 19

        C.    The Borrowers cannot show a likelihood of success on a
        claim that AFC breached the so-called Reopening
        Agreement because it does not exist and is not enforceable
        under New York law. ..................................................................... 21

    II.    The Borrowers cannot show irreparable harm for the injunction
    they seek. .............................................................................................. 23

    III.    The balance of equities and public interest weigh in favor of
    denying an injunction. .......................................................................... 27

    IV.    If the Court grants an injunction, the Borrowers need to post an
    adequate bond. ...................................................................................... 28

CONCLUSION ................................................................................................. 29

# TABLE OF AUTHORITIES

Page

## Cases

*Alexander v. Primerica Holdings, Inc.,*
  811 F. Supp. 1025 (D.N.J. 1993) .................................................................... 28

*In re Arthur Treacher's Franchisee Litig.,*
  689 F.2d 1137 (3d Cir. 1982) ........................................................................ 24

*Bank of Am, N.A., v. Won Sam Yi,*
  294 F. Supp. 3d 62 (W.D.N.Y. 2018) ....................................................... 26, 27

*Beacon Terminal Corp. v. Chemprene, Inc.,*
  75 A.D.2d 350 (App. Div. 1980) .............................................................. 15, 22

*Continuum Co. v. Incepts, Inc.,*
  873 F.2d 801 (5th Cir. 1989) ........................................................................ 28

*Delaware State Sportsmen's Ass'n, Inc. v. Delaware
  Dep't of Safety & Homeland Sec.,*
  108 F. 4th 194 (3d Cir. 2024) ....................................................................... 23

*In the Matter of Elcona Homes Corp.,*
  863 F.2d 483 (7th Cir. 1988) ........................................................................ 15

*GlaxoSmithKline LLC v. Boehringer Ingelheim Pharm., Inc.,*
  484 F. Supp. 3d 207 (E.D. Pa 2020) ............................................................. 28

*Goldblatt v. Englander Commc'ns, L.L.C.,*
  2007 WL 148699 (S.D.N.Y. Jan. 22, 2007) .................................................... 7

*Golden Fortune Imp. & Exp. Corp. v. Mei-Xin Ltd.,*
  2022 WL 3536494 (3d Cir. Aug. 5, 2022) ................................................ 24, 25

*Harris v. Provident Life and Acc. Ins. Co.,*
  310 F.3d 73 (2d. Cir. 2002) ............................................................................ 7

*Howmedica Osteonics Corp. v. Zimmer, Inc.,*
  2012 WL 847469 (D.N.J. 2012) .................................................................... 28

*Hoxworth v. Blinder, Robinson & Co.,*
  903 F.2d 186 (3d Cir. 1990) ......................................................................... 27

*Indus. Window Corp. v. Fed. Ins. Co.,*
  609 F. Supp. 2d 329 (S.D.N.Y. 2009) ........................................................... 13

*Instant Air Freight Co. v. C.F. Air Freight, Inc.,*
  882 F.2d 797 (3d Cir. 1989) ......................................................................... 24

## TABLE OF AUTHORITIES

**Page**

*James Connelly v. Nelson Christopher Ala,*
No. 657237/2017, 2024 NY Slip Op 30652
(N.Y. Sup. Ct. Mar. 1, 2024) ..................................................................... 22

*John Street Leasehold LLC v. FDIC,*
196 F.3d 379 (2d Cir. 1999) ..................................................................... 13

*Kraus v. Visa Int'l Serv. Assn.,*
304 A.D.2d 408 (App. Div. 2003) .............................................................. 6

*In re Lipitor Antitrust Litig.,*
868 F.3d 231 (3d Cir. 2017) ..................................................................... 27

*McBride v. Twp. of Washington,*
2020 WL 6947895 (D.N.J. Apr. 9, 2020) .................................................. 27

*Mead Johnson & Co. v. Abbott Lab.,*
201 F.3d 883 (7th Cir.2000) ..................................................................... 27

*MHR Cap. Partners LP v. Presstek, Inc.,*
12 N.Y.3d 640 (2009) ............................................................................... 20

*Novartis Consumer Health, Inc. v. Johnson &*
*Johnson-Merck Consumer Pharms. Co.,*
290 F.3d 578 (3d Cir. 2002) ..................................................................... 27

*Sanofi-Synthelabo v. Apotex, Inc.,*
470 F.3d 1368 (Fed. Cir. 2006) ................................................................ 28

*Scanvec Amiable Ltd. v. Chang,*
2002 WL 32341772 (E.D. Pa. Nov. 1, 2002),
*aff'd,* 80 Fed. App'x 171 (3d Cir. 2003) .................................................... 27

*Schuylkill Valley Sports, Inc. v. Corporate Images Co.,*
2020 WL 3167636 (E.D. Pa. 2020) ........................................................... 27

*Shields v. School of Law of Hofstra Univ.,*
77 A.D.2d 867 (App. Div. 1980) ................................................................ 6

*Tierney v. Capricorn Invs., L.P.,*
189 A.D.2d 629 (1993) ......................................................................... 13, 22

*Towers Charter & Marine Corp. v. Cadillac Ins. Co.,*
894 F.2d 516 (2d Cir.1990) ....................................................................... 13

## TABLE OF AUTHORITIES

**Page**

*USA Network v. Jones Intercable, Inc.*,
  704 F. Supp. 488 (S.D.N.Y. 1989) ........................................................ 24

*Washington Steel Corp. v. TW Corp.*,
  602 F.2d 594 (3d Cir. 1979).................................................................. 28

*Zalman Silber v. New York Life Ins. Co.*,
  92 A.D.3d 436 (App. Div. 2012)............................................................ 21

**Rules**

Fed. R. Civ. P. 65(c) ................................................................................ 27

Fed. R. Evid. 802..................................................................................... 21

## PRELIMINARY STATEMENT

Over the last four years, Plaintiffs (the "Borrowers") have borrowed tens of millions of dollars from Advanced Flower Capital Inc. ("AFC") after signing a credit agreement that appropriately contains terms and conditions to protect AFC's right to repayment. Among those terms and conditions is an obligation to make timely interest and principal payments. The Borrowers—which now owe AFC more than $100 million—do not dispute that they have failed to do so and thus are in default under the credit agreement. As the Borrowers themselves put it: they "were frequently late or unable to pay, resulting in defaults." (Mem. at 5.) The Borrowers likewise concede, as they must, that Section 9.1 of the credit agreement permits AFC to take control of the collateral—i.e., exercise its remedies—"[u]pon the occurrence and during the continuation of an Event of Default." (*Id.* at 27.) The Borrowers' payment defaults are continuing—they have not made up any of the missed payments—and thus the loan agreement permits AFC to foreclose on the collateral.

The Borrowers seem to believe that a forbearance agreement the parties signed in March 2024 somehow absolves them of these defaults or forever precludes AFC from exercising its remedies under Section 9.1. But it is hardly a get-out-of-jail-free card. To the contrary, in that agreement the Borrowers acknowledged their repeated payment defaults and agreed that once the forbearance agreement terminated, AFC could exercise all its remedies under Section 9.1 for those payment defaults. AFC's obligation to forbear "immediately and automatically cease[d] without notice or further action" upon the occurrence of "*any* Forbearance Default."

(Ex. A § 2.1.)[1]  Only one default is required: There is no materiality threshold for the default, no opportunity to cure the default, and no margin for Borrower error. Once *any* default occurs, the Borrowers do not pass go and do not collect $200: AFC's forbearance is over.

AFC has notified the Borrowers of approximately two dozen events that constitute Forbearance Defaults by the Borrowers.  Through their lengthy Complaint and Memorandum, the Borrowers dispute the facts on some and offer excuses on others.  But to show a likelihood of success on the merits, the Borrowers need to show a reasonable probability of being able to prove that somehow not a *single one* of those defaults is in fact a Forbearance Default.  Given their admissions, the Borrowers cannot possibly do so.  AFC therefore focuses below on only a portion of the defaults, any one of which permits AFC to begin foreclosing on the Borrowers' collateral under the operative agreements.

While the Borrowers put their own spin on their contractual obligations and seek to impugn AFC's competence and intentions, none of that helps the Borrowers show a likelihood of success on their claims.  It is black-letter law that in this breach-of-contract case, the Borrowers can neither present parol evidence to suggest an interpretation of the contract different from the words on the page nor defeat AFC's legal rights by suggesting that AFC had nefarious reasons for exercising them.  And as for the Borrowers' claim that AFC is somehow violating the UCC by

---

[1] Unless otherwise specified, all original alterations, internal quotation marks, and internal citations are omitted, and all emphasis is added in quoted passages.  All citations to Ex. __ are to the exhibits the Borrowers submitted with their papers.

foreclosing on the collateral, that argument is precluded by the Borrowers' admission that they are in default under the credit agreement.

The Borrowers' motion should therefore be denied on the merits. But it should also be denied because they cannot show irreparable harm. No actions the Borrowers propose to enjoin would impact this Court's ability to award the Borrowers sufficient monetary relief if appropriate. AFC, by contrast, will suffer millions of dollars in damages if it is wrongfully enjoined from enforcing its contractual rights. And under Rule 65(c), the Court must require the Borrowers to post security for those potential damages before entering any injunction.

## BACKGROUND

Founded in July 2020, AFC is an institutional lender to the commercial real estate sector that originates, structures, underwrites, and manages loans and debt securities, with a specialization in loans to cannabis industry operators in states that have legalized medical or adult-use cannabis. Justice Grown, founded by Jon Loevy and Michael Kanovitz, is a cannabis business operating through a network of subsidiaries that roll up to an ultimate parent, JG HoldCo LLC.[2] JG HoldCo owns, among other subsidiaries, 100% of Plaintiff Hayden Gateway LLC, which owns several dispensaries located in Pennsylvania. JG HoldCo also owns 87% of Plaintiff

---

[2] Weeks before the Borrowers filed this lawsuit, AFC had filed suit against Messrs. Lovey and Kanovitz alleging fraud and racketeering, among other claims, for their use of the Borrowers' funds as their personal piggy bank. The Borrowers spill much ink in this case defending that conduct, but AFC will prove those claims in New York. AFC does not address the unlawful transfers here, even though the conduct also constitutes Events of Defaults.

Bloc Dispensary LLC, which owns a cannabis cultivation and manufacturing company and several dispensaries in New Jersey.

On April 5, 2021, AFC entered into a credit agreement with Bloc and certain other Justice Grown affiliates through which AFC and its co-lenders agreed to fund up to $46,150,000 to finance the construction of Justice Grown's cultivation site and dispensaries in New Jersey. In September 2021, AFC entered into the Second Amended and Restated Credit Agreement (the "Credit Agreement," Exhibit H) to also finance the construction of a cultivation and processing site and dispensaries in Pennsylvania, increasing the financing commitment to $75,400,000. In exchange, the Borrowers, including Bloc and now Hayden Gateway, granted AFC a security interest in substantially all of their assets as collateral and provided various covenants about preserving the value of the collateral and notifying AFC if problems arose.

The Credit Agreement also requires the Borrowers to maintain compliance with certain financial covenants and to deliver certain financial reports, such as unaudited financial statements on a monthly and quarterly basis and audited financial statements on an annual basis. The Borrowers' failure to comply with any of these terms and covenants results—after a specified cure period—in an Event of Default under the Credit Agreement that gives AFC the right to exercise all rights and remedies under the Credit Agreement and the law. Other Events of Default under the Credit Agreement include engaging in affiliate transactions, failing to

make required principal or interest payments, failing to maintain financial covenants, and failing to satisfy other covenants and agreements.

The Borrowers struggled to comply with their obligations under the Credit Agreement almost immediately after signing it.  AFC tried to work with them to get them on the right track, entering into numerous amendments to the Credit Agreement.  Each Amendment was designed to give the Borrowers more flexibility to meet their obligations under the Credit Agreement, while providing AFC with more security for its increasingly risky investment.  But the Borrowers still could not get on track.  As a result, in September 2023, the parties entered into a forbearance agreement in which AFC agreed to forbear from exercising certain remedies for known Events of Default in exchange for further controls to get construction on schedule and the Borrowers' agreement to deliver to AFC proceeds from the disposition of certain assets.

Only one month later, the Borrowers defaulted under the Credit Agreement (and the 2023 Forbearance Agreement) again, by failing to deliver monthly financial statements for October 2023.  The Borrowers also missed their deadline to deliver monthly financial statements for November 2023.  The Borrowers then began missing interest and principal payments.  In March 2024, the parties entered into another forbearance agreement (the "Forbearance Agreement, Ex. A") in which AFC again agreed to forbear exercising its remedies for specified defaults, in exchange for the Borrowers again agreeing to further controls and covenants.  But the Borrowers' inability to honor their contractual commitments continued, and they

defaulted again under the Credit Agreement—now also a "Forbearance Default." On February 19, 2025, AFC provided a courtesy notice to Justice Grown and the Borrowers informing them of 17 Forbearance Defaults. (Ex. D.) As AFC explained to the Borrowers, the Forbearance Defaults automatically entitled AFC and its agents "to exercise all of their rights and remedies under [the] Credit Agreement and the other Loan Documents." (*Id.*) On April 9, 2025, AFC notified the Borrowers of six additional Forbearance Defaults, confirmed the automatic termination of the Forbearance Agreement, and provided notice of acceleration of the Borrowers' outstanding obligations under the Credit Agreement. (Ex. F.)

The Borrowers assert three claims against AFC: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) violation of the New York Uniform Commercial Code § 226. All three claims are governed by New York law. With this motion, the Borrowers ask the Court to enjoin AFC from exercising its rights under the Credit Agreement.

## ARGUMENT

## I.    The Borrowers cannot show a likelihood of success on the merits.

The Borrowers cannot establish a likelihood of success on the merits of their claims because they cannot show that they are likely to prove that AFC has breached a contract (Counts I and II) or seized assets in violation of the UCC (Count III). As an initial matter, the Borrowers do not identify what contractual provision of what contract AFC supposedly breached. This is fatal to their breach of contract claim. *See, e.g.*, *Kraus v. Visa Int'l Serv. Assn.*, 304 A.D.2d 408, 408 (App. Div. 2003) (affirming dismissal of breach-of-contract claim for failure to state a claim where

"plaintiff failed to allege the breach of any particular contractual provision");

*Shields v. School of Law of Hofstra Univ.*, 77 A.D.2d 867, 868 (App. Div. 1980)

("[T]he provisions of the contract upon which the claim is based must be alleged.").

The Borrowers' claim for breach of the implied duty of good faith also fails at the threshold because "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life and Acc. Ins. Co.*, 310 F.3d 73, 81 (2d. Cir. 2002). Consequently, a claim for breach of the implied covenant of good faith can stand "only if it is based on allegations different from those underlying the accompanying breach of contract claim." *Goldblatt v. Englander Commc'ns, L.L.C.*, 2007 WL 148699, *5 (S.D.N.Y. Jan. 22, 2007) (New York law, collecting cases). The Borrowers' claim is not. As for the Borrowers' assertion that AFC has violated the UCC by foreclosing on collateral when the Borrowers are not in default, that argument is precluded by the Borrowers' admission in the Forbearance Agreement—and before this Court—that they have been in default under the Credit Agreement for years.

The Borrowers' claims are thus legally deficient on their face, but in any event, AFC has not breached any contractual duty—implied or otherwise—by exercising its rights under the Credit Agreement to act on the Borrowers' admitted, persistent defaults. The Borrowers' excuses for their defaults do not resuscitate the long-terminated Forbearance Agreement, and AFC has not waived any of the ongoing defaults. The Borrowers' baseless invention of oral contractual

modifications is nothing more than a last-ditch attempt to introduce inadmissible evidence, avoid the clear, agreed consequences of their actions, and escape accountability to AFC.

> **A.    The Borrowers cannot show a likelihood of success on a claim that AFC is breaching the Credit Agreement or violating the UCC by exercising its remedies for the Borrowers' numerous continuing monetary defaults.**

The Borrowers admit that before they signed the Forbearance Agreement last year, they "were frequently late or unable to pay, resulting in defaults." (Mem. at 5.) And they agreed in the Forbearance Agreement that there had been no fewer than 19 Events of Default under the Credit Agreement. (*See* Ex. A § 1.2 (Borrowers "acknowledge and agree" to "Specified Defaults"), Schedule I (listing "Specified Defaults").) The admitted defaults include the Borrowers' failure to make "cash interest payment due and owing for the months ending June 30, 2023, July 31, 2023 and January 31, 2024, in violation of Section 2.5(c) of the Credit Agreement" and "the failure of the Loan Parties to make the principal payments due and owing on January 1, 2024 and February 1, 2024, in violation of Section 2.3(d) of the Credit Agreement." (Ex. A, Schedule I.) The Borrowers have not cured these monetary defaults by making the payments they missed, so those defaults are continuing and the Credit Agreement permits AFC to accelerate the loan and pursue remedies for repayment. (*See* Ex. H § 9.1.) The Borrowers cannot show that they are likely to succeed on a claim that AFC is breaching the Credit Agreement by exercising its remedies for their admitted, continuing, monetary defaults.

The Borrowers' claims under Section 9-625 of the UCC will likewise fail, because the UCC explicitly permits AFC to take control of the Borrowers' collateral. Plaintiffs concede that "Section 9-610 of the New York Uniform Commercial Code . . . provides, in relevant part, '*After default*, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral . . . .'" (Compl. ¶ 266.) As just explained, the Borrowers admit that they defaulted under the Credit Agreement by missing payments in 2023 and 2024, among other defaults. AFC has thus been entitled under the UCC to foreclose on the collateral for years, and the Borrowers' claim for a violation of the UCC will therefore fail.

> **B.    The Borrowers cannot show a likelihood of success on a claim that AFC breached the Forbearance Agreement by exercising its remedies because AFC's obligation to forbear terminated long ago.**

The Borrowers' alternate theory seems to be that AFC breached the Forbearance Agreement because AFC is no longer forbearing. But the Borrowers unambiguously agreed that once the Forbearance Agreement terminates, "all of Agent's and Lenders' rights and remedies under the Loan Documents and at law and in equity shall be available without restriction or modification, as if the forbearance had not occurred." (Ex. A § 1.8.) Put differently, the Borrowers explicitly agreed that neither the Forbearance Agreement "nor any actions taken in accordance with [it] or the Loan Documents, including Agent's and Lenders' continued making of loans to Borrower, shall be construed as a waiver of or consent to the Specified Defaults or any other existing or future defaults under the Loan Documents, as to which Agent's and Lenders' rights shall remain reserved." (*Id.*

§ 1.7.)  And once the Forbearance Agreement terminates, AFC "may exercise any and all remedies available under the Loan Documents by reason of the occurrence of any Events of Default thereunder *or the continuation of any Specified Default*."  (*Id.* § 2.1.)  Thus, to show a likelihood of success on a claim that AFC has breached the Forbearance Agreement, the Borrowers must show that they can likely prove that the Forbearance Agreement has not terminated.

The Borrowers cannot make this showing because the Forbearance Agreement terminates on "the date that *any* Forbearance Default . . . occurs."  (*Id.*) And "[t]he Forbearing Lenders' forbearance . . . shall immediately and automatically cease without notice or further action" on that date.  (*Id.*)  A "Forbearance Default" includes a failure by the Borrowers "to abide by or observe *any* term" of the Forbearance Agreement and *any* Default or Event of Default under the Credit Agreement.  (*Id.* §§ 10.1, 10.2.)  In sum, a *single* failure to abide a term in the Forbearance Agreement or in the Credit Agreement defeats the Borrowers' ability to show that AFC is not entitled to exercise its remedies.  There is no limitation on the type of default, no requirement of its magnitude, and no opportunity to cure it.  As explained below, AFC will present evidence of more than *ten* such Defaults.

### 1.    *Failure to Obtain a Certificate of Occupancy for the New Jersey Lab by May 15, 2024.*

Section 5 of the Forbearance Agreement sets forth the covenants the Borrowers gave "to induce Agent and the Forbearing Lenders to forbear from the exercise of their rights and remedies."  Among them is the Borrowers' promise to

"obtain the final certificate of occupancy and close out documents related to the [construction of the New Jersey lab] by no later than May 15, 2024." (*Id.* § 5.3(a).) The Borrowers admit their failure to abide this agreement. (*See* Mem. at 22 ("It is true that Bloc did not obtain the COO by May 15, 2024 . . . .").) There should be no legitimate dispute that the Borrowers' failure to adhere to this covenant constitutes a Forbearance Default. (*See* Ex. A § 10.1 ("fail[ure] to abide by or observe *any* term, condition, or covenant (including, for the avoidance of doubt, any covenant set forth in Section 5)" constitutes a "Forbearance Default").)

The Borrowers offer several excuses for this failure, but admit that they did not meet the deadline: they still do not have the COO today. (Mem. at 23.) Oddly, the Borrowers blame Tim Bossidy, their Chief Restructuring Officer, whom the Borrowers engaged in April 2024 (Ex. G), for their failure to meet the May 15, 2024 deadline, even though the Borrowers had been working on it for more than two years before he was engaged.[3] In any event, the Borrowers cite no legal authority that would allow them to violate their covenant by pointing the finger at others. The Borrowers complain that their violation of this covenant "is hardly grounds for default" (Mem. at 22), but the Forbearance Agreement does not require "grounds." The Borrowers' failure to obtain the COO by May 15, 2024, *is* a default, and AFC's

---

[3] The Borrowers blame Mr. Bossidy for many of their defaults. But his role was limited to overseeing the New Jersey operations. He had nothing to do with nearly all the defaults discussed in this memorandum, such as the Borrowers' loss of their license in Pennsylvania and their failure to notify AFC of the loss.

obligation to forbear "immediately and automatically cease[d] without notice or further action" at midnight that evening.  (Ex. A § 2.1.)

### 2. Failure to Cooperate in the Pennsylvania Cultivation Foreclosure Proceeding.

Another covenant the Borrowers gave to induce forbearance is found in Section 5.10 of the Forbearance Agreement.  There the Borrowers promised to "participate and fully cooperate" with AFC to foreclose on the Borrowers' Pennsylvania cultivation property.  (*Id.* § 5.10(a).)  Specifically, the Borrowers agreed to "promptly take such further actions and execute and deliver such further instruments and documents that Agent may reasonably request, in order for Agent to foreclose on the PA Cultivation Property."  (*Id.* § 5.10(b).)  Again, the Borrowers do not dispute that they have not met this promise.

In fact, when AFC filed the foreclosure proceeding in Pennsylvania state court, the Borrowers responded with a litany of affirmative defenses.  That is itself another Forbearance Default, because Section 10.7 explicitly declares a Forbearance Default if the Borrowers "challenge the validity or enforceability or otherwise seek to challenge, enjoin, avoid or unwind in any way . . . the PA Cultivation Foreclosure Proceeding."  Similarly, in Section 4.1(b), the Borrowers "represent[ed] and warrant[ed] to [AFC]" that they "have no grounds to and will not assert any defense to the enforcement of Agent's or the Lenders' rights and remedies . . . in connection with the PA Cultivation Foreclosure Proceeding."  This false representation is potentially another Forbearance Default.  (*See* Ex. A § 10.6 (declaring Forbearance Default if "Any representation or warranty of any Obligor made herein shall be

false, misleading, or incorrect in any material respect when made.").)  These are
*three* separate Forbearance Defaults, any *one* of which automatically terminates the
Forbearance Agreement and makes the Borrowers unable to show a likelihood of
success on their claims.

The Borrowers cannot dispute any of these facts but allege that AFC orally
relieved the Borrowers of this obligation.  (*See* Mem. at 31–33.)  That argument is
barred by Section 12.5 of the Forbearance Agreement, which provides: "The terms of
this Agreement may not be waived, modified, altered, or amended except by
agreement in writing signed by all the parties hereto."  The Borrowers do not claim
to have any such writing, and "New York law enforces such requirements and does
not permit oral modification when the original written agreement provides that
modifications must be in writing and signed."  *John Street Leasehold LLC v. FDIC*,
196 F.3d 379, 382 (2d Cir. 1999).  That is, "where a contract requires any
amendments to be evidenced by a writing signed by the parties, oral modifications
to the contract are *prohibited*."  *Indus. Window Corp. v. Fed. Ins. Co.*, 609 F. Supp.
2d 329, 339 (S.D.N.Y. 2009) (New York law).

There are "limited exceptions to the requirement of a written modification,
i.e., partial performance or estoppel," *Tierney v. Capricorn Invs., L.P.*, 189 A.D.2d
629, 631 (1993), but the Borrowers cannot show that either applies here.  "[I]n order
to excuse the absence of a writing" based on partial performance, that performance
"must be unequivocally referable to the alleged modification."  *Id.*  And for estoppel,
the Borrowers must demonstrate that "the conduct relied upon is not otherwise

compatible with the agreement as written." *Indus. Window Corp.*, 609 F. Supp. 2d at 339.  In other words, "for either exception to apply, the conduct claimed to have resulted from the oral modification must be conduct that is inconsistent with the agreement as written." *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir.1990) (New York law).  The Borrowers do not point to conduct inconsistent with the Forbearance Agreement.

As explained below, the Borrowers lost their license to operate last summer. While the parties were hoping that the Borrowers might get that license reinstated within six months so the Pennsylvania facility could re-open—and taking actions to that end—that is not inconsistent with their agreement to foreclose.  AFC could have decided not to foreclose if the property became operational in the near term. But the license still has not been reinstated today, and AFC decided to pursue the foreclosure it bargained for in the Forbearance Agreement.  The Borrowers' months-earlier decision to appeal the loss of their license and AFC's months-earlier decision to support a reopening if the license were promptly reinstated makes sense with or without AFC's alleged oral waiver.

Because the Borrowers cannot dispute these numerous Forbearance Defaults, the Forbearance Agreement is long terminated.  But that is just the beginning: The Borrowers have committed numerous Defaults and Events of Default under the Credit Agreement, and each also constitutes a Forbearance Default.

### 3.  Repeated Failure to Provide Audited Annual Financial Statements.

Under Section 5.1 of the Credit Agreement, the Borrowers are required to provide AFC with annual audited financial statements for their parent company, JG HoldCo, by no later than 75 days after the Borrowers' fiscal year end.  The Borrowers admit that this provision required them to provide AFC audited financial for their 2024 fiscal year by March 17, 2025, and that they did not do so.  (*See* Compl. ¶ 239 (admitting that Section 5.1 of Credit Agreement required Borrowers to provide its 2024 audited financial statements by March 17, 2025).)  And for this default the Borrowers do not even attempt to blame anyone but themselves.

Instead, the Borrowers argue that they are relieved from the financial reporting provisions in the Credit Agreement because they agreed to provide additional financial information in Section 5.11 of the Forbearance Agreement and the latter agreement somehow "replaced" the provisions of the Credit Agreement.  (*See id.* ¶ 239.)  That is simply wrong.  Under New York law, the "modification of a contract results in the establishment of a new agreement between the parties which *pro tanto* supplants the affected provisions of the original agreement *while leaving the balance of it intact.*"  *Beacon Terminal Corp. v. Chemprene, Inc.*, 75 A.D.2d 350, 354 (App. Div. 1980).  Leaving the terms of a lengthy credit agreement "intact" when executing a much shorter forbearance agreement is standard.  *See In the Matter of Elcona Homes Corp.*, 863 F.2d 483, 487 (7th Cir. 1988) ("If every forbearance to enforce a contract to its hilt operated to modify the contract against the party exercising forbearance, such forbearance would become rare.").

The Forbearance Agreement itself makes this clear.  Section 12.2(a) of the Forbearance Agreement provides: "Except as *specifically* set forth herein, *all terms*, conditions, covenants, representations and warranties contained in the Credit Agreement and other Loan Documents, and all rights of the Lender Group and all of the Obligations, shall *remain in full force and effect*."  Similarly, the Borrowers expressly agreed in Section 5.1 of the Forbearance Agreement that they would "continue to perform and observe all applicable covenants, terms, and conditions, and other obligations contained in all of the Loan Documents."  Section 5.11 only requires the Borrowers to provide certain financial information that AFC did not already have access to.  Nothing in the provision suggests that it relieves the Borrowers of any obligations under the Credit Agreement, much less "specifically" so.  Section 6 of the Forbearance Agreement, by contrast, sets forth the ways in which the Forbearance Agreement *was* amending the Credit Agreement to relieve the Borrowers of certain obligations.  (*See, e.g.*, Ex. A § 6.4 ("Sections 7.1, 7.2, 7.3, 7.4, 7.5, and 7.6 of the Credit Agreement [financial covenant provisions] are hereby deleted in their entirety.").)  Section 6 does not mention the Borrowers' reporting obligations or alter Section 5.1 of the Credit Agreement requiring the Borrowers to provide annual audited financial statements.  This reporting default terminated the Forbearance Agreement and AFC's obligation to forbear.  (The Borrowers had actually also failed to provide an audited 2023 financial statement last year, and so have committed two Forbearance Defaults.)  The Borrowers cannot show that the Forbearance Agreement remains in place.

### 4.  *Loss of the Pennsylvania Cannabis License.*

As the Borrowers admit, they lost their license to operate the Pennsylvania cultivation facility last summer.  (Compl. ¶ 229.)  This is an Event of Default under the Credit Agreement, which requires the Borrowers to "[a]t all times preserve and keep in full force and effect . . . good standing with respect to all other jurisdictions in which it is qualified to do business and any Permits or Cannabis Licenses material to its businesses."  (Ex. H § 5.3.)  It does not matter that the Borrowers have appealed that decision; the Event of Default occurred last summer 15 business days after the license was canceled.  (*See id.* § 8.1(b)(ii) ("fail[ure] to perform or observe any covenant or agreement contained in" § 5.3 constitutes an Event of Default if not cured within 15 business days).)

Once again, the Borrowers try to deflect blame back onto AFC for this default, saying that they lost the license because they shut down operations and it was AFC that caused or encouraged them to shut down.  (*See* Mem. at 37.)  The Borrowers cannot dispute, however, that they had to shut the facility down because it became infested with pests and mold.  (*See* Ex. J-1 at 2 (explaining that Pennsylvania facility had to be closed "in October 2023 due to pest pressure, including Russet mites, fungus gnats, and root aphids").)[4]  The Borrowers offer various excuses for this failure and try to blame AFC, but it is the Borrowers'

---

[4] In addition, the title of the notice of the license loss—which the Borrowers still have not provided to AFC, another Forbearance Default—suggests that the Borrowers lost the license because they did not file a timely application to renew it. (*See* Ex. J-1 at 3 (referring to "July 25, 2024, Notification Rejection Renewal Application *As Untimely* & Ordered Surrender of Grower/Processor Permit").

responsibility to maintain the license.  They expressly agreed in Section 11.2(a) of the Credit Agreement that "the Lender Group shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any . . . other Person." In Section 11.2(b), they agreed that "all risk of loss, damage, or destruction of the Collateral shall be borne by [the Borrowers]."  (*See* Ex. H.)

And while the Borrowers complain—without citing a single example—that the Borrowers could not get the facility in shape because AFC denied disbursement requests for maintenance, nothing was stopping the Borrowers or their shareholders from spending their own money to get the facility on track, as the shareholders subsequently agreed to do.  (*See id.* (describing personal pledge of $5 million by Borrowers' shareholders to re-open facility).)  The Borrowers—and the Borrowers alone—are responsible for maintaining their assets and abiding by their agreements.  Their failure to do so means that the Forbearance Agreement terminated last summer.

### 5. *Failure to Notify AFC of the Loss of the Pennsylvania Cannabis License.*

The Borrowers cannot blame AFC, or anyone else, for their *additional* default in failing to give AFC notice of the license loss as required by Sections 5.1 and 16.5 of the Credit Agreement.  Section 5.1 requires the Borrowers to provide the "items set forth on Schedule 5.1 no later than the times specified therein."  Schedule 5.1, in turn, requires the Borrowers to "within three (3) Business Days after [the

Borrowers] have knowledge of any event or condition that constitutes a Default or an Event of Default" give AFC "notice of such event or condition and a statement of the curative action that [the Borrowers] propose to take with respect thereto." No matter who supposedly caused the Borrowers to lose their Pennsylvania license—one of their most valuable assets—it is an Event of Default under Section 5.3, and the Borrowers were therefore required to promptly report it to AFC under Section 5.1. The Borrowers do not claim to have done so.

While Ms. Brashers-Krug swears that "Justice notified AFC via email of the denial," she does not say that she did so within three business days after receiving notice of the denial or even within the additional 10-business day cure period under Section 8.1(b)(i). (ECF No. 7-5 ¶ 28.) Nor does she suggest that notice was given in the form required by Section 16.5 of the Credit Agreement—i.e., "written notice from . . . the Borrower Representative referring to [the Credit] Agreement, describing such Default or Event of Default, and stating that such notice is a 'notice of default.'" She does not claim to have met either requirement. The Borrowers' failure to provide AFC notice of this Event of Default constitutes an independent Event of Default under the Credit Agreement. (*See* Ex. H § 8.1(b)(i) (failure to comply with § 5.1 reporting requirements constitutes Event of Default).) For this reason, too, the Forbearance Agreement terminated last summer.

### 6. *Failure to Provide Communications with the Pennsylvania DOH.*

Relatedly, the Borrowers had two additional independent Events of Default when they failed to provide AFC with the July 2024 "Notification of Rejection of

Renewal Application As Untimely & Ordered Surrender of Grower/Processor Permit" from the Pennsylvania Department of Health rejecting their license renewal. First, Section 5.22 of the Credit Agreement requires the Borrowers to "[p]romptly, but in no event later than five (5) days after submission to any Governmental Authority, or receipt thereof" "furnish to Agent all documents and information furnished to or received from such Governmental Authority in connection with any investigation of any Loan Party or inquiries by such Governmental Authority." The letter is obviously a document received from a "Governmental Authority," the Borrowers did not furnish it to AFC within five days, and 20 business days later, this became an Event of Default. (*See* Ex. H § 8.1(b)(iii).)

Second, Section 5.9(d)(iii) of the Credit Agreement requires the Borrowers to provide, within five business days, "written notice of a violation, citation, or other administrative order from a Governmental Authority." The DOH letter constitutes an administrative order, yet the Borrowers did not forward it within five days, and 15 business days later, that failure to provide notice became an Event of Default under the Credit Agreement. (*See* Ex. H § 8.1(b)(ii).) Although AFC identified these Events of Default in the February 19 letter sent to the Borrowers (Ex. D), the Borrowers offer no excuse or dispute with this one. They have no defense to these Forbearance Defaults. AFC's obligation to forbear terminated last summer.

**C.    The Borrowers cannot show a likelihood of success on a claim that AFC breached the so-called Reopening Agreement because it does not exist and is not enforceable under New York law.**

As a final attempt to conjure a claim against AFC, the Borrowers contend that AFC breached what the Borrowers call the "Reopening Agreement," i.e., "an agreement to re-open the Pennsylvania cultivation facility reached in the autumn of 2024." (Compl. ¶ 68; *see also id.* ¶ 232 (describing "Reopening Agreement" as AFC's agreement to plan proposed by Borrowers to re-open cultivation facility).) On its face, this agreement makes no sense, because it is not up to AFC whether the Borrowers re-open the facility. The claim of breach is equally spurious: According to the Borrowers' own submission, "[b]oth sides understood that the agreement was contingent upon DOH's sign off in a settlement of the appeal." (Mem. at 31.) That has never happened, so there is no enforceable agreement. It is black-letter law that contractual obligations do not arise if "an express condition precedent [is] not fulfilled." *MHR Cap. Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 643 (2009). AFC cannot possibly have breached the "Reopening Agreement," if one ever existed.

In an effort to concoct a breach, the Borrowers seek to characterize the agreement as including a promise not to foreclose on the Pennsylvania cultivation facility. But neither of the two Borrowers' declarants who discuss the alleged Reopening Agreement suggest that AFC's waiver of its right to foreclose was part of the agreement. (*See* ECF No. 7-3 ¶ 45; ECF No. 7-5 ¶¶ 17–36.) The Borrowers cite their own letter to the Pennsylvania DOH stating that AFC had made such an agreement (Ex. J-3 at 2), but all it proves is that the Borrowers lied to the Pennsylvania DOH. And of course the document is not admissible to prove that an

agreement existed.  *See* Fed. R. Evid. 802.  The Borrowers also cite an email from AFC's CEO approving Justice Grown's plan to use up to $500,000 from its equity account to re-open the Pennsylvania cultivation facility if the DOH agreed to a settlement and reinstated Justice Grown's license to operate.  (Ex. N.)  The email does not even mention AFC's right to foreclose, much less relinquish it.  The email that the Borrowers wrote to AFC expressing outrage at the foreclosure is even more telling; it asked AFC to reconsider its decision to foreclose but made no mention of any alleged oral agreement not to foreclose.  (*See* ECF No. 7-5 ¶ 35.)  And while the Borrowers' email also cast aspersions on AFC's competence and accused AFC of attempting to sabotage the Borrowers' efforts to perform, it does not suggest that AFC had breached any contractual obligation.  This new oral agreement and AFC's alleged breach of it are simply made up.

In any event, the witnesses' declarations suggest that neither of them can present sufficient evidence of the supposed oral agreement—i.e., definite and essential terms to which all parties agreed.  *See Zalman Silber v. New York Life Ins. Co.* 92 A.D.3d 436, 439 (App. Div. 2012) (A party claiming breach of an oral contract "must prove that a binding agreement was made as to all essential terms . . . [a]n agreement must have sufficiently definite terms and the parties must express their assent to those terms."); *James Connelly v. Nelson Christopher Ala,* No. 657237/2017, 2024 NY Slip Op 30652, *6-7 (N.Y. Sup. Ct. Mar. 1, 2024) ("A claim for breach of an oral contract must be supported by evidence demonstrating that there was a meeting of the minds between the parties as to essential contract terms").

One of the terms neither declarant mentions is the consideration the Borrowers gave to AFC for this supposed waiver.  That is of course a requirement for any contract, and any contractual modification or novation.  *See, e.g.*, *Tierney*, 189 A.D.2d at 631 ("Even if the alleged oral agreement is considered a superseding agreement or novation, there was a failure by plaintiff to show adequate consideration."); *Beacon Terminal Corp.*, 75 A.D.2d at 354 ("Fundamental to the establishment of a contract modification is proof of each element requisite to the formulation of a contract . . . .").  The Borrowers have identified nothing that AFC received in exchange for waiving its right to foreclose in the face of multiple, carefully negotiated and written agreements saying otherwise.

In short, the Borrowers cannot carry their burden to show that the Court should ignore the text of the Forbearance Agreement and find some subsequent oral agreement that supersedes it.  And Section 12.5 of the Forbearance Agreement's requirement that any waiver or amendment be in writing signed by AFC prohibits the Court from doing so.

## II.    The Borrowers cannot show irreparable harm for the injunction they seek.

The Borrowers' request for an injunction also fails because they have not explained—much less shown with evidence—how they will be irreparably harmed if they do not obtain an injunction.  The Borrowers ask the Court to order AFC "to cease seizing any of Plaintiffs' assets or cash (beyond the permitted scheduled cash sweeps), and to cease any other attempted remedy for any alleged default."  (Mem. at 48; *see also* ECF No. 7 at 2.)  But the Borrowers' only argument for irreparable

harm concerns the first request.  (*See* Mem. at 44–45.)  The second request should be denied out of hand because the Borrowers offer literally nothing to suggest how they would be irreparably harmed if AFC exercises its other contractual remedies, including foreclosure, for the Borrowers' defaults under their loan contracts.

As for the first request, the Borrowers cannot show irreparable harm.  The goal of a preliminary injunction is not to eliminate any chance of harm; it "is to ensure that, at the end of the case, the court can still grant an adequate remedy." *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 108 F. 4th 194, 200 (3d Cir. 2024).  As the Third Circuit recently clarified: "Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief."  *Id.* at 200–01 (raising concern that "[t]his extraordinary remedy has become ordinary").  Thus, the relevant question is whether the alleged harm threatens to moot the case before the Court can afford relief.  *Id.* at 201.

The Borrowers have not demonstrated and cannot demonstrate that AFC's seizure of assets or cash under the terms of the Credit Agreement have the potential to moot this case.  "In the contract setting, injunctive relief, both interlocutory and final, is the exception and not the rule."  *USA Network v. Jones Intercable, Inc.*, 704 F. Supp. 488, 491 (S.D.N.Y. 1989).  This is because monetary damages are almost always adequate to afford relief, even where one side claims that its business will be catastrophically disrupted.  The opinion in *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797 (3d Cir. 1989), is instructive.

-24-

There, the Third Circuit reversed a preliminary injunction granted in a contract case because the movant had failed to show irreparable harm.  The movant claimed that absent interim relief, it would lose 80% "of its business, many if not all of its employees, and its goodwill and reputation of the industry . . . forc[ing it] to shutdown or significantly curtail its operations." *Id.* at 798–99.  This was insufficient to show irreparable harm because the movant's claimed losses could be measured and compensated with monetary damages if it prevailed on the merits. *Id.*

The Third Circuit has "never upheld an injunction where the claimed injury constituted a loss of money or loss capable of recoupment in a proper action at law." *Id.* at 801; *see also In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1146 (3d Cir. 1982) (reversing preliminary injunction despite movant's claim of "imminent threat of bankruptcy" in contract dispute).  Monetary losses "can rise to the level of irreparable harm *only* where they *would* force the business to shut down." *Golden Fortune Imp. & Exp. Corp. v. Mei-Xin Ltd.*, 2022 WL 3536494, at *6 (3d Cir. Aug. 5, 2022) (cleaned up).  "[T]his threshold is a significant one." *Id.*  The movant must make a clear showing of immediate irreparable injury or a presently existing, actual threat. *See id.* at *5.  Evidence—not just the Borrowers' say-so—is required. *See id.*

The Borrowers here have not attempted to make any such showing.  In fact, their 48-page Memorandum devotes less than two full pages to irreparable harm. (Memo. at 44–45.)  According to the Borrowers, "[a]ny further unauthorized

withdrawals" will: (1) "leave Plaintiffs unable to pay their employees" and their bills; (2) lead to unspecified "regulatory consequences;" (3) destroy trust with vendors and suppliers, and "damage . . . the relationships which are crucial in the industry;" and (4) interfere with the Borrowers' collective bargaining agreement with employees who are members of a union. (*Id.*) None of these alleged harms is specific, direct, or consequential enough to warrant a preliminary injunction under Third Circuit precedent.

The Borrowers have not identified any specific evidence that their business will be shut down if AFC pursues its legal remedies. At most, Justice Grown's Controller avers that the Borrowers "will very soon be unable to pay their bills as they come due" and "*may* literally be unable to keep the lights on in six dispensaries and a cultivation facility" (ECF No. 7-7 ¶ 18) if AFC leaves less than $300,000 in the relevant accounts. That is not evidence of an imminent threat, and it is certainly not evidence that the Borrowers' business *will* be entirely and permanently destroyed if additional cash sweeps occur. The Borrowers have made no evidentiary showing that they require a certain level of cash to remain in business, nor have they made a showing that AFC's cash sweeps have ever caused the account to dip below $300,000 for any sustained period of time. The Borrowers provide no evidence that they lack other financial resources or business opportunities, and they have identified no vendors, suppliers, or relationships that might be disrupted if AFC takes possession of cash in the accounts it controls. Nor have the Borrowers attempted to explain why monetary damages would be insufficient to compensate

their claimed losses if they prevail on the merits, or how the case would be mooted if their requested relief is not granted.  The Third Circuit's guidance on irreparable harm leaves no possibility for an injunction on such a thin reed.

### III.  The balance of equities and public interest weigh in favor of denying an injunction.

The Borrowers do not show that the final two factors favor granting their requested injunction.  As should be clear by now, the Borrowers owe tens of millions of dollars to AFC, they have violated every agreement that the parties put in place over the years, and the cash they seek to protect will never come close to making AFC whole.  As explained in the section below, AFC will be harmed if it is not permitted to exercise its contractual rights over the Borrowers' collateral.  *See Bank of Am, N.A., v. Won Sam Yi*, 294 F. Supp. 3d 62, 81 (W.D.N.Y. 2018) (finding balance of hardships weighed in favor of lender even though seizing borrower's assets "may be the 'final nail in the coffin' for [his] floundering business.").  Particularly so, where the Borrower has "offered [Plaintiff] numerous opportunities to rectify their financial situation, and refrained from exercising its rights . . . even after discovering numerous instances of default."  *Id.* at 81.  "There is a well-recognized public interest in enforcing contracts and upholding the rule of law."  *Id.* (collecting cases); *see also Schuylkill Valley Sports, Inc. v. Corporate Images Co.*, 2020 WL 3167636, at *18 (E.D. Pa. 2020) ("[I]t is generally in the public interest to uphold an agreement freely entered into by the parties.").

**IV.    If the Court grants an injunction, the Borrowers need to post an adequate bond.**

If the Court grants a preliminary injunction, Federal Rule of Civil Procedure 65(c) requires that the Borrowers "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. Pro. 65(c).  "Given the text and policies of Rule 65(c), [the Third Circuit] has interpreted the bond requirement very strictly."  *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 210 (3d Cir. 1990).  "[I]n commercial actions, 'when setting the amount of security, district courts should *err on the high side*.'"  *Scanvec Amiable Ltd. v. Chang*, 2002 WL 32341772, at *3 (E.D. Pa. Nov. 1, 2002) (quoting *Mead Johnson & Co. v. Abbott Lab.*, 201 F.3d 883, 888 (7th Cir.2000)), *aff'd*, 80 Fed. App'x 171 (3d Cir. 2003).  The bond amount must be sufficient to "protect the opposing party from incurring costs and damages in the event that the stay is wrongfully imposed."  *McBride v. Twp. of Washington*, 2020 WL 6947895, at *1 (D.N.J. Apr. 9, 2020).

Where millions of dollars are at stake, the bond needs to be set in the millions.  *See, e.g., In re Lipitor Antitrust Litig.,* 868 F.3d 231, 255 (3d Cir. 2017) ($200 million bond upheld); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,* 290 F.3d 578, 585, n.3 (3d Cir. 2002) ($9,180,000 bond upheld);  *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1385 (Fed. Cir. 2006) (affirming bond set at $400 million); *Howmedica Osteonics Corp. v. Zimmer, Inc.,* 2012 WL 847469, at *1 (D.N.J. 2012) ($6 million bond granted); *Alexander v. Primerica Holdings, Inc.*, 811 F. Supp. 1025, 1038 (D.N.J. 1993) ($7.7 million bond

granted); *GlaxoSmithKline LLC v. Boehringer Ingelheim Pharm., Inc.*, 484 F. Supp. 3d 207, 229 (E.D. Pa 2020) ($5 million bond granted).

This is not an empty requirement.  In *Washington Steel Corp. v. TW Corp.*, 602 F.2d 594 (3d Cir. 1979), the Third Circuit reversed the grant of a preliminary injunction, finding that the plaintiff's legal theories were not legally viable.  The court noted that the district court had required the plaintiff to post a bond of $2 million—worth more than $9 million in today's dollars—and explained that the defendant "may, on remand, recover on the injunction bond any damages it can prove."  *Id.* at 598, 604.  That is especially important here, where the movant is distressed, because the bond is meant to protect wrongfully enjoined parties against the possible future insolvency of the party obtaining the injunction.  *See Continuum Co. v. Incepts, Inc.*, 873 F.2d 801, 803 (5th Cir. 1989).

AFC will present evidence at the hearing about the damages it will suffer from any delay in its ability to foreclose on its deeply troubled borrowers' assets.

## CONCLUSION

This case falls under the category of "no good deed goes unpunished."  The Borrowers have mismanaged AFC's collateral assets for years.  Yet AFC twice agreed to forbear, reduced the interest rate and minimum payments due under the loan, and refrained from enforcing rights for multiple infractions.  The Borrowers now try to turn this history into a claim that they have been wronged by AFC.    In truth, they owe more than $100 million to AFC and do not claim to have any prospect of repaying that, either now or next spring at the loan's original maturity

date.  AFC should be permitted to exercise its remedies and cut at least some of its

losses.

Dated: April 30, 2025

/s/ Jeffrey A. N. Kopczynski
Jeffrey A. N. Kopczynski
Abby F. Rudzin (*pro hac pending*)
O'MELVENY & MYERS LLP
1301 Ave. of the Americas, 17th Fl.
New York, NY 10019
Ph: (212) 326-2000
Fx: (212) 326-2061
jkopczynski@omm.com
arudzin@omm.com

*Counsel for Defendants Advanced*
*Flower Capital Inc. and AFC Agent LLC*