**LITT LAW, LLC**

Matthew R. Litt, Esq.
789 Farnsworth Avenue
Bordentown, New Jersey 08505
MLitt@LittLaw.net
Phone: (908) 902-7071

**DYNAMIS LLP**

Jamie Hoxie Solano, Esq.
NJ Bar No. 426422024
(214) 454-8829
11 Park Place
New York, NY 10008

Michael B. Homer, Esq.
*Pro hac vice application forthcoming*
(617) 693-9732
Constantine Economides, Esq.
*Pro hac vice application forthcoming*
(305) 985-2959
225 Franklin Street, 26th Floor
Boston, MA 02110
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **HAYDEN GATEWAY LLC and BLOC DISPENSARY LLC,** | **CIVIL ACTION NO.   3:25-CV-02789** |
| **Plaintiffs,** | |
| **v.** | |
| **ADVANCED FLOWER CAPITAL INC. and AFC AGENT LLC,** | |
| **Defendants.** | |

# Table of Contents

What is Not in Dispute...........................................................................................1

What Defendants Do Not Deny.............................................................................2

I.    The Alleged Default Allegations Fail..........................................................4

   A.    The Purported Defaults that AFC Has Now Abandoned ........................4

   B.    The Remaining Alleged Defaults Are Equally Pretextual........................5
     1.    Certificate of Occupancy .................................................................5
     2.    The Financial Audits .......................................................................7
     3.    The Pennsylvania-Related Alleged Defaults .................................8
        a.    There Was a Reopening Agreement ......................................8
        b.    Oral Agreements Are Enforceable ......................................11
        c.    Plaintiffs' Opposition to the Pennsylvania Foreclosure Action Was Not A Default 15
        d.    Plaintiffs' Pennsylvania Cultivation License ........................18
        e.    Alleged Failure to Notify AFC and Provide Communications .................21

II.    Plaintiffs Demonstrated Likelihood Of Success ......................................22

III.    Plaintiffs Can Demonstrate Irreparable Harm .......................................23

IV.    Defendants Have Not Justified Any Bond, Much Less A Significant One .................23

Conclusion ............................................................................................................26

## TABLE OF AUTHORITIES

### CASES

*Alpha Capital Anstalt v. Real Goods Solar, Inc.,* 311 F. Supp. 3d 623, 630 (S.D.N.Y. 2018).........14

*Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Com.,* 265 A.D.2d 513, 513-14, (1999)...17

*Bank Leumi Trust Co. of N.Y. v. Block 3102 Corp.,* 180 A.D. 588, 590, 580 N.Y.S.2d 299 (1992) 20

*Blue Ridge Investments, LLC v. Anderson-Tully Co.,* 2005 WL 44382, at *7 (S.D.N.Y. Jan. 10, 2005) ....................................................................................................8

*CoraMed USA, LLC v. Alexion Pharms., Inc.,* 695 F. Supp. 3d 251, 266-67 (E.D.N.Y. 2023).........7

Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc., 97 A.D.3d 781, 784, 949 N.Y.S.2d 115, 118 (2012)...25

*Fifty States Management Corp. v. Pioneer Auto Parks, Inc.,* 46 N.Y.2d at 576-77, 415 N.Y.S.2d at 802..........................................................................................................24

*Garcia v. Dezba Asset Recovery,* Inc., 665 F. Supp. 3d 390, 404 (S.D.N.Y. 2023)...................12, 13

Hamer v. Sidway, 124 N.Y. 538, 545, 27 N.E. 256 (1891).............................................................14

*In re 53 Stanhope LLC,* 625 B.R. 573, 584 (S.D.N.Y. Bankr. 2021) ..............................................7

*Madison Ave. Leasehold, LLC v. Madison Bentley Assocs. LLC,* 811 N.Y.S.2d 47, 50 (1st Dept. 2006) ..........................................................................................................7

*Mallet & Co. Inc. v. Lacayo,* 16 F.4th 364, 392 (3d Cir. 2021)........................................................26

*Merrill Lynch Interfunding, Inc. v. Argenti,* 155 F.3d 113, 121 (2d Cir. 1998) ...............................12

*Mindspirit,* 470 F. Supp. at 380...................................................................................................13

*Mirashi v. Doe,* No. 25CV1805 (EP) (LDW), 2025 WL 893003, at *5 (D.N.J. Mar. 21, 2025) ..... 27

Moran v. Erk, 11 N.Y.3d 452, 456, 872 N.Y.S.2d 696, 901 N.E.2d 187 ........................................ 25

*Premier Medical Systems, LLC v. NeuroLogica Corp.,* No. 1:21-cv-1337-GHW, 2022 WL 603999, at *10 (S.D.N.Y. 2022) ........................................................................................................... 15

*Randolph Equities, LLC v. Carbon Cap., Inc.,* 648 F. Supp. 2d 507, 518 (S.D.N.Y. 2009) ........... 13

*Rose v. Spa Realty Assocs.,* 397 N.Y.S.2d 922, 366 N.E.2d at 1283 .............................................. 13

*Rose v. Spa Realty Assocs.,* 42 N.Y.2d 338, 343 (1977) .......................................................... 12, 15

*Spinelli v. NFL,* 903 F.3d 185, 205-07 (2d Cir. 2018) .................................................................... 6

Plaintiffs begin their reply with (a) the things on which the parties agree, followed by (b) the things the Defendants do not deny, and then (c) the reasons why the Defendants are totally wrong about everything else. When that dust settles, the first two categories alone tell a devastating story. And as to the remainder, Defendants' arguments crumble under scrutiny. There are no legitimate defaults here, and Plaintiffs can easily demonstrate likelihood of success at Friday's hearing.

## What is Not in Dispute

Defendants spend quite a bit of energy on the proposition that Plaintiffs struggled mightily during the first few years of this loan. This is a strawman. Plaintiffs are saying the same thing. Between Covid, the regulatory delays, construction problems and all kinds of other problems, Plaintiffs quickly fell behind on this predatory-interest rate cannabis loan. It is undisputed that Plaintiffs could not make their payments and fell into default multiple times.

Each time, however, instead of foreclosing, Defendants renegotiated the loan -- but always on the condition that Plaintiffs' owners put in millions of dollars into AFC's pocket. Over the course of nine agreed renegotiations, Plaintiffs' owners drained their savings, sold everything, and put everything they had into this loan, a total of more than $18 million (not counting the additional millions they put into the operating account to keep the company floating).

It is telling that AFC's brief leans so heavily on the prior defaults. These earlier defaults are of course exactly what the case is *not* about. Plaintiffs paid dearly for forbearance for those defaults, culminating in the March 2024 Forbearance, which finally reduced the interest rate and set the monthly repayment at terms Plaintiffs could satisfy. Plaintiffs never defaulted again, making every payment on time. As ultimately renegotiated, the loan is now fully performing. The only thing that changed was that AFC got into a financial crisis, and began trying to change its positions.

**What Defendants Do Not Deny**

AFC does not dispute the sworn evidence presented by Plaintiff detailing the truth about what is really going on. And AFC has now officially declared that it will call no witnesses at the hearing to contradict it either. Its silence is deafening. Ignoring the truth does not make it go away.

The truth is, the March 2024 Forbearance was actually structured very much in AFC's favor. Not only did it cost Plaintiffs millions of dollars in cash to purchase further forbearance, but AFC got the right to sweep 75% of all profits for the remaining loan term, with Plaintiffs' 25% share going to pay back taxes. AFC received a huge upside, while Plaintiffs will have to earn at least $40 million before they ever see one dime back. The primary advantage to Plaintiffs, for which they paid a huge price, was the right to excuse prior defaults and not to be in default any longer so long as at least $250,000/month was generated, a payment which the business can finally meet, and the chance to quickly grow the business to its nine-figure ($200MM) potential.

The unanticipated flaw in the deal was Tim Bossidy. AFC installed an utterly incompetent leader, whose only redeeming credential was his willingness to sell out Justice for AFC's benefit. Bossidy was so terrible at his job that New Jersey failed to produce the returns AFC projected. With Bossidy generating only the $250k minimum for nearly a year, AFC found itself millions of dollars behind every month, and unable to meet expenses, including dividends. Its stock price cratered. Its brief does not even pretend to deny that it has run out of cash and is in danger of insolvency.

Nor does AFC deny that before it tried to claim that Justice was supposedly in breach, Tannenbaum tried to extort Plaintiffs' owners, threatening to sue them personally for fraud, theft, and running a RICO criminal enterprise unless they forked over $30MM in cash and tens millions more in collateral -- money that was not owed. To be clear, *AFC does not deny that Plaintiffs' owners are*

2

*not personally responsible for any of the debt,* meaning that *even if the loan was in default (which it is not),* the threat to groundlessly devastate their personal reputations if they did not personally pay AFC's crazy ransom demand meets every conceivable definition of extortion.

When Plaintiffs' owners refused to be shaken down, AFC followed through with its threat and sued them personally, calling them (literally) criminals. AFC then declared the loan in breach and promptly stole $1.8MM without warning or lawful justification, thereby jeopardizing Plaintiffs' ability to make payroll and survive. All so AFC could make its dividend payment four days later.

AFC does not even go through the motions of denying these truths. Nor does AFC intend to subject any of its witnesses to cross-examination by presenting any affirmative evidence that there is a breach. That is because everything Plaintiffs alleged under oath on these points is true and, at minimum, unrebutted for purposes of this proceeding.

AFC's recent decision to violate the TRO to foreclose on Plaintiffs' corporate parent eliminates any doubt that AFC knows it has no real case. If AFC thought it had any realistic chance of establishing a default, it would not have needed to race to court to get ahead of the Court's ruling. The reason AFC did not want to wait a week is because it knows its arguments will not hold up.[1]

That is the context to evaluate the Defendants' arguments about purported defaults, every one of which is pretextual, contrived, and lacking in merit.

---

[1] Unfortunately, we live in an age where some parties apparently believe that judges are not in any position to enforce court orders. Unhappy about being temporarily enjoined in New Jersey, powerful parties like AFC and their lawyers simply try again with a new judge on counsels' home turf, even at the risk of offending the original judge. This strategy should not be rewarded.

3

I.      **The Alleged Default Allegations Fail**

        A.      **The Purported Defaults that AFC Has Now Abandoned**

Plaintiff starts again with what is not in dispute. AFC has abandoned the purported breaches based on the misreported inventory, unspecified violations of the Bossidy consulting agreement, and the TCA loan on the perfection certificate. Plaintiffs' sworn evidence established that AFC's accusations for a default on those bases lacked all merit. That is a nicer way of saying AFC has not denied that it was untruthful and disingenuous about those accusations

Far more outrageous is AFC's silence about the alleged restricted payments. When trying to coerce Plaintiffs into yet another round of forbearance concessions even absent any real defaults, all AFC talked about was how Loevy and Kanovitz allegedly stole money and committed fraud. AFC's RICO lawsuit accuses the two of them of stealing more than $19MM to enrich themselves, and running a criminal enterprise designed to defraud AFC. As intended, the newswires picked up these sensational accusations against prominent attorneys with excellent reputations, and unnamed AFC spokespeople gave quotes about how they stole millions and committed fraud.[2]

Loevy and Kanovitz spent 25+ years building up sterling reputations. Their law careers entirely depend on being trusted by the community and the judges before they practice. Because they would not pay AFC $30MM they did not owe, AFC told the legal world that they are thieves and fraudsters who stole $19MM to enrich themselves. Every lawyer in their law firm is aware that they stand accused of stealing $19MM, as are all of their opposing counsel, friends, and families.

Plaintiffs' opening memo proffered detailed and comprehensive evidence, sworn under oath,

---

[2]  The irony is that Tannenbaum is actually the one who has made his fortune (as reported in the *Forbes* feature titled "Leonard Tannenbaum's Fifth Street: Fooling the Right People Some of the time") ripping off investors with fee-extracting management structures attached to predatory loans.

putting the lie to this false accusation. Loevy and Kanovitz stole nothing. Zero. Observers who do not study the evidence will inevitably assume that the truth is at least somewhere in between, that both sides have a story to tell. But that is not true. There are not two sides to this accusation. The real truth is that Loevy and Kanovitz did not steal a single penny, committed nothing that could even be remotely characterized as fraud, and did not engage in any RICO criminal conspiracy.

Defendants' brief was their big opportunity to corroborate their very serious $19 million theft accusation. If they had any coherent story to tell, any story that made any sense at all, this Court can be assured that AFC would have thrown it out there. Even if they lost the argument, at least they could have tried to make Plaintiffs look bad. AFC cannot even do that. Its inability to muster even an unsworn argument (that an attorney could sign) to support in any manner their accusation that Plaintiffs stole anything says all the Court needs to know.[3]

### B.    The Remaining Alleged Defaults Are Equally Pretextual

AFC's brief begins with a long explanation that, despite its unnecessary complexity, can all be fairly boiled down to the following: AFC wins if it can show a genuine default under the March 2024 Forbearance. *See* Resp. at 1-3, 8-10. True enough. But AFC cannot skip that step. There does have to be a genuine default under the March 2024 Forbearance. And there is not.

### 1.    Certificate of Occupancy

The March 2024 Forbearance provided a May deadline to obtain the COO. That deadline was

---

[3]    In a footnote, Defendants suggest that they have intentionally put off the day on which they will have to corroborate their vile accusations so as to avoid creating problems for their pending RICO lawsuit. Resp. at 3 n.2. The longer they can avoid having to say how exactly Loevy and Kanovitz engaged in "fraud and racketeering," *id.,* the longer AFC can keep this bogus cloud over them to try to maintain leverage. Plaintiffs implore the Court not to reward that strategy. Defendants had a full and fair opportunity to present their evidence in this proceeding, at which they were fully incentivized to present it, had there been even a modicum of validity to it.

not met. However, the testimony at the hearing will establish to the Court's satisfaction (in all likelihood without contradiction) that the May deadline for the COO would have been met but for the actions of AFC's agent, Tim Bossidy, who actually set the time line back by more than a year.

On that score, witnesses will testify that Plaintiffs were on target to meet the deadline before Bossidy showed up in April. From that forward until very recently, the facility and project remained under Bossidy's supervision, decision-making, and control.

Over Plaintiffs' strenuous objections, Bossidy's first move was to cut off payments to the contractor responsible for the lab over an unrelated billing dispute. Predictably, Bossidy's decision brought all construction work to an immediate standstill. Bossidy then reworked the lab design in such a way that it made the existing electrical work obsolete. It was the delay in redesigning and implementing that electrical work that held up the COO for the past year. *Spinelli v. NFL,* 903 F.3d 185, 205-07 (2d Cir. 2018) ("[n]either party to a contract shall do anything [that] has the effect of destroying or injuring the right of the other party to receive the fruits of the contract").

As soon as Bossidy was ousted, Plaintiffs moved the project forward and obtained a temporary COO for a portion of the lab space. The facility is nearly finished and ready for final COO.[4]

Tellingly, AFC's brief offers no evidence denying Plaintiffs' allegation that Bossidy was AFC's agent, controlled by AFC, and working on its behalf. AFC has literally no explanation, for example, for why Bossidy was forwarding attorney-client privilege emails to Neville at AFC saying things like "I just wanted to flag for you another forbearance breach to add to your list." Having installed its own incompetent manager to run things, AFC cannot legitimately pin Bossidy's failure

---

[4] Independently, Plaintiffs will also present testimony and written communications at the hearing establishing that AFC waived the alleged defaults along the way.

to obtain the COO on Plaintiffs. *CoraMed USA, LLC v. Alexion Pharms., Inc.,* 695 F. Supp. 3d 251, 266-67 (E.D.N.Y. 2023) (breach of fair dealing "where a party's acts subsequent to performance on the contract so directly destroy the value of the contract for another party that the acts may be presumed to be contrary to the intention of the parties"); *In re 53 Stanhope LLC,* 625 B.R. 573, 584 (S.D.N.Y. Bankr. 2021) (recognizing broader equitable exceptions for non-monetary defaults).

### 2.      The Financial Audits

There is no dispute that Plaintiffs never prepared audits during the entire loan term, except for 2021. Audits are expensive, especially for a cash-strapped business. Plaintiffs believe that AFC does not dispute that AFC waived the requirement for 2022, but understands that AFC is now trying to pretend that it stopped waiving the requirement for 2023 and 2024. The hearing will establish that this is untrue.

Justice's CEO (Alexzandra Fields) will testify -- without contradiction -- that Tannenbaum was unwilling to spend the money for audits in those years too. *Madison Ave. Leasehold, LLC v. Madison Bentley Assocs. LLC,* 811 N.Y.S.2d 47, 50 (1st Dept. 2006) ("A waiver is the voluntary abandonment or relinquishment of a known right.").[5] After Plaintiffs renewed their demand to fire Bossidy in February 2025, Neville for the first time demanded that Plaintiffs produce audited financials—and on an untenable timeline. That is an absurdly pretextual demand. As AFC is well aware, the process takes months. *Blue Ridge Investments, LLC v. Anderson-Tully Co.,* 2005 WL 44382, at *7 (S.D.N.Y. Jan. 10, 2005) (waiver cannot be expunged or recalled, "but, not being a

---

[5]  Given AFC's control over the bank account, it was well aware that the expense of preparing audited financials had never been approved or deducted, yet it never raised a peep in complaint about that. This is further corroborated of Plaintiffs' forthcoming testimony that Tannenbaum affirmatively waived the requirement to save the money. *Bank Leumi Trust Co. v. Block 3102 Corp.,* 180 A.D. 588, 590, 580 N.Y.S.2d 299 ("waiver may be evinced by words or conduct").

binding agreement, can ... be withdrawn, provided the party whose performance has been waived is given notice of the withdrawal and a reasonable time after notice within which to perform."). When Plaintiffs wrote back to confirm that AFC had previously waived the requirement, and asking whether AFC really wanted Plaintiffs to spend $150,000+ on procuring audits, Neville ignored the email. When Plaintiffs followed up with another email, Neville ignored it again. The audit allegation is an equally false basis for default.[6]

### 3.    The Pennsylvania-Related Alleged Defaults

All of AFC's remaining arguments come down to what the parties did or did not agree to regarding the Pennsylvania cultivation. On that score, the Court is going to have to hear the testimony, and make a credibility determination.

### a.    There Was a Reopening Agreement

Everything boils down to whether the Court decides to believe Justice's CEO (Fields) that there was a subsequent agreement (post-dating the March 2024 Forbearance) governing the PA cultivation, or whether it believes AFC's CEO (Neville) that there was not. Because she is telling the truth and Neville is not, Fields will be far more credible. Her testimony is as follows.

Both sides needed a solution to the Pennsylvania problem. The factory was unfinished, in need of mold remediation, beset with contractor bills, and not worth very much on the open market. AFC tried to shop it, but offers were only around $7MM.

The March 2024 Forbearance document set a date in May by which Plaintiffs had to either find an investor to put in $5MM in outside money, or AFC would have the right to foreclose.

---

[6] Plaintiffs also stand on the argument from their Memo that the information requirements in the March 2024 Forbearance superseded those of the original credit agreement -- particularly as established through the parties course of dealings.

Crucially, that was the was the remedy the parties set forth in their agreement: *foreclosure,* and nothing more. Ex. A. The March 2024 Forbearance *does not* provide that failure to find an investor by May would be a *breach. Id.*

Plaintiffs did not find a suitable investor willing to put in $5MM by May. AFC, however, did not foreclose. The parties continued to try to find a workable solution.

That Fall, after a series of conversations, Fields and Neville made a deal, one that worked very well for both sides. The Plaintiffs' owners (Loevy and Kanovitz) would commit to themselves putting in the fresh $5MM to reopen the cultivation. In exchange for that investment, AFC would agree not to foreclose while they reopened.

The resulting agreement was very beneficial to both sides. Plaintiffs got to salvage their business, and AFC got to fortify the value of the collateral, which by then was deeply under water. The State was very receptive, being keenly interested in increasing the supply of medical cannabis in the state.

Fields will further testify that the key premise of the deal was AFC's agreement not to foreclose while Loevy and Kanovitz invested in the reopening. No more than any outside investor would have, Plaintiffs' owners were not going to commit to contribute the last $5MM to their names to their project if they were simply helping AFC to do better by foreclosing and selling it. That would have been an obvious non-starter. The deal always was that if Plaintiffs' put new money into this highly-encumbered asset, AFC would not foreclose. Fields will testify credibly to that.

Were there any doubt, this is exactly how the deal was represented to the DOH in the written submission on the license appeal. That written submission specifically represented that AFC had agreed to "take no action to foreclose on the mortgage or otherwise impair the facility." Memo at 32,

Ex. J-3 at 2. When Neville got his copy of the DOH submission as requested, he never suggested Plaintiffs had gotten it wrong. Nor did he object when Fields sent him the email asking him for a letter confirming that AFC was amenable to allowing Plaintiffs to spend $500,000 held by AFC in escrow on the reopening. Quite to the contrary, Neville told her to have the attorneys write it up. *Id.*

Based on all of the foregoing, Plaintiffs are confident the Court will conclude that there was an oral agreement that post-dated the March 2024 Forbearance. It was admittedly not a fancy written agreement prepared by lawyers. But it meets all of the requirements to qualify as a binding meeting of the minds. Both Fields and Neville certainly had authority to enter into it, and Plaintiffs relied and began performing.

The best way to view this agreement is as the type that CEOs reach with one another without bringing in the lawyers. Lawyers may not like those kinds of agreements, but the law respects an oral contract (provided there is one) just as much as a 100 page document created by corporate attorneys.

If Neville tries to deny the deal's existence, he will have to explain the written corroboration that he did agree. And crucially, the Reopening Agreement is hardly counter-intuitive. It bailed out AFC arguably even more than it benefitted Plaintiffs. The testimony at the hearing will be that once reopened, the cultivation plus dispensaries *will generate more than $120MM/year, with a valuation of at least that much.*

In other words, the Reopening Agreement commits $5MM of Plaintiffs' money to create a collateral package worth multiples of that investment. AFC's subsequent denial that it ever agreed to such a deal is as inexplicable. In fact, its decision to renege and instead try to liquidate the factory for scraps ($7MM or less) only makes sense if one considers that AFC has run out of money and no longer has the luxury of honoring the parties' agreement.

10

Once the Court credits Fields' testimony that she and Neville agreed to the Reopening Agreement, the only question left for the Court to decide is what its term was. AFC's brief tries to suggest that if there was a deal, it was not for an indefinite term. For her part, Fields will testify that the agreement did not require Plaintiffs to put in $5MM while reserving AFC an option to abruptly change its mind and foreclose anytime at wanted, at its unilateral discretion. To the contrary, a very precise term was agreed to, namely, the timeline set forth in the DOH submission. The parties were on track to meet that timeline all the way up until the point AFC hit its financial crisis and improperly pulled the plug on the deal. Based on the evidence and testimony, Plaintiffs are confident that the Court will credit their account of the deal over that of Neville.

If the Court does credit Fields' testimony over Neville's that there was an oral understanding to reopen the Pennsylvania facility on the timeline submitted to the DOH -- that is, a new agreement that modified or novated the original March 2024 Forbearance in exchange for new consideration -- then Plaintiffs win. Specifically, the law supports Plaintiffs' claim that an oral understanding is perfectly enforceable, notwithstanding Defendants' "parol evidence" and merger clause arguments.

### b.     Oral Agreements Are Enforceable

AFC's argument that the written March 2024 Forbearance forecloses a subsequent oral modification or novation is simply wrong. Its discussion of parol evidence and merger clauses completely misses the point. Plaintiffs are arguing that there was an entirely new subsequent agreement, one supported by consideration and partial performance. The law fully supports this.

In New York, as elsewhere, the doctrine of partial performance provides that "an oral agreement may be enforced even in the absence of a writing if either party has partially performed under the terms of that oral agreement." *Merrill Lynch Interfunding, Inc. v. Argenti,* 155 F.3d 113,

11

121 (2d Cir. 1998) (citing *Rose v. Spa Realty Assocs.,* 42 N.Y.2d 338, 343 (1977)).

Crucially, partial performance can overcome the rule and provisions barring changes other than in writing, provided "that partial performance must be 'unequivocally referable' to the new contract." *Garcia v. Dezba Asset Recovery,* Inc., 665 F. Supp. 3d 390, 404 (S.D.N.Y. 2023) (citing *Merrill Lynch,* 155 F.3d at 122); *see also Mindspirit,* 470 F. Supp. at 380. "Under this doctrine, an oral agreement may modify a preexisting written agreement if (1) there has been partial performance of the oral modification and (2) that partial performance is unequivocally referable to the oral modification - that is, the conduct constituting the alleged partial performance must not be compatible with the written agreement." *Id.* (internal citations and quotation marks omitted). "To be 'unequivocally referable,' 'the action taken must be unintelligible or at least extraordinary, explainable only with reference to the oral argument.'" *Id.* (quoting *Merrill Lynch).*

Independently, the doctrine of equitable estoppel "can also serve to overcome a provision that prohibits oral modifications to a contract." *Garcia,* 665 F. Supp. 3d at 404; *see also Randolph Equities, LLC v. Carbon Cap., Inc.,* 648 F. Supp. 2d 507, 518 (S.D.N.Y. 2009) ("A party can overcome a no-oral-modification clause by showing either partial performance or equitable estoppel."). "Once a party to a written agreement has induced another's significant and substantial reliance upon an oral modification, the first party may be estopped from invoking the statute to bar proof of that oral modification." *Rose v. Spa Realty Assocs.,* 397 N.Y.S.2d 922, 366 N.E.2d at 1283 (citations omitted). As with the doctrine of partial performance, "conduct relied upon to establish estoppel must not otherwise be compatible with the agreement as written." *Garcia,* 665 F. Supp. 3d at 404 (citing Rose, 397 N.Y.S.2d 922, 366 N.E.2d at 1283) (internal quotation marks omitted).

Finally, to be enforceable, "an oral modification must possess all of the elements necessary to

form a contract, including valid consideration." *Mindspirit,* 470 F. Supp. at 380. "Under New York law, consideration is defined as 'some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility, given, suffered, or undertaken by the other.'" *Alpha Capital Anstalt v. Real Goods Solar, Inc.,* 311 F. Supp. 3d 623, 630 (S.D.N.Y. 2018) (quoting Hamer v. Sidway, 124 N.Y. 538, 545, 27 N.E. 256 (1891)).

Both exceptions apply here to the Reopening Agreement, as both parties subsequently took steps that were specifically and unequivocally referrable to the new contract. Under the existing 2024 Forbearance, AFC had the right to foreclose on the cultivation property and sell to the highest bidder. All of Plaintiffs' actions taken to invest into re-opening the cultivation are therefore fundamentally in conflict with the prior agreement. There is simply no point in finishing construction of a facility, and renewing the cannabis license for that facility, if the facility is simply going to be sold at auction.

Plaintiffs hired an outside law firm (Ice Miller) to appeal the DOH license denial, and ultimately submitted a detailed plan to DOH, which included a construction plan, timeline, photographs, and financial plan. *See* Memo Ex. J. Plaintiffs' owners signed written pledge agreements to inject $5 million of their personal funds to complete construction of the facility. Plaintiffs also paid thousands of dollars for contractors and service providers to prepare the site.

These actions were fundamentally incompatible with the March 2024 Forbearance Agreement, and are only explainable in reference to the Reopening Agreement; they clearly constituted partial performance of the Reopening Agreement and were supported by significant consideration, rendering the modification enforceable.

Defendants likewise took actions that were incompatible with the March 2024 Forbearance Agreement. In December 2012, Alexzandra Fields, Plaintiffs' President and CEO, emailed Dan

Neville, CEO of AFC, asking for a confirming letter from AFC that Justice could use up to $500k from its AFC equity account "for initial restart fees (utilities, cleaning, initial staffing, etc.)." *See* Memo Ex. N. In response, Neville agreed that AFC would provide the requested letter, and asked Fields to have the lawyers draft it. *Id.*

Both of the parties thus acted in a way that was not compatible with the March 2024 Forbearance Agreement, and was instead only compatible with the Reopening Agreement. *See, e.g., Premier Medical Systems, LLC v. NeuroLogica Corp.,* No. 1:21-cv-1337-GHW, 2022 WL 603999, at *10 (S.D.N.Y. 2022) ("Defendant does not dispute that it did, in fact, perform under the terms of the 2017 Modification. That conduct is sufficient to show partial performance."); *see also Rose,* 42 N.Y.2s 338, 366 N.E.2d at 1284-85 (explaining that partial performance was shown where written agreement referred to conveyance of land for 150 units, but alleged modification amended the quantity to 96, and parties' partial performance was unequivocally in reference to the latter).[7]

AFC also induced Plaintiffs' "significant and substantial reliance" on the Reopening Agreement by (1) agreeing to the plan and (2) actively contributing to the reopening efforts, including by approving additional capital. *See Rose,* 42 N.Y.2d 338, 366 N.E.2d at 1283 ("Once a party to a written agreement has induced another's significant and substantial reliance upon an oral modification, the first party may be estopped from invoking [º 15-301] to bar proof of that oral modification."). As a result of AFC's agreement to the Reopening Agreement, Plaintiffs expended

---

[7] Lest AFC try to persuade the Court that Plaintiffs did this not because they had been promised no foreclosure but instead to create value to reduce their indebtedness, Plaintiffs remind the Court that cannabis factory only has real value when coupled with Plaintiffs' license to cultivate. A foreclosure high-bidder is not authorized to use Plaintiffs' license, which is specific to Plaintiffs, and thus could not capture the full value of a cannabis factory. Besides, if Plaintiffs' motivation was to reduced indebtedness, they could have given the $5mm straight to AFC. The argument is phony.

significant time and money pursuing an appeal and eventual settlement with DOH, all in the name of reopening the Pennsylvania Cultivation.

Thus, even if this Court finds that Plaintiffs defaulted on the March 2024 Forbearance Agreement with regards to the Pennsylvania Cultivation (it did not), the Reopening Agreement was an enforceable modification to the contract regarding the Pennsylvania Cultivation. Plaintiffs complied with all terms of the Reopening Agreement; they are not in default. Everything thus turns on the Court's factual and credibility determination at the hearing about whether the Reopening Agreement was reached in the manner described by Fields and Brashers-Krug, or whether Neville is correct that it is all "made up."

In Defendants' world, Plaintiffs took these actions and made their representation to DOH that there was exactly such a deal in place (and then sent that document to AFC) even without having received those assurances from Neville. In Defendants' world, Plaintiffs were just being kind to AFC, improving the facility just so AFC could sell it. Plaintiffs anticipate that the Court will not find that testimony credible.

### c.    Plaintiffs' Opposition to the Pennsylvania Foreclosure Action Was Not A Default

Given the existence of the Reopening Agreement, AFC was the breaching party, not Plaintiffs. After Plaintiffs relied on this agreement and partially performed, AFC abruptly reneged, filing the very foreclosure action that it had previously agreed not to file. Under those circumstances, Plaintiffs were perfectly entitled to defend against the foreclosure action without being found in breach of the March 2024 Forbearance, which by then had been modified by the Reopening Agreement. *Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Com.,* 265 A.D.2d 513, 513-14, (1999) (defendant

cannot act "to prevent performance of the contract or to withhold its benefits from the plaintiff.").

Plaintiffs get that the Defendants deny that Neville ever agreed to hold off on foreclosing in exchange for Plaintiffs' agreement to invest $5MM into reopening. The existence *vel non* of this agreement is a question of fact this Court will have to decide after hearing from the witnesses. But in the event the Court does credit Plaintiffs' testimony that there was in fact a subsequent agreement to hold off on foreclosure in exchange for Plaintiffs' investments in support of reopening, then AFC is the one in breach, and its contention that Plaintiffs are somehow in breach for opposing the foreclosure action cannot stand.

There are other reasons that Plaintiffs' opposition to the foreclosure action is not a breach, each independently sufficient. For starters, Plaintiffs did not do anything that was actually prohibited. Citing Section 5.10(b) of the Forbearance Agreement, AFC contend that Plaintiffs admit to breaking a promise to "'promptly take such further actions and execute and deliver such further instruments and documents that Agent may request, in order for Agent to foreclose on the PA Cultivation Property'" claiming that Plaintiffs "do not dispute that they have not met this promise." The argument fails. Plaintiffs did not violate this provision because AFC never made any such request. Without such a request, there cannot even arguably be a violation.

With regard to Hi Park's alleged default for defending itself in the action that AFC filed in the Pennsylvania Court of Common Pleas, AFC's foreclosure complaint knowingly overreached, thereby creating the very problem for which it is now trying to default Plaintiffs. Specifically, AFC's premise seems to be that 2024 Forbearance requires Plaintiff to admit anything and everything that AFC chose to allege, so long as it styled its complaint as a foreclosure. But that is not at all what the 2024 Forbearance says. It provides only for a consensual judicial foreclosure and sale of the real property

16

with the proceeds being allocated to the Plaintiffs' debt. *See* Ex. A, Section 2.3(b) (defining "PA Foreclosure Proceeding"). Assuming there had been no reopening agreement, what Plaintiffs were obligated to do under the 2024 Forbearance was to enter into a consent judgment for such a foreclosure and sale. *See* Section 5.10.

As stated, however, that is not what AFC requested. Rather than ask Plaintiff Hi Park to sign a consent judgment and then file it, AFC filed a long complaint with 73 paragraphs of alleged facts about Hi Park and its affiliates, seeking not only foreclosure but also almost $12 million in excess money damages plus ongoing fees, damages, and interest in a judgment to be entered against Hi Park as well as the property. Plaintiffs will introduce this foreclosure complaint as an exhibit at the preliminary injunction hearing. Nothing in the Forbearance Agreement required Plaintiff Hi Park to consent to a $12 million judgment being entered against it (indeed, to any amount), much less make untrue admissions about itself and its affiliates, admissions which AFC and others might later use against it and its Justice affiliates as evidence in collateral litigation such as this one.

For example, AFC alleged in ¶ 61 that it had incurred $1,324,793.75 in attorney's fees and costs, which seems like an astronomically outrageous sum to file a foreclosure case. Hi Park was not obligated by the March 2024 Forbearance to "cooperate" by admitted that supposed fact. AFC included other paragraphs alleging supposed defaults by Plaintiff and its affiliates which are very much disputed. For example, ¶ 65 alleged that Hi Park "and its affiliated borrowers have defaulted on their obligations under the Notes, the Credit Agreement, and the other Loan Documents." Admitting this allegation would have been binding in any later case that AFC chose to bring, as unfair defenses in the Bossidy action. And again, the idea that Hi Park would make these confessions was unfair, and not what was contemplated by the terms of the Forbearance Agreement.

Simply put, AFC overreached and tried to bully Plaintiffs into making judicial admissions and paying $12 million, neither of which it was obligated to do. AFC has not and cannot point to a single provision of the Forbearance Agreement which required Hi Park to admit allegations in a complaint (much less allegations with far reaching implications beyond merely turning over the piece of real estate), nor to incur any money judgment at all. At best, AFC was entitled to a consent judgment for the piece of property -- which it never requested. Accordingly, there is no predicate for AFC's claim that Hi Park's opposition to that pleading breached the Forbearance Agreement.[8]

AFC's arguments under Section 10.6 and 10.7 fail for these same reasons. First, PA Foreclosure Proceeding is a defined term, and what AFC filed is something far beyond it.  Second, the Reopening Agreement novates Section 10.6 and 10.7 anyway because AFC subsequently contracted not to foreclose. Finally, AFC's argument that Section 12.5 vitiates any oral agreement to forbear (that AFC itself wanted and got valuable consideration for), fails under New York law for the reasons discussed, supra.

### d.      Plaintiffs' Pennsylvania Cultivation License

The Reopening Agreement defeats this alleged breach as well. If the Court credits the testimony that the Neville and Fields reached the reopening agreement, AFC thereby waived its complaint about the gap in licensure. There will be testimony at the hearing about the Department's interest in restoring the license. To the extent there was a breach, it has therefore been waived. *Bank Leumi Trust Co. of N.Y. v. Block 3102 Corp.,* 180 A.D. 588, 590, 580 N.Y.S.2d 299 (1992) (a

---

[8]   AFC also skips past the fact that Hi Park is the entity that defended its foreclosure action in Pennsylvania. Even if that action violated the 2024 Forbearance agreement, which it does not, it is not a Forbearance Default by Bloc nor Hayden Gateway, and it does not allow AFC to take those entities' monies or sell them.

contracting party may "orally waive enforcement of a contract term notwithstanding a provision to the contrary in the agreement," and "such waiver may be evinced by words or conduct").

AFC also fails to defeat Plaintiffs' argument the fact that the license was not renewed due to circumstances that AFC agreed to and encouraged. Fields will testify without contradiction that Tannenbaum lobbied her to shut down Pennsylvania to devote limited resources on the extraordinary opportunity in New Jersey (a limited license in a fantastic market) and then refused to approve Plaintiffs' requests to use their own money to pay the expenses necessary to prevent mold and keep the facility open, even with a skeleton crew. Having itself effectively decided to shut down the facility, AFC cannot use the resulting consequences as a basis for a breach.

Finally, the reliance in Defendants' response brief on Section 5.3 turns out to be misplaced. AFC drafted that provision very poorly, so poorly, in fact, that it does not support any relief. Memo Ex. H. The provision is addressed to corporate existence in the state of incorporation and the states where it does business as its title states:

> 5.3 **Existence**. At all times preserve and keep in full force and effect such Person's (i) valid existence and good standing in its jurisdiction of formation or organization and (ii) good standing with respect to all other jurisdictions in which it is qualified to do business and any Permits or Cannabis Licenses material to its businesses.

Section (i) talks about corporate existence in the state of formation (i.e. NJ and PA) and section (ii) talks about corporate good standing in other jurisdictions where the corporation operates. There is clearly a typo in section (ii). The section goes from talking about corporate good standing to "and any Permits and Cannabis licenses material to its business." Language is missing. AFC left out the connecting concept.

Clearly there are two subsections addressed to corporate good standing: one about existence and good standing in the jurisdiction of incorporation and the other about good standing

19

in other jurisdictions where the corporation is in the cannabis business. Assuming that the parties did not intend to suddenly switch topics then the missing concept is some conjunctive concerning good standing in the jurisdiction. Subsection (ii) would therefore properly be read "At all times preserve and keep in full force and effect such Person's . . . good standing with respect to all other jurisdictions in which it is qualified to do business and **[has]** any Permits or Cannabis Licenses material to its businesses." That interpretation makes sense, Cannabis Licenses is a modifier of the additional jurisdictions-- corporate good standing is required everywhere that the Person is in the cannabis business. This harmonizes subsection (ii) with both the section heading and subsection (i).

AFC wants to read the language to, instead, create a third obligation on a new topic in addition to good standing. As AFC reads it, grammatically there would have to be a third subsection inserted into the paragraph, addressed to the first phrase in the paragraph rather than to the preceding words in subsection (ii), being: "At all times preserve and keep in full force and effect such Person's . . . **[(iii)]** Permits and Cannabis Licenses material to its businesses."

AFC's interpretation of the ambiguity does not work because it requires the Court to presume that the parties intended to switch to an entirely different topic than is covered by the prior two subsections. Courts avoid such interpretations, particularly when there is another equally reasonable or better one that keeps the subsections addressed to the same topic. Familiar cannons of construction require that words be construed with regard to the other words with which they appear.

The fact is, Pier Cove's cultivation license is not included in the term "Cannabis License." The terms "Cannabis License" is defined in the definitions section and further speficied in Section

4.7 of the Credit Agreement ("(d) The Loan Parties have all Cannabis Licenses required to conduct their business as currently conducted, each of which are set forth on Schedule 4.7(d)."). Schedule 4.7(d) lists the Cannabis Licenses separately for New Jersey and Pennsylvania and the only Pennsylvania Cannabis Licenses listed are the three *dispensary licenses*. This also jibes with other provisions of the agreement that treat the Pennsylvania cultivation license differently than the defined term "Cannabis License". See Section 3.6 on early termination requiring that in the event of an early NJ termination that AFC would receive a lien on Pier Cove's cultivation license. Examined closely, the assumption that the Section supposedly rendering the loss of the license of a breach thus does not even actually say that. Instead, it obligates the entity to remain in good standing, not the license. Given the well-established canon that documents are construed against he drafter, AFC loses out of the gate on this ground alone.

### e.    Alleged Failure to Notify AFC and Provide Communications

Evidence at the hearing will likely establish that Plaintiffs were a few days or weeks late in letting AFC know about the decision not to renew the license at the end of July 2024. There is no dispute that AFC knew the denial was in the mail, because AFC knew the date for the renewal, and knew that it had essentially forced Plaintiffs to shut down the facility, meaning there was no way the license could be renewed. There also is or will be no dispute that Plaintiffs did provide AFC the requisite written notification fairly soon after the "three business days" written in the agreement.

None of this justifies holding Plaintiffs in default and terminating the loan because both of these alleged defaults are supposedly breaches under the Credit Agreement, not the March 2024 Forbearance. That circumstance triggers the "continuing violation" problem identified in Plaintiffs' opening Memo at 26-27, a problem AFC pointedly ignores. The condition precedent to any remedies

is that the defect be continuing, and it has long since been cured, and without any discernable prejudice. AFC ignored that argument, forfeiting it, because it has no answer.

In truth, AFC should be embarrassed to be claiming that its actions in terminating a $100MM+ loan, stealing $1.8MM from Plaintiffs' bank account, and foreclosing on Plaintiffs' corporate parent (in violation of a TRO, no less) are at least partially justified because it got the email a few days late telling it something it that already knew. The fact that AFC felt obliged to devote three pages to these alleged breaches belies just how desperate AFC is to try to justify its actions. *Fifty States Management Corp. v. Pioneer Auto Parks, Inc.,* 46 N.Y.2d at 576-77, 415 N.Y.S.2d at 802 ("[E]quity abhors forfeitures, and will intervene to prevent a substantial forfeiture caused by a trivial or technical breach [and] unconscionable overreaching against the effect of a good faith mistake that is promptly cured by the defaulting party with no prejudice to the creditor.").

## II.    Plaintiffs Demonstrated Likelihood Of Success

Curiously, AFC claims that Plaintiffs cannot show a likelihood of success on their breach of contract claim because they "do not identify what contractual provision of what contract AFC supposedly breached." Resp. at 6. Not so. Plaintiffs' Complaint and brief are replete with discussion of AFC's contractual breaches, including, for example, the detailed description of Defendants' breach of the 2024 Forbearance by unauthorized transfer or funds from Plaintiffs' bank accounts in violation of that agreement. Compl. ¶¶ 47, 52, 88-89, 173-190. To remove all doubt, Plaintiffs also allege that Defendants breached*, inter alia,* sections 5.9 and 6.1 of the 2024 Forbearance.

It is also settled law in New York that "[e]ven if a party is not in breach of its express contractual obligations, it may be in breach of the implied duty of good faith and fair dealing ... when it exercises a contractual right as part of a scheme to realize gains that the contract implicitly denies

or to deprive the other party of the fruit (or benefit) of its bargain." *Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc.,* 97 A.D.3d 781, 784, 949 N.Y.S.2d 115, 118 (2012); accord *Moran v. Erk,* 11 N.Y.3d 452, 456, 872 N.Y.S.2d 696, 901 N.E.2d 187.[9]

## III.    Plaintiffs Can Demonstrate Irreparable Harm

Gail Brashers-Krug will testify at the hearing about the irreparable regulatory and other harm Plaintiffs will suffer if AFC continues to destroy its business. The law supports Plaintiffs.[10]

## IV.    Defendants Have Not Justified Any Bond, Much Less A Significant One

---

[9]   AFC contends that Plaintiffs cannot recover on a breach of contract claim and a claim alleging breach of the covenant of good faith where both claims are based on the same facts. The doctrine AFC cites is merely one of election of remedies. Plaintiffs can certainly plead in the alternative, even if it could not ultimately recover on two causes of action based on the same facts. In any event, the claims are not necessarily based on the same facts. Plaintiffs allege that AFC breached the 2024 Forbearance by, inter alia, stealing money from Plaintiffs' accounts in violation of that agreement, plus multiple breaches of the covenant of good faith by, for example, actively conspiring with Bossidy to hold Plaintiffs in default of the 2024 Forbearance. Compl. ¶¶ 109-111.

[10]   *See Second on Second Cafe, Inc. v. Hing Sing Trading, Inc.,* 66 A.D.3d 255, 884 N.Y.S.2d 353 (1st Dep't 2009) (finding irreparable harm where "Cafe's inability to operate a restaurant in its establishment potentially jeopardized its liquor license"); *Lowe v. City of Detroit,* 544 F. Supp. 3d 804, 816 (E.D. Mich. 2021) (irreparable harm based on potential loss of "recreational marijuana retail license"); *Finch v. Treto,* 606 F. Supp. 3d 811, 835 (N.D. Ill. 2022), aff'd in part, dismissed in part, 82 F.4th 572 (7th Cir. 2023) (irreparable harm based on loss of potential cannabis license because "dispensary licenses are scarce and granted only occasionally"); *D2 Mark LLC v. OREI Investments LLC,* 2020 WL 3432950 (N.Y.Sup.) (fact that lender was actively shopping Plaintiffs' businesses -- as AFC is apparently doing here -- constituted irreparable harm); *U.S. Ice Cream Corp. v. Carvel Corp.,* 136 A.D.2d 626, 628 (2d Dep't 1988) (interference with an ongoing business, "particularly one involving a unique product and an exclusive licensing and distribution arrangement, risks irreparable injury and is enjoinable"); *accord Guardian Realty Partners LLC v. Deepdale Funding PA LLC,* 2022 WL 17340925 (N.Y.Sup.) (finding irreparable harm based on "[t]he loss of plaintiffs' ownership in a business and of ongoing business"); *Datwani v. Datwani,* 102 A.D.3d 616, 617, 959 N.Y.S.2d 153 (1st Dep't 2013) (finding irreparable harm in the threatened loss of management and control of a closely held corporation); *Sba Monarch Towers 1, LLC v. Hirakis,* 2019 WL 4239242 (N.Y. Sup. 2019) (finding irreparable harm where plaintiff's business risked closure or dissolution); *Bionpharma Inc. v. CoreRx, Inc.,* 582 F. Supp. 3d 167, 175 (S.D.N.Y. 2022) (finding irreparable injury on the ground that reputational damage in the industry is "precisely the sort of harm for which monetary damages are inappropriate").

Defendants' bond argument is conspicuously insufficient. They basically argue that various other random cases involving a lot of money sometimes warrant big bonds. This approach ignores the law. In reality, courts must "engage in a case-specific analysis that accounts for the factual circumstances of the parties, the nature of the case and competing harms, and the scope and potential impact of the injunction." *Mallet & Co. Inc. v. Lacayo,* 16 F.4th 364, 392 (3d Cir. 2021)

In this case, the actual need for a bond is vanishingly small. Defendants already hold a security interest in the collateral, control every penny in Plaintiffs' bank account, and are entitled to most (75%) of the profits to boot. If they eventually win, they already have maximum security.

Viewed fairly, moreover, the risk that needs to be bonded is any actual incremental damage AFC would suffer between the time of an improvidently granted preliminary injunction and the later date on which a permanent injunction is denied. In this case, that time period should be short. AFC does not need any discovery. *It already knows all of the reasons why it put Plaintiffs in default, and has already acted on them.* AFC does not need to (and should not get to) root around in discovery, looking for new things to argue about. Final adjudication and judgment can therefore happen quickly -- if not on Friday, than certainly less than a month later.

If AFC turns out to have been wrongfully subjected to a TRO, a fair remedy is the lost interest on whatever it could have sold Plaintiffs' assets for. Assuming for the sake of argument that it is delayed by 30 days in selling all of Plaintiffs' assets at "fire sale prices" for $75MM. At 6% interest, lost use of the money would cost AFC perhaps $375k/month. AFC, however, is already receiving at least $250k/month. And now that Bossidy is gone and Plaintiffs have dramatically turned around the operations, AFC is going to receive at least that amount again on top of the $250k in the cash sweep in the first month alone. AFC, in other words, suffers no financial damages associated with delayed

24

foreclosure. It actually comes out ahead. *See Mirashi v. Doe,* No. 25CV1805 (EP) (LDW), 2025 WL

893003, at *5 (D.N.J. Mar. 21, 2025) ("the Court may waive this [FRCP 65] security requirement").

Notably un-stated by AFC is any contention that the Defendants are suffering any sort of cash

squeeze that might justify faster relief. The law requires parties to "place on the record their reasons

for setting a bond amount, so as to provide a meaningful basis for appellate review." *Mallet,* 16 F.4th

at 392 (3d Cir. 2021). For reasons known only to AFC, it has declined to assert any incremental harm

associated with a short delay. The Court should not speculate about arguments AFC is unwilling to

make (although who knows what Neville will say at the hearing).

At the end of the day, AFC continues to ignore the gigantic elephant in the room. Plaintiffs'

assets are hardly diminishing in value. To the contrary, they will soon be worth many times more than

they are worth now. In their present state, they are at their absolute lowest value. There will be

testimony at the hearing that if post-Bossidy New Jersey ramps up to anywhere near the potential that

AFC penciled out when it underwrote the loan, the integrated New Jersey operation (plus

dispensaries) will alone soon generate $100MM/year, and be worth at least that much. Fire selling it

now in the Bossidy-induced state of shambles would be cutting its value in half.

Pennsylvania is even more extreme. Desperate for cash, AFC proposes to sell it for scraps,

even with a deal under discussion with DOH to reopen, restore the license, and potentially add more

dispensaries. That totals many more millions in value by the end of the loan term.

The fact that AFC has run out of financial runway is not a valid excuse to crush Plaintiffs'

business and sell it for a fraction of its value, and try to extort Plaintiffs' owners to make up the

difference. Plaintiffs are not in breach, and should be permitted to enjoy the benefits of the bargain

that they paid more than $18MM to put into place. From a bonding perspective, time for the collateral

25

to reach its potential is actually very good for AFC, not bad. Unless and until AFC admits that its only concern is saving itself, it should stop pretending about what is truly going on -- and stop breaching its covenant of good faith and fair dealing.

## Conclusion

AFC's brief concludes with the quote that "no good deed goes unpunished." It is difficult to imagine what "good deed" AFC is trying to give itself credit for. It is undoubtedly not referring to stealing Plaintiffs' money, installing Bossidy to help it manufacture defaults, or violating the TRO. Perhaps it is referring to its forbearance of prior defaults, but that was hardly charity: AFC extracted more than $18MM in cash in order to renegotiate the loan to terms Plaintiffs could satisfy. If AFC means its agreement to cooperate in reopening Pennsylvania, it does not deserve credit after turning around and breached that agreement when its own needs became more acute.

As in all disputes, the Court must consider the allegations of in the context of what is really going on here. AFC is no longer satisfied with the terms of the March 2024 Forbearance. Its agent (Bossidy) failed to generate the profit cash sweeps that AFC had been hoping for. The problem for AFC is that Plaintiffs, having paid dearly for the forbearance terms, are dutifully making the agreed upon payments, and are not in default. Under the terms of the parties' agreement, there is still another year left on the loan before it comes due, by which time, if all goes well, the business may well be worth several hundred million dollars, far more than the even the bloated loan balance.

Much as AFC wishes it were otherwise, its own financial cash crunch is not valid cause to renege on the deals it made. It had no right to declare Plaintiffs in default; to call its owners thieves, criminals, and fraudsters; and to try to sell its assets, even after being enjoined from doing so. No matter how powerful AFC and its lawyers believe they may be, AFC needs to wait another year before

it has any legitimate claims. AFC has made it clear it has no intention of backing down -- exemplified most recently by its contemptuous actions. Because AFC is going to keep doing whatever it wants to do unless and until ordered to stop, injunctive relief is necessary here.

Dated: May 1, 2025

Respectfully submitted,

**LITT LAW, LLC**

By: _/s/ Matthew R. Litt_
Matthew R. Litt, Esq.
789 Farnsworth Avenue
Bordentown, New Jersey 08505
Phone: (908) 902-7071

**DYNAMIS LLP**

Jamie Hoxie Solano, Esq.
NJ Bar No. 426422024
(214) 454-8829
11 Park Place
New York, NY 10007
JSolano@dynamisllp.com

Michael B. Homer, Esq.
_Pro hac vice application forthcoming_
(617) 693-9732
MHomer@dynamisllp.com
Constantine Economides, Esq.
_Pro hac vice application forthcoming_
(305) 985-2959
CEconomides@dynamisllp.com
225 Franklin Street, 26th Floor
Boston, MA 02110
_Attorneys for Plaintiffs_

27

## CERTIFICATE OF SERVICE

I, Matthew R. Litt, hereby certify that on the date indicated below, I caused a true and correct copy of the foregoing document to be served via email on Abby F. Rudzin, counsel for the defendants, who has agreed accept service on behalf of the defendants.

Dated: May 1, 2025

*/s/ Matthew R. Litt*

Matthew R. Litt, Esq.

28