<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **HAYDEN GATEWAY LLC,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **ADVANCED FLOWER CAPITAL INC.,** *et al.*, <br><br> Defendants. | Civil Action No. 25-2789 (ZNQ) (JBD) <br><br> **OPINION** |

<u>**QURAISHI, District Judge**</u>

 **THIS MATTER** comes before the Court upon a Motion for a Preliminary Injunction filed by Plaintiffs Hayden Gateway LLC and Bloc Dispensary LLC ("Plaintiffs"). ("Motion," ECF No. 7.) Plaintiffs seek a preliminary injunction order that bars Defendants Advanced Flower Capital Inc. and AFC Agent LLC (collectively, "Defendants" or "AFC") from "seizing any of Plaintiffs' assets or cash (beyond certain permitted and scheduled cash sweeps)," and from seeking "any other attempted remedy for any alleged default." (ECF No. 7-21 at 2.) In support of their Motion, Plaintiffs filed a Complaint (ECF No. 1), a Memorandum of Law ("Moving Br.," ECF No. 7-1), and various declarations and document exhibits (ECF Nos. 7-2 to 7-20). Defendants filed a Memorandum in Opposition. ("Opp'n Br.," ECF No. 19.) Plaintiffs filed a Brief in Reply. ("Reply Br.," ECF No. 28.) The Court conducted an evidentiary hearing on May 2, 2025. Having considered the parties' submissions, and the evidence and argument presented at the hearing, the Court will **GRANT** Plaintiffs' Motion for a Preliminary Injunction for the reasons set forth below.

## I.    BACKGROUND

### A.    PROCEDURAL HISTORY

Plaintiffs filed their initial Complaint against Defendants on April 17, 2025.  ("Compl.," ECF No. 1.)  The Complaint asserts three counts: 1) breach of contract (Count One); 2) breach of the implied covenant of good faith and fair dealing (Count Two); and 3) relief under Section 9-625 of the New York Uniform Commercial Code.  (Compl. ¶¶ 254–268.)  Shortly thereafter, Plaintiffs filed a Motion for an "Order to Show Cause with Temporary Restraints to be Converted to a Preliminary Injunction."  (ECF No. 7.)

The Court conducted a telephonic case management conference on April 24, 2025 to address the then-pending emergent application.  (ECF No. 9.)  During the conference, the Court ordered a briefing schedule and set a preliminary injunction hearing for May 2, 2025.  (ECF No. 14.)  The parties also consented to a brief temporary restraining order.  (*Id.*)  They filed a joint, stipulated status quo order (ECF No. 16), which the Court entered on April 28, 2025 ("TRO," ECF No. 17.)  The TRO provided in part that "Defendants will not seize any of Plaintiffs' assets or cash (beyond the cash sweeps permitted by the 2024 Forbearance Agreement), initiate foreclosure proceedings, or seek to auction any of Plaintiffs' assets."  (*Id.*)  The TRO expires on May 12, 2025. (*Id.*)

### B.    BACKGROUND

Plaintiffs Hayden Gateway LLC ("Hayden") and Bloc Dispensary LLC ("Bloc") are subsidiaries of Justice Cannabis Co. ("Justice"), which is owned by Jon Loevy ("Loevy") and Michael Kanovitz ("Kanovitz").  (Kanovitz Decl. ¶ 1, ECF No. 7-4.)[1]  Hayden is Justice's

---

[1] As noted in the Complaint, "Plaintiffs are part of a group of affiliated cannabis companies in five states doing business as Justice Cannabis Co."  (Compl. ¶ 1.)  Hayden's sole member, and one of Bloc's members, is JG Holdco LLC ("JG Holdco"), known as "Justice Grown."  (*Id.* ¶¶ 2, 4)  JG Holdco is Justice's parent company.

Pennsylvania entity and Bloc is Justice's New Jersey entity.  (*Id.* ¶ 2.)  Defendants Advanced Flower Capital Inc. and AFC Agent LLC, known collectively as "AFC Gamma," are "institutional lender[s] that primarily originate[], structure[], underwrite[], invest[] in and manage senior secured loans and other types of mortgage loans and debt securities, with a specialization in loans to cannabis industry operators."  (*See* P-64.)  Leonard Tannenbaum ("Tannenbaum") is the largest shareholder and the Chairman of the Board of AFC Gamma.  (Compl. ¶ 11; P-64.)  Dan Neville ("Neville") is the Chief Executive Officer ("CEO") of AFC Gamma.  (P-64; Tr. 284:6–13.)

On September 30, 2021, after entering into an original loan agreement and an amended and restated loan agreement, Plaintiffs entered into a Second Amended and Restated Credit Agreement with Defendants for funding to build Plaintiffs' cannabis businesses.  ("Credit Agreement," Ex. P-8.)[2]  Notably, Section 15.1 of the Credit Agreement includes a no oral modifications clause stating that no party can amend, waive, or modify the terms in the agreement "unless the same shall be in writing and signed by the Required Lenders."  (*Id.* § 15.1(a).)  Section 16.5 requires that Plaintiffs must notify Defendants of any defaults to the Credit Agreement upon actual knowledge.  (*Id.* § 16.5.)

It is undisputed that Plaintiffs did not satisfy their obligations under the Credit Agreement as a result of the COVID-19 pandemic and delays in construction; consequently, Plaintiffs were in default.  (Tr. 90:8–22; Moving Br. at 3; Reply Br. at 1.)[3]

After failing to meet their payment obligations under the Credit Agreement multiple times, Plaintiffs negotiated with Defendants to amend the Credit Agreement.  (Tr. 219:9–14; Compl.

---

[2] The are several parties to the Credit Agreement.  There are eight total borrowers: JG New Jersey LLC, SRG 1761 North Olden LLC, SRH 1474 Prospect LLC, SRG Waretown LLC, Hayden Gateway LLC, Pier Cove LLC, SRG 272 Main Street LLC, SRG Hi Park LLC, and JG HoldCo LLC as Parent and corporate guarantor of the loan.  There are three lenders: AFC Management LLC as agent, AFC Gamma, Inc., and A BDC Warehouse LLC as documentation agent.

[3] Section 9.1 of the Credit Agreement sets forth Defendants' rights upon an event of default.

¶ 69.)  As part of those negotiations, the parties entered into two forbearance agreements: the 2023 Forbearance Agreement and the 2024 Forbearance Agreement.  (Exs. P-9 and D-6, respectively).[4] In total, Plaintiffs paid more than $21 million to Defendants to avoid default.  (Tr. 219:15–19.)

1.    2024 Forbearance Agreement

On March 6, 2024, the parties entered into the 2024 Forbearance Agreement as a way to relieve Plaintiffs of their previous defaults under the Credit Agreement.  (Ex. D-6.)  Defendants agreed to forgo "during the Forbearance Period", among other things, accelerating on the loan and repossessing or disposing of Plaintiffs' collateral.  (*Id.*)  Under the 2024 Forbearance Agreement, Plaintiffs' interest rate and payments were significantly reduced, Plaintiffs needed to maintain $300,000 in their bank accounts, and Plaintiffs needed to pay Defendants $250,000 every month. (Tr. 110:14–24; Ex. D-6.)

The 2024 Forbearance Agreement also contained several covenants including, but not limited to: 1) Plaintiffs were to abide by the Credit Agreement unless specifically stated in the Forbearance Agreement (Ex. D-6, § 5.1); 2) Plaintiffs were to obtain a final certificate of occupancy for the New Jersey cultivation facility by no later than May 15, 2024 (*id.* § 5.3); 3) Plaintiffs would enter into a consulting agreement with SierraConstellation Partners LLC ("SierraConstellation") whereby an employee of SierraConstellation would control all New Jersey operations (*id.* § 5.7); 4) the parties would engage in a cash sweep process whereby Defendants were entitled to 75 percent of excess cash and a monthly payment of $250,000 (*id.* § 5.7); 5) Plaintiffs would fully cooperate and participate in any Pennsylvania foreclosure proceeding (*id.* § 5.10); and 6) Plaintiffs would provide Defendants with certain information including a schedule

---

[4] The 2023 Forbearance Agreement is not pertinent to this Opinion.

of payroll expenses, copies of invoices, and a consolidated accounts payable aging report (*id.* § 5.11).

The 2024 Forbearance Agreement also contained a provision defining events of default. (*Id.* § 10.) Under that provision, a "Forbearance Default" occurs, for example, (1) when there is a default under the Credit Agreement (*id.* § 10.2), (2) when there is a failure to comply with the covenants listed in Section 5 of the Forbearance Agreement (*id.* § 10.1), or (3) when the borrowers challenge the validity or enforceability or otherwise seek to challenge, enjoin, avoid, or unwind in any way the Pennsylvania Cultivation Foreclosure Proceeding (*id.* § 10.7).[5] Notably, the 2024 Forbearance Agreement provides that "all terms, conditions, covenants, representations and warranties contained in the Credit Agreement . . . shall remain in full force and effect." (*Id.* § 12.2.) Additionally, the 2024 Forbearance Agreement "shall not be deemed or construed to be a satisfaction, reinstatement, novation or release of the Credit Agreement or any other Loan Document." (*Id.*)

As to the covenant regarding SierraConstellation, the 2024 Forbearance Agreement explains that

> (a) JG New Jersey LLC shall promptly . . . enter into a consulting or similar agreement with SierraConstellation Partners LLC. . . pursuant to which the NJ Operations Manager has full control to manage the operations of Borrowers in New Jersey until Agent is satisfied in its sole discretion that the cash flows from Borrowers' operations are adequate to support Borrowers' payment obligations under the Credit Agreement.

---

[5] Defendants assert that the "Borrowers' commencement of this action on April 13, 2025 constitutes a Forbearance Default" under Section 10.5 of the 2024 Forbearance Agreement. (Defendants' Proposed Findings of Fact ¶ 36, ECF No. 42.) Section 10.5 provides that default occurs if "Any Obligor or any of their respective Affiliates commences a case, proceeding, or other action against Agent . . . relating to any of the Obligations, Collateral, Loan Documents, this Agreement, or any action or omission by Agent [or] Lender." (*See* Ex. D-6.) For the reasons set forth herein, the Court finds that Defendants cannot enforce this provision because they themselves are in breach of the Reopening Agreement and the implied covenant of good faith and fair dealing. Moreover, the Court questions whether precluding Plaintiffs from seeking relief would violate public policy. *See SI Venture Holdings, LLC v. Catlin Specialty Ins.*, 118 F. Supp. 3d 548, 551 (S.D.N.Y. 2015) (explaining when a provision violates public policy and that "[t]here is no magic formula" for this determination).

> (b) In the event the NJ Consulting agreement is terminated for any reason prior to the Specified End Date, JG New Jersey LLC shall promptly enter into a consulting agreement or similar agreement on similar terms as the NJ Consulting Agreement with a consulting or operations manager acceptable to Agent in its sole discretion.

> (c) JG New Jersey LLC shall comply with the terms of the NJ Consulting Agreement . . . in all material respects and shall not interfere with or otherwise challenge the operational control of the NJ Operations Manager.

(*Id*. § 5.7.)  Bloc complied by engaging SierraConstellation on April 1, 2024 to assist with the New Jersey cultivation operations.  (Ex. P-7.)

2.    Tim Bossidy

Neville recommended Tim Bossidy ("Bossidy") to Plaintiffs to control Plaintiffs' New Jersey operations.  (Tr. 328:6–19; 329:7–330:5.)    Bossidy is a Managing Director at SierraConstellation and was appointed on or around April 2024 by Neville as the Chief Restructuring Officer ("CRO") of New Jersey operations for Plaintiffs pursuant to Section 5.7 of the 2024 Forbearance Agreement.  (Tr. 102:5–15.)  The testimony at the hearing was conflicting on whether Neville insisted that Bossidy, and only Bossidy, be installed as the CRO, (Tr. 104:16–21), or whether Neville would have accepted someone else (Tr. 304:15–306:16).    Plaintiffs objected to Bossidy's appointment but to no avail.  (Tr. 104:16–20.)  Nevertheless, Bossidy was granted full operational control of Plaintiffs' New Jersey operations.  (Tr. 105:15–17.)

The parties also dispute the adequacy of Bossidy's performance as CRO and whether Bossidy was acting as an agent of Plaintiffs or Defendants.    Plaintiffs attest that Bossidy's performance was "disastrous."  (Fields Decl. ¶¶ 5–26, ECF No. 7-3.)  In fact, under Bossidy's leadership, Plaintiffs' New Jersey cultivation sales were down by more than 50 percent, Bossidy decreased morale amongst Plaintiffs' employees, there was a severe backlog of cannabis in the facility, and Bossidy refused to pay vendors.  (*Id.*; Tr. 109:4–112:2; 128:7–13; 129:23–130:25;

131:1–13; 214:4–25; Ex. P-20)  Defendants, however, suggest that Bossidy performed well and Plaintiffs' financial struggles were due to internal strife.  (Tr. 306:4–4; 311:24–312:4.)

Bossidy was eventually terminated after Plaintiffs found him surfing the internet looking at scandalous photos of women, and shopping for luxury watches, cars, and real estate while he was supposed to be working.  (Tr. 121:10–16.)  The evidence presented at the hearing shows that once Bossidy was fired, there was an immediate improvement in morale amongst the New Jersey employees.  (Tr. 128:5–9, 14–19.)  There was also an increase in productivity and sales from the New Jersey facility.  (Tr. 129:16–25.)  And since Bossidy's termination, Plaintiffs obtained a temporary certificate of occupancy for one of its New Jersey facilities.  (Tr. 213:6–9.)

### 3. New Jersey Cultivation

Bloc owns and operates Justice's licensed cannabis cultivation and manufacturing facilities in New Jersey, including one in Ewing Township, the one relevant here.  (Compl. ¶ 4.)  Notably, Section 5.3 of the 2024 Forbearance Agreement requires Plaintiffs to obtain a final certificate of occupancy for the Ewing facility by no later than May 15, 2024.  (Ex. D-6, § 5.3.)  To obtain a certificate of occupancy, Plaintiffs' Ewing facility needed to be functional.  A certificate of occupancy "means that [the] building is complete.  It's safe for employees to be in."  (Tr. 126:3–6.)  Plaintiffs hired Mosaic Construction LLC ("Mosaic") as the general contractor to build the facilities in New Jersey, including Ewing.  (Tr. 203:1–3; 269:23–270:1.)  Mosaic was first hired to work on the New Jersey cultivation project in September 2021.  (Tr. 203:4–6.)  Mosaic provided a schedule to complete the construction in Ewing so that Plaintiffs could obtain the certificate of occupancy in time to comply with its obligations under the 2024 Forbearance Agreement.  (Tr. 205:15–19.)  Mosaic did not complete the construction in time and Plaintiffs failed to meet the May 15, 2024 date for obtaining a final certificate of occupancy.  (*See* Tr. 270:1–25.)  Accordingly, Plaintiffs were in default of Section 5.3 of the 2024 Forbearance Agreement.  (Reply Br. at 5–6.)

4.    Pennsylvania Cultivation

As to Plaintiffs' Pennsylvania operations, Plaintiffs applied for and won a license/permit[6] to operate three retail medical dispensaries in Pennsylvania.  (Compl. ¶¶ 2, 26.)  Relevant here, Pier Cove LLC ("Pier Cove") is the licensed entity that owns and operates the cannabis cultivation facility in Hazle Township, Pennsylvania.  (*Id.* ¶ 17.)  On July 25, 2024, the Pennsylvania Department of Health ("DOH") did not renew the cultivation permit for the Hazle facility, in part, because the Hazle facility was only "about 60% completed."  (Fields Decl. ¶ 35.)  Under Pennsylvania law, a non-operational facility cannot be renewed. (Tr. 135:17–19.)  On August 15, 2024, Plaintiffs notified Defendants that their Pier Cove cultivation license was not renewed and that they intended to appeal the decision.  (Ex. P-22.)  This notice to Defendants was admittedly beyond the five-day notice period required by Section 5.22 of the Credit Agreement.  (Ex. P-8 § 5.22.)[7]  Defendants, however, initially supported Plaintiffs' efforts to appeal the DOH's permit renewal.  (Fields Decl. ¶ 45; Tr. 332:10–14.)

Simultaneously, Plaintiffs sought investors to help make the Pennsylvania cultivation facility operational by an agreed upon deadline of April 30, 2024, but to no avail.  (Tr. 331:1–7.)  Defendants were under the impression that they could foreclose on the property on this basis.  (Ex. D-6, § 2.3.)

To resolve this potential default event, the parties entered into an oral agreement known as the "Reopening Agreement."  The parties heavily dispute the nature and effect of this Reopening Agreement.  It is undisputed that in September 2024, the parties agreed that Defendants would

---

[6] In this Opinion, permit and license will be used interchangeably.  (*See* Tr. 216:1–6 ("What happens is—well, first of all, you have a permit, not a license.  Not to be nitpicky.  Pennsylvania is medical only.  So in states that are medical only, they usually call it a permit.")).

[7] Defendants posit that the applicable reporting period was the three-day one required by Section 5.1 for any event that constituted a default and a 10-day cure period.  In any event, based on this record, it appears that Plaintiffs failed to meet any of these deadlines.

make available $500,000 of Plaintiffs' equity funds towards startup costs to reopen and operate the Hazle facility. (Tr. 330:22–23; Ex. P-13.) Plaintiffs' owners also pledged to commit $5 million of their own funds to reopen the Hazle facility. (Fields Decl. ¶ 45; P-10.) The parties "understood that the agreement was contingent upon DOH's sign off in a settlement of the appeal." (Fields Decl. ¶ 45.) The appeal is ongoing. Although they agreed to release the $500,000 equity, Defendants insist that they never waived their right to foreclose on the Hazle facility. (Tr. 330:16–19.)

Consequently, on February 5, 2025, Defendants brought a foreclosure action on the Pennsylvania cultivation property in Pennsylvania state court. (Tr. 249:23–250:2.)[8] Plaintiffs answered the foreclosure action and asserted affirmative defenses, which Defendants assert constitutes a forbearance default under Section 10.7. (Ex. D-6 § 10.7.)

5.    Demand Letters

After Plaintiffs' alleged defaults to the Credit Agreement and 2024 Forbearance Agreement, Defendants sent Plaintiffs two demand letters. On February 19, 2025, Defendants sent Plaintiffs a Notice of Events of Default letter and demanded $30 million. (Ex. P-4; Tr. 248:4–8.) On April 9, 2025, Defendants sent Plaintiffs another letter explaining that Plaintiffs were in default under the Credit Agreement and the 2024 Forbearance Agreement and that Defendants sought to accelerate the loan and liquidate Plaintiffs' assets. (Ex. P-6.) That letter notes that the total amount of outstanding obligations owed to Defendants was $123,615,601.00. (*Id.*) Defendants also

---

[8] On May 6, 2025, Defendants filed a request for judicial notice of the complaint and answer in the Pennsylvania foreclosure proceeding. (ECF No. 41.) Plaintiffs oppose the request arguing that Defendants should have introduced the complaint and answer at the hearing, "at which time Plaintiffs would have had a fair opportunity to offer rebuttal evidence or elicit testimony regarding the facts [Defendants are] now asking the Court to judicially notice." (ECF No. 43.) Having reviewed the parties' submissions, the Court declines to take notice of the complaint and answer in the Pennsylvania foreclose proceeding because Defendants' submission is untimely and because the Court finds that considering it after the hearing would be prejudicial to Plaintiffs by depriving them of the opportunity to offer clarifying testimony or documents.

demanded Plaintiffs pay them $10 million.  (Kanovitz Decl. ¶ 18.)  Plaintiffs refused to pay.  (*Id.* ¶ 19.)  When Plaintiffs refused to pay, Defendants withdrew more than $1.8 million from Plaintiffs' bank accounts, which Plaintiffs characterize as an "unscheduled raid" and an "unauthorized cash sweep."  (Tr. 154:4–20; Kanovitz Decl. ¶ 21.)

## II.    **SUBJECT MATTER JURISDICTION**

The Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000.

## III.    **MAY 2, 2025 HEARING CONDUCT AND TESTIMONY**

The Court conducted a hearing on May 2, 2025 during which the parties presented five witnesses.  (*See* Transcript ("TR"), ECF No. 36.)  Each witness testified in person with the exception of Plaintiffs' witness Andy Poticha, who appeared virtually via Zoom.  During the hearing, the parties admitted numerous exhibits.  (Exs. P-2 through P-22; P-23 through P-25; P-33; P-50; P-51; P-61 through P-65; P-68; D-1; D-6; D-8.)  Several of the witnesses' declarations were also admitted into evidence.  (*See* Fields Decl., ECF No. 7-3; Brashers-Krug Decl., ECF No. 7-5; Kanovitz Decl., ECF No. 7-4.)

### A.    ALEXZANDRA FIELDS (HEARING TRANSCRIPT 100–200)

Alexzandra Fields ("Fields") was the first witness.  She is the President and CEO of Justice and its affiliated entities, including Plaintiffs.  (Tr. 101:5–6.)  Fields testified, among other thing, about her background with Justice; her issues with Bossidy's performance at the company when he was appointed as the CRO; the fact that Bossidy refused to pay certain vendors; that she notified Neville numerous times about Bossidy's poor performance; that Bossidy had several interactions with Neville and AFC and that it appeared to her that Bossidy was not loyal to Justice; that there was an improvement in morale and finances once Bossidy left the company; about the certificate

of occupancy that was required under the 2024 Forbearance Agreement; about the Pennsylvania cultivation facility; regarding the fact that Plaintiffs failed to submit audited financial statements to Defendants; and that the parties reached an oral Reopening Agreement.

Fields' declaration was also adopted as her direct testimony. (Tr. 157:5–24.) In her declaration, Fields discusses Bossidy's leadership, the success of Plaintiffs following Bossidy's departure, the 2024 Forbearance Agreement, inventory records and accounting, and the Reopening Agreement. (*See generally* Fields Decl.)

Based upon Fields' demeanor, manner in which she testified, and substance of her testimony in conjunction with other corroborative evidence, the Court found her testimony to be credible and assigns it substantial weight.

### B.    GAIL BRASCHERS-KRUG (HEARING TRANSCRIPT 201–253)

Gail Braschers-Krug ("Braschers-Krug") is the current Chief Compliance Officer at Justice. (Tr. 202:19–22.) Among other things, Braschers-Krug testified about Mosaic; the certificate of occupancy for the Ewing facility; the fact that Bossidy refused to pay Mosaic which impacted the date Plaintiffs received the certificate of occupancy; Bossidy's "disastrous" performance; that Plaintiffs did not lose their Pennsylvania cannabis license because they refused to surrender the license while they took an administrative appeal; and the negative implications of Plaintiffs' inability to make payroll.

Additionally, Braschers-Krug's declaration was adopted as direct testimony. (Tr. 228:8–10.) In her declaration, she attested that she negotiated a 2023 Forbearance Agreement with Neville and Tannenbaum in light of Plaintiffs' struggles with their Missouri operations. (Braschers-Krug Decl. ¶¶ 1–21.) Braschers-Krug also testified in her declaration about the Reopening Agreement, including that she spoke to Neville about using money from Plaintiffs' equity account

11

to reopen the Hazle facility and that Justice's owners, Loevy and Kanovitz, pledged to personally contribute $5 million to pay for construction and reopening costs for the cultivation. (*Id.* ¶¶ 30–33.) Finally, Braschers-Krug discussed in her declaration the cultivation inventory discrepancy in the Ewing facility and how she and Bossidy overcame that issue. (*Id.* ¶¶ 37–45.)

Accordingly, based upon Braschers-Krug's demeanor, manner in which she testified, and substance of her testimony in conjunction with other corroborative evidence, the Court found her testimony to be credible. As a related matter, the testimony at the preliminary injunction hearing showed that Braschers-Krug's law license was suspended for not complying with the continuing legal education requirements in the wake of a family tragedy. (Tr. 232:18–25; 233:20–22.) Braschers-Krug thereafter engaged in the unauthorized practice of law while acting in her role as in-house counsel. (Tr. 230:4–19; 233:16.) The Court finds that this lessens Braschers-Krug's credibility to a certain degree, but not to such an extent as to undermine her testimony as to the relevant facts in this case. Therefore, the Court assigns Braschers-Krug testimony a moderate amount of weight.

### C. MICHAEL KANOVITZ (HEARING TRANSCRIPT 254–266)

Michael Kanovitz is the majority owner of Justice with his co-owner and co-counsel Joe Loevy. Kanovitz's declaration was adopted as direct testimony. (Tr. 254:18–23.) In his declaration, he attested as to the backgrounds of Bloc and Hayden, that each cultivation facility should be generating revenues of more than $5 million per month, and importantly, that "[b]ased on [an] investigation, review of [Defendants'] public filings and statements, and other industry information, [he] is aware that [Defendants are] experiencing financial distress." (Kanovitz Decl. ¶ 7.) Kanovitz explained: 1) Defendants' stock price lost more than 40 percent of its value; 2) Defendants borrow money from their own lenders; 3) Defendants announced in March 2025 that

it would pay a smaller-than-anticipated dividend to shareholders yet needed approximately $5 million to pay that dividend; 4) Neville sent Justice a default notice and letter to Kanovitz and Loevy demanding $50 million, which was later reduced to $10 million, and threatened to sue and bring a RICO lawsuit against them; 5) after Plaintiffs refused to pay the demands, Defendants "raided Justice's bank accounts and sued Loevy and [Kanovitz] personally, alleging fraud and RICO violations"; and 6) he saw email communications between Neville and Bossidy.  (*Id.* ¶¶ 9, 10, 11, 17, 18, 21, 24, 25.)  Kanovitz also testified as to what happened after he fired Bossidy, including that Neville immediately demanded audited financials within twenty-four hours, despite previously waiving that requirement.  (*Id.* ¶¶ 29–30.)

On cross-examination, Kanovitz conceded that his knowledge about Defendants' financial situation was based solely on public information and filings with the Securities and Exchange Commission; that he never asked Defendants for another CRO other than Bossidy; that to Kanovitz's knowledge, "Neville and Bossidy encountered each other in connection with Neville's company's purchase of assets from MedMen"; and that one of the reasons for Defendants' smaller dividend to their shareholders is Justice's failure to pay interest on the loan.  (Tr. 258:3–10.)

The Court acknowledges that there may be personal bias in Kanovitz's testimony because he has spent a significant amount of money trying to build his cannabis companies, that potential default of the 2024 Forbearance Agreement will result in substantial financial loss to himself and his companies, and that the lawsuits against him could result in reputational and financial harm. However, based upon Kanovitz' demeanor, manner in which he testified, and substance of his testimony in conjunction with other corroborative evidence, the Court found his testimony to be credible and assigns it substantial weight.

### D.    ANDY POTICHA (HEARING TRANSCRIPT (269–281)

Andy Poticha ("Poticha") testified remotely.  Poticha is the founder and CEO of Mosaic.  (Tr. 269:20–24.)  Poticha testified that Mosaic is the general contractor for the construction of Justice's cultivation facilities in New Jersey and that Mosaic had a construction schedule and could have finished the Ewing, New Jersey, project by the May 15, 2024 certificate of occupancy deadline.  (Tr. 270:2–9.)  He testified that Mosaic could not meet the deadline because of substantive changes on the project and because payments were being withheld.  (Tr. 270:9–20.)  Lastly, Poticha stated unequivocally that Mosaic "would have achieved [the date for the certificate of occupancy] if we had not had—a [sic] withholding of payment and [] changes on the project." (Tr. 270:24–25 to 271:1.)

On cross-examination, Defendants elicited testimony that it may have been possible for Justice to not receive a certificate of occupancy irrespective of the issues testified by Poticha.  (Tr. 278:4–7.)

Although Poticha appeared virtually via Zoom, based upon his demeanor, manner in which he testified, and substance of his testimony in conjunction with other corroborative evidence, the Court found his testimony to be credible and assigns it substantial weight.

### E.    DAN NEVILLE (HEARING TRANSCRIPT 283–351)

The final witness was Dan Neville, the CEO of AFC, which includes Defendants Advanced Flower Capital Inc. and AFC Agent LLC.  Neville testified that he told his shareholders he was cutting dividends; that he was aware of the restrictive payments with Plaintiffs; that he was the lead negotiator of the 2024 Forbearance Agreement; that he wanted someone from SierraConstellation Partners to be the CRO as a condition to the 2024 Forbearance Agreement;

and that he received emails from Bossidy notifying him of alleged breaches.  The Court confirmed that Neville preserved all emails and text messages between Neville and Bossidy.

Neville also testified that Plaintiffs had not provided an audited financial statement for 2023 or 2024; that Neville never waived the requirement for Plaintiffs to do so; that Neville never made an agreement of any kind with Bossidy on how to run the New Jersey operations; and that Neville never made a Reopening Agreement or promised not to foreclose on the Hazle property. Neville explained that AFC will suffer if the Court grants the preliminary injunction: "[t]he damages we'd suffer would be the opportunity costs that we have from having our capital stuck in this loan with Justice [] relative to our ability to foreclose and monetize the assets today, as opposed to waiting an additional year."  (Tr. 341:24 to 342:1–3.)

Given Neville's stake in AFC, the Court is mindful of the potential for bias.  As to the nature of his actual testimony, assessing Neville's demeanor, manner in which he testified, and the substance of his testimony together with other corroborative evidence, the Court found his testimony only somewhat credible and assigns it little weight for the following reasons: 1) he could not recall or give answers to questions that a CEO can customarily provide; 2) he testified that he does not read the financial statements his company files with the Securities and Exchange Commission and that he was not sure whether "restrictive payments" were reported in the filings, despite being the company's CEO (Tr. 295:22–25); 3) he was evasive in his responses to multiple questions—both to the Court and counsel—and could not explain the bases behind certain emails he was copied on (Tr. 294:10–12; 300:22–24; 301:1–2; 305:6–8; 315:1:22); 4) he claims he did not know Bossidy's title yet also testified that he spoke to Bossidy "every other week," and received numerous text messages and emails from him (Tr. 307:17–22); 5) he stated timidly, "sure", when asked if he was the lead negotiator of the contracts (Tr. 302:12–13); 6) he testified

15

inconsistently when he claimed that he never made a Reopening Agreement with Plaintiffs but later testified that he made an agreement about using money from Plaintiffs' equity account contingent on certain requirements (Tr. 330:16–24); and 7) he testified that he never told Bossidy about a "list" of defaults or breaches that he kept but then explained that he was not surprised when Bossidy emailed him with information about another breach to add to his list (Tr. 312:1–4; 315:1:22).

## IV.    **EVIDENTIARY OBJECTIONS**

Before the preliminary injunction hearing, Defendants submitted a letter addressing anticipated evidentiary issues for resolution. ("Evidentiary Motion," ECF No. 27.)  The Court explained to Defendants at the hearing that all evidentiary objections in the letter were preserved and would be addressed in the Court's decision on the preliminary injunction. (*See* Tr. 30:1–10.)

In the letter, Defendants explained that they were concerned about Plaintiffs' intention to introduce "irrelevant evidence unnecessary for the Court's determination of the pending motion." (Evidentiary Motion at 1.)  Defendants object to the following: 1) evidence of AFC's motive; 2) Sheraz Warraich's opinion regarding how much revenue Plaintiffs' facilities will generate; 3) parol evidence; 4) evidence purporting to blame Bossidy for Plaintiffs' forbearance defaults; and 5) the introduction of an email chain with redacted emails due to a dispute about whether the emails contained attorney-client communications. (*Id.* at 1–4.)  Plaintiffs responded to Defendants' concerns in a letter filed on May 5, 2025. (Opp'n Letter," ECF No. 37.)

The Court can dispose of these objections rather quickly. As an initial matter, the Federal Rules of Evidence are "relaxed" in the context of a hearing on a motion for preliminary injunction. (*See* Tr. 22:2–15) (Court reminding counsel of relaxed application of evidence rules); *see Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004); *see also Univ. of Texas v.*

*Camenisch*, 451 U.S. 390, 395 (1981) (noting that because preliminary injunctions have a "limited purpose," they are "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits"). The Court addresses each objection in turn.

### 1. AFC's Motive

Defendants first argue that AFC's motive is irrelevant and inadmissible under Federal Rule of Evidence 602. (Evidentiary Motion at 2.) Plaintiffs argue that evidence of bad faith motive is relevant in contractual disputes when there is an allegation of self-dealing and when there is a claim for breach of the implied covenant of good faith and fair dealing. (Opp'n Letter at 1–2.)

The Court finds that evidence of AFC's motive is highly relevant to the instant matter, and thus, the Court overrules Defendants' objection. *See Colson v. Mingo*, Civ. No. 18-2765, 2025 WL 688832, at *4 (S.D.N.Y. Mar. 4, 2025) (noting that there is a "low bar" for satisfying the relevance standard under the Federal Rules of Evidence); *Healthquest of Cent. Jersey, LLC v. Antares Aul Syndicate 1274*, Civ. No. 18-12375, 2022 WL 225028, at *2 (D.N.J. Jan. 25, 2022) ("The threshold for determining the relevancy of evidence is low."); *Forrest v. Parry*, 930 F.3d 93, 114 (3d Cir. 2019).

As explained previously, Defendants' CEO Dan Neville was presented as a witness for both Plaintiffs and Defendants, and the Court is capable of making credibility determinations regarding his testimony, including whether he has personal knowledge of AFC's financial situation. Notably, Plaintiffs' allege that they never breached the 2024 Forbearance Agreement and any purported breach is a pretext used by AFC due to its financial situation; thus, Plaintiffs argue that motive is "unquestionably relevant." (Opp'n Letter at 2.) The Court agrees. Testimony about AFC's financial motive is highly relevant to the issues in this case: whether Plaintiffs breached the 2024 Forbearance Agreement and the Reopening Agreement, and whether

Defendants breached the implied covenant of good faith and fair dealing. *See Premier Med. Sys., LLC v. NeuroLogica Corp.*, Civ. No. 21-1337, 2022 WL 603999, at *7 (S.D.N.Y. Feb. 28, 2022) ("to state a claim for breach of the implied covenant of good faith and fair dealing, plaintiffs must satisfactorily allege specific elements that are not required to state a claim for breach of contract, including by suppl[ying] 'specific factual allegations' of bad faith."). To the extent Defendants are concerned about Plaintiffs' witnesses, including Kanovitz, speculating about AFC's motive, the Court will perform its role as gatekeeper and determine which testimony it finds persuasive and reliable.

Accordingly, this objection is overruled.

### 2. Sheraz Warraich's Opinion Testimony

Defendants argue that the Court should exclude Sheraz Warraich's ("Warraich") opinion testimony regarding how much revenue Plaintiffs' facilities will generate on the grounds that Warraich is not an expert and his opinion is not relevant to whether Plaintiffs can succeed on the merits of their claims. (Evidentiary Motion at 2.) Plaintiffs write in opposition that their "[l]etter does not address Defendants' objections to evidence that was never offered, such as the testimony of Mr. Warraich." (Opp'n Letter at 1 n.1.) Insofar as Sheraz Warraich was an anticipated witness at the preliminary injunction hearing but did not testify, the Court finds that this objection is moot.[9]

### 3. Parol Evidence

Defendants' object to the introduction of parol evidence on the basis that the contracts are unambiguous and any testimony about the parties' contractual negotiations or true intent or rationale for the contractual terms violates the parol evidence rule. (Evidentiary Motion at 2–3.) Plaintiffs argue that (1) they presented evidence that the contract provisions in question are

---

[9] Defendants' objection was understandably raised based on the joint hearing schedule provided by the parties in advance of the hearing that listed Sheraz Warraich as a witness.

ambiguous, (2) the doctrine of partial performance allows entry of evidence related to the oral Reopening Agreement, and (3) parol evidence does not bar consideration of evidence that there was a subsequent oral contract modifying the 2024 Forbearance Agreement. (Opp'n Letter at 3–4.)

As an initial matter, the Court finds that Plaintiffs did not attempt to introduce parol evidence contrary to Defendants' position in its letter. Instead, they offered testimony establishing the existence of a Reopening Agreement, a separate and subsequent oral contract. The parol evidence rule permits the consideration of oral terms that "interpret, explain, or clarify . . . the written document." *United States v. Lennox Metal Mfg. Co.*, 225 F.2d 302, 313 (2d Cir. 1955) (quoting *Rotberg v. Dodwell & Co.*, 152 F.2d 100, 101 (2d Cir. 1945)).[10] That is not what happened here. Moreover, the parol evidence rule does not permit the consideration of oral terms that contradict a written document. *Id.*; *Cerveceria Modelo, S.A. de C.V. v. USPA Accessories LLC*, Civ. No. 07-7998, 2008 WL 3919186, at *1 (S.D.N.Y. Aug. 25, 2008) ("[T]he parol evidence rule excludes evidence of all prior or contemporaneous negotiations, agreements or understandings offered to contradict, vary or modify the terms of their writing."). Notably, however, the parol evidence rule is inapplicable to negotiations or agreements entered into after the contract has been negotiated. *Federal Deposit Ins. Corp. v. Schuhmacher,* 660 F. Supp. 6, 9 (E.D.N.Y. 1984); *Deerfield Specialty Papers, Inc. v. Black Clawson Co.*, 751 F. Supp. 1578, 1582 (S.D.N.Y. 1990). Here, the Reopening Agreement was an agreement entered into after the 2024 Forbearance Agreement was negotiated and testimony regarding its terms do not violate the parol evidence rule.

---

[10] The parol evidence rule is a common law rule that impacts the substantive law of contracts. *DeFebo v. Andersen Windows, Inc.*, 654 F. Supp. 2d 285, 293 (E.D. Pa. 2009) (noting that parol evidence is a common law doctrine). Given that the parties have stipulated that New York law governs the interpretation of their agreements, New York law applies to this objection. *See Betz Lab'ys, Inc. v. Hines*, 647 F.2d 402, 405 (3d Cir. 1981) ("[T]he parol evidence rule is substantive rather than evidentiary, so we apply state law rather than the federal rules of evidence."); *Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc.*, 111 F. Supp. 2d 450, 454 (S.D.N.Y. 2000) (same).

Defendants specifically object to Gail Brashers-Krug—or any other witness—"testifying about the parties' contractual negotiations or 'true' intent or rationale for contractual terms." (Evidentiary Motion at 2.) As explained, Baschers-Krug did not in fact testify about the parties' contractual negotiations at all prior to the issuance of the Credit Agreement or 2024 Forbearance Agreement. Although her declaration includes attestations about the parties' negotiations, the 2023 Forbearance Agreement, and the Reopening Agreement, the Reopening Agreement was entered into *after* the Credit Agreement and 2024 Forbearance Agreement were drafted. Additionally, Defendants were given the opportunity to cross-examine Baschers-Krug on the statements in her declaration, and the Court could assess her credibility and whether she had personal knowledge of the negotiations. Accordingly, the objection is overruled.

### 4. Tim Bossidy

Defendants argue that evidence of Bossidy's performance as CRO is irrelevant to the issues in this case. (Evidentiary Motion at 3.) Plaintiffs argue that Bossidy's conduct is highly relevant to Plaintiffs' claims. (Opp'n Letter at 4.) For the same reasons as discussed above pertaining to AFC's motive, the Court finds that evidence of Bossidy's "disastrous" management of Plaintiffs' New Jersey operations is directly relevant to the claims here. The Court explained at the beginning of the preliminary injunction hearing that it believed Bossidy's conduct to be relevant to this litigation. (*See* Tr. 9:13–25 to 10:1–2.) To reiterate, the essential issue for adjudication at this juncture is whether Plaintiffs breached the 2024 Forbearance Agreement and the Reopening Agreement. Their defense to default is that Bossidy caused the breaches. Accordingly, the Court overrules this objection and finds evidence about Bossidy's conduct highly relevant.

### 5. P-19 and P-67

Lastly, the parties argue about whether Plaintiffs' Exhibit 19 (P-19) and Plaintiffs' Exhibit 67 (P-67) should be admitted. The exhibits are evidence of similar email chains, with some

distinctions: P-19 is the full email chain containing, as argued by Plaintiffs, purported privileged attorney-client communications, and P-67 is a "shorter, incomplete version of the email chain." (Evidentiary Motion at 4.)  Defendants object to Plaintiffs relying on the introduction of P-67 based on the Rule off Completeness embodied by Federal Rule of Evidence 106.

The Court has reviewed both exhibits and finds that they are not relevant to the Court's analysis on this Motion.  Accordingly, the Court does not rule on Defendants' objection or Plaintiffs' assertion of attorney-client privilege at this time.  Those issues have been referred to Magistrate Judge Day for resolution.

## V.    LEGAL STANDARD

"Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances."  *Kos Pharms.*, 369 F.3d at 708 (internal quotation marks and citation omitted).  The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered."  *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994).  This remedy should be granted only if movants establish that: 1) "they are likely to succeed on the merits of their claims"; 2) "they are likely to suffer irreparable harm without relief"; 3) "the balance of harms favors them"; and 4) "relief is in the public interest."  *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) (citation omitted); *Winter v. NRDC*, 555 U.S. 7, 20 (2008).  "A plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate."  *NutraSweet Co. v. Vit-Mars Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (citation omitted).  Similarly, "[t]he burden is on the moving party 'to convince the district court that all four factors favor preliminary relief.'"  *Peter v. Att'y Gen. of N.J.*, Civ. No. 23-3337, 2023 WL 4627866, at *1 (D.N.J. July 19, 2023) (quoting *AT&T v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)).

**VI.**   **DISCUSSION**

**A.**   **LIKELIHOOD OF SUCCESS ON THE MERITS**[11]

Plaintiffs allege three counts in their Complaint.  Plaintiffs seek injunctive relief based on each count.  (Tr. 16:17–23.)  The Court will first consider whether Plaintiffs meet their burden as to Count One.

1.   Breach of Contract (Count One)

a)   Pennsylvania Cultivation – Reopening Agreement

Plaintiffs allege that Defendants are in breach of the parties' loan agreements.  (Compl. ¶ 58.)  Notably, Plaintiffs argue that the oral Reopening Agreement comprised a novation or modification of the parties' prior agreements concerning the circumstances under which Defendants would refrain from foreclosing on the Pennsylvania cultivation facility.  (Moving Br. at 32.)  Consequently, Plaintiffs argue that Defendants breached the Reopening Agreement when they instituted foreclosure proceedings in state court.  (*Id.* at 34.)  Defendants argue in rebuttal that there was never a definite Reopening Agreement and that they never promised not to foreclose on the Pennsylvania property.  (Opp'n Br. at 22.)  Moreover, Defendants argue that Plaintiffs failed to comply with Section 5.10 of the 2024 Forbearance Agreement by asserting affirmative defenses in the Pennsylvania foreclosure action.  (*Id.* at 12.)  Defendants lastly argue that there was no novation or modification by the alleged Reopening Agreement because Section 12.5 of the 2024

---

[11] The parties do not dispute that New York law applies to their contract claims.  (*See* Moving Br. at 16; *see generally* Opp'n Br.; Ex. D-6 § 12.10; Ex. P-8 § 13.)  Plaintiffs, however, state in a footnote in their Moving Brief that Pennsylvania law arguably governs the Reopening Agreement, but proceeds to address the breach of contract claim as to that agreement under New York law.  (Moving Br. at 36 n.10.)  Defendants do not suggest which states' laws apply to the Reopening Agreement but rely on New York caselaw in opposition.  (*See* Opp'n Br. at 9–11.).  For the purposes of this Motion, the Court utilizes New York law given that the parties agreed that New York law applied to the Credit Agreement and 2024 Forbearance Agreement.  Nonetheless, the outcome under Pennsylvania law would be the same.  *See CM Goat, LLC v. Valdez*, 318 A.3d 392, 397 (Pa. Super. Ct. 2024) ("A written agreement may be orally modified, even when the contract expressly provides that all modifications must be in writing, if the parties' conduct clearly shows the intent to waive the no-oral-modifications clause.").

Forbearance Agreement states that the agreement may not be waived, modified, or amended unless in writing. (*Id.* at 12–14.)

"Under New York law, a breach of contract claim requires a plaintiff to allege that '(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages.'" *Shinano Kenshi Corp. v. Honeywell Int'l, Inc.*, Civ. No. 22-3704, 2023 WL 2431327, at *3 (S.D.N.Y. Mar. 9, 2023) (quoting *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (N.Y. 2022)). In New York, no-waiver clauses, like Section 12.5 of the 2024 Forbearance Agreement, are uniformly enforced. *Northrock Mgmt. LLC v. Cohen*, Civ. No. 24-3155, 2025 WL 1285923, at *8 (S.D.N.Y. May 2, 2025). However, "parties may modify a contract by another agreement, by course of performance, or by conduct amounting to a waiver or estoppel." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003); *MaxEn Cap. Advisors, Ltd. v. Pure Lithium Corp.*, Civ. No. 24-2231, 2024 WL 4520062, at *9 (S.D.N.Y. Oct. 17, 2024). "Modifications of written contracts may be proved circumstantially by the conduct of the parties subsequent to the agreement." *Kamhi v. East Coast Pain Management, P.C.*, 112 N.Y.S.3d 189, 191 (N.Y. App. Div. 2019); *see also* 22A N.Y. Jur. 2d Contracts § 475 (same).

More specifically, although no-waiver clauses are routinely enforced, New York recognizes oral modification or waiver of a contractual provision, but only under limited circumstances: when (1) "there has been partial performance of an agreement to modify, so long as the partial performance is unequivocally referable to the oral modification," or (2) "one party has induced the other party to rely on an oral modification' such that 'the first party may be equitably estopped from invoking the requirement that any modification be in writing." *DiStefano*

*v. Maclay*, 102 F. App'x 188, 189 (2d Cir. 2004); *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990).

Here, based on the evidence presented at the hearing, the Court finds that there was an oral agreement, a Reopening Agreement, between the parties that acted as a novation of the provisions in the 2024 Forbearance Agreement pertaining to the Hazle cultivation facility.  The evidence showed that under the Reopening Agreement, instead of getting outside investors, Defendants would make available $500,000 of Plaintiffs' equity funds towards startup costs to reopen and operate the Pennsylvania facility, contingent on Plaintiffs' successful appeal of their cannabis license renewal to the Pennsylvania DOH.  (Tr. 330:22–23; Ex. P-13; Fields Decl. ¶ 45.)  The evidence also showed that Plaintiffs' owners additionally agreed to pledge $5 million of their own funds to pay for the work required to reopen the Pennsylvania facility.  (Fields Decl. ¶ 45; Ex. P-13.)  The evidence showed that this oral agreement was beneficial to Defendants because an operational Pennsylvania facility would bring in more money to Defendants.  (Fields Decl. ¶ 46.)  The consideration for the oral agreement was that Neville agreed not to foreclose on the Hazle property.  (Ex. P-10.)  It is therefore apparent to the Court based on the evidence presented at the hearing, and the terms and effect of the oral agreement, that there was an offer, an acceptance, and consideration for the Reopening Agreement.  *See Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003) ("To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms. . . .").

The Court further finds that, for the limited purposes of this motion, the evidence indicates Defendants breached the Reopening Agreement by foreclosing on the Pennsylvania property. Fields testified credibly that by entering into the Reopening Agreement, she understood that

Defendants would not foreclose on the property.  (Tr. 150:17–21; Tr. 332:10–16.)  Additionally, the documentary evidence memorializes the terms of the Reopening Agreement, implicitly and explicitly stating that Defendants would not foreclose.  Specifically, Plaintiffs' Exhibit 10—which is a letter prepared by Plaintiffs' counsel to the Pennsylvania DOH—explains that "Pier Cove has arranged for financing for the above-described construction and re-start costs. . . .  Specifically . . . AFC[] has pledged to release funds of $500,000 for operation re-start costs."  (Ex. P-10.)  An attachment to Plaintiffs' Exhibit 10 suggests as well that in exchange for the release of funds and $5 million pledge, Neville agreed not to foreclose on the Pennsylvania property.  (Ex. P-10 ("Neville, Chief Executive Officer of AFC, has informed Pier Cove of AFC's agreement to (1) take no action to foreclose on the mortgage or otherwise impair the facility").)  Plaintiffs' Exhibit 13 also suggests that Neville was aware of the oral Reopening Agreement and that it was satisfactory to him.  (*See* Ex. P-13.)  For example, in response to an email from Fields explaining the terms of the Reopening Agreement and the settlement with the Pennsylvania DOH, and informing Neville that she is "getting a pledge from [the] owners on the additional capital needed for construction restart with Mosaic," Neville responded, "Ok.  Can you guys or ICE draft.  Happy to do we're just a bit out of the loop on the details."  (Ex. P-13.)

Defendants maintain that they may have agreed to certain terms of the Reopening Agreement, but they never agreed not to foreclose on the Pennsylvania property.  (Tr. 330:16–19; Moving Br. at 21.)  The documentary evidence and the testimony at the hearing, however, suggest otherwise.  (*See* Ex. P-10; P-13; Tr. 150:17–21; Tr. 332:10–16.)  Practically, the Court finds that the terms of the Reopening Agreement and Defendants' conduct are inconsistent with Defendants' argument and Neville's testimony that they will not foreclose on the Pennsylvania property.  (*See* Tr. 151:12–15; Ex. P-13.)  The evidence further illustrates that Neville worked closely with

Plaintiffs to reopen the Pennsylvania facility. (Tr. 150:20–21; 148:1–25.) Defendants also assisted in Plaintiffs' appeal to the DOH (Tr. 332:10–20), and did not immediately foreclose on the Pennsylvania property when they were entitled to do so, further implying the existence of such an agreement. Based on the evidence before the Court, it is therefore apparent that there has been partial performance attributable to the Reopening Agreement. *See DiStefano*, 102 F. App'x at 189.

There is also no evidence before the Court that Plaintiffs failed to satisfy their obligations under the Reopening Agreement. To the contrary, Plaintiffs performed under the Reopening Agreement by working to reopen the facility and pledging the money they promised. (Tr. 147:23– 149:19; P-10.) *See Zorbas v. U.S. Tr. Co.*, 48 F. Supp. 3d 464, 474 (E.D.N.Y. 2014) (to succeed on a breach of contract claim, a plaintiff must perform under the contract).

Accordingly, based on the record at this stage of the proceedings, the Court finds that there has been no evidence of a forbearance default related to the Pennsylvania cultivation facility. Because there has been no evidence of a forbearance default related to Pennsylvania, there has been no evidence of a default under the Credit Agreement.[12]

In sum, the Court finds that Plaintiffs have met their burden of showing a likelihood of success on their claim for breach of the parties' Reopening Agreement (Count One) with respect to the Pennsylvania cultivation facility.

b)    <u>Audited Financial Statements as to the Entire Operation</u>

Defendants next argue that Plaintiffs defaulted under Section 5.1 of the Credit Agreement because they never provided Defendants with annual audited financial statements for their parent company JG Holdco. (Opp'n Br. at 15.) Plaintiffs concede that they never prepared financial

---

[12] Consequently, the Court does not address Defendants' arguments that Plaintiffs breached the Credit Agreement by (1) failing to cooperate in the Pennsylvania foreclosure proceedings, (Opp'n Br. 12), (2) losing their Pennsylvania cannabis license, (*id.* at 17), (3) failing to notify Defendants of their loss of the cannabis license, (*id.* at 18), and (4) failing to provide communications with the Pennsylvania DOH, (*id.* at 19.)

statements but argue that Defendants waived this requirement.  (Reply Br. at 7; Tr. 151:22 to 152:16.)  For the reasons that follow, the Court agrees with Plaintiffs.

Fields credibly testified at the hearing that Plaintiffs never submitted audited financial statements for the 2023 and 2024 fiscal years because the statements would have cost "upwards of $150,000, and AFC did not deem them necessary."  (Tr. 151:24–25.)  Fields described her conversations with Tannenbaum, who relieved Plaintiffs from complying with their obligation to submit financial statements in years past. (Tr. 152:6–9.)  The Court credits Fields' testimony that there was an oral modification in place that relieved Plaintiffs of their duties to submit audited financial statements.  Such a waiver makes practical sense because Defendants wanted Plaintiffs to focus on making their cannabis facilities' operational, which in turn would have benefited Defendants.  (Tr. 152:6–9 ("I had a conversation on two occasions with [] Tannenbaum . . . where he said, oh, we've waived that before.  You guys need to just focus on operating.").)  Fields explained that when Neville became CEO, she followed up with him multiple times about the audited financial statements but he failed to respond.  (Tr. 153:4.)  This testimony as to Neville's lack of responsiveness was corroborated by Neville when he testified that he sometimes did not read emails or respond.  (Tr. 311:18–19; 313:15–19.)  Defendants did not credibly rebut Fields' persuasive testimony that "AFC waived [Plaintiffs'] audit requirement in prior years" and that it waived it for 2024 and 2025.  (Tr. 196:11–13.)  All of this evidence, taken together, shows that Tannenbaum's and Neville's conduct constituted a waiver of Plaintiffs' obligation to produce audited financial statements.

Therefore, the Court finds that Plaintiffs are likely to succeed on the merits of their breach of contract claim against Defendants for breach of the Defendants' oral agreement to waive the requirement that Plaintiffs submit audited financial statements.

2.    Breach of the Implied Covenant of Good Faith and Fair Dealing (Count Two)

Count Two of the Complaint alleges breach of the implied covenant of good faith and fair dealing.  It is apparent from the relevant submissions to the Court and evidence presented at the hearing that this claim pertains to Plaintiffs' Ewing, New Jersey, cultivation facility and the actions of Bossidy.

Plaintiffs argue that Defendants breached the implied covenant of good faith and fair dealing by forcing Plaintiffs to hire Bossidy and to let him run their facility, which in turn caused Plaintiffs' failure to obtain a final certificate of occupancy for the Ewing facility, which constituted a default under the 2024 Forbearance Agreement.  (*See* Moving Br. at 22.)  In opposition, Defendants argue that, as a legal matter, Count Two fails because New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." (Opp'n Br. at 7 (quoting *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d. Cir. 2002)).  On the merits, Defendants argue that Plaintiffs' failure to obtain a final certificate of occupancy was not Bossidy's fault and it is a default under Section 5.3 of the 2024 Forbearance Agreement.  (*Id.* at 11.)

Under New York law, the covenant of good faith of fair dealing is implied by all contracts, and "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) (internal quotation marks and citation omitted).  "[A] defendant violates the implied covenant when it purposefully sabotages a plaintiff's ability to benefit under the contract."  *Thompson v. Advanced Armament Corp.*, LLC, 614 F. App'x 523, 525 (2d Cir. 2015) (surveying Second Circuit and New York state case law).

Defendants are correct that New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris*, 310 F.3d at 81. However, here, the Court finds that Plaintiffs' breach of the implied covenant claim is premised on facts separate from their breach of contract claim. Count Two is premised on Bossidy's purposeful conduct that sabotaged Plaintiffs' ability to perform under the 2024 Forbearance Agreement. The Court therefore rejects Defendants' argument that Plaintiffs cannot bring Count Two. *See Grewal v. Cuneo*, Civ. No. 13-6836, 2015 WL 4103660, at *11 (S.D.N.Y. July 7, 2015) (finding breach of implied covenant claim to be sufficiently distinct from breach of contract claim where conduct underlying the former was defendants' alleged efforts "to subvert and expropriate [plaintiff's] work," done "in bad faith, and that—but for this subversion and expropriation—[plaintiff's] work would have resulted in fees").

Turning next to Bossidy's conduct, for the reasons that follow, the Court finds that Plaintiffs have met their burden of showing success on the merits of their claim for breach of the implied covenant of good faith and fair dealing.

Plaintiffs concede that they failed to obtain a final certificate of occupancy by the May 15, 2024 deadline. (Moving Br. at 22; Reply Br. at 5–6.) However, they argue that they would have met the deadline to obtain the final certificate of occupancy had Bossidy not acted in bad faith. (Reply Br. at 5–6.)

Based on the evidence presented at the hearing, the Court agrees. The evidence presented at the hearing showed that Bossidy was loyal to Defendants rather than Plaintiffs. Bossidy was working as an agent for Defendants, or at the least, in concert with Neville. Neville and Bossidy had a prior professional relationship and Neville specifically sought Bossidy to help with the New

Jersey operations. (*See* Ex. P-15 ("Tim's engagement was a critical component of the forbearance agreement that was heavily negotiated and he's expected to be in place until we're satisfied we'll be paid back on our loan.")). Neville testified that he "knew Tim Bossidy worked at SierraConstellation" (Tr. 303:15), that they would communicate "every other week on average" (Tr. 307:17), and that they would have personal conversations via text and phone calls (Tr. 310:2–3.) Most illustrative of Bossidy's conflicted loyalty was that Bossidy forwarded an email to Neville between Braschers-Krug, Chief Compliance Officer for Plaintiffs, and Bossidy, CRO for Plaintiffs, "flag[ging] another forbearance breach to add to [Neville's] list." (Ex. P-2.) When asked by the Court what Bossidy's email meant, Neville was unable to provide meaningful answers. (*See* Tr. 311–320.) Based on the nature of the interactions between Bossidy and Neville, the Court finds that it is unreasonable for Bossidy, as a supposed employee of Plaintiffs, to send confidential internal communications to Defendants, as outside lenders. Further demonstrating this point is that Plaintiffs presented evidence showing numerous emails between Neville and Bossidy, suggesting a concerted effort between the two. (*See, e.g.*, Ex. P-51 ("FYI—will call you today Dan—want to pick your brain on Gail.")). Accordingly, on this record, Plaintiffs have shown that Bossidy and Neville were coordinating their activities.

As to Bossidy's conduct and its effects on Plaintiffs, Fields testified credibly at the hearing that once Bossidy was hired, Fields expressed concern to Neville about Bossidy's performance as CRO. (Tr. 102:13–25.) Fields also testified that every time she disagreed with Bossidy, she was overruled. (Tr. 105:18–24.) Plaintiffs introduced several email chains supporting Fields' testimony that she reported her concerns about Bossidy's poor performance but was ignored. (*See* Ex. P-15 ("We'd like to know how much longer Tim will be engaged on the NJ project."; Ex. P-16 ("[W]e'd like to move past this period of having him as our highly ineffective CRO.")). The

emails also show that Neville threatened Fields "to not interfere with [Bossidy's] oversight of the New Jersey operations." (Ex. P-15.)

Fields also testified credibly that under Bossidy's leadership, New Jersey sales "completely tanked." (Tr. 108:20.) Specifically, she testified that sales declined despite the fact that the facility was producing high amounts of cannabis. (Tr. 108:23–109:4.) Notably, and highly relevant to Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is Fields' testimony that Bossidy stopped paying vendors. (*See* Tr. 109:3–5 ("[Bossidy] said on those calls his first week, I need to score points with AFC. Let's not pay these vendors.")). Plaintiffs' Exhibit 20 corroborates Fields' testimony that Bossidy withheld payments to vendors. (Ex. P-20.)

For the avoidance of doubt, Fields' testified unequivocally that Bossidy's decisions impacted Plaintiffs' ability to obtain the final certificate of occupancy by May 15, 2024. (Tr. 121:17–19.) For example, she explained that Bossidy refused to pay Mosaic:

> So when Mr. Bossidy came in, he—as I referenced, he made it clear that he needed to score points with AFC. And that included revising a previously agreed-upon lab and kitchen design. He wanted to scale back some of the equipment and change them out, which then caused a multitude of delays. Both in having to have plans redrafted, waiting for equipment providers to redraft their scopes. But the biggest thing that he did was he already had a very fragile relationship with our general contractor, Mosaic. And that stems from prior people at the company and dealings with AFC, pre-forbearance agreement, where Mosaic was not paid in a timely fashion. So we had to rebuild that relationship and gain Mosaic's trust. They had been on site for about four months. They were doing their work. The lab and kitchen, to any of us who would walk in, you're like, this looks like a complete area. And it really was. There wasn't much left to do in April of 2024. And Mr. Bossidy came in. And one of the first things he said was, I'm not going to pay Mosaic. And I said—I was like, this is going to set us back months. He's like, no, no, no. This will just be a couple weeks. And we knew that in our forbearance agreement that we had a May 15th deadline to get our COO, our certificate of occupancy. And he says, no, no, no. It's fine. This is going to be worth it.

(Tr. 121:22–122:25.)  Fields testified that Bossidy "was in direct communication" with Neville, providing weekly updates to him.  (Tr. 127:4–7.)  Neville corroborated that testimony.  (*See* Tr. 307:17.)  Based on this evidence, the Court finds that the withholding of payments for Defendants' benefit sufficiently impacted Plaintiffs' ability to receive the final certificate of occupancy by the date required in the 2024 Forbearance Agreement.  This in turn resulted in default, causing Plaintiffs' to not receive the benefit of their bargain.  *See Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.,* 281 N.E.2d 142 (N.Y. 1972) (implied in every contract is a promise that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."); *Random Ventures, Inc. v. Advanced Armament Corp., LLC*, Civ. No. 12-6792, 2014 WL 113745, at *48 (S.D.N.Y. Jan. 13, 2014) ("By creating conditions to try and force [the plaintiff] to breach his [contract], defendants engaged in bad faith conduct.").

Additionally, the Court finds that Plaintiffs, as a reasonable party to the contract, would not expect Bossidy, their employee, to deny payment to a vendor in order to further their lenders' interests.  *See 19 Recordings Ltd. v. Sony Music Ent.*, 165 F. Supp. 3d 156, 161 (S.D.N.Y. 2016) ("The implied covenant of good faith and fair dealing obligates a promisor to fulfill any promises which a reasonable person in the position of the promisee would be justified in understanding were included in the contract.") (internal quotation marks omitted).

The testimony from Poticha and Braschers-Krug further supports the claim that Defendants breached the implied covenant of good faith and fair dealing.  Both witnesses testified at the hearing that the final certificate of occupancy would likely have been obtained but for Bossidy's mismanagement of the New Jersey operations.  (Tr. 203:23–25 (Braschers-Krug); Tr. 280:20–22 (Poticha).)  And the evidence showed that Bossidy's mismanagement of the operations, in the way

that he did, was likely because he wanted to satisfy Neville.  (*See* Tr. 121:22–122:25; Tr. 209:22–210:4.)

Braschers-Krug, moreover, credibly explained that Mosaic stopped construction because Bossidy refused to approve payments to them.  (Tr. 208:22–24.)  Notably, the evidence showed that Bossidy would explain to the team, including Braschers-Krug, that he spoke to AFC to keep them apprised of the status of the construction and the certificate of occupancy.  (Tr. 209:22–210:4.)  In addition, Poticha credibly explained that payments were being withheld (Tr. 270:18–20), which delayed Mosaic from completing construction by the May 15, 2024 deadline (Tr. 270:21–25.)  The updated construction schedule attached to an email chain between employees of Mosaic, Plaintiffs, and Defendants also shows that Mosaic was on track to finish construction by May 15, 2024, so that Plaintiffs could obtain the final certificate of occupancy in compliance with the 2024 Forbearance Agreement.  (Ex. P-62.)  None of this testimony was credibly rebutted.  Accordingly, the Court finds that Plaintiffs would likely have obtained a final certificate of occupancy but for Bossidy's bad faith conduct.  *See LJL 33rd St. Assocs., LLC v. Pitcairn Properties Inc.,* 725 F.3d 184, 195 (2d Cir.2013) ("The implied covenant of good faith and fair dealing bars a party from taking actions 'so directly to impair the value of the contract for another party that it may be assumed that they are inconsistent with the intent of the parties.'"  (quoting *Bank of China v. Chan,* 937 F.2d 780, 789 (2d Cir. 1991))).

In sum, the Court finds that the preliminary evidence presented at the hearing demonstrates that Bossidy and Neville were acting in concert and that they interfered with Plaintiffs' rights under the 2024 Forbearance Agreement.  Accordingly, Plaintiffs have met their burden of showing a likelihood of success as to Count Two.[13]

---

[13] Insofar as Plaintiffs have shown a likelihood of success on Counts One and Two, the Court does not reach Count Three, which asserts a claim under Section 9-625 of the New York Uniform Commercial Code.

### B.    IRREPARABLE HARM

The Court next considers whether Plaintiffs meet the second factor, irreparable harm.  "The irreparable harm requirement is met if [the plaintiffs] demonstrate[] a significant risk that [they] will experience harm that cannot adequately be compensated after the fact by monetary damages." *Guardian Life Ins. Co. of Am. v. Est. of Cerniglia,* 446 F. App'x. 453, 456 (3d Cir. 2011) (quoting *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484–85 (3d Cir. 2000)).

Plaintiffs argue that Defendants' unauthorized cash sweeps leave Plaintiffs short of cash, unable to pay their employees, and unable to pay bills and vendors.  (Moving Br. at 44.)  Plaintiffs also argue that "[g]iven the extremely competitive cannabis market," Plaintiffs will "cease to exist."  (*Id.*)  Defendants argue in opposition that Plaintiffs have not shown that they would be harmed if Defendants continue to exercise their contractual remedies. (Opp'n Br. at 24.)  More specifically, Defendants argue that Plaintiffs have not identified any specific evidence that their business will be shut down as a result of Defendants' action.  (*Id.* at 26.)

Plaintiffs' harms are clear even on this limited record.  Fields credibly testified that Plaintiffs' business operations would suffer greatly, possibly shut down, if AFC were to continue to take cash in excess of what is laid out in the 2024 Forbearance Agreement.  (Tr. 154:11–16.) *See New Jersey Staffing All. v. Fais*, 749 F. Supp. 3d 511, 521 (D.N.J. 2023), *aff'd,* 110 F.4th 201 (3d Cir. 2024) (normally economic harm does not constitute irreparable harm, but "an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business").  Moreover, if AFC continues to make unauthorized cash sweeps, it will have a "disastrous effect" on Plaintiffs financially, jeopardizing their ability to make payroll, which in turn could be a violation of "all kinds of regulations" and contracts, including collective bargaining agreements from their employees' unions.  (Tr. 221:10–15; 221:16–19.)  In addition to impacting

Plaintiffs' approximately 200 employees in New Jersey and Pennsylvania, the unauthorized cash sweeps risk Plaintiffs defaulting on obligations to their business partners, vendors, and other creditors. (Tr. 222:9–23.) Fields explained that Defendants' actions "not only ha[ve] a negative effect on [Plaintiffs'] ability to operate, it [also] impacts [Plaintiffs'] employees' lives and wellbeing[] as well as the surrounding areas." (Tr. 154:11–16.) Braschers-Krug further credibly testified that cannabis licenses are hard to obtain and, given the competition amongst cannabis companies, Defendants' unauthorized cash sweeps would interfere with Plaintiffs' ability to obtain and maintain a cannabis license because the cash sweeps "would be very, very chaotic [and] upend [Plaintiffs'] negotiations with the Department of Health to reopen the cultivation" in Pennsylvania. (Tr. 220:19–21.)

Lastly, Brascher-Krug credibly explained that Bloc is a national brand and the issues in this case could impact the brand reputation and goodwill as a whole. (Tr. 224:11–17.) Under these circumstances, the Court finds that the harm in this case is more than mere economic and therefore irreparable. *Cf Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102–03 (3d Cir. 1998) (holding that "purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement").

Accordingly, the Court finds that Plaintiffs have met their burden of demonstrating irreparable harm in the absence of a preliminary injunction.

## C.    BALANCE OF THE EQUITIES

The Court turns to the third factor and weighs the potential harm of an injunction to Defendants against the harm it has already found for Plaintiffs if an injunction is denied.

Plaintiffs argue that an injunction would merely maintain the status quo and would benefit both parties by letting Plaintiffs succeed and increase the value of their business. (Moving Br. at

46.)  Defendants counter that they will be harmed if they are not permitted to exercise their contractual rights over Plaintiffs' collateral.  (Opp'n Br. at 27.)  At the hearing, Neville estimated that Defendants would suffer $7.3 million in damages in the form of opportunity cost if they were enjoined.  (Tr. 341:22–349:8.)

Even giving Neville's arguably self-serving testimony its full credit, the Court notes that Defendants' assets in the form of outstanding loans exceeded $360 million as of the close of 2024. (AFC Gamma SEC Form 10-K for fiscal year ended December 31, 2024 at 82, Ex. P-64.) Objectively speaking, $7.3 million is a substantial amount of money, but it is a small proportion of Defendants' assets.  Weighing Defendants' monetary harm against the monetary *and* nonmonetary harms to Plaintiffs, the Court finds that the balance tips in Plaintiffs' favor. Accordingly, the Court finds that Plaintiffs have met their burden of establishing this element for a preliminary injunction.

### D.    THE PUBLIC INTEREST

The fourth factor is that relief is in the public interest.  Plaintiffs cite a series of public interests that would be served by entering a preliminary injunction: preserving patient access to medical cannabis; avoiding unemployment for Plaintiffs' approximately 200 employees; preventing lenders from unilaterally declaring default and seizing collateral; and the downstream economic benefits of letting Plaintiffs pay their vendors.  (Moving Br. at 47–48.)  Defendants cite opposing public interests: enforcing agreements and upholding the rule of law.  (Opp'n Br. at 28.)

Defendants' public interests are persuasive, but contrary to their position.  As to enforcing agreements, as set forth above, the Court has found, at least on this preliminary record, that the parties reached an oral Reopening Agreement that merits enforcement.  As to upholding the rule of law, the Court has found—again, based on a preliminary record—that Bossidy's conduct with

respect to the New Jersey facility presents a more than colorable claim for breach of the parties' implied covenant of good faith and fair dealing. The Court finds that enforcing that implied covenant as a rule of law is appropriate here. On balance, therefore, the Court concludes that Plaintiffs have met their burden of establishing that the public interest favors the entry of an injunction.

### E.    BOND/SECURITY

Having concluded that a preliminary injunction order should issue, the Court turns to the final consideration under Rule 65, which is to assess whether a bond is appropriate. Rule 65 provides that "the court may issue a preliminary injunction or temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The bond is intended to protect the enjoined party in the event the injunction should not have been imposed, as "with rare exceptions, a defendant wrongfully enjoined has recourse only against the bond." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 804 (3d Cir. 1989). The bond further "serves to inform the plaintiff[s] of the price they can expect to pay if the injunction was wrongfully issued." *Id*. at 804–05. The amount of the bond is left to the district court's discretion. *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010).

Plaintiffs do not address the issue of a bond in their initial moving papers. Defendants' opposition argues that, given that this is a commercial action with millions of dollars at stake, the bond should be set in the millions and they advised they would provide relevant testimony at the hearing as to the bond amount. (Opp'n Br. at 28.) In their reply, Plaintiffs offer three arguments for why only a minimal bond is warranted. First, Defendants are currently secured insofar as they "already hold a security interest in the collateral, control every penny in Plaintiffs' bank account

and are entitled to most (75%) of the profits to boot." (Reply Br. at 24.) Second, a determination on Plaintiffs' permanent injunction can be made quickly because Defendants do not need discovery given that they already have the facts regarding their own decision to pursue default because they are the ones asserting the default. (*Id.*) Finally, Plaintiffs propose their own estimate of a fair security for an injunction. Their estimate is based on Defendants foregoing a "fire sale" of Plaintiffs' properties for $75 million and 6 percent cost for lost usage of that money. (*Id.* at 24–25.) Plaintiffs offset that revenue by the income Plaintiffs are already providing to Defendants plus an anticipated increase in that income to Defendants now that Bossidy is no longer interfering with Plaintiffs' New Jersey operations. (*Id.*) According to Plaintiffs, Defendants will actually profit by foregoing foreclosure. (*Id.* at 25.)

As noted above, Neville estimated at the hearing that Defendants would suffer $7.3 million in damages in the form of opportunity cost if they were enjoined. (Tr. 341:22–349:8.) The implication is that this would be an appropriate amount for a bond. However, as the Court already observed, it found Neville's testimony less than credible on the whole. On this issue in particular, the Court found his testimony problematic on multiple levels. First, although Neville was remarkably uninformed on several subjects, he purported to be well informed in this one particular area and his testimony is especially self-serving. Second, his estimated rate of return on capital— a high 11 to 14 percent per year—lacked any foundation and any recognition, much less discussion, of risk to that capital.[14] Third, his valuation of Plaintiffs' Pennsylvania cultivation facilities was dubious at best. Specifically, he considered and then rejected a $6 million value for the facilities

---

[14] With respect to Defendants' investment risk, the Court notes that AFC Gamma's SEC Form 10-K filing contains the following heading that warns investors: "Our loans may be risky, and we could lose all or part of our loan." (Form 10-K at 32.) The discussion under that heading acknowledges that its loans would be "below investment grade" if they were rated. (*Id.*)

if sold for alternate (non-cannabis) use in favor of a $20 million valuation for cannabis use after mentioning, then apparently later omitting, $5 million in what he characterized as "spin up costs" but without considering how long it would take to actually spin-up the facilities before they could be sold at that higher value.  On the whole, the Court found his testimony in this regard unpersuasive.

Having considered the parties' positions and supporting evidence, the Court rejects the parties' wildly disparate proposals for bond.  The Court instead finds that a $1 million bond is appropriate given the parties' projections, a more realistic rate of return, and the timing at issue. Accordingly, the security is set in the amount of $1 million.

## VII.    CONCLUSION

For the reasons stated above, the Court will **GRANT** Plaintiffs' Motion for a Preliminary Injunction.  An appropriate Order will follow.


Date: May 9, 2025

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**