

A Massachusetts Limited Liability Partnership

*Michael B. Homer, Esq.\**
*Jamie Hoxie Solano, Esq.*
*Constantine Economides, Esq.\**

**August 6, 2025**

<u>VIA ECF</u>
The Honorable Zahid N. Quraishi
United States District Judge
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street Room 2020
Trenton, NJ 08608

      Re:    **Hayden Gateway LLC, et al. v. Advanced Flower Capital Inc., et al.,
<u>Case No. 3:25-cv-2789, Response to Premotion Conference Letter</u>**

Dear Judge Quraishi,

    Plaintiffs, Hayden Gateway LLC and Bloc Dispensary LLC, respond to Defendants' July 30, 2025 letter for a premotion conference regarding a motion to dismiss the amended complaint. The issues raised in that letter reflect that any Rule 12(b)(6) motion should plainly be denied.

### The Original Claims: Breach of Contract, Implied Covenant of Good Faith and Fair Dealing, and New York UCC

    Defendants argue that Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing, one theory supporting the breach of contract claim, and the NY UCC claim should all be dismissed. Defendants seemingly ignore that this Court has already properly determined that Plaintiffs will likely succeed on the merits of several of these claims; the requested motion serves little more than further wasting Plaintiffs' resources. Defendants' letter purports to be "mindful" that the Court has already decided Plaintiffs are likely to succeed on the merits, but points out that that determination was preliminary. While Plaintiffs are not suggesting any final decisions on the issues have been reached, the Court's conclusion, after considering the testimony and considering documentary evidence presented by both sides, that Plaintiffs are likely to succeed is certainly sufficient to overcome a Rule 12(b)(6) motion where the Defendants must concede the allegations pled.

### The Declaratory Judgment Claim

    Defendants' arguments pertaining to the declaratory judgment claim should also be rejected. As described in the Amended Complaint, the publicly traded AFC Gamma ("AFCG") operates as a shell for a web of AFC entities that "service" or "manage" loans in exchange for exorbitant fees that have been mostly funded not by the borrowers' loan payments, but unwittingly by investors' own capital. *See* Amended Complaint ("AC") ¶ 43. Essentially, AFCG has been deferring borrower interest payments into the future to avoid writing down loans, while booking the future interest as earnings in the present. AC ¶ 46. As

*\*Not admitted to practice in New Jersey, admitted in this case pro hac vice*

**Boston**        **Miami**        **New York**        **New Jersey**

The Honorable Zahid N. Quraishi
August 6, 2025
Page 2 of 4

alleged in the Amended Complaint, upon information and belief, AFCG is not separate from Leonard Tannenbaum (the largest shareholder of AFCG and Board Chairman) and his related entities. AC ¶ 45.

It appears that Mr. Tannenbaum has extracted a significant amount of AFCG's profits and since AFCG publicly listed in 2021, taking out more than $60 million in fees for themselves and diverting multiple assets of struggling borrowers into their family office. AC ¶ 43. Meanwhile, AFCG's shareholders have seemingly suffered an accumulated deficit of at least $50 million, and its market cap has crashed to less than half of the amount of the money Tannenbaum raised. *Id.*

Mr. Tannenbaum originally made his fortune in the finance industry by starting Fifth Street Asset Management ("Fifth Street"), which was engaged in high-interest, asset-based lending to small and medium-sized companies, largely in the health care industry. AC ¶¶ 14, 19. Fifth Street was described by Forbes Magazine in a feature article as Mr. Tannenbaum's "fee-reaping management company" attached to an "obscure financing vehicle" akin to a REIT. AC ¶ 14. The company made high-yield loans, generating enormous fees, "while Tannenbaum assured investors that his portfolio was sound." *Id.*

Mr. Tannenbaum took Fifth Street public, but it eventually collapsed under the weight of underperforming loans, leaving Mr. Tannenbaum rich but his investors holding the bag. AC ¶ 16. The SEC ultimately charged Fifth Street with violations of various federal laws, including misleading the SEC, inflating asset valuations, and unjustified fees. AC ¶ 18. Those Fifth Street allegations settled with a cease-and-desist order, censure, and millions in penalties and disgorgement. *Id.* Mr. Tannenbaum also faced a series of class actions but resolved them all while remaining fabulously wealthy. *Id.*

When Mr. Tannenbaum started over again with AFCG in 2021, he brought over many former colleagues from Fifth Street, as well as his wife. AC ¶ 20. Taking advantage of the inability of cannabis companies to secure conventional financing, Mr. Tannenbaum charges predatory rates, typically exceeding 20% per annum. AC ¶ 42. And while the Tannenbaums hold out AFCG as a tax-exempt, mortgage real estate investment trust ("REIT"), it appears that it is actually operating it as an asset-based lender like Fifth Street. AC ¶ 19.

Plaintiffs' declaratory judgment claim stems from the fact that AFCG holds itself out to the world as a REIT but is collecting money from Plaintiffs contrary to the laws applicable to REITs, a scenario expressly covered by the parties' Credit Agreement. Section 856 of the Internal Revenue Code provides that an entity claiming tax exempt REIT status must obtain at least 75% of its gross income from interest derived from real estate activities, that is, loans secured by real estate. Stated another way, REITs cannot receive interest income from non-real estate sources exceeding those thresholds.

The Amended Complaint alleges how the value of the collateral secured by Plaintiffs' loan (and the others in AFCG's portfolio) rests primarily on non-real estate assets.

**Boston       Miami       New York       New Jersey**

The Honorable Zahid N. Quraishi
August 6, 2025
Page 3 of 4

*See* AC ¶¶ 50-72. Where, as here, the amount of the loan exceeds the loan value of the real property, then the applicable law provides generally that the interest income apportioned by REITs to the real property must be an amount equal to the interest income multiplied by a fraction, the numerator of which is the loan value of the real property, and the denominator of which is the amount of the loan. The interest income apportioned to the other property is an amount equal to the excess of the total interest income over the interest income apportioned to the real property. *See* AC ¶ 53; 26 CFR § 1.856-5(c).

Defendants chose to include Section 2.5(f) in the parties' Credit Agreement, which makes clear that in the event Plaintiffs' interest payments would render payments to Defendants a violation of any "Applicable Law," such money in excess of what the law permits must be applied to reduce the principal balance of the loan, as opposed to being an interest payment. Defendants' characterization that failing the 75% test would merely have it "lose its eligibility for REIT tax treatment" ignores the obvious—it would lose eligibility *because it violates* an "Applicable Law." The Amended Complaint alleges that it has held itself out as a REIT (i.e., has taken advantage of said tax status), which is in violation of the Internal Revenue Code because treating the interest payments as interest payments would violate the IRS's 75% rule.[1]

Accepting the Amended Complaint's allegations as true, Plaintiffs' payments, if considered interest payments, would plainly violate the regulations governing REITs, and thus need to be re-apportioned. Significant amounts of payments formerly allocated to interest income must therefore instead be applied to reduce the principal balance of the loan under the plain terms of the Credit Agreement. Plaintiffs thus seek a declaratory judgment of the amount due and amount disbursed under the parties' loan agreements.

The Court should reject Defendants' request to decline jurisdiction over the declaratory judgment claim. This lawsuit addresses the parties' dispute over the loan obligations, and the relevant factors make clear that adjudicating this issue alongside the other three claims is appropriate. And "the absence of pending parallel state proceedings [regarding the loan balance] militates significantly *in favor* of exercising jurisdiction[.]" *Kelly v. Maxum Specialty Ins. Grp.*, 868 F.3d 274, 282, 288-89 (3d Cir. 2017) (emphasis added) (quoting *Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 144 (3d Cir. 2014)) (reversing court's order abstaining from declaratory judgment).

Plaintiffs have a very pressing need to know how much they actually owe in order to successfully explore refinancing. The parties are litigating issues of default in this very litigation. Plaintiffs would be prejudiced if they had to wait until Defendants tried to hold them in default before they could even begin the process of getting a ruling on how much they actually owe. And Defendants' self-interest in avoiding having to take and defend a public position on whether they are actually a REIT is certainly not a valid counter-interest.

---

[1] Further, the Amended Complaint makes clear that the parties have a live disagreement about the amounts of money owed under the loan, regardless of Defendants' violation of laws applicable to its purported REIT status. *See* AC ¶¶ 320-323.

**Boston        Miami        New York        New Jersey**

The Honorable Zahid N. Quraishi
August 6, 2025
Page 4 of 4

        Respectfully submitted,

        **DYNAMIS LLP**

        By: *s/ Jamie Hoxie Solano*
        Jamie Hoxie Solano, Esq.
        NJ Bar No. 426422024
        Michael B. Homer, Esq.
        Constantine Economides, Esq.
        200 Connell Drive
        Berkeley Heights, NJ 07922
        973-295-5495
        JSolano@dynamisllp.com
        MHomer@dynamisllp.com
        CEconomides@dynamisllp.com

        *Attorneys for Plaintiffs*