Thomas M. Hanson, State Bar No. 184465
hanson@loevy.com
Jon Loevy, *pro hac vice* application forthcoming
jon@loevy.com
Mike Kanovitz, *pro hac vice* application forthcoming
mike@loevy.com
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900 (phone)
(312) 243-5902 (fax)

*Attorneys for Plaintiffs*

Electronically FILED by
Superior Court of California,
County of Los Angeles
9/08/2025 2:49 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By A. Munoz, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF LOS ANGELES

| | |
|---|---|
| **JG HOLDCO LLC**, A Delaware limited liability company, and **BLOC DISPENSARY LLC**, A New Jersey limited liability company, and **HAYDEN GATEWAY LLC**, A Pennsylvania limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> **LEONARD TANNENBAUM**, an individual, and **ROBYN TANNENBAUM**, an individual, and **DANIEL NEVILLE**, an individual, and **TIMOTHY BOSSIDY**, an individual, and | Case No. 25STCV26439 <br><br> **COMPLAINT FOR DAMAGES** <br><br> **DEMAND FOR JURY TRIAL** |

LOEVY & LOEVY
Attorneys at Law

**ADVANCED FLOWER CAPITAL, INC.**,
A Maryland corporation, and
**AFC AGENT LLC**,
A Delaware limited liability company, and
**AFC MANAGEMENT LLC**,
A Delaware limited liability company, and
**SIERRACONSTELLATION PARTNERS**,
A California limited liability company

Defendants.

## INTRODUCTION

1.    This lawsuit arises out of a conspiracy between a business consulting firm and a publicly-traded cannabis lender to mismanage and even outright steal Plaintiffs' assets.

2.    The lender, Defendant Advanced Flower Capital, Inc. ("AFCG"), and its principals used a consulting firm managed by an agent of theirs to take control of Plaintiffs' four New Jersey businesses. Together, the defendants ran those businesses into the ground, either intentionally for the gain of their principals, the Tannenbaums, or through egregious mismanagement. As a result, Defendants' lawless actions have cost Plaintiffs more than one hundred million dollars in damages.

3.    If the Tannenbaums and the other Defendants do someday ultimately succeed in their plan to steal and/or liquidate Plaintiffs' business through foreclosure,

LOEVY & LOEVY
Attorneys at Law

they will be jointly and severally liable in an amount to be decided by a jury of their peers.

## PARTIES

4.      **The Justice Entities**: Plaintiff **Bloc Dispensary LLC** ("Bloc") is a New Jersey limited liability company that owns and operates a licensed cannabis cultivation and manufacturing facility in Ewing Township, New Jersey and three licensed cannabis dispensaries in central New Jersey.

5.      Plaintiff **Hayden Gateway LLC** ("Hayden") is a Pennsylvania limited liability company that owns and operates three licensed cannabis dispensaries in Pennsylvania. Hayden's principal place of business is in Pennsylvania.

6.      Plaintiff **JG HoldCo LLC** ("HoldCo") is the parent company of Bloc and Hayden. It is a Delaware limited liability company that owns and operates a group of affiliated cannabis companies in five states, including Plaintiffs Bloc and Hayden, doing business as Justice Cannabis Co.

7.      Defendants are a large, private lender; the individuals who own and/or control that lender; a consulting company they hired to take over Plaintiff's operations; and the individual consultant.

8.      **The AFC Defendants**: Defendant **Advanced Flower Capital Inc.** ("AFCG") is a publicly-traded Maryland corporation with its principal place of business

LOEVY & LOEVY
Attorneys at Law

in Florida. AFCG was formerly known as AFCG, Inc., and is listed on the NASDAQ under the symbol "AFCG."

9.     **AFC Agent LLC** ("AFC Agent") is a Delaware limited liability company with its principal place of business in Florida. AFC Agent is wholly owned by Leonard M. "Len" Tannenbaum and his wife, Robyn Tannenbaum. On information and belief, both of them are domiciled in West Palm Beach, Florida.

10.     **AFC Management, LLC** ("AFC Manager") is a Delaware limited liability company of which Len Tannenbaum owns 75% and Robyn Tannenbaum owns 10%.

11.     **Dan Neville** is the CEO of AFCG, a large shareholder in AFCG, and a minority owner of AFC Manager. On information and belief, Neville is domiciled in New York.

12.     **Len Tannenbaum** is the largest shareholder and Chairman of the Board of AFCG, holding approximately 24% of its shares, and the majority owner of AFC Agent and AFC Manager. He also supervises the CEO, Dan Neville, making Tannenbaum the primary manager. On information and belief, he is domiciled in Florida.

13.     **Robyn Tannenbaum** is the wife of Len Tannenbaum. She serves as President and Chief Investment Officer of AFCG, and serves on the Investment Committee. She also owns approximately 10% of AFC Manager. On information and belief, she is domiciled in Florida.

- 4 -
**COMPLAINT**

LOEVY & LOEVY
Attorneys at Law

14.     **The Consultant Defendants**: SierraConstellation Partners, LLC ("SCP"), is a California limited liability company that specializes in providing "interim management" services to restructuring companies.

15.     **Tim Bossidy** is a Managing Director of SCP and former investment banker, who holds himself out to be a turnaround specialist with experience in the cannabis industry. According to SCP's website, he divides his time between California and Florida.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant Cal. Civ. Proc. Code § 86 because it is an action at law and the amount in controversy exceeds the jurisdictional threshold.

17.     This Court has personal jurisdiction over the Consultant Defendants pursuant to Cal. Civ. Proc. Code § 410.10, because Defendant SCP is a California limited liability company, organized under California law. Moreover, many of the actions taken by Defendant Bossidy described below were undertaken when he was physically located in California.

18.     Additionally, this Court has personal jurisdiction over the Consultant Defendants because they contracted for jurisdiction in their contract with Plaintiff Bloc.

19.     This Court has personal jurisdiction over the AFC Defendants pursuant to Cal. Civ. Proc. Code § 410.10, because the Defendants purposefully availed themselves of the forum. They did so through the following actions:

    a.  Entering into a conspiracy with the Consultant Defendants based out of California and taking steps in support of that conspiracy in California;

    b.  Requiring Plaintiffs to hire the Consultant Defendants, who are domiciled in California;

    c.  Participating in drafting the contract in California;

    d.  Requiring Plaintiffs to execute the contract with the Consultant Defendants that provides for exclusive jurisdiction in California courts;

    e.  Regularly and continuously communicating, or causing their agents to communicate, with the Consultant Defendants, who are domiciled in California, in the course of committing the tortious acts set forth below; and

    f.  Transferring the funds they stole from Plaintiffs' bank accounts to their bank accounts at a California Bank, East West Bank.

20.     Previous litigation between some of the Plaintiffs and Defendant Bossidy over some of the events described in this Complaint was originally brought in New Jersey. In August 2025, Bossidy successfully moved to transfer that case to California,

LOEVY & LOEVY
Attorneys at Law

relying on a provision in SCP's contract with Plaintiffs requiring jurisdiction in California.

21.    Venue lies in this Court because the principal place of business of the Consultant Defendants is situated in this county. Cal. Civ. Proc. Code § 395(a).

## FACTUAL ALLEGATIONS

22.    This action concerns a loan made by AFCG to a multistate cannabis operator Plaintiffs to grow, manufacture and sell cannabis products.

## I.  The AFC Defendants

### A.    *Len Tannebaum's History of Misconduct in Lending Practices*

23.    Len Tannenbaum made his fortune by starting a company called Fifth Street Asset Management, which was described in a feature article in Forbes Magazine[1] as "his fee reaping management company" that he attached to an "obscure financing vehicle" akin to a Real Estate Investment Trust.

24.    Fifth Street's business was asset-based lending to small and medium businesses, largely in the health care industry. Tannenbaum raised public capital by promising outsized returns based on his portfolio of high interest loans made to companies experiencing cash squeezes.

---

[1] *See* Leonard Tannenbaum's Fifth Street: Fooling the Right People Some of the Time (https://www.forbes.com/sites/antoinegara/2016/02/09/fooling-the-right-people-some-of-the-time/).

LOEVY & LOEVY
Attorneys at Law

25.     The company's high interest loans generated enormous management fees for Tannenbaum. According to the sources quoted in the Forbes article, Tannenbaum's company was the "poster child" for a poor performing management company that "has been mismanaged for the benefit of the external manager," namely, the Tannenbaum controlled entities, while "Tannenbaum assured investors that his portfolio was sound." *Id.*

26.     After Tannenbaum took Fifth Street public, it quickly ran afoul of the securities laws. The SEC ultimately charged Fifth Street with violations of the Investment Advisors Act and other federal laws, including misleading the SEC, inflating asset valuations, and charging unjustified fees. Those allegations against Fifth Street settled with a cease and desist order, censure, and millions in penalties and disgorgement.

27.     The failure of Fifth Street did not stop Tannenbaum from becoming extremely wealthy. By the time Fifth Street ceased to exist, Tannenbaum had made and retained hundreds of millions of dollars, even while the shareholders suffered $1.2 billion in lost market cap. One of the investors left holding the bag was his former father-in-law, who had originally staked Tannenbaum (before Tannenbaum divorced his daughter) but later sued him.

28.     After the collapse of Fifth Street, Tannenbaum became interested in investing in cannabis. Personally and through entities he owns and controls, he invested

LOEVY & LOEVY
Attorneys at Law

in several cannabis businesses. He ultimately decided to create AFCG and its related entities for that purpose.

29.    Tannenbaum has executed a remarkably similar scam in the cannabis space with his next set of companies, AFCG and its related, Tannenbaum-owned entities.

**B.    AFCG Is a Shell Company and Exists as a Front for the AFC Defendants**

30.    AFCG and the AFC Defendants represent a continuation of Tannenbaum's fee-reaping business model. AFCG contracts with AFC Manager to run its business through a Management Agreement. AFCG contracts with AFC Agent to serve as an administrative agent on its loans.

31.    Although it is a public company, AFCG operates as a shell for the real parties in interest, namely, AFC Agent, AFC Manager, and other Tannenbaum-controlled entities that "service" or "manage" the loans in exchange for exorbitant fees that are funded both by the borrowers' loan payments and unwittingly by investors.

32.    Although the relationship between the various Tannenbaum-controlled entities and the publicly traded AFCG must legally be at arm's length, AFCG is in fact the alter ego of the Tannenbaums, which they created to raise public money for their business venture into the cannabis space.

33.     AFCG has no genuine existence separate from the Tannenbaum entities. It has no employees. It exists only on paper. The series of legal documents and contracts that constitute AFCG all tie back to the Tannenbaums.

34.     Moreover, all of the agents that act on behalf of AFCG (and who hold themselves out as AFCG employees) actually work for the Tannenbaum Entities and give their loyalty to them.

35.     For example, Gabriel Katz is an attorney employed by Tannenbaum Capital Group but, from time to time, he acts as General Counsel of AFCG, a structure that is rife with the potential for conflicts of interest between Tannenbaum owned companies and the publicly held AFCG.

36.     A prime example of these conflicts of interest is the Management Agreement between AFCG and AFC Manager. First of all, AFC Manager is owned by Len and Robyn Tannenbaum, Dan Neville (CEO of AFCG), and Bernard Berman (a coconspirator who profited with Tannenbaum in the Fifth Street debacle that ran afoul of the SEC). The Management Agreement entitles AFCG Management (which is controlled by the Tannenbaums) to provide Tannenbaum Capital Group employees (which is also controlled by the Tannenbaums) to staff AFCG while charging AFCG for the employees' time. The Management Agreement also entitles AFC Manager (i.e., the Tannenbaums) to take a series of fees from AFCG which include both a set management

fee and a potentially much larger incentive or "success fee," earned regardless of whether AFCG is actually succeeding.

37.    Among other evidence of the conflicted origins of the Management Agreement is the fact that it was signed by an employee of Tannenbaum Capital Group (Len Tannenbaum's employee) on behalf of AFCG and by Len Tannenbaum himself for AFC Manager. Moreover, Mr. Katz acted as attorney for both AFCG and AFC Manager, as did O'Melveney & Meyers, the law firm which also assisted the Tannenbaums in raising the public capital and in shirking the statutory requirement to register AFCG as an investment company.

38.    Since AFCG publicly listed in 2021, AFC Manager has extracted more than $60 million in fees for themselves, and has diverted multiple assets of struggling borrowers into their family office.

39.    On information and belief, **AFC Manager and AFC Agent have collectively reaped more than $80 million in fees** since AFCG became publicly traded. Most of the money went straight into the Tannenbaums' pockets.

40.    The cost of those exorbitant fees is borne by both the borrowers (in the form of direct fees) and the shareholders (in the form of diverted profits).

## II.    Plaintiffs' Cannabis Businesses

41.    To cultivate cannabis or operate a cannabis dispensary, an entity must be licensed to do so by the state in which it operates. Cannabis sold in any given state must

be produced in that state and cannot be transported across state lines.

42.    Plaintiff Bloc applied for and won an integrated license in New Jersey that allowed it to operate a cannabis cultivation and manufacturing facility, as well as three retail cannabis dispensaries, in New Jersey. Plaintiff Hayden applied for and won a permit to operate three retail medical dispensaries, in the Northeast region of Pennsylvania. Another Justice-related entity and borrower (but not a party to this lawsuit), Pier Cove LLC, applied for and won a permit to operate a cultivation and manufacturing facility in Pennsylvania.

43.    The licenses are extremely valuable. In many states, including New Jersey and Pennsylvania, these licenses were limited, meaning that only several dozen were issued to aspiring companies based on a competitive process under which applicants were scored and ranked. The limited nature of the licenses made them valuable.

44.    Another reason Plaintiffs' licenses are valuable is that both its New Jersey and Pennsylvania operations are vertically integrated, meaning that the Plaintiff could supply its own dispensaries with products grown and manufactured at its own cultivation facilities. Likewise, the affiliated dispensaries give the manufacturers assurance of shelf-space for their products. Thus, integrated cannabis operations are less risky and can achieve greater economies and maximize profits.

### III.    AFCG's Loan to the Justice Entities

45.     Cannabis has long been, and remains, a controlled substance under federal law. Although many states have enacted legalization programs, illegality under federal law has made it extremely difficult for cannabis businesses to transact business in the ways normal companies do, particularly when it comes to raising capital. Banks and other traditional lenders have been consistently unwilling to make conventional loans available to finance cannabis company operations.

46.     Thus, the AFCG business model exploits the predatory nature of lending to a capital-starved industry. AFCG charges its borrowers extremely high interest rates, often approaching or exceeding 20% per annum once fees and costs are factored in, knowing that the borrowers lacked other options due to the federal illegality of cannabis. The borrowers often fail, to the benefit of the AFC Defendants. AFCG and its principals have made a career out of strangling borrowers with high interest loans, extracting expensive concessions, and then taking their assets.

47.     Beginning in 2021, AFCG loaned money to various Justice-related entities, including but not limited to Bloc and Hayden (the "Borrowers"). The loan was secured by, among other things, the value of each business's cannabis license, as well as its real estate, equipment, and inventory. Holdo provided a guaranty on the loans.

LOEVY & LOEVY
Attorneys at Law

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LOEVY & LOEVY
Attorneys at Law

48.     The loan agreement from AFCG to the Borrowers consists of an original agreement, plus at least five amendments and two separate forbearance agreements, which together comprise nearly a thousand pages of dense, complex legal terms.

49.     The Loan Agreement contemplated that AFCG would lend the Borrowers up to $75,400,000 on New Jersey and Pennsylvania.

50.     All told, over the course of the past four years, AFCG has disbursed to Plaintiffs approximately $50-60 million. AFCG charged Plaintiffs close to $15 million in PIK/capitalized interest and $10 million in asserted loan fees.

51.     The loan ran into trouble almost immediately. The cannabis industry has turned out to be challenging, and the parties' plans did not proceed as expected. Almost as soon as the loan was closed, the Borrowers struggled to comply with their financial covenants.

52.     The COVID pandemic struck at a very inopportune time. Construction of the eight Cannabis Businesses was significantly delayed, and costs substantially higher than expected, due to, among other things, COVID-related supply chain disruptions.

53.     Regulatory approvals in New Jersey also took substantially longer than expected due to changes in the regulatory scheme.

54.     Additionally, the general contractor for the Pennsylvania cultivation performed very poorly, ultimately ending with the contractor being terminated for cause, and the cultivation facility left partially constructed.

55.    The federal government has promised, but failed to implement, banking and taxation reform that would have relieved some of the onerous financial burdens plaguing the industry.

56.    As a result of the foregoing, within months of closing the loan, the Borrowers could not meet their financial covenants and were in default.

57.    At that time, AFCG could have foreclosed on the loan, but the Tannenbaums chose not to do so. Instead, the parties began renegotiating the loan obligations. Those negotiations continued over the course of three years, culminating in a forbearance agreement among the parties executed in March 2024 (the "2024 Forbearance"). Over the course of those amendments, Plaintiffs and their owners paid the AFC Defendants nearly $20 million dollars, wholly apart form payments on the loan, for the privilege of continuing the loan.

## IV. The 2024 Forbearance

58.    The 2024 Forbearance is the document that reflects the parties' current agreement. The goals of the 2024 Forbearance—a lengthy and complex 50-page contract—were (1) to right-size the interest payments to a level that the Borrowers could satisfy and ensure the loan could stay out of default, and (2) to improve the management of the New Jersey businesses to ensure maximum return.

*59.*    In fact, unbeknownst to Plaintiffs, the AFC Defendants' goals were more nefarious. They, and in particular the Tannenbaums, built in provisions allowing them to

seize control to benefit their own cannabis investments, with an eye to ultimately steering the assets to themselves and their proxies.

### A. The Cash Sweeps

60.    To accomplish the ostensible goal of right-sizing the interest payments, the 2024 Forbearance established, *inter alia*, a cash-sweep mechanism for the Borrowers' monthly payments, with a minimum of $250,000 per month. Pursuant to that agreement, AFCG controlled Plaintiffs' operating bank accounts, and approved every dollar that Plaintiffs spent from those accounts. Every payroll, every bill paid, every expenditure had to be approved by AFCG.

61.    To be clear, the sole legitimate purpose of the agreement for control of the accounts was so that AFCG could approve Plaintiffs' payments to keep the businesses operating, not so that AFCG could take the money in the accounts for its own use and without Plaintiffs' approval.

62.    Plaintiffs have met the loan payment obligation each and every month since the 2024 Forbearance. They have never even been late with a payment since that date.

63.    As set forth in section 5.9 of the 2024 Forbearance, AFCG conducted biweekly cash sweeps of all New Jersey bank accounts (the "Scheduled NJ Cash Sweeps") and monthly sweeps of the Pennsylvania bank account (the "Scheduled PA Cash Sweeps").

64.    The **Scheduled NJ Cash Sweeps**, which took place shortly after Plaintiffs' biweekly payroll, were conducted as follows, pursuant to section 5.9 of the 2024 Forbearance:

a.    AFCG calculated Ending Cash, which is the amount of cash in the accounts after payroll and the weekly payment of all outstanding bills, less a set percentage of retail sales (which is transferred to a separate tax reserve account, the "tax reserve"), less the $300,000 minimum balance that the account is required to maintain.

b.    AFCG swept 75 percent of the Ending Cash from Plaintiffs' New Jersey accounts to its own California bank accounts, applied toward the loan.

c.    Plaintiffs were obligated to use the remaining 25% of Ending Cash to pay any additional tax liability above the tax reserve and pay down accumulated bills that had accrued prior to the 2024 Forbearance.[2]

65.    The **Scheduled PA Cash Sweeps** took place on a monthly basis, under a slightly different formula. For operational reasons, a much larger portion of Pennsylvania revenues were reserved for taxes.

### B. The Chief Restructuring Officer

66.    To accomplish the AFC Defendants' stated goal of improving the

---

[2] Beginning in January 2025, Plaintiffs had paid off all the accrued bills and were therefore permitted to use a portion of their 25% to reimburse Justice $40,000 per month for overhead expenses incurred by its corporate offices, such as HR, accounting services, compliance functions, and the like. AFCG has refused to approve those reimbursements, which currently total $120,000.

LOEVY & LOEVY
Attorneys at Law

1
2

profitability of the New Jersey businesses, AFCG required Justice to retain an outside

Chief Restructuring Officer (CRO) to manage all the New Jersey operations.

3
4
5
6
7
8
9
10
11
12

67.    AFCG negotiated for itself the sole and exclusive right to approve the

CRO, and expressly prohibited Bloc or Justice from interfering with the CRO's control

of the New Jersey assets. In this way, AFCG used the 2024 Forbearance agreement to

select an agent whom it controlled, and who in turn exerted total operational control over

the New Jersey operations. AFCG therefore controlled Plaintiffs' New Jersey operations

from April 2024 until the arrangement ended and the Consultant Defendants were

terminated in March 2025.

13
14
15
16
17
18

68.    From the outset, AFCG insisted that Bloc hire Defendant Bossidy as the

CRO, through his entity, Defendant SCP. Justice reached out to other qualified

candidates, but AFCG rejected those candidates and insisted on Bossidy. Plaintiffs asked

AFCG to conduct a search process and consider additional candidates for the CRO role,

but AFCG refused any process other than a direct hire of Bossidy.

19
20
21
22
23
24
25

69.    At the AFCG Defendants' insistence, Plaintiff Bloc therefore entered into

an agreement with the Consultant Defendants which specified that Bossidy had a

fiduciary duty to Bloc. Despite that clear duty, however, from the very beginning,

Bossidy took his direction from AFCG, which managed and controlled his actions and

directed him on a nearly daily basis.

26
27
28

LOEVY & LOEVY
Attorneys at Law

70.     By contrast, Bossidy never spoke to either of Plaintiffs' two main owners a single time during the nearly one year he was in charge of the New Jersey operations. Moreover, he repeatedly rebuffed any input or assistance from Plaintiffs' CEO, Alexzandra Fields, whom he effectively shut out.

71.     In fact, at AFCG's insistence, the 2024 Forbearance Agreement expressly prohibited Bloc and Justice from having a reporting relationship with Bossidy. It provided that Bloc "shall not interfere with or otherwise challenge the operational control of" Bossidy, a restriction that Bossidy and AFCG lorded over Justice. The agreement literally prohibited Bloc and Justice from running their own company. It gave the Consultant Defendants complete control over every aspect of Plaintiffs' New Jersey Operations, and it gave AFCG complete control over the Consultant Defendants.

72.     Bossidy had an nefarious history of acting as the agent of lenders and acquisitors while serving as the fiduciary of the borrowers, of which the AFC Defendants were well aware. Bossidy had held a similar position at Med Men, a cannabis company that was experiencing financial difficulties and that has since collapsed. While in charge of Med Men, Bossidy made a deal to deliver very valuable assets that Med Men owned in New York to a company where Dan Neville was also an officer. Bossidy suddenly resigned from Med Men and the new leadership thereafter cancelled Bossidy's New York deal, presumably because it was unfair to Med Men. Neville was critical of Med Men cancelling Bossidy's deal.

73.     As the AFC Defendants well knew, Bossidy has also been accused of mismanaging other cannabis companies prior to AFCG installing him in charge of Plaintiffs' operations. The allegations are that a company called Greenrose was having trouble with its lenders when Greenrose's then-CEO was offered a bribe to let the lender take its assets, which included the largest cannabis facility in Connecticut. When the CEO refused, he was fired and replaced by Bossidy. Bossidy mismanaged the Connecticut asset, thereby allowing the lender to foreclose upon it.

74.     Unbeknownst to Plaintiffs, AFCG was trying to raise money based on its portfolio of cannabis liens, of which Plaintiffs assets were a prime component, and had hatched a plan to roll multiple borrowers assets up into a multi-state cannabis operation (MSO), alone or together with assets owned by one or more operators friendly to the Tannenbaums. In fact, AFCG's CEO, Dan Neville, was discussing the AFCG plan with financiers, investors, and other individuals at or around the same time that AFCG insisted on installing Bossidy in charge of Plaintiffs' operations.

## V. The Defendants Run the New Jersey Businesses into the Ground

### A.  The AFCG Defendants Were Operating the Businesses Through Bossidy

75.     Even though Bossidy was the titular CRO, emails and other contemporaneous communications confirm that the AFC Defendants were in fact running the company through their agent, Bossidy. For example, there are emails confirming that Bossidy had to get AFCG's sign-off on even the most granular

decisions, such as employee raises, expenditure of funds, and payment of contractors. These emails demonstrate Bossidy worked in conjunction with AFCG to run the operation.

76.     In addition, as noted above, AFCG assumed complete control of the New Jersey bank accounts, controlling every expenditure to the penny.

77.     Bossidy rarely appeared on site at any of the New Jersey businesses. Instead, he claimed to be working remotely from Los Angeles, California, and other cities.

78.     Whenever Justice complained about Bossidy's performance, AFCG responded that Justice needed to let Bossidy run the company and stop complaining, or AFCG would consider it a default of the 2024 Forbearance.

79.     In sum, AFCG and Bossidy were collaborating in the control of the New Jersey operations, from strategic decisions to day-to-day management. The AFC Defendants controlled the purse strings. By contrast, Bossidy ignored or rebuffed all attempts by Plaintiffs' CEO (who successfully manages cannabis operations in several states) to collaborate with him. Indeed, the AFC Defendants threatened to default Plaintiffs if their CEO continued those efforts.

80.     Despite legally owing a fiduciary duty to Justice and no one else, Bossidy subordinated Plaintiffs' interests to those of the AFC Defendants, and began actively

promoting the AFC Defendants' interests at the expense of those of Bloc, his putative employer.

81.    To take an example, just two months after the AFC Defendants installed Bossidy, Bossidy forwarded to Dan Neville a privileged email from Justice's in-house counsel. Included with the forwarded, privileged email is a message from Bossidy to Neville stating that the email will help AFCG hold Bloc in default, taking its assets and/or charging more millions of dollars for further forbearance. Bossidy's message to Neville states in relevant part (emphasis added):

> "I'll manage this – so nothing for you to do - **I just wanted to flag for you another forbearance breach to add to your list.**"

82.    Just one month later, on July 18, 2024, Justice's Chief Legal Officer, Gail Brashers-Krug, sent Mr. Bossidy another attorney-client privileged email, this one outlining a dispute between the company and one of its vendors, and containing the same privilege warnings at the bottom. Less than two hours later, Bossidy forwarded this privileged email to AFCG's CEO and its Vice President, stating: "FYI - will call you today [] - want to pick your brain on Gail [Brashers-Krug]."

83.    Plaintiffs were not aware that Bossidy was forwarding confidential and privileged emails to the AFC Defendants, and would have strenuously objected and endeavored to prevent him from doing so had they known.

84.     When the AFC Defendants received this and other privileged emails from Justice's lawyer about privileged subjects, they took no steps to urge Bossidy to stop that behavior. To the contrary, they eagerly and willingly encouraged Bossidy to continue to spy on Justice and help manufacture a case against it.

85.     As described below, Bossidy failed miserably. During his tenure, if not before, it must have become clear to the AFC Defendants that Bossidy was unable to effectively manage the New Jersey businesses. Even though Plaintiffs always made the required minimum monthly payment, there were no additional profits to sweep. AFC Defendants, facing a cash crunch of their own, decided to stop honoring the payment terms of the 2024 Forbearance. The $250,000 minimum payment was contractually required, but AFC Defendants found themselves in need of more.

86.     The AFC Defendants therefore calculated that it was in their best interest (but certainly not in Plaintiffs') to find a way to claim that Plaintiffs had defaulted on the 2024 Forbearance. That way they could terminate the loan a year before its maturity and sell Plaintiffs' assets.

**B.  The Defendants Failed Miserably and Ran the New Jersey Businesses into the Ground**

87.     At the time the AFC Defendants installed Bossidy to run the New Jersey operations, construction of the New Jersey cultivation and manufacturing facility was

largely completed. The facility was finally primed and ready to reach its potential, which is around $5 million per month in revenue.

88.     Beginning almost immediately after his tenure as CRO began in April 2024, Bossidy began to run the business into the ground, while reporting regularly and directly to the AFC Defendants. His performance was catastrophic by every metric.

89.     As stated, AFCG purports to be a REIT, owned and run by Wall Street professionals. While extremely skilled at extracting exorbitant fees and predatory interest rates, the AFC Defendants were woefully bad at running a cannabis company. Under Bossidy, the AFC Defendants ran the New Jersey operation with extraordinary incompetence. Their mismanagement under Bossidy was epic.

90.     **Cultivation**: Over the course of the year after the AFC Defendants installed Bossidy, the New Jersey operation's cultivation sales cratered, declining by more than 50%. At the same time, the inventory backlog increased five-fold.

91.     In other words, the cultivation facility continued to grow and harvest cannabis successfully, but Bossidy inexplicably failed to sell the cannabis to dispensaries and wholesalers. By the end of his tenure, the facility had accumulated *hundreds of pounds* of harvested, cured cannabis, stored in totes stacked to the ceiling throughout the facility, ready to be packaged and sold.

92.     The entire facility filled with unsold cannabis, even as Bossidy fired the relatively modestly-paid employees whose job it was to package and sell it. No matter

how many times Bloc and its CEO begged the AFC Defendants and Bossidy to reconfigure the operation (e.g., hire employees) so that it could sell this backlogged inventory, the AFC Defendants and Bossidy refused.

93.    These factory jobs were not particularly expensive for Plaintiffs to maintain, and the expense pales in comparison to the revenues lost by eliminating them. These are manufacturing jobs—which are important not only to the workers and the company, but also to the economically disadvantaged community where Plaintiffs operate—and cutting them saved perhaps $15,000 per month.

94.    Compounding the problem, Bossidy failed to implement any structure within the sales part of the organization (tracking, deal pipeline, etc.); his production schedules had to be changed frequently because of errors; and he constantly changed directions and declined to make decisions, always promising instead to "circle back."

95.    The resulting cannabis backlog was both predictable and unnecessary. It represents approximately *ten months'* worth of sales at the rates Bossidy's management imposed. There is no legitimate business justification to accumulate so much inventory. Indeed, it is a terrible and irrational business decision for the following reasons:

  a. First of all, cannabis degrades in quality over time and loses potency and value rapidly.

  b. Second, the volume of unsold cannabis exceeded the capacity of the secure vault, meaning that harvested, cured cannabis sat around in unlocked

**COMPLAINT**

rooms and hallways, causing the facility to receive a notice of violation from the New Jersey Cannabis Commission.

c. Third, storing so much controlled substances creates a needless security hazard. On information and belief, no cannabis cultivation in New Jersey would or ever has built up even 25% as much inventory as the AFC Defendants did under Bossidy's tenure.

96. Bossidy's intentional creation of a backlog also pushed Bloc to the financial brink by vastly diminishing the revenues it could earn, while keeping its costs high.

97. **Dispensaries:** Bossidy's catastrophic mismanagement did not just harm the operation of the cultivation facility, he also interfered in the ability of Bloc's dispensary retail staff to perform their jobs. Bloc's cultivation is the primary supplier, but by no means the only supplier, to its three dispensaries. Bossidy's actions harmed the dispensaries in at least two ways. First, he cut popular product lines (also called SKUs) from cultivation operations, so that the dispensaries no longer stocked some of their most popular products. Second, he limited the outside suppliers from the dispensaries were allowed to buy from. Specifically, he refused to allow the dispensaries to purchase products from suppliers who did not buy from Bloc's cultivation. The result is that Bloc's dispensaries have lost customers and sales volume to competitors who are willing to supply the products they want.

98.     There is also a long and documented history of other mismanagement by which Bossidy has alienated vendors, employees, and others. For example, he insisted on delaying payments to New Jersey vendors in order to increase payments to the AFC Defendants, demoralized employees, and otherwise disadvantaged the business.

99.     Bossidy also entered into business deals on behalf of Plaintiffs to sell certain other products at below-market prices. Those deals were contrary to the interests of Plaintiffs, but were calculated to assist the AFC Defendants by benefitting favored borrowers and business partners.

## C. Bloc's Financial Performance Tanked

100.    As a result of all of that mismanagement and sabotage, Bloc's financial performance plummeted. At the end of the nearly one year during which Bossidy was in charge, Bloc was unable to pay down the principle, which continued to grow as interest gets added on (although Plaintiffs did pay the monthly minimum interest payments as required by the 2024 Forbearance).

101.    Perhaps most crucially, Bloc's Bossidy-induced financial performance was so poor that it prevented Plaintiffs from finding other lenders to refinance the AFCG loan. Plaintiffs were thus trapped in a predatory loan due to Defendants' mismanagement and misconduct.  This was as Defendants intended and foresaw.

102.    Had Defendants' mismanagement not set the New Jersey businesses back by a full year, the cultivation facility alone would presently be earning more than $5 million per month.

103.    Plaintiffs estimate that the Defendants' mismanagement of their New Jersey assets resulted in lost sales and business opportunities, unnecessary expenses, and other cascading losses, damaging Plaintiffs in the amount of at least $170 million.

104.    In addition to that amount, Defendants' mismanagement diminished the market value of the New Jersey assets by hundreds of millions of dollars, at reasonable valuation multiples.

105.    Each of the Defendants is responsible, jointly and severally, for those losses.

### D. The AFC Defendants Refused to Let Justice Terminate Bossidy

106.    Justice raised the forgoing and many other concerns with AFCG's CEO on numerous occasions. For example, Justice's CEO wrote in October 2024:

> I feel our conversation about how Tim [Bossidy] approaches production and retail has had the exact opposite effect and he is doubling down on bad ideas. There isn't a single person on our NJ staff that has confidence in him. Our bank balance continues to tank bc of his 'ideas' and he wants to get more and more expensive equipment.

107.    Despite the serious nature of the complaint, the AFC Defendants ignored it. Justice's CEO continued to try to remedy the situation, but the AFC Defendants continued to ignore her.

108.   The AFC Defendants finally responded the following month by making clear that nothing was going to change: "[Bossidy will] remain in place until we're satisfied that we'll be paid back on our loan. I let the last couple of texts on this subject slide, but also want to remind you and Justice and Grown (sic) of ypur (sic) commitments to not interfere in Tim's oversight of the New Jersey operations."

109.   At these and many other junctures, the AFC Defendants refused to replace Bossidy and insisted that Justice allow him to continue his disastrous mismanagement on threat of being held in default. Unbeknownst to Justice at the time, Bossidy was secretly working behind the scenes with the AFC Defendants to help build a case to allow them to seize Justice's assets notwithstanding the forbearance agreement and the millions Justice had paid them for it, e.g., the email described above wherein Bossidy (nominally Justice's CRO) writes to AFCG about "another forbearance breach to add to your list."

110.   Throughout the debacle, Justice employees repeatedly complained to the AFC Defendants about the havoc that Bossidy was inflicting on Bloc. However, the AFC Defendants steadfastly insisted that Bossidy remain in a place and that Justice do nothing to interfere with his decisions, even as the damages from his mismanagement continued to pile up.

111.   Without the millions of additional profits on which it had been counting, AFC lost interest in honoring the terms of the 2024 Forbearance. The $250,000

minimum payment, while all that was contractually required, was less than what AFC had been hoping to collect. Facing its own financial crunch, AFC decided to invent pretextual reasons to terminate the loan a year before its expiration and sell Plaintiffs' assets.

112.    The AFC Defendants' refusal to replace such an obviously flawed manager seems counter-intuitive, since a lender acting in good faith should want Bloc to succeed. Their conduct makes perfect sense, however, because they were instead in fact acting as would-be acquirors who want to take more of Justice's assets. As it turns out, the AFC Defendants intentionally sabotaged Bloc's performance in order to try to cause Plaintiffs to default on the loan, so that they could foreclose and seize Plaintiffs' valuable cannabis assets.

113.    That is why the Consultant Defendants, acting in concert with the AFC Defendants, intentionally caused the cannabis inventory to accrue on Justice's dime: the AFC Defendants planned to foreclose on the facility so that they could gain control of the assets, and sell them for their own profit. AFCG claims a security interest in the Plaintiffs' unsold cannabis inventory.

114.    The fact that AFCG claims a security interest in the unsold cannabis inventory means the AFC Defendants could benefit themselves at Plaintiffs' expense by allowing the inventory to build in anticipation of an attempted foreclosure.

LOEVY & LOEVY
Attorneys at Law

115.    Plaintiffs' CEO and other senior management began to express concerns about Bossidy's performance. After several months of disastrous performance, Plaintiffs' CEO implored the AFC Defendants to fire Bossidy and approve a different CRO. They repeatedly refused.

116.    Frustrated with Bossidy's performance, on February 18, 2025, Plaintiffs' CEO and CFO drafted a memorandum to AFCG, outlining Bossidy's failures and proposing a plan to move forward without him.

## VI.    AFCG Calls the Loan Over Pretextual Defaults

117.    AFCG responded to Plaintiffs' proposal to replace Bossidy by declaring war.

118.    The next day, on February 19, 2025, AFCG sent Plaintiffs an official letter, falsely claiming that Plaintiffs were in default of the 2024 Forbearance for, *inter alia*, mismanaging the New Jersey operations under Bossidy's tenure and interfering with Bossidy's control of the New Jersey operations.

119.    With hindsight, it is now clear that this counter-factual letter was sent in the lead-up to AFCG's annual earnings call in March, at which it intentionally misled the public about Justice and this loan.

### A. The AFC Defendants Are on the Brink of Financial Collapse

120.    AFCG and the AFC Defendants are on the brink of financial collapse, and their business has begun to suffer badly. Their borrowers are operators in the cannabis

LOEVY & LOEVY
Attorneys at Law

industry, an industry that has struggled mightily for numerous reasons, such as federal illegality, punishing taxation, and lack of access to financial markets and banking services. The federal government's failure to deliver long anticipated regulatory relief that would normalize the ability to operate cannabis businesses has only made things worse.

121.    Because of these persistent challenges, AFCG's cannabis borrowers are falling behind, and almost none of the cannabis loans in AFCG's portfolio have performed as hoped or expected. Accordingly, AFCG has not generated the cash it modeled when making its extremely high interest loans.

122.    based financial institution. That loan matured on April 29, 2025.

123.    In February 2025, when AFCG claimed Plaintiffs were in breach of their loan based on trumped-up defaults, the loan maturity date was looming. AFCG was so desperate for cash that it had borrowed $40 million from yet another Tannenbaum-owned entity, AFC Finance LLC. That loan functioned as a bridge loan, to be repaid when AFCG renewed or refinanced its loan with East West Bank.

124.    As a result, on April 10, 2025, less than three weeks before its East West loan came due, AFCG was experiencing extreme financial distress and had begun to collapse. With the collapse of its share price, it could not raise more equity in the market. Desperate for liquidity, AFCG attempted to call Plaintiffs' loan and extort its owners.

### B. Bossidy Was Only Pretending to Do His Job

125.    Justice investigated Bossidy further. Justice analyzed video of Mr. Bossidy during his very rare visits to Bloc's facilities. (As a licensed cannabis facility, all activity on the premises is required to be recorded.) What Justice discovered was proof that Bossidy is a fraud. The CRO was merely pretending to work while charging $700 per hour. During his somewhat-rare visits to the facility, he would park himself in a conference room for hours on end and surf the internet for scantily clad models, exotic cars, vacation homes, luxury watches, and clickbait photos.

126.    On a budgeting video call he took from the facility with Justice's CEO, for example, instead of engaging with the critical budgeting subject matter, he immediately switched over from the video call to his browser and viewed other websites, including bikini models.

127.    The fact that Mr. Bossidy was only pretending to be a CRO while he was billing $700/hour to surf the internet powerfully demonstrated that he understood his job was not to run Justice successfully. To the contrary, the AFC Defendants installed him to spy on Justice, and to help it build a case that would permit them to baselessly declare Justice in default, which is exactly what Bossidy did.

128.    Plaintiffs forwarded the video to the AFC Defendants. Their hand now forced, they grudgingly allowed Plaintiffs to terminate Bossidy.

LOEVY & LOEVY
Attorneys at Law

129.    The AFC Defendants cannot dispute that Bossidy's financial performance was abysmal, and that he mismanaged the facility. There is no serious argument otherwise. Despite having ample time to do so after having been in charge for nearly a full year, Bossidy not only failed to reach the facility's $5 million per month potential-which would have made the venture highly successful-but he actually took the facility's performance backwards, leaving it in far worse shape than when he took over (at a time when it was finally getting on its feet after having completed construction).

### C.    The Defendants Conceal Their Emails from Justice

130.    Now under threat of default, Plaintiffs instructed Bossidy to provide all his communications with the AFC Defendants, so Plaintiffs could gather evidence to defend themselves from the new false accusations.

131.    Bossidy was plainly obligated to provide these documents to Plaintiff Bloc as its fiduciary. There is no possible argument otherwise. He was working for Bloc as a senior executive at the time he sent the emails, and owed Bloc his loyalties.

132.    Bossidy nevertheless refused Bloc's reasonable requests to turn them over to Justice. On information and belief, he took that action, a further breach of his fiduciary duties, in conjunction with the AFC Defendants, his true patrons.

133.    When Bossidy kept stalling and making excuses rather than turn over Bloc's property in the form of these communications, Bloc eventually had to take legal

action, culminating in a lawsuit entitled Bloc Dispensary LLC v. Bossidy, 25-CV-1725 (D.N.J.).

### VII. AFCG Breaches the 2024 Forbearance Agreement and Raids Plaintiffs' Assets

134.    As described below, these dire financial straits prompted the AFC Defendants to invent pretexts for claiming that Plaintiffs' loan was in default and seizing Plaintiffs' assets.

135.    On April 10, 2025, the AFC Defendants called the loan.

### A. The AFC Defendants' Bank Raid

136.    As described above, the AFC Defendants and Plaintiffs had worked out a complicated cash sweep mechanism, memorialized in the 2024 Forbearance, pursuant to which the AFC Defendants were permitted to sweep 75% of excess cash after Plaintiffs' payroll and bills were paid.

137.    On April 10, 2025, AFCG declared the loan in default, and Defendant AFC Agent immediately stole almost two million dollars from Plaintiffs' pledged bank accounts.

138.    Specifically, on April 10, 2025, AFC Agent, directed by the AFC Defendants, obtained $1,500,000 from Plaintiff Hayden's Pennsylvania bank account and transferred it to AFCG's bank account at East West Bank.

139.    Also on April 10, 2025, AFC Agent, directed by the AFC Defendants, obtained $288,501.63 from Plaintiff Bloc's New Jersey bank account and transferred it to AFCG's bank account at East West Bank.

140.    This theft directly contravened the cash sweep arrangement the parties agreed to in the 2024 Forbearance. It occurred wholly outside the agreed-upon cash sweeps.

141.    As a result, the New Jersey account was left with less the minimum $300,000 the parties had agreed to in the 2024 Forbearance as necessary to run Plaintiffs' businesses.

142.    It occurred just days before AFCG was obligated to pay a $5 million dividend it announced before its stock price crashed 40%, $5 million it likely did not have laying around. If AFCG used the stolen funds to pay the dividend or to enable it to borrow to pay the dividend, then it has distributed, hastily and desperately, prohibited proceeds of plant-touching activity to all of its shareholders, including large funds like Black Rock, Vanguard, State Street and Northern Trust.

143.    To be clear, the accounts from which the AFC Defendants took the money were already controlled not only by the cash sweep mechanism set forth in the 2024 Forbearance, but also by a deposit account control agreement (DACA) such that *Plaintiffs could not have withdrawn any money without consent from the AFC Defendants*. Thus, there was no emergent need to move the money, even if Plaintiffs

were in a default under the loan agreement, which they were not. In other words, even if Defendants' pretext for seizing those funds had been true, Defendants could have better served their interests by freezing those funds or permitting the use of those funds for Plaintiffs' operations (i.e., the operations that generate the capital used to make the required payments under the loan). Instead, AFCG took the money on the eve of its dividend obligation, giving the clear impression of desperation.

144.    As part of the scheme to raise cash for itself, the AFC Defendants also began threatening to sell Plaintiff Hayden's membership interests, which it also holds as a pledge for the loan. (In states like Pennsylvania where AFCG cannot hold a security interest in the actual cannabis license, it instead holds a security interest in the actual license-holding entity. Thus, all the shares in Hayden are pledged as security for the loan.)

145.    To justify these actions, the AFC Defendants baselessly claimed that Plaintiffs were in default of their loan, even though Plaintiffs were not in default. As noted above, on the day it stole the money in the bank accounts, AFCG sent a letter declaring default, again baselessly, and purporting to accelerate Plaintiffs' loan. Hours later, it had raided Plaintiffs' accounts.

146.    The AFC Defendants stole this money, knowing full well that it was the day before Bloc's check run to its vendors and its payroll to employees went out, threatening to upend not only the viability of the business, but also the lives of the

employees who depend on their salaries. Plaintiffs employ more than 200 employees, most of them hourly workers and many of them union members and subject to a collective bargaining agreement. Those employees' payroll is paid through the very bank accounts Defendants raided.

147.    Had it not been for the fortuity that a substantial vendor payment hit Plaintiffs' account the same day, AFCG's theft would have left Plaintiffs unable to make their full payroll and check run.

148.    The AFC Defendants were not finished. They communicated that they intended to continue to raid Plaintiffs' accounts without notice, and continued threatening to seize and sell Plaintiffs' assets without going through the courts.

**B.    *Plaintiffs Obtain Emergency Relief***

149.    Defendants' actions were lawless. Plaintiffs were not in default. There were no valid grounds under any of the applicable agreements to hold Plaintiffs in default, seize their money, or begin the process of liquidating their company.

150.    The AFC Defendants' actions were thus a breach of the parties' loan agreements, and a wrongful conversion.

151.    On that basis, Plaintiffs sought the protection of the federal district court in New Jersey to prevent the AFC Defendants from continuing to violate their rights in this manner.

152.    Specifically, Plaintiffs filed a motion for a TRO and then preliminary injunction against the AFC Defendants to prevent them from continuing their lawless attempts to drain Plaintiffs' bank accounts and liquidate their company.

### C.    The Preliminary Injunction

153.    On basis of the briefing and supporting affidavits, the Honorable Zahid Quraishi granted Plaintiffs a TRO and set the matter for an evidentiary hearing on Plaintiffs' further request for a preliminary injunction.

154.    As part of those proceedings, the parties collectively submitted more than 100 pages of briefing, numerous affidavits, and thousands of pages of documentary exhibits.

155.    Judge Quraishi then presided over a full-day evidentiary hearing, at which five witnesses testified, including one Plaintiffs' owners and AFCG's CEO, Dan Neville.

156.    At the conclusion of the evidentiary hearing, Judge Quraishi issued a lengthy, 39-page opinion rejecting all the asserted grounds for default and finding in Plaintiffs' favor. The Court expressly "ruled and DECLARE[D]" that Borrowers "are not in breach or default." Accordingly, it issued a preliminary injunction preventing Defendants from seizing Plaintiffs' assets or taking any further steps that would have been permissible if Plaintiffs had breached the loan covenants.

157.    Judge Quraishi further found that the testimony of Plaintiffs' owner and CEO was credible, and that the testimony of AFCG's CEO, Dan Neville, was not credible.

158.    Judge Quraishi expressly found that that "evidence presented at the hearing showed that Bossidy was loyal to Defendants rather than Plaintiffs." He found that "acting in concert," Neville and Bossidy "interfered with Plaintiffs' rights under the 2024 Forbearance Agreement," and that the AFC Defendants violated the implied covenant of good faith by conspiring with Bossidy.

159.    Judge Quraishi also expressly enjoined AFCG from seeking any remedy for default on several of the specific pretextual "defaults" it had claimed. Despite that injunction, AFCG has also brought at least two other frivolous lawsuits against Plaintiffs' parent company and owners, in New York state and federal court. Those additional lawsuits, both premised on a breach of a loan that is not in breach, are legally groundless. AFCG filed and pursued them solely to cause gratuitous economic harm to Plaintiffs' business, to try to gain leverage to protect the Tannenbaums, and to prevent Plaintiffs and their related companies from obtaining alternative financing.

160.    Accordingly, the current status quo is that Plaintiffs are not in breach or default, and AFCG is not permitted to foreclose on their assets.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LOEVY & LOEVY
Attorneys at Law

### D.    *The Post-Bossidy Turnaround*

161.    Bossidy's incompetence is proved by his absence. In mid-March 2025, after Justice showed AFCG the video evidence that Bossidy was not doing his job, AFCG finally relented and allowed Plaintiffs to terminate him.

162.    Since Bossidy was terminated, and Justice's CEO took over operations, the New Jersey businesses have experienced the greatest financial performance in their history.

163.    **Cultivation sales**: In the first full week of the first full month after AFC Gamma relinquished control, cultivation sales were up more than 70% over the numbers from the first week of each of the previous three months. In July 2025, the cultivation hit record numbers in sales, selling $1.3 million in cannabis flower, over a million of that to third-party buyers (meaning not to its own dispensaries). The cultivation facility is seeing record levels of success despite having to replace incompetent sales staff hired under Bossidy's tenure.

164.    **Cultivation quality**: The quality of cannabis flower produced at the cultivation has dramatically improved. Each harvest must be independently evaluated by state-licensed and certified laboratories through chemical analysis. Since cannabis flower has a growth cycle of at least 16 weeks, the cultivation is only just starting to see the lab results for plants grown after Bossidy's termination, and the improvement in

quality is striking. THC levels are higher and more consistent, and contaminants such as mold and insects are virtually nonexistent.

165.    By contrast, Plaintiffs have learned that substantial quantities of the formerly usable cannabis Bossidy had hoarded in the facility have degraded to the point that they failed laboratory testing, and are unusable and fit only for supervised destruction, resulting in the loss of millions of dollars of income.

166.    **Cultivation manufacturing**: Since Bossidy's firing, the cultivation facility has finally received approval to operate its extraction lab and manufacturing facility (for producing vape cartridges, infused gummies, and other manufactured, non-flower product). Plaintiffs are beginning to produce a wide variety of manufactured products that will be available in dispensaries across the state for the adult use market.

167.    **Cultivation facility management**: Since Bossidy's termination, Plaintiffs have also been able to address and remediate the chronic problem the facility faced with environmental mold. Bossidy failed to address the persistent mold issues for months, leading ultimately to an OSHA investigation. The new management team is working with regulators and third party contractors to remediate the damage and address the underlying problems (stemming from HVAC failures and roof leaks) once and for all.

168.    **Dispensary sales**: Since Bossidy's departure, net income at the company's three New Jersey dispensaries has increased markedly overall. In fact, in July 2025, its Waretown dispensary showed a 130% increase year-over-year compared to July 2024

(when Bossidy was running the operation). Similarly, the Somerset location showed an increase of 83% year-over-year compared to July 2024.

169.    **Employee morale**: Equally importantly, employee morale at all New Jersey locations has improved. Attrition is down as employees choose to remain longer with the company. Team members report feeling valued, respected, and heard. The cultivation employees threw a party when Bossidy was fired.

170.    In sum, the New Jersey businesses are performing better on all fronts since Bossidy was fired. Once he was out of the way and Plaintiffs were permitted to run their business successfully (as they do in the other states where they operate), the New Jersey businesses have flourished. Despite having to undo a year of damage caused by Bossidy's "stewardship," the dispensaries' sales figures grow every month, and the cultivation facility is well on its way to reaching the facility's expected potential.

## VIII. Plaintiffs Sustain Damages

171.    Plaintiffs sustained enormous damages as a result of Defendants' malfeasance.

172.    First, Plaintiffs sustained more than 100 million dollars in lost sales revenue from the cultivation facility and the dispensaries as a result of Defendants' breaches and tortious behavior. Those losses include sales that Plaintiffs' businesses should have made, but could not, due to Defendants' actions; sales revenue lost because of inventory degradation; and sales revenue lost due to irresponsible "sweetheart" deals

Defendants entered into to benefit the AFC Defendants' other borrowers and business partners. The damages from lost sales continue to accrue, as Plaintiffs work to undo the systemic damage wrought by Defendants.

173.   Second, Plaintiffs sustained more than $100 million dollars in additional damages in valuation that the companies would have achieved. In cannabis, a business is valued at a multiple of its annual revenues. If Defendants had not sabotaged their performance, Bloc (the New Jersey entity) would have seen significantly increased sales, which, in turn, would increase the value of the company in a sale transaction.

174.   Third, Plaintiffs sustained tens of millions of dollars in additional damages because the decline in revenues and value impaired their ability to refinance the loan with a competing cannabis lender. But for Defendants' malfeasance, Plaintiffs would have been able to refinance their loan, which is due to mature in May 2026, on favorable terms. Those prospects are now greatly diminished. Those damages continue to accrue as the maturity date nears.

175.   The Defendants are jointly and severally liable for all the damages Plaintiffs incurred.

# CLAIMS FOR RELIEF

## COUNT I
## BREACH OF FIDUCIARY DUTY
### (Consultant Defendants)

176.    Plaintiffs incorporate by reference all of the allegations in this Complaint as though set forth herein.

177.    The Consultant Defendants owed Plaintiffs a fiduciary duty. Acting as a C-suite executive for Plaintiffs, Defendant SCP owed Plaintiffs a fiduciary duty as a matter of law.

178.    Defendant Bossidy owed Plaintiffs a fiduciary duty as a matter of law, and additionally owed Plaintiffs a fiduciary duty as set forth in the consulting contract between Plaintiffs and the Consultant Defendants.

179.    The fiduciary duties Consultant Defendants owed to Plaintiffs include a duty of care; a duty of loyalty (meaning that they must act in Plaintiffs' best interest and put Plaintiffs' interest before their own); a duty of confidentiality; and a duty of candor.

180.    The Consultant Defendants breached that duty in the following ways:

    a.  By failing to use care to operate Plaintiffs' businesses successfully, and instead mismanaging those businesses;

    b.  By falsely billing for services not rendered;

c.   By failing to act in Plaintiffs' best interests, and instead acting in their own best interests or in the interests of AFCG;

d.   By violating Plaintiffs' confidence and sharing confidential and privileged materials with AFCG;

e.   By refusing to produce emails and other documents belonging to Plaintiffs during and after their contract period.

181.   As a consequence of those breaches, and proximately caused by them, Plaintiffs were damaged by incurring unnecessary expenses, including expenses paid to the Consultant Defendants; by lost profits and business opportunities; and by diminution in the value of their business and assets as described above.

WHEREFORE, Plaintiffs seek compensatory damages in an amount to be proven at trial, plus interest, costs, and attorney's fees, as well as any other relief the Court deems just and proper.

## COUNT II
## BREACH OF FIDUCIARY DUTY
### (AFC Defendants)

182.   Plaintiffs incorporate by reference all of the allegations in this Complaint as though set forth herein.

183.   The AFC Defendants actions in taking over Plaintiff's business described above created a fiduciary duty owed to Plaintiffs. The AFC Defendants took control of Plaintiffs' bank accounts; exercised control over everyday operations and strategic

operations of the Plaintiffs' New Jersey businesses; insisted that Plaintiffs hire their chosen CRO; controlled and supervised Plaintiffs' CRO; prohibited Plaintiffs from operating their New Jersey businesses or even exercising supervisory authority over them; and essentially acted as Plaintiffs' alter ego, controlling the businesses when Plaintiffs were not permitted to do so. Accordingly, the AFC Defendants incurred fiduciary duties to Plaintiffs.

184.   The fiduciary duties the AFC Defendants owed to Plaintiffs include a duty of care; a duty of loyalty (meaning that they must act in Plaintiffs' best interest and put Plaintiffs' interest before their own); a duty of confidentiality; and a duty of candor.

185.   The AFC Defendants breached that duty in the following ways:

a.     By failing to use care to operate Plaintiffs' businesses successfully, and instead mismanaging those businesses;

b.     By failing to act in Plaintiffs' best interests, and instead acting in their own best interests or in the interests of their other borrowers;

c.     By violating Plaintiffs' confidence and receiving confidential and privileged materials with AFCG;

d.     By refusing to produce emails and other documents belonging to Plaintiffs during and after their contract period.

186.   In addition or in the alternative, the AFC Defendants aided and abetted the Consultant Defendants in breaching their fiduciary duties to Plaintiffs.

187.    The AFC Defendants knew that the Consultant Defendants owed Justice fiduciary duties of care, loyalty, confidentiality, and candor.

188.    The AFC Defendants knew, through regular contact with Bossidy, that his conduct constituted a breach of those duties.

189.    The AFC Defendants gave substantial assistance and encouragement to Bossidy to so act, by insisting that Plaintiffs hire him; by communicating with him regularly and offering support and advice to help him accomplish those acts; and by paying his fees.

190.    As a consequence of those breaches, and proximately caused by them, Plaintiffs were damaged by incurring unnecessary expenses, including expenses paid to the Consultant Defendants and payments made to the AFC Defendants; by lost profits and business opportunities; by diminution in the value of their business and assets; and by loss of opportunities to refinance their loan with other lenders on more favorable terms.

WHEREFORE, Plaintiffs seek compensatory damages in an amount to be proven at trial, plus interest, costs, and attorney's fees, as well as any other relief the Court deems just and proper.

## COUNT III
## CONVERSION
### (AFC Defendants)

191.   Plaintiffs incorporate by reference all of the allegations in this Complaint as though set forth herein.

192.   Plaintiffs owned and had a right to possess the money in their bank accounts.

193.   The AFC Defendants removed the money from Plaintiffs' bank accounts without Plaintiffs' permission in a manner inconsistent with Plaintiffs' property rights.

194.   Specifically, on April 10, 2025, AFC Agent and its owners and agents, directed by AFC Manager and its owners and agents and AFCG and its owners and agents, obtained $1,500,000 from Plaintiff Hayden's Pennsylvania bank account and transferred it to AFCG's bank account at East West Bank.

195.   Also on April 10, 2025, AFC Agent and its owners and agents, directed by AFC Manager and its owners and agents and AFCG and its owners and agents, obtained $288,501.63 from Plaintiff Bloc's New Jersey bank account and transferred it to AFCG's bank account at East West Bank.

196.   In each case, they did so by falsely representing to representatives of Parke Bank and representatives of East West Bank that they were legally entitled to those funds, when in fact they were not.

197.   Plaintiffs lost the use of those funds and were harmed thereby.

198.    The AFC Defendants caused damages to Plaintiffs in an amount to be determined at trial.

WHEREFORE, Plaintiffs seek compensatory damages in an amount to be proven at trial, plus interest, costs, and attorney's fees, as well as any other relief the Court deems just and proper.

**COUNT IV**
**INTENTIONAL INTERFERENCE WITH CONTRACT**
**(AFC Defendants)**

199.    Plaintiffs incorporate by reference all of the allegations in this Complaint as though set forth herein.

200.    Between April 2024 through March 2025, a valid contract existed between Plaintiff Bloc, on the one hand, and Defendants Bossidy and SPC, on the other (the "CRO Contract").

201.    The CRO Contract required Bossidy to act as Plaintiff's Chief Restructuring Officer and expressly imposed upon him fiduciary duties to Bloc.

202.    The CRO Contract required SCP to act as support to Bossidy in performing his CRO duties for Bloc.

203.    The fiduciary duties Bossidy owed to Plaintiffs include a duty of care; a duty of loyalty (meaning that he must act in Plaintiffs' best interest and put Plaintiffs' interest before anyone else's); a duty of confidentiality; and a duty of candor.

204.    Bossidy breached those duties in the following ways:

a.  By failing to use care to operate Plaintiffs' businesses successfully, and instead mismanaging those businesses;

b.  By falsely billing for services not rendered;

c.  By failing to act in Plaintiffs' best interests, and instead acting in his own best interests or in the interests of AFCG;

d.  By violating Plaintiffs' confidence and sharing confidential and privileged materials with AFCG;

e.  By refusing to produce emails and other documents belonging to Plaintiffs during and after the contract period.

205.  All AFC Defendants knew of the existence and terms of the CRO Contract. Indeed, they insisted on its existence as a condition to entering into the 2024 Forbearance.

206.  As described above, the AFC Defendants intentionally acted to cause Bossidy to breach the contract.

207.  The AFC Defendants succeeded in inducing Bossidy to breach his fiduciary duties and act in furtherance of AFCG's interests, to the detriment of Plaintiff Bloc's interests.

208.  As a result of Defendants' intentional interference with the CRO Contract, Plaintiffs have sustained more than one hundred million dollars in actual damages.

WHEREFORE, Plaintiffs seek compensatory damages in an amount to be proven at trial, plus interest, costs, and attorney's fees, as well as any other relief the Court deems just and proper.

**COUNT V**
**UNJUST ENRICHMENT**
**(All Defendants)**

209.    Plaintiffs incorporate by reference all of the allegations in this Complaint as though set forth herein.

210.    Between April 2023 and March 2024, the Consultant Defendants were enriched by hundreds of thousands of dollars of fees paid to them for their alleged services.

211.    Between April 2023 and March 2024, the AFC Defendants received millions of dollars in monthly interest payments from Plaintiffs.

212.    At the same time, all Defendants' actions directly and proximately caused Justice's New Jersey operations to sustain substantial financial losses, including loss of profits and business opportunities.

213.    Permitting Defendants to retain those funds is therefore against equity and good conscience.

214.    Plaintiffs are entitled to recover from all Defendants the full amount of the amount by which they were enriched, plus interest, costs, and attorney's fees, as well as any other relief the Court deems just and proper.

WHEREFORE, Plaintiffs seek compensatory damages in an amount to be proven at trial, plus interest, costs, and attorney's fees, as well as any other relief the Court deems just and proper.

## JURY DEMAND

215.    Plaintiffs demand trial by jury on all issues so triable.

216.    Although AFCG inserted a clause into the loan agreement purporting to prohibit Plaintiffs from trying their claims to a jury, that provision is unenforceable in California under California law.

217.    Accordingly, Plaintiffs are entitled to, and hereby demand, a jury trial at which the claims against all Defendants, including claims for punitive damages, will be adjudicated by an impartial jury of their peers.

Dated: September 8, 2025                    Respectfully submitted,


                                            /s/ Thomas M. Hanson
                                            *One of Plaintiff's Attorneys*

Thomas M. Hanson, SBN 184465 (hanson@loevy.com)
Jon Loevy (jon@loevy.com)*
Mike Kanovitz (mike@loevy.com)*
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900 (phone)
(312) 243-5902 (fax)
*Counsel for Plaintiff*

* *Pro hac vice* application forthcoming