**DYNAMIS LLP**
Jamie Hoxie Solano, Esq.
NJ Bar No. 426422024
200 Connell Drive
Berkeley Heights, NJ 07922
(973) 295-5495
JSolano@dynamisllp.com

Michael B. Homer, Esq.
Constantine Economides, Esq.
175 Federal Street, Suite 1200
Boston, MA 02110
(617) 693-9732
*Appearing Pro Hac Vice*

*Attorneys for Plaintiffs Hayden Gateway LLC,
Bloc Dispensary LLC, and JG HoldCo LLC*

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Hayden Gateway LLC, Bloc Dispensary LLC, and JG HoldCo LLC,<br><br>  Plaintiffs,<br><br>v.<br><br>Advanced Flower Capital Inc., and AFC Agent LLC,<br><br>  Defendants. | **The Honorable Zahid N. Quraishi**<br><br>Civil Action No. 25-2789 (ZNQ) (JBD)<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF ITS DECLARATORY JUDGMENT CLAIM** |

# Table of Contents

I. Plaintiffs Have Stated A Viable Cause of Action……………………………………...1

    A. AFC Was a REIT……………………………………………………………………...1

    B. As a REIT, AFC Was Prohibited By Law Applicable to REITs From Charging As Much Interest As It Charged Plaintiffs……………………………………………….1

    C. The Express Terms of the Credit Agreement Provide That the Interest Calculation on Plaintiffs' Loan Must Be Recalculated……………………………………………..2

        i. The Definition of "Applicable Law" Includes REIT Law…………………….2

        ii. In Context, "Maximum Lawful Rate" and "Highest Permissible Rate" Mean The Maximum Rates Legally Allowed by Any Applicable Law that Applied to AFC on the Date of Closing, as Determined by a Court……………………...3

        iii. Because the Interest Payments Violated the REIT Law, "Rate or Rates of Interest or Manner of Payment Exceeds the Maximum Allowable Under Applicable Law" Includes Borrowers' Payments to AFC as a REIT…………5

        iv. Viewing the Contract as a Whole, It Is Clear That Section 2.5(f) Must Be Interpreted to Limit the Borrowers' Interest Payment Obligations While AFC Was Bound By REIT Laws……………………………………………………6

II. AFC's Arguments Misapply The Terms Of The Contract…………………………….8

# TABLE OF AUTHORITIES

**CASES**

*Beal Sav. Bank v. Sommer,* 865 N.E.2d 1210 (N.Y. 2007) .............................................................. 10

*Bloomfield v. Bloomfield*, 764 N.E.2d 950 (N.Y. 2001) ................................................................. 7

*Condor Capital Corp. v. CALS Investors, LLC*, 179 A.D.3d 592 (N.Y. App. Div., 1st Dep't 2020) .................................................................................................................................... 3

*Dreisinger v. Teglasi,* 130 A.D.3d 524 (N.Y. App. Div., 1st Dep't 2015) .......................................... 8

*In re HRP Myrtle Beach Holdings, LLC*, 2008 WL 4442606 (Bkr. D. Del. Sept. 29, 2008) .......... 4

*Matter of Dube v. Horowitz*, 258 A.D.2d 724 (N.Y. App. Div., 3d Dep't 1999) ............................ 8

*Meyer v. Price*, 165 N.E. 814 (N.Y. 1929) ...................................................................................... 7

*Niagara Frontier Transp. Auth. v. Euro-United Corp.*, 303 A.D.2d 920 (N.Y. App. Div., 4th Dep't 2003) .................................................................................................................................. 3

*Nomura Home Equity Loan, Series 2006-FM2 v. Nomura Credit & Capital, Inc.*, 92 N.E.3d 743 (N.Y. 2017) ................................................................................................................................... 7

*Slattery Skanska Inc. v. Am. Home Assur. Co.*, 67 A.D.3d 1 (N.Y. App. Div., 1st Dep't 2009) .... 3

**STATUTES**

28 U.S.C. § 856 ................................................................................................................... 1, 4, 5, 6, 7

28 U.S.C. § 857 ................................................................................................................................. 2

**REGULATIONS**

26 C.F.R. § 1.856-5 ................................................................................................................... 1, 2, 5

In response to the Court's order dated October 10, 2025, Plaintiffs respectfully file the following supplemental briefing on certain legal issues raised by the Court pertaining to Plaintiffs' declaratory judgment claim. *See* Opp. to MTD at 16-17; Am. Compl. ("Compl.") ¶¶ 11, 50-72.

### I. Plaintiffs Have Stated a Viable Cause of Action

There are three premises in Plaintiffs' argument: (1) AFC is a real estate investment trust ("REIT"); (2) the laws applicable to REITs prohibit AFC from charging Plaintiffs as much interest as it has been charging; and (3) the Credit Agreement that AFC drafted contains a clause providing that whenever AFC charges more interest than is allowed by any "Applicable Law," those payments will be recalculated to avoid any scenario where the interest exceeds what is allowed under any Appliable Law. Here, as alleged, each of these premises is absolutely true and correct.

#### A. AFC Was a REIT

AFC's REIT status is presumably not disputed. AFC filed documents with the SEC and investors declaring itself a REIT. *E.g.,* Form 10-K, AFC Gamma, Inc., Securities and Exchange Commission (Mar. 7, 2022) (AFC "ha[s] elected to be taxed as a REIT under Section 856"). *Available at:* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001822523/000114036122 008768/brhc10034929_10k.htm.

#### B. As a REIT, AFC Was Prohibited By Law Applicable to REITs From Charging As Much Interest As It Charged Plaintiffs

Under the laws applicable to REITs, including Section 856 of the Internal Revenue Code (28 U.S.C. § 856) and the associated regulations, including 26 C.F.R. § 1.856-5(c) (hereafter, "Rule 1856-5(c)"), a company can only claim REIT status if 75% or more of its gross income comes from a real estate source (hereinafter, the "75% Rule"). One component of gross income is "interest income. *See* IRS Form 1120 REIT, line 2. Rule 1.856-5(c) covers the computation of interest income under Section 856(c) and addresses the exact situation before the Court: accounting for

1

payments from a borrower when the loan is secured by both real estate and personalty. The 75% Rule limits a REIT's permissible "interest income" to a *pro rata* amount of the borrowers' payment corresponding to the percentage of the loan value secured by real property. See § 1.856-5(c)(ii).

Where an allocation to personalty exceeds 25%, the REIT must either reallocate the buyers' payments so that the allowable portion exceeds 75% of its gross income by crediting the remainder as the return of principal (which would not be considered income), or forfeit its preferred tax status, paying taxes of up to 100% on the unallowable portion, plus penalties. See 28 U.S.C. § 857(b)(5).

That, however, is not the end of the story. In this case, the Credit Agreement drafted by AFC contains a provision that directs courts to keep the contract in compliance, *ipso facto,* with the laws and regulations applicable to REITs. As discussed in the following section, that provision operates as an automatic recalculation of the interest at the time it was paid to AFC.

### C. The Express Terms of the Credit Agreement Provide That the Interest Calculation on Plaintiffs' Loan Must Be Recalculated

The parties' Credit Agreement – Section 2.5(f) – contains what is known as a "blue pencil" clause, one that directs the Court to reform the interest rate and manner of payment provisions to prevent AFC from running afoul of any "Applicable Law." For example, if the interest rate AFC charged was ever deemed by a court to have been usurious, its right to collect interest would not just be stricken from the contract as null and void. Instead, Section 2.5(f) would kick in to reduce the interest to the "maximum allowable" under the state usury statute, thereby protecting AFC.

#### i. The Definition of "Applicable Law" Includes REIT Law

Seeking to maximize its protection against other, possibly unforeseen risks, AFC drafted this blue pencil clause to the broadest possible extent, in more than just usury laws. It extends to all "Applicable Laws," which is defined by Section 1.1 of Credit Agreement as, with the exception of federal cannabis law, any law "related to the conduct and business" of AFC. See Section 1.1.

2

The broad language of Section 1.1 includes the laws and regulations applicable to REITs, which are undisputedly "related to [AFC's] conduct and business." Reading the plain terms, there can be no serious argument otherwise. *E.g., Condor Capital Corp. v. CALS Investors, LLC*, 179 A.D.3d 592, 592 (N.Y. App. Div., 1st Dep't 2020) ("[A] written agreement that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms.") (citation omitted). Indeed, the "best evidence of what the parties to an agreement intended is the language of the agreement itself." *Slattery Skanska Inc. v. Am. Home Assur. Co.*, 67 A.D.3d 1, 13-14 (N.Y. App. Div., 1st Dep't 2009).[1]

> ii. **In Context, "Maximum Lawful Rate" and "Highest Permissible Rate" Mean The Maximum Rates Legally Allowed by Any Applicable Law that Applied to AFC on the Date of Closing, as Determined by a Court**

Section 2.5(f) of the Credit Agreement states further that the parties intended for any interest payments owed by the Borrowers would be "limited" to the "Maximum Lawful Rate," automatically, and that the "highest permissible rate," would be the highest rate that a Court determines may be allowed under any Applicable Law.

The parties' intended meaning is clear: the term "Maximum Lawful Rate" appears in the heading of the section with the "Intent to Limit Charges." *See, e.g., Niagara Frontier Transp. Auth. v. Euro-United Corp.*, 303 A.D.2d 920, 921-22 (N.Y. App. Div., 4th Dep't 2003)

---

[1] Moreover, the phrase "Applicable Law" is used throughout the Credit Agreement in various provisions beyond Section 2.5(f), thus indicating that the parties intended it to be as broad as possible (to cover every possible legal issue). *E.g.*, §§ 2.3(b)(i) ("Apportionment and Application"); 4.4(b) ("Due Organization and Qualification; Subsidiaries"); 4.5(b) ("Due Authorization; No Conflict"); 4.7(a)-(c) ("Compliance with Laws; Permits; Licenses"). Section 1.1 includes the phrase "Applicable Law" within various other definitions—such as "Anti-Money Laundering Laws," "Environmental Law," "Government Authority," "Hazardous Materials," and "Material Adverse Effect"—while also providing a separate and additional definition for "Applicable Law," further reinforcing the point that the phrase "Applicable Law" was intended to be as broad as possible, and thus applies to any section affecting the parties' legal rights or status.

3

(interpreting agreement, including analysis of text and subheadings, in light of agreement's "primary purpose"). The provision states further that in the event there is *any* Applicable Law that the manner of Borrowers' payments would exceed, then, "*ipso facto* . . . the Borrowers are and shall be liable only for such maximum amount as is allowed by law and, and payment received from the Borrowers in excess of such legal maximum, *whenever received*, *shall* be applied to reduce the principal balance of the Obligations to the extent of such excess." Credit Agreement Section 2.5(f) (emphasis added).

Under these terms, then, if a Court determines that there was any Applicable Law that applied to AFC that would limit the amount of interest payment that AFC could receive, then by operation of Section 2.5(f), *ipso facto*—i.e., automatically and immediately—the Borrowers' liability for interest payment would be reduced to such lower interest rate as required by the then-Applicable Law, and the payments, *when received*, would be applied to reduce the principal balance instead of being treated as interest payments.[2]

As discussed above, the REIT statute and regulations precisely provided a Maximum Lawful Rate that AFC could charge by way of its REIT status. Subsection (c) of Section 856 provides various limitations that are imposed on REITs. One of those limitations is the 75% Rule: "a corporation, trust, or association shall not be considered a real estate investment trust for any taxable year unless . . . at least 75 percent of its gross income (excluding gross income from prohibited transactions) is derived from" real property, including "interest on obligations secured by mortgages on real property or interests in real property." 28 U.S.C. § 856(c)(3)(B).

---

[2] That is particularly true when one compares Section 2.5(f) of the Credit Agreement with similar but different provisions in other lending agreements. For example, in *In re HRP Myrtle Beach Holdings, LLC*, the parties chose a provision that was specific to "the maximum *non-usurious interest rate*," 2008 WL 4442606, at *29 (Bkr. D. Del. Sept. 29, 2008) (emphasis added), as opposed to all applicable laws.

Rule 1.856-5 provides that "the term 'interest' includes only an amount which constitutes compensation for the use or forbearance of money." 26 C.F.R. § 1.856-5(a). The regulations also provide that where, as here, "a mortgage covers both real property and other property," "an apportionment of the interest income must be made for purposes of the 75[%] requirement of section 856(c)(3)." *Id.* § 1.856-5(c). Specifically, "[i]f the loan value of the real property is equal to or exceeds the amount of the loan, then the entire interest income shall be apportioned to the real property." *Id.* § 1.856-5(c)(i). But "[i]f the amount of the loan *exceeds* the loan value of the real property, then the interest income apportioned to the real property is an amount equal to the interest income multiplied by a fraction, the numerator of which is the loan value of the real property, and the denominator of which is the amount of the loan." *Id.* § 1.856-5(c)(ii). "The interest income apportioned to the other property is an amount *equal to the excess of the total interest income over the interest income apportioned to the real property*." *Id.* (emphasis added).

Thus, under Section 1.856-5(c)(ii), when calculating its gross income under Section 856, the Applicable Law required AFC to drastically reduce the amount of interest income it received from the Borrowers so as not to exceed the maximum limit (i.e., any interest payments that would cause AFC to exceed the rule that at least 75% of its gross income be derived from real property). In other words, because the majority of AFC's income is from interest and payments on loans that are predominantly collateralized by other property (namely, the valuable cannabis licenses), AFC's business did not comply with the Applicable Law's 75% Rule.

### iii. Because the Interest Payments Violated the Laws Governing REITs, "Rate or Rates of Interest or Manner of Payment Exceeds the Maximum Allowable Under Applicable Law" Includes Borrowers' Payments to AFC as a REIT

Against this backdrop, the phrase "rate or rates of interest or manner of payment exceeds the maximum allowable under Applicable Law," is, again, broad and includes AFC receiving a

5

manner of payment as "interest payments" instead of a repayment of the loan principle. The manner in which AFC was receiving payments from the Borrowers, i.e., receiving said payments as interest payments instead of principle repayment, violated the then-Applicable Law governing REITs. For the same reasons described above, the remedy for that is the automatic reduction of Borrowers' liability for interest payments and applying the payment, instead, "to reduce the principal balance of the Obligations to the extent of such excess." Credit Agreement § 2.5(f).

      iv.  **Viewing the Contract as a Whole, It Is Clear That Section 2.5(f) Must Be Interpreted to Limit the Borrowers' Interest Payment Obligations While AFC Was Bound By REIT Laws**

When Section 2.5(f) is read in conjunction with the rest of the Credit Agreement, it becomes clear that the intent of the parties was to prioritize AFC's status as a lawful REIT. For example, one of the covenants in the Credit Agreement, Section 5.18, is titled "Cooperation with REIT" and specifically provides that the parties will cooperate with any amendment or modifications to the contract that are "necessary or advisable to maintain the status of any Lender in its capacity as a '<u>real estate investment trust</u>' within the meaning of Section 856." *See* Credit Agreement § 5.18 (emphasis in original). The language of this section is not limited to specific provisions; rather, it is broad enough to permit any amendment, supplement, or modification necessary for AFC to comply with Section 856. In other words, the inclusion of this covenant, when read in conjunction with Section 2.5(f), makes it clear that the phrases "Maximum Lawful Rate," "highest rate permissible," and "rate or rates of interest or manner of payment exceeds the maximum allowable under the Applicable Law," must be read in context of the parties' clear intent to comply with Section 856.

To construe the phrases in question too narrowly (such that "Maximum Lawful Rate" did not account for the method through which the interest rate is determined) would not be a reasonable interpretation, particularly because the Credit Agreement specifically provides that

6

the interest rate is calculated through a dynamic formula rather than as a static rate (and thus, for an interest rate to violate the "Maximum Lawful Rate," the parties must have contemplated a scenario where some portion of that formula could violate the law—not simply the total rate itself). Moreover, construing Section 2.5(f) so narrowly would permit AFC to collect interest in a manner and amount that explicitly disqualifies it from electing REIT status, thereby rendering Section 5.18 of the Credit Agreement—and particularly the language about changes that are "necessary" to comply with 28 U.S.C. § 856—meaningless. *E.g.*, *Nomura Home Equity Loan, Series 2006-FM2 v. Nomura Credit & Capital, Inc.*, 92 N.E.3d 743, 748 (N.Y. 2017) ("[A] contract must be construed in a manner which gives effect to each and every part, so as not to render any provision 'meaningless or without force or effect.'") (citation omitted).

      Finally, construing the contract in a way that would allow AFC to continue to collect interest income that directly violated the 75% Rule (while it also continued to elect, and enjoy the benefits of, REIT status) would violate federal law. This Court should avoid that construction in light of the longstanding principle that, "[w]hen evidence is lacking that parties intended to violate the law, a contract that may be construed both lawfully and unlawfully should be construed in favor of its legality." *Bloomfield v. Bloomfield*, 764 N.E.2d 950, 953 (N.Y. 2001) (citations omitted); *Meyer v. Price*, 165 N.E. 814, 818 (N.Y. 1929) (explaining that if a contract is subject to two reasonable interpretations, "one making it illegal and the other legal, it is the duty of the courts to adopt the latter"). Further, Section 4.7 of the Credit Agreement requires the parties not to violate any Applicable Law in any material respect.

      It is clear that AFC's actions—and specifically, their action of charging an interest rate that was derived almost exclusively from collateral other than real property—violated federal tax law; by *ipso facto* automatic operation as laid out in Section 2.5(f), the percentage of interest

7

payment that would cause AFC to exceed the 75% Rule automatically, when it was received, "shall be applied to reduce the principal balance."

## II. AFC's Arguments Misapply the Terms of the Contract

AFC's Motion to Dismiss (ECF 88-1) and Reply (ECF 97) insisted repeatedly that the Applicable Law does not create a "cap" in terms of a "maximum allowable" amount of interest a REIT like AFC can charge. To the extent AFC means that the law surrounding REITs does not prohibit AFC from imposing high interest rates on cannabis borrowers who have no conventional financing options, AFC is correct. Applicable Law contains no such caps. But, usury aside, to remain in compliance with the law governing REITs, the interest charged cannot fail the 75% Rule.

If Defendants had truly meant to cabin Section 2.5(f) to usury laws, it should not have used the much broader and defined term Applicable Laws. Instead, this contract, like all contracts must be applied as written. *Dreisinger v. Teglasi,* 130 A.D.3d 524, 527 (N.Y. App. Div., 1st Dep't 2015). And to the extent any of these phrases are ambiguous, any such ambiguity must of course be construed against AFC as the drafter of the Credit Agreement. *See, e.g., Matter of Dube v. Horowitz*, 258 A.D.2d 724, 725 (N.Y. App. Div., 3d Dep't 1999) (citation omitted).

In response, AFC's prior pleadings fell back on the contention that even if Plaintiffs are correct about everything, all that means is that AFC was not entitled to the rich tax benefit conferred by its REIT status after all. *See* ECF 97 at 11 ("Even if, as Plaintiffs allege, AFC's collection of interest from Plaintiffs caused AFC to fail the 75% test, AFC could simply forgo the benefits of REIT tax treatment."). According to AFC, in other words, all that Plaintiffs have shown is that AFC has been misleading the Government and its investors. There are two problems with that argument.

First and foremost, it wholly fails to account for Section 2.5(f), the very purpose of which is to mandate adjustments to keep AFC in compliance with all Applicable Law. As already explained,

Section 2.5(f) requires an *ipso facto* recalculation of interest to ensure that the law governing REITs is not violated. The provision does not allow AFC to make an after-the-fact election, or provide a period by which AFC can try to engage in retroactive curative measures. Instead, Section 2.5(f) operates automatically, "*ipso facto*," and effectively limits the Borrowers' interest at the time each payment is received by AFC. *See* Section 2.5(f) ("payment received from the Borrowers in excess of such legal maximum, *whenever received*, *shall* be applied to reduce the principal balance of the Obligations to the extent of such excess" (emphasis added)). The plain language makes clear that if a payment, when received, would violate that Applicable Law, it automatically is reduced or recharacterized as a repayment of the principal. The provision does not permits AFC to elect whether it would like the Applicable Law to apply or would prefer the interest payment; it instead evidences an automatic recalculation at the time payment is received to conform with the Applicable Law, and is written to "limit" or "reduce" the Borrowers' interest rate obligations.

Second, even were the Court to disregard Section 2.5(f), which it cannot, AFC's argument that it "could simply forgo the benefits of REIT tax treatment" also ignores the fact that it already *has* claimed those tax benefits, and has been doing so for years. AFC cannot credibly maintain that this Court should grant the motion to dismiss because it may someday decide to give back all of the tax savings they have enjoyed. At a minimum, the Court has not assurances that it will actually do so.

At best, AFC's argument implies that it may have grounds to cut off future liability on this claim by forgoing future tax benefits, should it follow through with its stated intention to no longer be a REIT. Future status changes would not absolve AFC's liability for the interest it already

9

improperly collected in violation of Applicable Law. The motion to dismiss must therefore be denied as to the interest already charged.[3]

In a single sentence in its Reply, AFC also contended that it could "recharacterize interest from other loans in their portfolio to satisfy the 75% test." ECF 97 at 11. That is doubtful: the 75% problem almost certainly infects AFC's whole portfolio because AFC's business model depends on taking liens in valuable cannabis licenses operating businesses in less valuable real estate, or even rental properties. Regardless, the validity of AFC's hypothesis can only be answered after discovery regarding AFC's other loans, and is thus not a viable argument for a motion to dismiss. If anything, the argument demonstrates why all of its borrowers rights need to be adjudicated simultaneously.

Finally, Plaintiffs note that Section 2.5(f) includes the phrase "*ipso facto,*" when explaining the required mechanism for the recalculation in the event the 75% Rule is violated. That term, which means automatically and immediately, does not suggest some sort of election option, whereby AFC can decide whether to accept massive tax penalties associated with a status change when a problem arises. Any other reading would render the term *"ipso facto"* meaningless, which must be avoided. *Beal Sav. Bank v. Sommer,* 865 N.E.2d 1210, 1213 (N.Y. 2007).[4]

---

[3] As pointed out in Plaintiffs' Motion to Dismiss Response, shortly after Plaintiffs identified the problem discussed herein, AFC announced on an earnings call that it would seek shareholder approval to convert from a REIT to another corporate form. Even if AFC's shareholders at some point in the future do decide to vote in favor of not being a REIT any longer, that change would not extinguish AFC's liability to Plaintiffs for the period of time that AFC was a REIT. And to state the obvious, AFC will continue to be a REIT unless and until it actually changes its corporate form.

[4] Plaintiffs urge the Court to consider how AFC's position on the language could change if the allocation issue was being raised by the IRS. If the IRS said: "you have been filing false tax returns since you first claimed REIT status in 2020 and have vastly underpaid your taxes. You now owe full back taxes plus penalties and interest." Under those circumstances, AFC could reverse course and make the very argument that Plaintiffs are making, pointing to Section 2.5(f) to argue that the amounts of interest income that the IRS claims are unallowable (*i.e.* that exceed the "maximum allowable") are repayment of principal.

Dated:  October 24, 2025

                                  Respectfully submitted,

**DYNAMIS LLP**

By: */s/ Jamie Hoxie Solano*
Jamie Hoxie Solano, Esq.
200 Connell Drive
Berkeley Heights, NJ 07922
973-295-5495
JSolano@dynamisllp.com

Michael B. Homer, Esq.
Constantine Economides, Esq.
175 Federal Street, Suite 1200
Boston, MA 02110
MHomer@dynamisllp.com
CEconomides@dynamisllp.com
*Admitted Pro hac vice*

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on October 24, 2025, I caused a copy of this brief to be served on counsel of record by filing the document through the Court's CM/ECF System.

*s/ Jamie Hoxie Solano*
Jamie Hoxie Solano
