**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **HAYDEN GATEWAY LLC,** *et al.*,  Plaintiffs,  v.  **ADVANCED FLOWER CAPITAL INC.,** *et al.*,  Defendants. | Civil Action No. 25-2789 (ZNQ) (JBD)  **OPINION** |

**QURAISHI, District Judge**

  **THIS MATTER** comes before the Court upon a Motion to Dismiss filed by Defendants Advanced Flower Capital Inc. and AFC Agent LLC (collectively, "Defendants" or "AFC"). ("Motion," ECF No. 88.) Defendants submitted a brief in support of the Motion. ("Moving Br.," ECF No. 88-1.) Plaintiffs Hayden Gateway LLC ("Hayden"), Bloc Dispensary LLC ("Bloc"), and JG HoldCo LLC ("JG") (collectively, "Plaintiffs") submitted a brief in opposition to the Motion ("Opp'n Br.," ECF No. 91). Defendants filed a reply brief. ("Reply Br.", ECF No. 97.) The Court ordered the parties to submit supplemental briefing "more fully addressing the proper interpretation of, and interplay between, Section 856 of the Internal Revenue Code (and implementing regulations) and Section 2.5(f) of the parties' Credit Agreement." (ECF No. 103.) Thereafter, Plaintiffs (ECF No. 104) and Defendants (ECF No. 105) submitted supplemental briefing.

1

The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will **DENY** Defendants' Motion.

I. <u>**BACKGROUND AND PROCEDURAL HISTORY**</u>

This case stems from a contract dispute. Plaintiffs are licensed cannabis businesses operating in New Jersey and Pennsylvania and are part of a group of affiliated cannabis companies in five states doing business as Justice Cannabis Co. (Am. Compl. ¶ 1.) In 2021, Defendants lent money to Plaintiffs to finance the build-out and operation of Plaintiffs' Pennsylvania and New Jersey cannabis operations. (*Id.* ¶ 28.)

    A. **CANNABIS FINANCING AND AFC GENERALLY**

Because the production and sale of cannabis remains illegal under federal law, it is difficult to obtain financing for cannabis-related projects. (*Id.* ¶ 39.) AFC is "one of the largest, if not the largest, companies from whom cannabis businesses can obtain debt." (*Id.* ¶ 41.) AFC charges cannabis companies "extremely high rates, often approaching or exceeding 20% per annum once fees and costs are factored in, knowing that . . . borrowers lacked other options." (*Id.* ¶ 42.) Because rates are so high, borrowers often fail. (*Id.*) Thereafter, AFC obtains the cannabis assets through foreclosure and sale of notes. (*Id.*)

    B. **BACKGROUND OF THE LOAN AND THE MARCH 2024 FORBEARANCE AGREEMENT**

In 2021, Defendants lent money to Plaintiffs to invest in the building and operation of cannabis cultivation facilities and dispensaries in Pennsylvania and New Jersey (the "Loan"). (*Id.* ¶ 49.)

From the outset, Plaintiffs struggled to comply with the Loan's terms and quickly fell into default. (*Id.* ¶ 129.) Because both parties wanted to ensure the Loan's survival, they amended and

2

reconfigured the terms of the Loan seven times over four years.  (*Id.* ¶ 134.)  Plaintiffs had to pay more than $19 million to obtain forbearance and get out of breach, with the vast majority going to AFC.  (*Id.* ¶¶ 135, 143.)

The parties renegotiated the parties' obligations for the final time in March 2024 (the "2024 Forbearance").  (*Id.* ¶ 137.)  Defendants agreed to forego their remedies and reduce the interest payments to a level Plaintiffs could satisfy to ensure that the Loan could avoid default.  (*Id.* ¶ 139.)  The terms of the 2024 Forbearance required a cash-sweep mechanism for the borrower's monthly payments, with a minimum of $250,000 per month to Defendants, and for Plaintiffs to cede control of their bank accounts.  (*Id.* ¶¶ 138, 135.)  Plaintiffs were willing to concede to these terms because their cannabis operations had the potential to become extremely valuable.  (*Id.* ¶¶ 145–147.)

Under the original Loan terms, Plaintiffs were required to produce audited financial statements to Defendants.  (*Id.* ¶ 300.)  After the parties entered into the 2024 Forbearance, because preparing audited financial statements is "expensive, cumbersome, and slow," Defendants waived this requirement, as they did not want to waste money on formalities that did not help the bottom line.  (*Id.* ¶ 302.)  Plaintiffs claim that AFC's Chair of the Board "himself expressly discussed waiver of this requirement with Plaintiffs." (*Id.*)  Plaintiffs reached out to AFC Chief Executive Officer Dan Neville on several occasions about the audited financial statements, which Neville ignored.  (*Id.*)

### C. PENNSYLVANIA REOPENING AGREEMENT

In late 2023, Defendants told Plaintiffs to shut down their Pennsylvania facility in order to devote resources to more profitable New Jersey opportunities.  (*Id.* ¶ 283.)  Critically, non-operational facilities in Pennsylvania cannot renew their licenses.  (Opp'n Br. at 6.)

3

In July 2024, the Pennsylvania Department of Health ("DOH") denied Plaintiffs' application to renew their annual cultivation license, citing failure to operate the facility. (Am. Compl. ¶ 284.) Plaintiffs appealed DOH's administrative decision denying renewal, which remains pending. (*Id.*)

In attempts to resolve the dispute on appeal, Plaintiffs negotiated a deal with DOH to renew the cultivation license in exchange for Plaintiffs' promise to contribute the cost of construction, remediation, and restarting cultivation and manufacturing operations—amounting to $5 million. (*Id.* ¶ 285.) Defendants knew about Plaintiffs' ongoing discussions with DOH and agreed to make $500,000 of Plaintiffs' funds available for part of the restart expenses. (*Id.* ¶ 286.)[1] Defendants also agreed not to initiate foreclosure proceedings (hereinafter, the "Reopening Agreement"). (*Id.*)

Plaintiffs took several actions in reliance on the Reopening Agreement. (*Id.* ¶ 290.) Plaintiffs: addressed outstanding liens with their contractor; obligated themselves to DOH to invest another $5 million upon the appeal's resolution; expended funds and time to develop the reopening plan; hired outside counsel to negotiate the reopening with DOH; and paid for contractors and service providers to prepare the site for construction. (*Id.* ¶¶ 290–291.)

In December 2024, Plaintiffs sent a letter to DOH memorializing that Defendants agreed to: (1) take no action to foreclose on the mortgage or otherwise impair the facility; (2) continue to honor the terms of the forbearance agreement; and (3) make available $500,000 to be used toward re-opening expenses pending permit renewal. (*Id.* ¶ 292.) Neville read this letter and was aware of the representations made to the DOH, and Neville and AFC worked with Plaintiffs to reopen the Pennsylvania facility.[2] (*Id.* ¶ 293.) Despite this, Defendants filed a lawsuit in Pennsylvania

---

[1] Defendants had been holding the $500,000 in escrow. (Am. Compl. ¶ 286.)
[2] Plaintiffs' appeal of the DOH's nonrenewal of Plaintiffs' Pennsylvania license is ongoing. (Am. Compl. ¶ 284.)

4

seeking foreclosure of the Pennsylvania property (the "PA Lawsuit"), which jeopardized Plaintiffs' settlement discussions with DOH. (*Id.* ¶ 297.)

      **D.    CHIEF RESTRUCTURING OFFICER BOSSIDY**

The 2024 Forbearance required Plaintiffs to hire a consultant to serve as their Chief Restructuring Officer ("CRO") to manage New Jersey operations. (*Id.* ¶ 150.) AFC negotiated for itself the sole and exclusive right to approve the CRO and prohibited Plaintiffs from interfering with the CRO's control of the New Jersey assets. (*Id.*)

AFC insisted that Bloc hire Timothy Bossidy. (*Id.* ¶ 151.) Almost immediately, Bossidy conspired with Neville and AFC to interfere with and undercut Plaintiffs' rights under the 2024 Forbearance. (*Id.* ¶ 152.) Plaintiffs insist that Bossidy "was catastrophic by every metric." (*Id.* ¶ 166.) Ultimately, Bossidy was fired. (*Id.* ¶¶ 197–198.)

      **E.    THE ALLEGED DEFAULTS**

Because essentially none of the cannabis loans in AFC's portfolio have performed as hoped or expected, AFC has not generated the cash it modeled when making its high-interest loans. (*Id.* ¶ 75.) In attempts to recoup cash, Plaintiffs allege that AFC attempted to extort Plaintiffs and their principals. (*Id.* ¶¶ 84–87, 232, 234.) In demand letters, AFC demanded that Plaintiffs' owners personally pay $30 million. (*Id.*) If they refused, AFC threatened to sue them for Racketeer Influence and Corrupt Organizations Act ("RICO") violations. (*Id.*)

AFC brought RICO claims against Plaintiffs' owners in New York state court. (*Id.* ¶ 236.) Plaintiffs submitted a pre-filing letter explaining why the claims were frivolous. (Opp'n Br. at 10.) Thereafter, AFC amended its complaint to voluntarily dismiss the RICO claim outright. (*Id.*)

The same day AFC filed its RICO case in New York, AFC declared that Plaintiffs were in default and raided Plaintiffs' accounts, taking almost $2 million. (Amended Compl. ¶ 90.) AFC

5

informed Plaintiffs that it was going to continue to raid Plaintiffs' accounts and begin to liquidate and sell Plaintiffs' assets to raise cash. (*Id.* ¶¶ 96, 98, 336.)

### F. PROCEDURAL HISTORY

Seeking emergency injunctive relief, Plaintiffs filed this action on April 17, 2025. (ECF No. 1.) The Court thereafter entered a temporary restraining order ("TRO") and scheduled a preliminary injunction hearing. (ECF No. 17.)

The same day the Court entered the TRO, AFC filed a lawsuit in New York state court seeking to enforce the shareholder guaranty against Plaintiffs' corporate parent, based on the same alleged default that the Court had just enjoined AFC from proceeding on. (ECF No. 18.)

On May 2, 2025, the Court held a preliminary injunction hearing. (ECF No. 34.) The Court granted the preliminary injunction, ruling that: (1) Plaintiffs were likely to succeed on their breach of the Reopening Agreement claims (ECF No. 46 at 22–26); (2) Plaintiffs were likely to succeed on their implied covenant of good faith and fair dealing claim due to Neville and Bossidy's conduct (*id.* at 28–33); and (3) Plaintiffs' failure to prepare audited financial statements did not constitute a default, as AFC had waived that requirement (*id.* at 26–27).

On July 11, 2025, Plaintiffs filed an Amended Complaint that incorporated some of the evidence presented at the preliminary injunction hearing and added allegations and a count for declaratory judgment seeking adjudication of the balance due under the loan. (ECF No. 77.)

Throughout the Loan's lifetime, AFC held itself out as a tax-exempt real estate investment trust ("REIT").[3] (Am. Compl. ¶¶ 19, 61.) Plaintiffs now allege that AFC does not comply with the rules applicable to REITs, despite representations to the Internal Revenue Service ("IRS") and AFC's shareholders. (*Id.* ¶¶ 19, 61–70.) Plaintiffs argue that the payments they have been making

---

[3] In an August 2025 investor earnings call, AFC told investors that it intended to convert from a REIT to another corporate structure. (Opp'n Br., Ex. A.)

6

were required to be deducted from the principal due as opposed to being treated as interest payments in order for AFC to be in compliance with laws applicable to REITs. (*Id.* ¶¶ 71–72.) Under Section 2.5(f) of the operative Credit Agreement for the Loan, if a court determines that the manner of interest payment exceeds what is legally permitted under any applicable law, any excess payments must be reclassified to reduce the principal balance due under the Loan. (*Id.* ¶¶ 120–123.)

Because the Loan is due in May 2026 and the parties disagree on how much money is owed, Plaintiffs allege this dispute threatens their ability to secure alternate financing. (*Id.* ¶¶ 72, 343.)

## II.  SUBJECT MATTER JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as the parties are diverse and the amount in controversy exceeds $75,000.

## III.  LEGAL STANDARD

Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted).

The court, however, may ignore legal conclusions or factually unsupported accusations that merely state the defendant unlawfully harmed the plaintiff. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

### IV.     DISCUSSION

Plaintiffs' Amended Complaint asserts four claims: breach of contract ("Count I"); (2) breach of implied covenant of good faith and fair dealing ("Count II"); relief under section 9-625 of the New York UCC ("Count III"); and (4) declaratory relief regarding the loan balance ("Count IV"). (Am. Compl. ¶¶ 324–345.)

Defendants move to dismiss the Amended Complaint in its entirety. (Moving Br. at 4.) First, Defendants argue that Counts I, II, and III fail as a matter of law because at least one default occurred, and they were thus entitled to exercise any or all of their rights and remedies under the Credit Agreement and Forbearance Agreement. (*Id.* at 20–21.) Additionally, Defendants insist that the oral agreement not to foreclose the Pennsylvania Property is unenforceable. (*Id.* at 21.) Second, Defendants argue that Count IV should be dismissed because Plaintiffs have failed to allege a sufficient dispute warranting court intervention and that the requested relief is best suited for state court. (Opp'n Br. at 33.)

A.  **COUNTS I, II, AND III**

Defendants move to dismiss Counts I, II, and III. Plaintiffs argue that Defendants merely seek to "redo the preliminary injunction hearing." (Opp'n Br. at 24.) Further, Plaintiffs assert that "none of AFC's motion actually seeks to dismiss *claims* . . . [i]nstead, the motion seeks dismissal of certain remedies and theories supporting those claims that were already addressed at the preliminary hearing." (*Id.*)

1. Count I: Breach of Contract

To state a claim for breach of contract under New York law,[4] a plaintiff must allege "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Weiner v. AXA Equit. Life Ins. Co.*, 113 F.4th 201, 214 (2d Cir. 2024).

a)  Audited Financial Statements

"[T]he roots of waiver lie firmly in equity, and are designed to prevent the waiving party from lulling the other party into a belief that strict compliance with a contractual duty will not be required and then either suing for noncompliance or demanding compliance for the purpose of avoiding the transaction." *Kamco Supply Corp. v. On the Right Track, LLC*, 149 A.D.3d 275, 281 (N.Y. App. Div., 2d Dep't 2017) (internal quotation marks and citations omitted). New York law provides that "section 15-301 nullifies only 'executory' oral modification," and "[o]nce executed, the oral modification may be proved" like any other question of fact. *Rose v. Spa Realty Assocs.*, 366 N.E.2d 1279, 1283 (N.Y. 1977).

AFC argues that Count I fails to state a claim because Plaintiffs concede that they themselves did not adequately perform insofar as Plaintiffs failed to produce audited financial statements. AFC ignores, however, that "even where a contract specifically contains a nonwaiver

---

[4] The parties agree that New York law applies.

9

clause and a provision stating that it cannot be modified except by a writing" —like the agreement here— "it can, nevertheless, be effectively modified by actual performance and the parties' course of conduct." *Aiello v. Burns Int'l. Sec. Svcs. Corp.*, 110 A.D.3d 234, 245 (N.Y. App. Div., 1st Dep't 2013) (citations omitted). Waiver "may be accomplished by affirmative conduct or failure to act so as to evince an intent not to claim the purported advantage." *Stassa v. Stassa*, 123 A.D.3d 804, 806 (N.Y. App. Div., 2d Dep't 2014) (citations omitted).

It is true that Plaintiffs admit they did not submit audited financial statements for 2023 and 2024, but as they also pled in their Amended Complaint, they did so because Defendants deemed the statements unnecessary in light of Plaintiffs' financial situation and because Defendants had access to all of Plaintiffs' accounts. After Bossidy was fired, AFC immediately demanded audited financials the next business day. (Am. Compl. ¶ 303.) Plaintiffs sent Neville an email reminding him of AFC's prior waiver and offered to prepare the financials if AFC would authorize the funds to do so. (*Id.*) AFC did not respond to Plaintiffs' email. (*Id.* ¶ 304.) These facts are sufficient to support Plaintiffs' pleading, as they establish "'a clear manifestation of intent' to relinquish [the] contractual protection" of requiring audited financials. *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006) (quoting *Gilbert Frank Corp. v. Federal Ins. Co.*, 520 N.E.2d 512, 514 (N.Y. 1988)). The Court therefore rejects Defendants' challenge to Count I based on the Amended Complaint's pleading with respect to the adequacy of Plaintiffs' own performance.

          b)      <u>Pennsylvania Facility</u>

AFC also asserts that Count I fails to state a claim as to the Pennsylvania facility's Reopening Agreement because it fails to plead an enforceable oral modification of the parties' agreement.

New York law recognizes several exceptions to § 15-301(1) where an alleged oral modification has been partially executed. "First, an oral modification may be enforced when there has been partial performance of the agreement to modify, so long as the partial performance is 'unequivocally referable to the oral modification.'" *Towers Charter & Marine Corp. v. Cadillac Ins., Co.*, 894 F.2d 516, 522 (2d Cir. 1990) (quoting *Rose*, 366 N.E.2d at 1283). Second, "when one party has induced the other party to rely on an oral modification, the first party may be equitably estopped from invoking the requirement that any modification be in writing." *Id.* For either exception, "the conduct claimed to have resulted from the oral modification must be conduct that is inconsistent with the agreement as written." *Id.*

The Amended Complaint pleads a plausible oral modification. AFC took several steps to assist with the reopening process, including assisting Plaintiffs with the appeals process with DOH. (*See* Am. Compl. ¶¶ 292–293.) As pled, Plaintiffs relied on AFC's promise not to foreclose the Pennsylvania facility, when Plaintiffs sent a letter to DOH indicating such and promising to pay $500,000. (*See id.* ¶¶ 290–291, 295.)

AFC cites several cases that are distinguishable from the facts presently before this Court. First, it cites to *Towers Charter*, 894 F.2d at 522. (*See* Moving Br. at 31.) In that case, all of the actions that allegedly constituted "partial performance" of the oral modification were already requirements of the written contract and all occurred prior to the deadline specified in the contract at issue. 894 F.2d at 519–20, 521–22. Here, the alleged oral modification occurred after DOH denied Plaintiffs' license renewal and Defendants' actions entirely contradict both Plaintiffs' letter to DOH as well as the underlying agreement.

Next, AFC cites *L & B 57th St., Inc. v. E.M. Blanchard, Inc.*, 143 F.3d 88 (2d Cir. 1998). (*See* Moving Br. at 32.) That case focused on a landlord-tenant nonpayment of rent dispute in

11

which no writings memorialized the alleged oral agreement. *L & B 57th St., Inc.*, 143 F.3d at 90. In that case, however, general principles of landlord-tenant law guided the court's decision, and it was decided at the summary judgment stage, not the motion to dismiss stage.

Finally, AFC relies upon *John Street Leasehold LLC v. F.D.I.C.*, 196 F.3d 379 (2d Cir. 1999). (*See* Moving Br. at 32–33.) In that case, written evidence of an agreement was produced, but no other evidence of performance was presented. *John Street Leasehold LLC*, 196 F.3d at 381–82. Here, Plaintiffs allege that AFC took steps to assist Plaintiffs in their appeal with DOH, thus plausibly pleading an enforceable oral modification.

Separately, AFC also argues that Plaintiffs fail to plausibly plead equitable estoppel. "Equitable estoppel is grounded on notions of fair dealing and good conscience and is designed to aid the law in the administration of justice where injustice would otherwise result." *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2d Cir. 1996). The doctrine "is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001). "Under New York law, the elements of equitable estoppel are with respect to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts." *In re Vebeliunas*, 332 F.3d 85, 93–94 (2d Cir. 2003). "The parties asserting estoppel must show with respect to themselves: (1) lack of knowledge and of the means of knowledge of the true facts; (2) reliance upon the conduct of the party to be estopped; and (3) prejudicial changes in their positions." *Id.* at 94. "When the parties dispute whether an oral agreement has been formed, it is the conduct of the party advocating *for* the oral agreement that is 'determinative,' although the conduct of both parties may be relevant."

*Eujoy Realty Corp. v. Van Wagner Commc'ns*, 4 N.E.3d 336, 344 (N.Y. 2013) (emphasis in original) (citing *Messner Vetere Berger McNamee Schmetterer Euro RSCG Inc. v. Aegis Grp. PLLC*, 711 N.E.2d 953, 958 (N.Y. 1999)).

Again, Plaintiffs pled in detail that they took several steps in reliance on Defendants' promise not to foreclose the Pennsylvania facility, including: "addressing outstanding liens with its contractor;" "obligat[ing themselves] to DOH to invest another $5 million upon resolution of the appeal;" "expending funds and . . . time developing the reopening plan;" "hiring outside counsel to negotiate the reopening with [DOH]"; and "paying for contractors and service providers to prepare the site for renewed construction." (Am. Compl. ¶¶ 290–291.) These allegations are more than sufficient to state a claim for equitable estoppel. As such, the Court will **DENY** the portion of the Motion seeking to Dismiss Count I.

2. Count II: Breach of Implied Covenant of Good Faith and Fair Dealing

In New York, "persons invoking the aid of contracts are under implied obligation to exercise good faith not to frustrate the contracts into which they have entered." *Pitcairn Props., Inc. v. LJL 33rd St. Assocs., LLC*, Civ. No. 11-7318, 2012 WL 6082398, at *5 (S.D.N.Y. Nov. 20, 2012) (quoting *Novick v. AXA Network, LLC*, 642 F.3d 304, 312 (2d Cir. 2011)). To state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must "allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff." *Dweck Law Firm, L.L.P v. Mann*, 340 F. Supp. 2d 353, 358 (S.D.N.Y. 2004).

a) Audited Financial Statements

AFC argues that Count II either fails to state a claim or is moot. However, Plaintiffs allege that Defendants waived this requirement by their conduct in 2023 and 2024. Furthermore, Defendants had complete control over Plaintiffs' accounts. (Am. Compl. ¶ 138.) Additionally,

even though AFC had expressed to Plaintiffs that the audited financial statements were not necessary because it had access to Plaintiffs' accounts, AFC later demanded them. (*Id.* ¶¶ 302–303.) These facts can support a claim for breach of the implied covenant of good faith and fair dealing. As such, Count II states a claim as to the audited financial statements.

### b)     Other Breaches Alleged by Defendants

AFC also cites several alleged defaults that they assert violate Plaintiffs' duty of implied covenant and fair dealing, rendering moot Plaintiffs' allegations as to the audited financial statements. (Opp'n Br. at 21 n.3.) These allegations, however, are outside the four corners of the complaint. *See* Rule 12(b)(6).

First, AFC references Plaintiffs' response to the PA Lawsuit. This Court, however, has already found that AFC's filing of the PA Lawsuit was a breach of the Reopening Agreement. (*See* ECF No. 46 at 25–26.)

Next, AFC also alleges that Plaintiffs' loss of their Pennsylvania permit amounts to a default. Not so. The Reopening Agreement's sole purpose was to reopen the facility—an act which required the renewal of Plaintiffs' permit. In fact, the license was not renewed at AFC's own urging. (Am. Compl. ¶¶ 283–284.) AFC decided to shut down the facility and have Plaintiffs focus on operations in New Jersey. (*See id.*) Defendants cannot now reverse course and argue that Plaintiffs' lack of a Pennsylvania permit is a breach when Defendants had a hand in the nonrenewal of that permit.

AFC additionally asserts that Plaintiffs' email notifying Defendants of the nonrenewal of the Pennsylvania permit was late and thus constitutes a breach. As pointed out by Plaintiffs,

14

however, this "argument relies on facts outside the pleading and should be rejected on that ground alone."[5] (Opp'n Br. at 38.)

AFC also briefly mentions that Plaintiffs' failure to obtain a final certificate of occupancy constitutes a default. However, as discussed at the preliminary hearing, the failure to obtain the certificate was attributable to Bossidy. (*See* ECF No. 46 at 28–33.)

Thus, even if the Court could consider these purported beaches at this stage of the proceedings, none moot Plaintiffs' Count II claims. As such, Count II survives Defendants' Motion to Dismiss.

3. Count III

Section 9-625 of the New York Uniform Commercial Code ("UCC") "permits a debtor to seek an injunction to prevent a secured party from enforcing its security interest in a manner that is inconsistent with the statute." *DAOL Rexmark Union Station LLC v. Union Station Sole Member, LLC*, 772 F. Supp. 3d 373, 408 (S.D.N.Y. 2025) (citing N.Y. U.C.C. § 9-625(a)). "If it is established that a secured party is not proceeding in accordance with [Article 9], a court may order or restrain collection, enforcement, or disposition of collateral on appropriate terms and conditions." N.Y. U.C.C. § 9-625(a).

Plaintiffs allege that "Defendants have threatened to seize" Plaintiffs' assets in which they hold secured interests in and have threatened to "sell them at a public auction under Section 9-610" of the New York UCC. (Am. Compl. ¶¶ 335–336.) Section 9-610 permits a secured party to "sell, lease, license, or otherwise dispose of any or all . . . collateral" "*after* default." N.Y. U.C.C. § 9-610 (emphasis added). As previously discussed, Plaintiffs have plausibly pled waiver and equitable estoppel and, as such, Count III survives Defendants' Motion to Dismiss.

---

[5] Regardless, Plaintiffs allege that Defendants were always aware of their negotiations with the DOH. (Am. Compl. ¶ 294.)

### B. COUNT IV

Defendants argue that Plaintiffs' claim for declaratory judgment should be dismissed because they have failed to allege a dispute warranting court intervention. (Moving Br. at 33.) Plaintiffs oppose this argument and assert that they plausibly allege "an important, live controversy" as to the Loan. (Opp'n Br. at 14.)

#### 1. Whether Court Intervention is Warranted

Although the parties appear to agree, or at the very least, do not dispute that the Loan balance is due in May 2026, the parties do dispute how much is due and owing under the Loan. For the following reasons, the Court finds that this issue is particularly relevant and warrants review.

Article III requires that a case be ripe. *Nat'l Shooting Sports Found. v. Att'y Gen. of New Jersey*, 80 F.4th 215, 219 (3d Cir. 2023). The ripeness doctrine operates "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Foulke v. Twp. of Cherry Hill*, Civ No. 23-2543, 2025 WL 1245759, at *6 (D.N.J. Apr. 30, 2025). "The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Id.* (internal quotation marks omitted). A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated or indeed may not occur at all. *Texas v. U.S.*, 523 U.S. 296, 300 (1998). Notably, ripeness requires an evaluation of "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977). Under the fitness prong, courts consider "whether the issues presented are purely legal, as opposed to factual." *Phila. Fed'n of Teachers, Am. Fed'n of Teachers, Local 3, AFL-CIO v. Ridge*, 150 F.3d 319, 323 (3d Cir. 1998) (setting forth factors to consider: "whether the claim involves uncertain and

contingent events that may not occur as anticipated or at all; the extent to which a claim is bound up in the facts; and whether the parties to the action are sufficiently adverse"). Under the hardship prong, courts consider whether the proponent of federal jurisdiction would suffer an "immediate and significant hardship should judicial review . . . be deferred." *Felmeister v. Office of Atty. Ethics*, 856 F.2d 529, 537 (3d Cir. 1988).

"The parameters of 'ripeness' are especially difficult to define within the context of declaratory judgment actions." *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1154 (3d Cir. 1995) (citing *Step-Saver Data Sys, Inc. v. Wyse Tech.*, 912 F.2d 643, 646 (3d Cir. 1990)). "This difficulty is due, in large measure, to the fact that declaratory judgments are, of necessity, rendered before an 'accomplished' injury has been suffered." *Id.* (citing *Step-Saver*, 912 F.2d at 647).

First, the court must examine the adversity of the interest between the parties to the action. Parties' interests are adverse where harm will result if the declaratory judgment is not entered. *Id.* Although the action cannot be based on a contingency, *Step-Saver*, 912 F.2d at 647–48, "the party seeking declaratory relief need not wait until the harm has actually occurred to bring the action." *Travelers Ins. Co.*, 72 F.3d at 1154 (citing *Armstrong World Indus., Inc. v. Adams*, 961 F.2d at 412. As such, a litigant can seek a declaratory judgment when harm is threatened in the future, so long as they demonstrate "that the probability of that future event occurring is real and substantial, "'of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"" *Id.* (quoting *Steffel v. Thompson*, 415 U.S. 452, 460 (1974)).

Here, Plaintiffs dispute the amount of outstanding principal. (Am. Compl. ¶¶ 322–323.) Because the parties disagree on this, they likewise cannot agree as to the appropriate calculation of the interest that has been accruing each month. (*Id.*) As Plaintiffs highlight, this uncertainty poses an issue: "Plaintiffs cannot obtain financing to refinance a loan with an unknown amount of

17

principal and an unclear amount of interest." (Opp'n Br. at 15.) There is, therefore, a very real and immediate adversity of interests.

Next, the court must consider the conclusiveness of the declaratory judgment. The "contest must be based on a 'real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Travelers Ins. Co.*, 72 F.3d at 1155 (quoting *Step-Saver*, 912 F.2d at 649). "An integral part of the conclusiveness inquiry is the necessity that the court be presented with a set of facts from which it can make findings. Without a concrete set of facts, the court cannot engage in its required fact-finding role and declare the parties' rights based on those facts." *Id.*

"[T]here are situations where the need for complete factual development is not absolutely essential." *Id.* "There are also situations where a declaratory judgment can be issued absent proof of a necessary fact." *Id.* For instance, "if a future event is 'certain to occur, such as . . . the future expiration of a contract, franchise or lease, a judgment declaring rights is appropriate.'" *Id.* (quoting *Step-Saver*, 912 F.2d at 649 n.7).

Here, the Loan is essentially a contract. The Loan becomes due in May 2026. Plaintiffs cannot obtain financing to refinance the Loan with an unknown amount of principal and an unclear amount of interest. Plaintiffs should not have to risk being unable to refinance the Loan merely because the parties dispute how much is due and owing. Plaintiffs' request does not, as Defendants contend, constitute "an exercise in 'procedural fencing.'" (Moving Br. at 39.)

Based on the foregoing, the Court exercises its discretion to find that Plaintiffs' claim for declaratory judgment is appropriate at this time. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 286, 288 (1995) (noting that the Declaratory Judgment Act "place[s] a remedial arrow in the district

court's quiver" and confers "unique and substantial discretion" on the district court in regard to when and if to use it.)

        2.      <u>Proper Jurisdiction</u>

Finally, Defendants argue that the Court should dismiss Plaintiffs' declaratory judgment claim because "any effort to determine the loan balance would be more appropriately undertaken elsewhere." (Moving Br. at 37.) Plaintiffs point to *Kelly v. Maxum Specialty Ins. Grp.*, 868 F.3d 274, 282–83 (3d Cir. 2017), in support of their argument that the Court should not abstain from deciding the declaratory judgment claim. (Opp'n Br. at 19.)

As the Third Circuit observed in *Kelly*, "the absence of pending parallel state proceedings [regarding the loan balance] mitigates significantly in favor of exercising jurisdiction." 868 F.3d at 282 (quoting *Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 144 (3d Cir. 2011)). Defendants argue that they will sue Plaintiffs for collection in one of the New York state courts specified in the Credit Agreement or initiate foreclosure proceedings in state courts where collateral is located. (Moving Br. at 38.) While Defendants may be within their rights to do so at a later time, Plaintiffs are entitled to clarification as to how much remains due under the Loan *now*—not after the Loan matures. As to convenience, the Court also agrees with Plaintiffs that forcing the parties to "address[] this claim in New Jersey federal court alongside the other claims it must defend regarding the same loan document" is hardly inconvenient. (*See* Opp'n Br. at 20.)

Based on the foregoing, the Court will **DENY** the portion of the Motion seeking to dismiss Count IV.

## V. CONCLUSION

For the reasons stated above, the Court will **DENY** Defendants' Motion to Dismiss.[6] An appropriate Order will follow.

Date: November 29, 2025

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

---

[6] The Court notes that the parties also recently submitted letters (ECF Nos. 106-108) disputing the propriety of continuing the stay of discovery in this matter pending the current motion to dismiss in light of the discovery ordered in two suits in New York. Given the Court's denial of the Motion herein, the Court finds the parties' dispute is moot. The parties are instructed to confer and submit a proposed schedule for consideration by the Magistrate Judge by no later than December 6, 2025.