## MARINO, TORTORELLA & BOYLE, P.C.
### ATTORNEYS AT LAW

KEVIN H. MARINO
JOHN D. TORTORELLA
JOHN A. BOYLE
———
EREZ J. DAVY*
MICHAEL J. FLYNN

437 SOUTHERN BOULEVARD
CHATHAM, NEW JERSEY 07928-1488
TELEPHONE (973) 824-9300
FAX (973) 824-8425
www.khmarino.com

875 THIRD AVENUE, 21ST FLOOR
NEW YORK, NEW YORK 10022
TELEPHONE (212) 864-7200
e-mail: kmarino@khmarino.com
*OF COUNSEL

February 20, 2026

**VIA ECF**

Hon. J. Brendan Day
United States Magistrate Judge
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street, Courtroom 7E
Trenton, NJ 08608

Re:   *Hayden Gateway LLC, et al. v. Advanced Flower Capital Inc., et al.*,
      Case No. 3:25-cv-02789-ZNQ-JBD

Dear Judge Day:

      On behalf of Advanced Flower Capital Inc. ("AFC") and AFC Agent LLC, we write pursuant to the Court's request for supplemental facts supporting of Defendants' motion for a Protective Order to preclude Plaintiffs from deposing Leonard Tannenbaum. The record establishes two things. First, Mr. Tannenbaum possesses no unique, noncumulative knowledge about AFC's REIT compliance. Second, Plaintiffs have made no effort to obtain information from AFC's CEO or CFO, the people responsible for that compliance work. Either deficiency is independently fatal to their request.[1]

      First, Plaintiffs cannot show that Mr. Tannenbaum has unique knowledge concerning AFC's REIT status. Mr. Tannenbaum serves as the non-executive Chairman of AFC's Board of Directors.[2] He is not involved in the day-to-day operations of AFC, but instead divides his time among a wide range of professional obligations across multiple affiliated entities.[3] Mr. Tannenbaum founded and leads Tannenbaum Capital Group ("TCG"), an alternative asset management platform with five separate investment advisers that together manage assets across private credit, real estate lending, and cannabis finance.[4] Like each of the entities operating under TCG, AFC has its own management team and operational staff responsible for its day-to-day

---

[1] Plaintiffs do not dispute that their demand "clearly implicates the Apex Doctrine," *York Group, Inc. v. Pontone*, 2012 WL 12895759, at *4 (W.D. Pa. June 15, 2012), which presumes "that a high-level official's deposition represents a significant burden upon the deponent." *Jessen v. Model N, Inc.*, 2024 WL 3371433, at *2 (D.N.J. July 11, 2024) (quotation omitted). To overcome the presumption, Plaintiffs must show that the witness "has personal or unique knowledge on relevant subject matters" and the information sought cannot "be obtained from lower-level employees." *See id.* at *4.

[2] *See* https://investors.afcgamma.com/corporate-governance/board-of-directors/.

[3] *See* https://thetcg.com/.

[4] *See id.*

MARINO, TORTORELLA & BOYLE, P.C.
ATTORNEYS AT LAW

Hon. J. Brendan Day, U.S.M.J.
February 20, 2026 – Page 2

affairs, as well as certain shared personnel from TCG. It is those individuals—CEO Daniel Neville, CFO Brandon Hetzel, and dedicated underwriting and portfolio management teams—who manage AFC's operations, oversee its tax reporting, and, as relevant here, evaluate whether AFC's portfolio of loans qualifies for REIT status. CFO Hetzel joined AFC in September 2020 and brings technical REIT compliance expertise from years in PricewaterhouseCoopers' REIT audit practice—making him the employee responsible for the analysis that determines whether AFC's portfolio satisfies the 75% gross income test. These officers, in turn, work closely with outside professionals, including auditor Cohn Reznick LLP, which certifies AFC's REIT compliance to the IRS.

Mr. Tannenbaum does none of this. As particularly relevant here, Mr. Tannenbaum did not perform the loan-level or property-level analysis that AFC consistently undertook to maintain its REIT status. He did not scrutinize property appraisals, value property improvements, calculate construction costs, or apportion the real and personal property underlying specific loans to conform to the applicable Treasury Regulations, nor did he prepare the submissions to Cohn Reznick.

In short, Mr. Tannenbaum performs no functions that could result in unique knowledge about AFC's REIT status—and Plaintiffs' own response to a direct question confirms it. When Defendants asked what unique information Mr. Tannenbaum might have that employees with actual operational responsibility do not, Plaintiffs responded that he was "involved" in investments "affecting AFC's REIT status."[5] But every board chair at every REIT is "involved" in investments that affect REIT status—that is what it means to sit on the board of a REIT. General board-level involvement does not give one unique knowledge of operational issues.

At the February 18 Hearing, Plaintiffs claimed certain e-mail chains suggest that Mr. Tannenbaum played an important role in AFC's client relationship with Baker Tilly—a well-known financial and tax advisory firm that performs property appraisals, among other services. They do not.[6] The chains, spanning just five months in 2021, show that the Baker Tilly engagement was managed throughout by AFC's then-CFO Thomas Geoffroy and Director Jeff Boccuzzi. Mr. Geoffroy selected the sample properties, reviewed the engagement letter, coordinated document uploads, managed Baker Tilly's information requests, and served as Baker Tilly's primary contact. Mr. Hetzel—then AFC's Controller and now its CFO—was copied on the substantive exchanges from the beginning. *See* AFC00028336; AFC00028374. Mr. Tannenbaum's contribution to these lengthy chains consists of brief iPhone messages asking for bottom-line valuation numbers—"One is 3.6 million and the other is 6 million?," "How about the other one? The same?," "You can complete the second The [*sic*] are doing over 10 million ebitda," and "Lets get on the phone and discuss tomorrow"—a one-line message forwarding a Baker Tilly inquiry to Mr. Geoffroy with the word, "Tom?," *see* AFC00028338, AFC00028344-45,

---

[5] E-mail from Plaintiffs' counsel to Defendants' counsel dated February 13, 2026.

[6] AFC has produced its full communications with Baker Tilly. From that entire production, spanning years of engagement, Plaintiffs identified only two email chains from the very beginning of the relationship in 2021.

**MARINO, TORTORELLA & BOYLE, P.C.**
ATTORNEYS AT LAW

Hon. J. Brendan Day, U.S.M.J.
February 20, 2026 – Page 3

AFC00028382, and a single sentence informing Baker Tilly that AFC is looking to retain a real estate appraiser, *e.g.*, AFC00030304-05.[7]  That is his entire substantive involvement in the documents on which Plaintiffs rely.[8]  The people who actually managed that work—including Mr. Hetzel—are available for deposition.

Plaintiffs speculated at the February 18 Hearing that Mr. Tannenbaum might have conveyed something to Baker Tilly outside the written record.  Defendants' complete document production forecloses that theory.  Each Baker Tilly report reflects on its face the assumptions used and the appraisal methodology applied—there is no gap in the record for undisclosed Tannenbaum inputs to fill.

AFC's conversion from a REIT to a Business Development Company ("BDC"), another area on which Plaintiffs claim a need to depose Mr. Tannenbaum, further illustrates the point.  The decision to convert was made through ordinary collective corporate processes.  The CEO—whose deposition Defendants offered and Plaintiffs declined—was involved in the deliberations and included in the relevant communications.  AFC filed a lengthy proxy statement and its shareholders voted to approve the conversion.  Outside advisors were engaged.  If Plaintiffs want to understand the process behind the BDC conversion, the CEO is the witness to depose.  Mr. Tannenbaum has no unique knowledge about the conversion by virtue of his position as Board Chair.  Indeed, any board chair would ask others for such information.[9]  *See Ciarrocchi v. Unum Group*, 2009 WL 10676631, at *3 (D.N.J. Aug. 27, 2009) (rejecting apex depositions of CEO and COO where plaintiff offered no evidence that either had "unique knowledge" about topics at issue).

Similarly, as a member of AFC's Investment Committee, Mr. Tannenbaum evaluates information provided and summarized by others to vote on investment decisions for the company.  At the February 18 Hearing, Plaintiffs referred to certain Investment Committee memoranda that provide detailed information about a potential deal to aid in the investment decision.  But Mr. Tannenbaum did not prepare these memoranda; they were prepared *for* him by lower-level

---

[7] Nor is Mr. Tannenbaum's potential participation in a couple of phone calls with Baker Tilly at the outset of the relationship, as referenced in the same documents, any reason to suspect he has unique knowledge about AFC's REIT status.  *See, e.g.*, AFC00028381-84.

[8] After Plaintiffs' counsel complied with the Court's direction to provide Defendants with the Bates numbers of the emails they had cited to the Court, we asked them to also identify any other documents they intended to rely on in their submission.  They did not identify any.

[9] It also bears noting that AFC's decision to abandon REIT status has little to no relevance here.  If, as Plaintiffs' surmise, AFC had been improperly claiming REIT status during the period at issue, the evidence of that would be in the company's financial data.  Moreover, Plaintiffs' speculation that AFC changed its status from a REIT to a BDC in response to Plaintiffs' July 2025 amended complaint is belied by the evidence they cite.  A May 8, 2025 e-mail indicating that the change from a REIT to a BDC should be raised with Mr. Tannenbaum shows that AFC was considering this step at least two months *before* Plaintiffs first raised AFC's REIT status in their Amended Complaint.

MARINO, TORTORELLA & BOYLE, P.C.
ATTORNEYS AT LAW

Hon. J. Brendan Day, U.S.M.J.
February 20, 2026 – Page 4

employees. Thus the knowledge contained in those memos is not unique to Mr. Tannenbaum—it belongs to the people who generated it.[10] Further, three of the four memos Plaintiffs cite are from 2020—before AFC was even a REIT—and therefore could not reflect that Mr. Tannenbaum has unique knowledge concerning AFC's REIT status. And, regardless, AFC's Portfolio Management and Accounting Departments—not Mr. Tannenbaum—have always been responsible for managing and maintaining AFC's compliance with REIT rules and regulations.

Finally, Plaintiffs have failed to fulfill the second prong of the Apex Doctrine by first seeking relevant information from lower-level witnesses, who have been identified to Plaintiffs and offered up for deposition. This further confirms that the apex doctrine bars this deposition. *See, e.g.*, *Younes v. 7-Eleven, Inc.*, 2015 WL 12844446, at *3 (D.N.J. Aug. 19, 2015) ("The Court will not permit high ranking depositions to go forward if plaintiffs did not attempt to get the information they want from lower level witnesses.").

Mr. Tannenbaum's lack of unique knowledge and Plaintiffs' refusal to depose high-level officers with equal or greater information than Mr. Tannenbaum raises the concern that Plaintiffs seek to do exactly what the Apex Doctrine is meant to prevent—burden an apex individual for tactical purposes.

For all of these reasons, Defendants respectfully request that the Court enter a protective order precluding Plaintiffs from deposing Mr. Tannenbaum. Thank you for your consideration of this submission.

Respectfully submitted,

Kevin H. Marino

cc: All counsel of record

---

[10] Plaintiffs also argued that, in some instances, the other members of the Investment Committee listed in the referenced memoranda have left AFC. But that also fails to indicate Mr. Tannenbaum has unique knowledge about AFC's REIT status, how the deals described in the memoranda affected that status (if at all), or any unique knowledge about the related real property appraisals or any other relevant information. Those metrics are, in fact, reviewed and maintained by dedicated, lower level employees on a day-to-day basis.